```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                            —   —   —

     UNITED STATES OF AMERICA,
 4
                   Plaintiff,
 5
       v.                                    Case No. 21-20405
 6
     NOE GARZA,                              Hon. Matthew F. Leitman
 7
                   Defendant.
 8   _____/

 9        OFFER OF PROOF REGARDING AGENT HURT'S TESTIMONY

10             BEFORE THE HONORABLE MATTHEW F. LEITMAN
                      United States District Judge
11            Theodore Levin United States Courthouse
                      231 West Lafayette Boulevard
12                         Detroit, Michigan
                      Thursday, November 10, 2022
13

14   APPEARANCES:

15    For the Plaintiff:        JULES M. DEPORRE
                                UNITED STATES ATTORNEY'S OFFICE
16                              600 Church Street
                                Flint, MI 48502
17                              (810) 766-5177

18    Also Present:            Jessica Szukhent,
                               United States Attorney's Office
19

20    For the Defendant:       CHARLES O. LONGSTREET, II
                               LONGSTREET LAW FIRM, PLLC
21                             18971 Livernois
                               Detroit, MI 48221
22                             (313) 288-0103

23

24        To obtain a copy of this official transcript, contact:
            Robert L. Smith, Federal Official Court Reporter
25           (313) 234-2612 • robert_smith@mied.uscourts.gov
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TABLE OF CONTENTS

MATTER                                                          PAGE

OFFER OF PROOF REGARDING AGENT HURT'S TESTIMONY

AGENT DUSTIN HURT
Direct Examination by Mr. DePorre................... 3
Cross-Examination by Mr. Longstreet................27
Redirect Examination by Mr. DePorre................31

ARGUMENT
by Mr. DePorre.....................................32
by Mr. Longstreet..................................33

Ruling by the Court................................36

 1  Detroit, Michigan

 2  Friday, November 11, 2022

 3  at about 12:05 p.m.

 4                          —    —    —

 5        (Court reconvened at 12:05 p.m.; Court, Counsel and

 6        Defendant present.)

 7        THE COURT:  Okay.  Welcome back.  We are back on

 8  the record, it's just after noon.  We have picked our jury,

 9  and they have gone for the day.

10        We are going to pick up with a matter that we

11  discussed at the final pretrial conference, which is hearing

12  testimony from a case agent that Mr. DePorre wishes to call

13  at trial to offer opinion evidence on the meaning of certain

14  terms that were used either during an interview or on a

15  tape-recorded conversation.  And I just want to remind

16  ourselves how we got here.

17        The -- when I looked at the case law at the final

18  pretrial conference, my view was that this sort of opinion

19  testimony is permitted under Rule 702.  The case law that I

20  found instructive was *United States v. Kilpatrick*, the

21  Sixth Circuit's decision, 798 F.3d 365, page 379, where the

22  court remarked that courts often qualify law enforcement

23  officers as expert witnesses under Rule 702 to interpret

24  intercepted conversations that use slang, street language,

25  and the jargon of the illegal drug trade.

1          And there was another case that Mr. DePorre brought

2     to my attention, *United States v. Williams*, a helpful

3     District Court decision, 2016 Westlaw 899145.

4          So in my view, the law, in theory, allows opinion

5     testimony as to the meaning of these sorts of slang terms.

6     The question, though, is whether Mr. DePorre has identified a

7     witness with the appropriate qualifications to be able to

8     offer that opinion testimony under Rule 702, and I decided

9     that the best way to proceed was rather than have Mr. DePorre

10    try to establish the qualifications in front of the jury,

11    with objections and argument, the most efficient way to do it

12    was to have this hearing outside of the presence of the jury,

13    for us to hear what the testimony about the officer's

14    qualifications would look like, and I can make a ruling now,

15    outside of the presentence of the jury, as to whether the

16    witness has the qualifications to offer the opinions.

17          And with that, Mr. DePorre, why don't you go ahead

18    and call our witness?

19          MR. DePORRE:  Thank you, Your Honor.  The witness

20    the government is going to call is ATF Agent -- Special Agent

21    Dustin Hurt.  He's not the case agent assigned to this case.

22    His role in this case -- and he's been identified on the

23    witness list, initially, as a -- to -- to offer opinion

24    testimony regarding the interstate nexus of firearms and

25    ammunition, as well as the meaning of these slang terms.

1   There's no issue regarding his qualifications with respect to

2   interstate nexus, and I understand that to be an issue that

3   the defense will stipulate to, that there is a nexus, in this

4   case, for the firearm and the ammunition.

5          THE COURT:  All right.  Can you turn that podium so

6   you don't strain your --

7          MR. DePORRE:  Hurt my neck.

8          THE COURT:  Mr. Longstreet, is that correct, that

9   with respect to the interstate commerce elements, the defense

10  would be stipulating that element is satisfied?

11         MR. LONGSTREET:  That is correct, as far as

12  interstate commerce, yes, that is correct, interstate nexus,

13  yes.

14         THE COURT:  Okay.  Thank you.

15         All right.  Mr. DePorre, are we -- so I guess I

16  used the term, "case agent."  I didn't mean that in the

17  technical sense, but --

18         MR. DePORRE:  He is, in fact, a case agent, just

19  not on this case.

20         THE COURT:  Okay.  All right.

21         MR. DePORRE:  The government calls Dustin Hurt.

22         THE COURT:  Agent Hurt, as you are coming up, would

23  you raise your right hand?

24         Do you solemnly swear the testimony you are about

25  to give will be the truth?

 1        AGENT HURT:  Yes, I do.

 2        THE COURT:  Okay.  Thank you.  Please have a seat.

 3        The acoustics in this room are not terrific, so as

 4   you're settling in, could I ask you to keep your voice up and

 5   speak slowly, so I can hear everything you have to say?

 6        AGENT HURT:  Yes, sir.

 7        THE COURT:  Thank you.

 8                    AGENT DUSTIN HURT,

 9   called at about 12:09 p.m., was examined and testified on his

10   oath as follows:

11                    DIRECT EXAMINATION

12   BY MR. DePORRE:

13   Q.  Mr. Hurt, how are you currently employed?

14   A.  The Bureau of Alcohol, Tobacco, Firearms and Explosives.

15   Q.  And I don't know if you spelled your name, but could you

16   do that, for the record?

17   A.  Yes, sir.  D-U-S-T-I-N, H-U-R-T.

18   Q.  You said you are employed has a special agent with the

19   Bureau of Alcohol, Tobacco, and Firearms?

20   A.  Yes, sir.

21   Q.  What sort of crimes do you investigate as an ATF agent?

22   A.  Violent crimes, usually involving firearms.

23   Q.  Do you investigate alcohol-related crimes?

24   A.  Not -- not in my career thus far.

25   Q.  How about tobacco-related crimes?

```
 1   A.  Same answer.
 2   Q.  Is your particular focus on firearm crimes?
 3   A.  Yes, sir.
 4   Q.  And where do you work?
 5   A.  City of Flint.
 6   Q.  How long have you been an police officer?
 7   A.  Since 2009.
 8   Q.  And what did you -- what sort of training did you
 9   receive before you became a law enforcement officer?
10   A.  In terms of education?
11   Q.  Yes.
12   A.  I went to Grand Valley State University, I double
13   majored in criminal justice and political science, and then
14   after that I went to grad school and got a  Master's in
15   business administration.
16   Q.  And your criminal justice major and political science
17   major, that resulted in a Bachelor's degree?
18   A.  Yes, sir.
19   Q.  In 2009, you said you began your law enforcement career.
20   How did you -- what sort of role were you in at that point?
21   A.  I went through the Mid Michigan Police Academy, which is
22   in Lansing Community College, at which point after that, I
23   got employed -- I was a full-time police officer with the
24   City of Grand Ledge, which is about eight miles west of
25   Lansing.
```

1    Q.   What year did you get your bachelor's?

2    A.   Bachelor's would have been 2008.

3    Q.   And when did you get your Master's?

4    A.   I believe, 2014.

5    Q.   And then you went to the police academy in -- was

6    that 2009?

7    A.   2009, yes.

8    Q.   All right.  And how many weeks or months was that

9    training?

10   A.   I believe that one was between 16 weeks and 5 months,

11   somewhere in there.

12   Q.   Did you have firearms training in that?

13   A.   Yes, sir.

14   Q.   Did you talk about different investigatory techniques?

15   A.   Often.

16   Q.   After that, did you -- how long were you a police

17   officer in Grand Ledge?

18   A.   Just shy of three years.

19   Q.   And what did you do after those three years?

20   A.   I was then -- I got hired on by the Michigan State

21   Police.

22   Q.   All right.  Prior to joining the State Police, did you

23   have additional training for the State Police?

24   A.   Additional training for the State Police?

25   Q.   Did you go to the State Police Academy?

 1   A.   Yes, sir.

 2   Q.   And how many weeks was that?

 3   A.   That was approximately five months.

 4   Q.   Did you have special training in firearms there?

 5   A.   Yes, sir.

 6   Q.   And did you talk about investigatory techniques?

 7   A.   Often.

 8   Q.   Did you talk about different ways people refer to drugs?

 9   A.   Yes, sir.

10   Q.   Did you talk about different ways people refer to

11   firearms?

12   A.   Yes, sir.

13   Q.   How long were you with the Michigan State Police?

14   A.   Approximately seven years.

15   Q.   And during that time period, where were you assigned?

16   A.   I was assigned to -- I went out of recruit school I went

17   to the Flint post.  I was road patrol for approximately

18   two-and-a-half, three years, and then I got on as a task

19   force officer with the FBI's Safe Streets Task Force, which

20   is a gang and violent crimes task force that operates in and

21   around the City of Flint.  I was there for approximately

22   three years, and then I transferred to the Lansing post,

23   where I did road patrol for a short period of time, until I

24   got onto their violent crime initiative through MSP, Lansing

25   PD, FBI, ATF, all the agencies in that area.  After about a

*Offer of Proof • November 10, 2022*

 1    year at Lansing, I promoted to detective sergeant in the

 2    polygraph unit, and I ended my career with the State Police

 3    there, before coming here.

 4    Q.  In Flint and Lansing, did you investigate firearm

 5    crimes?

 6    A.  Often.

 7    Q.  Did you speak with confidential informants?

 8    A.  Often.

 9    Q.  Did you speak with witnesses?

10    A.  Often.

11    Q.  Did you speak with victims?

12    A.  Often.

13    Q.  Did you speak -- did you listen to recorded

14    communications?

15    A.  Yes, sir, many.

16    Q.  What sort of communications would you listen to?

17    A.  Jail calls, often jail calls, recorded, like, one-party

18    communication, things like that, and then, obviously,

19    face-to-face interviews, jailhouse interviews, stuff like

20    that.

21    Q.  Did you review evidence obtained from cellular

22    telephones?

23    A.  Yes, sir.

24    Q.  And in reviewing those, did you review, specifically,

25    text messages?

*Offer of Proof • November 10, 2022*

1  A.  Yes.

2  Q.  In the course of your work as a law enforcement, have

3  you listened to 911 calls?

4  A.  Many.

5  Q.  How many -- is it possible for you to quantify the

6  amount of recorded communications discussing firearms that

7  you've listened to?

8  A.  Probably not; over a hundred, less than a thousand,

9  maybe.

10  Q.  If you put that in terms of hours, would you say at

11  least 50 hours or can you give the Court a number?  I don't

12  mean to suggest one.

13  A.  I -- 20 to 50 hours.

14          THE COURT:  This is listening to recordings?

15          MR. DePORRE:  Yes.

16  BY MR. DePORRE:

17  Q.  Regarding, specifically, firearms?

18  A.  Correct.

19  Q.  How many -- if you can qualify this, how many informants

20  have you spoken with regarding firearms?

21  A.  Maybe 30.

22  Q.  And in those discussions, have you heard informants use

23  slang terms to describe firearms?

24  A.  Yes.

25  Q.  What are some of the slang terms you've heard?

1    A.   Heater, piece, ratchet, tool, hammer, stick, banger.

2    There's plenty of others, I can keep going if you want.

3    Q.   Have you ever heard of a chopper?

4    A.   Yes.

5    Q.   Could you describe what a chopper is?

6    A.   A chopper, or a chop, is an AK-47.

7    Q.   You mentioned, "stick."

8    A.   Uh-huh.

9    Q.   Have you heard informants use the word, "stick?"

10   A.   Often.

11   Q.   Who else has used the word, "stick," or where else have

12   you heard that context referred to specifically as a firearm?

13   A.   Informants, victims, defendants in various cases,

14   recorded calls.

15   Q.   Is that also true of -- you mentioned, "banger."

16   A.   Yes, sir.

17   Q.   Have you heard the same sort of people refer to a

18   firearm as a banger?

19   A.   Yes.

20   Q.   Now, you testified earlier that a chopper specifically

21   referred to a unique type of firearm, correct?

22   A.   Yes.

23   Q.   And with respect to a "heater," does that refer to a

24   specific type of firearm?

25   A.   Not necessarily.

```
 1    Q.  Have you ever heard it to describe one type of firearm
 2    in particular, as opposed to just general firearms?
 3    A.  More often than not, it would be used to refer to a
 4    pistol, a handgun.
 5    Q.  Are you familiar with a murder-for-hire investigation
 6    involving recorded jail calls?
 7    A.  Yes.
 8         MR. DePORRE:  I would like to play a call from one
 9    of those investigations.  Ms. Szukhent, would you
10    start -- I'd like to mark this for purposes of the record as
11    Evidentiary Hearing Exhibit 1, or Hurt 1.
12         THE COURT:  Do you have a copy of what it is you
13    want to mark?
14         MR. DePORRE:  I don't.  It's an audio recording.
15         THE COURT:  Oh, I'm sorry.  It's not the
16    transcript, it's just the recording?
17         MR. DePORRE:  Correct.
18         THE COURT:  Okay.  So what is this a recording of?
19         MR. DePORRE:  It is a recording -- a jail
20    recording in a murder-for-hire investigation.
21         THE COURT:  All right.  Any objection to this,
22    Mr. Longstreet?
23         MR. LONGSTREET:  Is it this phone call?
24         MR. DePORRE:  No.
25         MR. LONGSTREET:  Then I'm objecting to the
```

```
1    relevance of what's in a phone call, in another unrelated

2    case, has to do with anything in this case.  I would object

3    to it being played.

4            THE COURT:  Is this -- yeah.  Can you just respond

5    to that?  I have a thought, but go ahead.

6            MR. DePORRE:  Certainly, Your Honor.  This is a

7    specific instance were a -- during a recorded phone call, it

8    is evident --

9            THE COURT:  Hold on one second.  Is something

10   beeping?

11           (A brief pause in the proceedings at 12:18 p.m.)

12           THE COURT:  All right.  So you were saying,

13   Mr. DePorre, this is a recorded jail call in an investigation

14   not related to this case; is that correct?

15           MR. DePORRE:  That's correct.

16           THE COURT:  All right.  And you were going to

17   explain to me the relevance here?

18           MR. DePORRE:  That's correct.  It is evident from

19   the call that they are referring -- that the people speaking

20   on the call are referring to a "stick" as a gun or a firearm.

21           THE COURT:  Is this an investigation that

22   Agent Hurt participated in --

23           MR. DePORRE:  It is.

24           THE COURT:  -- before today?  It's actually -- in

25   other words, this is what I'm trying to get at.  Under
```

```
 1   Rule 702, a person can be qualified to offer an opinion based
 2   on their experience.
 3            MR. DePORRE:  Correct.
 4            THE COURT:  So my question to you is, is this
 5   recording -- listening to this recording, part of the law
 6   enforcement experience that Agent Hurt had before coming in
 7   today?
 8            MR. DePORRE:  It is.
 9            THE COURT:  Okay.  Any response to that,
10   Mr. Longstreet?
11            MR. LONGSTREET:  Again, it has no relevance or
12   bearing to the issues in this particular case, what somebody
13   else means in another case doesn't have anything to do with
14   what Mr. Garza means in this particular case, so I don't see
15   how it's relevant to the issues.
16            THE COURT:  Okay.  Thank you.  I appreciate and
17   understand the objection.  I'm going to overrule it, and I
18   want to make clear the basis on which I'm going to allow that
19   testimony for the purpose of this proceeding.  As I
20   indicated, under Rule 702, a person can be qualified to offer
21   opinion testimony based on experience.  And Mr. DePorre has
22   indicated to me that he will, in a series of questions with
23   Agent Hurt, establish that listening to this recording was
24   something that Agent Hurt did in the ordinary course of his
25   work, and thus, that the recording and monitoring it is part
```

*Offer of Proof • November 10, 2022*

1    of the experience that, according to the government,

2    qualifies Agent Hurt to offer an opinion as to the meaning of

3    these slang terms.

4            But before we play the recording, it is probably

5    helpful for you to lay the foundation first, before you do

6    that.

7            MR. DePORRE:  Certainly, Your Honor.

8    BY MR. DePORRE:

9    Q.  Special Agent Hurt, are you involved in an investigation

10   of a murder-for-hire case against a defendant who has been

11   charged in Federal Court, named Reginald Hunter?

12   A.  Yes, sir.

13   Q.  What's your role in that case?

14   A.  I'm the agent in charge of the case, sir.

15   Q.  And as the agent in charge, have you reviewed the

16   recorded jail calls from Mr. Hunter to third parties?

17   A.  Yes.

18   Q.  During one of those calls, are you familiar with

19   Mr. Hunter using the word, "stick"?

20   A.  Yes.

21           MR. DePORRE:  All right.  May I play that call?

22           THE COURT:  Is there -- I mean, he's now said that.

23   Is there any reason we need to hear the call?  How long is

24   the call?

25           MR. DePORRE:  I'm going to play about, I think, 13

1  seconds.

2           THE COURT:  All right.  I can spare 13 seconds.

3           MR. DePORRE:  Thank you, Your Honor.  If

4  Ms. Szukhent would start at 5 minutes and 41 into the call.

5           (Audio recording played for the Court

6           at 12:21 p.m.)

7  BY MR. DePORRE:

8  Q.  In that call, did you hear La Kayla Marie Dunning ask

9  Regional Hunter what kind of gun it was that he was arrested

10  with?

11  A.  I did.

12  Q.  And did you hear him respond "like some sticks for

13  real"?

14  A.  Yes, sir.

15  Q.  And then did you hear her ask, "Was it an AK?"

16  A.  I did.

17  Q.  And what did he respond?

18  A.  He said, "No."

19  Q.  Based on your experience -- we talked a little bit about

20  a chopper meaning an AK, specifically.  Are there any special

21  meanings that "stick" has, based on your experience and

22  training?

23  A.  Yes.  Oftentimes, when the term "stick" is used, it is

24  used for an extended magazine -- or a magazine that extends

25  beyond the grip of a pistol.

1   Q.  And have you also heard the term, "banger," used for a

2   particular type of gun?

3   A.  A particular type of gun, no.

4   Q.  Could that refer to a handgun?

5   A.  Yes.

6   Q.  Could it refer to a long gun?

7   A.  Yes.

8   Q.  And that's all based on your experience, correct?

9   A.  Correct.

10  Q.  I'd like you to take a look at what has been marked as

11  Government's Exhibit 5C.  This is trial exhibit Government

12  Exhibit 5C.

13        THE COURT:  What is it?

14        MR. DePORRE:  It's a photograph of the firearm that

15  was seized in this case.

16        THE COURT:  Okay.

17        MR. DePORRE:  Is it on all of the monitors?

18        THE COURT:  It's not on mine, but I'm not sure why.

19  Can you see it, Mr. Longstreet?

20        MR. LONGSTREET:  I can.

21        THE COURT:  Okay.

22  BY MR. DePORRE:

23  Q.  Can you see the firearm depicted in Government's

24  Exhibit 5C?

25  A.  Yes, sir.

*Offer of Proof • November 10, 2022*

```
1    Q.  Do you recognize that firearm?

2    A.  I do.

3    Q.  Who manufactured that firearm?

4    A.  Ruger -- Sturm & Ruger.

5    Q.  What model is it?

6    A.  An EC9, nine-millimeter.

7    Q.  And I think you answered the next question.  It fires

8    nine-millimeter caliber ammunition?

9    A.  Yes, sir.

10   Q.  Have you seen -- could you turn to Government's

11   Exhibit 6B?

12            THE COURT:  Is something beeping again?

13            MR. DePORRE:  May I approach, Your Honor?

14            THE COURT:  Yeah.  Is that what was beeping?

15            MR. DePORRE:  Yes.

16            THE COURT:  Okay.

17   BY MR. DePORRE:

18   Q.  Do you see the magazine in this case?

19   A.  Yes, sir.

20   Q.  And is this magazine a -- does it have any unique

21   attributes?

22   A.  The only unique attribute I would see is that it has the

23   magazine extension for making the grip larger.  So the black

24   piece that is on top of the butt plate, that would go down

25   over the actual magazine itself, would give you a longer
```

*Offer of Proof • November 10, 2022*

 1   grip, for probably the pinkie finger of the shooter's hand.

 2   Q.  And would you go back to 5C, Ms. Szukhent?

 3          A typical magazine for an EC9, that was the type of

 4   firearm this is, correct?

 5   A.  Yes, sir.

 6   Q.  Where would that magazine end generally?

 7   A.  You can see above where that extension would be, and I

 8   would guess that the manufacturer that, when it was sold,

 9   would end flush with the bottom of that -- where the grip

10   actually stops at the bottom, where it meets that extension.

11          THE COURT:  Do you know that or are you just

12   guessing?

13   A.  I would guess at this point.  I don't know that for a

14   fact.

15   BY MR. DePORRE:

16   Q.  Are you familiar with most handguns?

17   A.  Yes.

18   Q.  And do most handguns -- do you know, for a fact, that

19   most handguns have a magazine, that the manufacturer makes,

20   that fits flush with the grip?

21   A.  Yes.

22          MR. DePORRE:  At this point, I would ask

23   Ms. Szukhent to play Government's Exhibit 11B.  This is a

24   transcript of Mr. Garza's call with Madison Merrill.

25          THE COURT:  Is this the one attached to your trial

1    brief?

2            MR. DePORRE:  It is a portion of it, yes.  It is a

3    very small portion of that call.

4            THE COURT:  Okay.

5            (Audio recording played for the Court

6            at 12:27 p.m.)

7            MR. DePORRE:  All right.  Ms. Szukhent, would you

8    also play the full call, and begin at 5 minutes

9    and 40 seconds into the call.

10           (Audio recording played for the Court

11           at 12:27 p.m.)

12           MR. DePORRE:  You can stop it.

13   BY MR. DePORRE:

14   Q.  Special Agent Hurt, have you listened to the entire call

15   that was just played, you know, a portion of it here in court

16   today?

17   A.  Yes.

18   Q.  And are you familiar with the term, "whip"?

19   A.  Yes.

20   Q.  What is a "whip"?

21   A.  It's usually referred to as a vehicle or a car.

22   Q.  Okay.  And how are you familiar with that term, "whip"?

23   A.  I've heard it used countless times from -- over the

24   course of my career.

25   Q.  When you heard the words, "stick" and "banger," in this

1   calls -- in these calls -- or these excerpts of calls, what

2   is your opinion about the meaning of the word, "banger,"

3   first?

4   A.  The meaning, banger would be a firearm.

5   Q.  And what is your opinion about the meaning of "stick"?

6   A.  In that call, listening to it, it actually said,

7   "there's a stick in the banger," so it would mean to me that

8   it was the magazine protruding from the bottom of the grip,

9   meaning the stick in the banger, which is the magazine in the

10  firearm.

11  Q.  And all of that is based on your experience and training

12  with listening to different calls and different people

13  describing firearms to you over the course of your law

14  enforcement career?

15  A.  Yes, sir.

16          MR. DePORRE:  All right.  I have no further

17  questions.

18          THE COURT:  Mr. Longstreet, before you ask your

19  questions, I have a few questions I want to ask.

20          Agent Hurt, you were asked about your experience

21  and you gave a fair bit of testimony about that, and you

22  talked about hearing these terms used, "heater," "stick,"

23  "banger," and that based on your experience, you understand

24  those terms to refer to firearms, right?

25  A.  Correct.

1    THE COURT:  So when Mr. DePorre played the first

2    recording, that was a recording in which I can understand how

3    somebody listening to that as part of their duties, you,

4    would conclude that the term -- I think it was "stick" that

5    was used in that recording?

6    A.  Correct.

7    THE COURT:  I can understand how you would regard

8    that term, "stick," as used is referring to a gun, because in

9    the context of that discussion itself, if you were listening

10   to it, the context would indicate to you that's what the

11   speaker meant.

12   Help me understand how, in the other times when

13   folks were using the term, "heater" or "banger" or "stick,"

14   you were able to understand that they were referring to a

15   firearm.  Was it in a similar conversation where they

16   specifically said a name of a firearm and then used the term,

17   "stick," as a synonym?  Was it in an interaction where they

18   pointed at a firearm and used the term, "stick" or "banger"?

19   In other words, help me understand what aspect of your

20   experience allowed you to conclude that when somebody was

21   using the term, "stick" or "banger," they were connecting it

22   to a firearm?

23   Was my question, in any way, clear?  That was my

24   best effort.

25   A.  Yes, I got it.  So through the course of our duties, we

1  do a lot of controlled purchases with confidential informants

2  and such, and oftentimes a confidential informant and I will

3  talk and they'll say he's got "sticks on deck" or "sticks for

4  sale."  And that means -- and I'll ask them to elaborate, and

5  they'll show me pictures of sticks that were sent to them for

6  sale, and, more often than not, they do have the extended

7  magazine.  And I've had them break that down and tell me what

8  a lot of slang terms for firearms mean, that before my time

9  in Flint, I probably wasn't accustom to, so --

10           THE COURT:  If I am understanding you correctly,

11  the part of your experience with informants that is relevant

12  here, is you've had informants show you a photo of a firearm

13  and used the term, "stick," to describe the contents of the

14  photo?

15  A.  Oftentimes.

16           THE COURT:  What about -- you mentioned that your

17  interaction with witnesses is part of the experience that

18  helps you form an opinion that a reference to a "stick" or a

19  "banger" is to a firearm.  Can you help me understand the

20  interactions you've had with witnesses that is relevant here?

21  A.  I have spoken with witnesses on numerous shooting scenes

22  that have said so-and-so had a stick and returned fire before

23  fleeing.  I was at a shooting scene yesterday, where I

24  believe the term, "stick," was used, when shots were being

25  fired into a vehicle in a neighborhood in the City of Flint.

1    THE COURT:  So if I'm understanding you correctly,

2    are you saying that in your -- in repeated conversations that

3    you've had with witnesses, the context in which those

4    witnesses have used the terms, "stick" and "banger," has

5    indicated to you that they must have been referring to a

6    firearm?

7    A.  On numerous occasions, yes.

8    THE COURT:  All right.  And the context, just so I

9    understand it, is, are you saying that they are referencing

10   "stick" or "banger" as firing bullets, that's one way?

11   A.  So the stick, more often than not, refers to the

12   extended magazine that goes into the banger --

13   THE COURT:  Right.

14   A.  -- which would then, obviously, fire the bullet, but

15   yes.

16   THE COURT:  But the references to "sticks" and

17   "bangers" are in the context of bullets being fired, is that

18   what you are saying?

19   A.  Correct, yes, sir.

20   THE COURT:  What about victims?  What experience

21   have you had with victims that enables you to understand that

22   when they are using those terms, they are referring to a

23   firearm?

24   A.  I've spoken with countless shooting victims that have

25   used those terms to explain to me how they were shot with a

1   stick or a banger or a firearm or the like.

2          THE COURT:  And they've tied those terms to the

3   device that was doing the shooting, is that what you're

4   saying?

5   A.  Yes, sir.

6          THE COURT:  I think you also mentioned recorded

7   jail calls and we heard this one, where, as I said, I

8   understand how somebody listening to that call could conclude

9   that the reference to stick or banger, whatever was in that

10  call, is referring to a firearm, because it was in the

11  context of somebody else using a proper name for a firearm.

12         Have other jail calls been like that,

13  where -- how -- let me try this a different way.

14         If I listened to a jail call and somebody just

15  threw out the word, "banger" or "stick," unless there was

16  some context, I wouldn't know what they were talking about.

17  Can you help me understand the type of context of these other

18  calls that you listened to, that enabled you to conclude that

19  references to stick or banger were to a firearm?

20  A.  A lot of the time, through the course of my

21  investigative career, it's been the vast majority of the

22  crime I have investigated have been violent crimes, usually

23  involving a firearm.  So when I first started -- it takes a

24  while, I guess is what I'm saying.  It takes practice and it

25  takes talking to CIs and talking to witnesses and talking to

 1   victims, and after a while, you start picking up the terms

 2   and the terminology.

 3           THE COURT:  Let me ask a better question.  When you

 4   listen to these recorded jail calls, were others of those

 5   calls like this one, where the use of the term, "stick" or

 6   "banger," was in connection with an unmistakable, explicit

 7   reference to a firearm?

 8   A.   Numerous calls.

 9           THE COURT:  Okay.  I'm all set with my questions.

10           MR. LONGSTREET:  Thank you.

11                   CROSS-EXAMINATION

12   BY MR. LONGSTREET:

13   Q.   Is it detective, sergeant, agent; what's your title?

14   A.   Agent is fine.

15   Q.   Agent.  All right.  Sir, you had an opportunity to

16   listen to the phone call associated with the case, with

17   Mr. Noe Garza; is that correct?

18   A.   Correct.

19   Q.   All right.  And in that particular phone call, you hear

20   the word, "banger," used on multiple occasions; is that

21   correct?

22   A.   Yes, sir.

23   Q.   Okay.  And in that particular phone call, when the word,

24   "banger," is used, it's not necessarily referring to a gun,

25   is it?

 1  A.   In my opinion, it is, yes.

 2  Q.   So when he says, "I'm about to bang on them niggers,"

 3  does that mean he's about to shoot at them or he's about to

 4  fight them?

 5  A.   It made it sound like when he was trying to get out, and

 6  made it sound like he was going to bang on them, as in shoot

 7  at them.

 8  Q.   Okay.  But can't, also, a person getting into a

 9  fistfight mean, I'm banging on somebody?

10  A.   You could, yes.

11  Q.   Okay.  Have sex with a woman, you could be banging on

12  her?

13  A.   Yes.

14  Q.   Okay.  There's other -- banger doesn't always

15  necessarily mean gun, correct?

16  A.   Correct.

17  Q.   It also means good music; that song was a banger?

18  A.   Yes, sir.

19  Q.   So the meaning of the word is, ultimately, in regards to

20  how it's being used?

21  A.   Say that again, sir.

22  Q.   The meaning of a word is sometimes depending on how the

23  word is being used?

24  A.   Yes, sir.

25  Q.   Okay.  Now, in the phone call we previously listened to,

1    referring to your murder investigation, the person who was

2    referring to a gun said "gun," correct?

3    A.   He said, "stick."

4    Q.   Okay.  I'm talking about the woman.

5    A.   I believe so, yes.

6    Q.   And he says, "some sticks or something"; is that

7    correct?

8    A.   Yes, sir.

9    Q.   Now, also, you indicated that a stick was a firearm with

10   an extended clip; is that correct?

11   A.   A magazine, yes.

12   Q.   Okay.  But not every time a person is talking about a

13   stick are they referring to an extended clip?

14   A.   I would agree.

15   Q.   Okay.  They could be talking about a gun itself,

16   correct?

17   A.   Correct.

18   Q.   Okay.  Or it could be talking about a machete?

19   A.   I've never heard a machete referred to as a --

20   Q.   How about a stick?

21   A.   A --

22   Q.   A stick is a stick, right?

23   A.   Yes, sir.

24   Q.   So a stick doesn't necessarily mean gun, correct?

25   A.   Correct.

*Offer of Proof • November 10, 2022*

```
 1    Q.  All right.  Now, during your time and experience, have
 2    you ever heard of or referred someone -- or
 3    referred -- someone refer to gun or banger and not be talking
 4    about a firearm?
 5              THE COURT:  You said, gun.
 6              MR. LONGSTREET:  I did.  Let me rephrase my
 7    question.  Strike that.
 8    BY MR. LONGSTREET:
 9    Q.  Have there been times, during your time as an officer,
10    that you referred -- heard someone refer to banger and not be
11    talking about a gun?
12    A.  I haven't -- the context that you just talked about,
13    like a banger of a song or something like that, I have, yes.
14    Q.  And you also heard a conversation or where people talked
15    about sticks and weren't talking about a gun?
16    A.  Usually, in the context of my work, a stick is usually
17    referred to as a gun or a firearm.
18    Q.  But it doesn't necessarily have to mean gun, correct?
19    A.  Correct.
20    Q.  What, if any, special training or experience did
21    you -- have you received, in your time as a police officer,
22    that indicates to you that gives definitions of slang terms?
23    A.  I would say, no formal training in slang terms.
24    Q.  Just simply how certain people use those particular
25    words, correct?
```

*Offer of Proof • November 10, 2022*

```
 1    A.   Correct.
 2    Q.   Okay.  And would you say language is also regional, so
 3    banger might mean something one place, but it means something
 4    else someplace else?
 5    A.   It could.
 6    Q.   Okay.  So ultimately, the meaning of a word is up to a
 7    person's particular interpretation; would that be correct?
 8    A.   I would agree.
 9    Q.   And that would be your interpretation of what that word
10    means, not necessarily what the speaker actually meant.
11    Would you agree with that?
12    A.   It could be.
13           MR. LONGSTREET:  Thank you.  Nothing further.
14           THE COURT:  Any other questions, Mr. DePorre?
15           MR. DePORRE:  Just one.
16                      REDIRECT EXAMINATION
17    BY MR. DePORRE:
18    Q.   Of the years you've been in law enforcement, how many of
19    those years have been spent in Michigan?
20    A.   All of them.
21    Q.   And of the years you've been in law enforcement, how
22    many have been in Flint?
23    A.   Ten, approximately.
24    Q.   And how many have been in Lansing?
25    A.   An additional one -- one and a half.
```

1    Q.  Well, in the Lansing area.

2    A.  Four.

3    Q.  Were you assigned anywhere besides Flint and Lansing?

4    A.  With the State Police?

5    Q.  With the State Police, Grand Ledge, Lansing area, metro

6    areas, at any point with ATF or the State Police?

7    A.  No, sir.

8              MR. DePORRE:  I have no further questions.

9              THE COURT:  Mr. Longstreet, any follow-up?

10             MR. LONGSTREET:  No.

11             THE COURT:  Thank you.  You may step down.  Thank

12   you for your time today.

13             (Witness excused at 12:40 p.m.)

14             THE COURT:  Do you want to offer any testimony that

15   he was qualified to offer opinion about the meaning of

16   "stick" and "banger"?

17             MR. DePORRE:  Very briefly.  What we are really

18   focusing on is whether or not Mr. Hurt's experience qualifies

19   him to offer an opinion about those meanings.  And he's

20   testified that he has heard those terms specifically

21   referencing firearms, that he's heard that term, "stick,"

22   specifically referencing a firearm with an extended magazine

23   on numerous occasions and in various contexts.  And so the

24   government does maintain that he's qualified to offer an

25   opinion as to this case, with respect to the meaning of

*Offer of Proof • November 10, 2022*

1  "stick" and "banger."

2          Certainly, that's not going to be the ultimate

3  issue for -- you know, the jury will have to conclude whether

4  or not he's able to -- whether or not they agree with his

5  opinion and that's a jury question, but I do believe that he

6  meets the threshold burden to offer that opinion today.

7          THE COURT:  Okay.  Thank you.

8          Mr. Longstreet, your response?

9          MR. LONGSTREET:  The defense disagrees --

10         THE COURT:  Would you mind coming to this

11 microphone?

12         MR. LONGSTREET:  Very good.

13         THE COURT:  It is easier on your neck and we can

14 hear you better.

15         MR. LONGSTREET:  The defense respectfully disagrees

16 with the prosecutor's -- the government's position that

17 the -- this agent is qualified to testify as to the

18 particular meaning of words.  Clearly, the meaning of a word

19 is ultimately determined by the speaker and also the context

20 of which the word is being used.

21         This officer can testify as to what his

22 opinion -- what he believes that word to mean, but

23 ultimately, the meaning of that word and the determination of

24 that word should be determined by the jury.

25         I don't think, at this point, that the government

1 has put on enough evidence, at this point, to suggest that

2 this officer's experiences, along with any of his specialized

3 training or education, provides him specialized knowledge to

4 assist the trier of fact in regard to what "banger" or

5 "stick" means, seeing as how, in this particular phone call

6 with Mr. Garza, the word, "banger," is used multiple times,

7 not necessarily meaning shoot and/or gun.  Also, the officer

8 testified that those words can be used in context and not

9 necessarily mean a firearm.

10         I think it should be left up to the jury to

11 determine what that word means, and the officer should not be

12 allowed to simply say what it means.

13         Thank you.

14         THE COURT:  Okay.  Thank you very much for your

15 thoughts, Mr. Longstreet.

16         I'm persuaded that the government has established

17 that Agent Hurt is qualified to offer the opinion testimony.

18 Again, the step one is from *Kilpatrick,* where the

19 Sixth Circuit says, "Courts often qualify law enforcement

20 officers as expert witnesses under Rule 702, to interpret

21 intercepted conversations that use slang, street language and

22 jargon of the illegal drug trade."

23         So then we have to ask, is Agent Hurt the type of

24 witness who is qualified?  And Rule 702 offers a number of

25 different ways that a witness can be qualified.  One is by

1    experience.

2         And I'm satisfied that Agent Hurt's answers to my

3    questions, particularly the ones where I probed in some

4    detail about the nature of his experience, I'm satisfied that

5    his experience qualifies him to offer the opinion that

6    "banger" and "stick" are references to firearms.

7         Agent Hurt offered four sources of experience that

8    would, in my view, be relevant to his qualifications to offer

9    that opinion.  The first was his experience with numerous

10   informants.  And I asked him, how did you know that when the

11   informants were using the term, "banger" or "stick," they

12   were referring to a firearm?  And he gave an answer to that

13   question.  He explained that it was not uncommon for them to

14   refer to photos and point to a firearm.  So that would be an

15   experience that he has, repeatedly, where the terms are being

16   connected expressly to firearms.

17        He gave a similar answer when I asked him about how

18   his interactions with witnesses led him to conclude that when

19   they referring to a "stick" or "banger," they were referring

20   to a firearm.

21        He did the same with victims, telling me that

22   victims would use that term and explicitly connect it to

23   somebody firing bullets.

24        And with respect to jail calls and recorded calls,

25   he mentioned that there were many that he listened to that,

1    like the one that Mr. DePorre played from a different case,

2    in many of these calls, there were expressed connections

3    between the terms "stick" and "banger" and firearms.

4            So in my view, Agent Hurt has sufficient

5    qualifications to offer the opinions on the meaning of

6    "stick" and "banger" as used in the recorded calls that the

7    government intends to offer him for.

8            Mr. Longstreet, as you always do, you have raised a

9    number of serious arguments, and I think the testimony that

10   you elicited today, if you elicit it before the jury, will

11   give you a number of arguments available to the defense when

12   you are arguing to the jury to try to undermine the force of

13   the testimony.  And I agree with you that, ultimately, this

14   will be the question for the jury, and you will have many

15   arguments available to you to suggest that, notwithstanding

16   Agent Hurt's testimony, "stick" and "banger" didn't mean gun

17   here, and you will presumably be able to elicit from him, in

18   front of the jury, many of the acknowledgements that he made

19   here, during your cross-examination.

20           So I think that that is the appropriate way to deal

21   with this.  I can't remember if this was Mr. DePorre's motion

22   to offer this testimony or --

23           MR. LONGSTREET:  It was my motion to exclude.

24           THE COURT:  It was the motion to exclude.  So the

25   motion to exclude will be denied, and I will permit the

1  government to offer the opinion testimony from Agent Hurt

2  with respect to his interpretation of the terms "stick" and

3  "banger" as used on the recorded telephone calls.

4           So when we get to Agent Hurt's testimony in front

5  of the jury, rather than rehash this argument which we've

6  created, as you guys know, in the Sixth Circuit, we don't

7  formally move to qualify somebody as experts.  Mr. DePorre,

8  the proper procedure in a Sixth Circuit published case

9  written by Judge Lawson sitting up there, is for you to call

10  Agent Hurt to lay the foundation that was laid today, in

11  terms of how his experience qualifies him.  And if -- and you

12  can tender him to offer an opinion, and at that point, the

13  defense can simply say you renew your objections from Friday,

14  I will overrule them, and we will move on.  That way the

15  issue is preserved and we have proceeded in the appropriate

16  way.

17           Are you okay proceeding that way, Mr. DePorre?

18           MR. DePORRE:  Yes, Your Honor.  Thank you.

19           THE COURT:  Mr. Longstreet?

20           MR. LONGSTREET:  Yes.

21           THE COURT:  Okay.  All right.

22           (Excerpt of offer to proof concluded at 12:48 p.m.)

23                          —   —   —

24

25

*CERTIFICATION*

       I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of UNITED STATES OF AMERICA vs. NOE GARZA, Case No. 21-20405, on Thursday, November 10, 2022.

                    *s/Robert L. Smith*
                    Robert L. Smith, RPR, CSR 5098
                    Federal Official Court Reporter
                    United States District Court
                    Eastern District of Michigan

Date:  11/11/2022
Detroit, Michigan