```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                          —   —   —

     UNITED STATES OF AMERICA,
 4
                    Plaintiff,
 5
        v.                                 Case No. 21-20405
 6
     NOE GARZA,                            Hon. Matthew F. Leitman
 7
                    Defendant.
 8    _____/

 9                    JURY TRIAL - Volume 1B

10             BEFORE THE HONORABLE MATTHEW F. LEITMAN
                    United States District Judge
11          Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
12                       Detroit, Michigan
                    Thursday, November 10, 2022
13

14   APPEARANCES:

15    For the Plaintiff:        JULES M. DEPORRE
                                UNITED STATES ATTORNEY'S OFFICE
16                              600 Church Street
                                Flint, MI 48502
17                              (810) 766-5177

18    Also Present:            Jessica Szukhent,
                                United States Attorney's Office
19
      For the Defendant:        CHARLES O. LONGSTREET, II
20                              LONGSTREET LAW FIRM, PLLC
                                18971 Livernois
21                              Detroit, MI 48221
                                (313) 288-0103
22

23

24        To obtain a copy of this official transcript, contact:
             Robert L. Smith, Federal Official Court Reporter
25            (313) 234-2612 • robert_smith@mied.uscourts.gov
```

TABLE OF CONTENTS

MATTER                                                        PAGE


OFFER OF PROOF

AGENT DUSTIN HURT
Direct Examination by Mr. DePorre................... 6
Cross-Examination by Mr. Longstreet.................27
Redirect Examination by Mr. DePorre.................32

ARGUMENT REGARDING OFFER OF PROOF
by Mr. DePorre.....................................33
by Mr. Longstreet..................................33
Ruling by the Court................................35

1 | Detroit, Michigan

2 | Thursday, November 10, 2022

3 | at about 11:38 a.m.

4 |                         —   —   —

5 | THE COURT:  Okay.  Please be seated.  The jury has

6 | left.

7 | What I would propose now is we take about a

8 | 15-minute comfort break, collect ourselves, and then return

9 | for the portion of the hearing where we are going to hear the

10 | testimony from the law enforcement officer who Mr. DePorre

11 | wants to offer as an opinion witness on the slang terms.  So

12 | I will see you, I guess, in about 15 minutes.  Thank you.

13 | (Court recessed at 11:38 a.m.)

14 |                         —   —   —

15 | (Court reconvened at 12:05 p.m.; Court, Counsel and

16 | Defendant present.)

17 | THE COURT:  Okay.  Welcome back.  We are back on

18 | the record, it's just after noon.  We have picked our jury,

19 | and they have gone for the day.

20 | We are going to pick up with a matter that we

21 | discussed at the final pretrial conference, which is hearing

22 | testimony from a case agent that Mr. DePorre wishes to call

23 | at trial to offer opinion evidence on the meaning of certain

24 | terms that were used either during an interview or on a

25 | tape-recorded conversation.  And I just want to remind

1    ourselves how we got here.

2          The -- when I looked at the case law at the final

3    pretrial conference, my view was that this sort of opinion

4    testimony is permitted under Rule 702.  The case law that I

5    found instructive was *United States v. Kilpatrick*, the

6    Sixth Circuit's decision, 798 F.3d 365, page 379, where the

7    court remarked that courts often qualify law enforcement

8    officers as expert witnesses under Rule 702 to interpret

9    intercepted conversations that use slang, street language,

10   and the jargon of the illegal drug trade.

11         And there was another case that Mr. DePorre brought

12   to my attention, *United States v. Williams*, a helpful

13   District Court decision, 2016 Westlaw 899145.

14         So in my view, the law, in theory, allows opinion

15   testimony as to the meaning of these sorts of slang terms.

16   The question, though, is whether Mr. DePorre has identified a

17   witness with the appropriate qualifications to be able to

18   offer that opinion testimony under Rule 702, and I decided

19   that the best way to proceed was rather than have Mr. DePorre

20   try to establish the qualifications in front of the jury,

21   with objections and argument, the most efficient way to do it

22   was to have this hearing outside of the presence of the jury,

23   for us to hear what the testimony about the officer's

24   qualifications would look like, and I can make a ruling now,

25   outside of the presentence of the jury, as to whether the

1    witness has the qualifications to offer the opinions.

2              And with that, Mr. DePorre, why don't you go ahead

3    and call our witness?

4              MR. DePORRE:  Thank you, Your Honor.  The witness

5    the government is going to call is ATF Agent -- Special Agent

6    Dustin Hurt.  He's not the case agent assigned to this case.

7    His role in this case -- and he's been identified on the

8    witness list, initially, as a -- to -- to offer opinion

9    testimony regarding the interstate nexus of firearms and

10   ammunition, as well as the meaning of these slang terms.

11   There's no issue regarding his qualifications with respect to

12   interstate nexus, and I understand that to be an issue that

13   the defense will stipulate to, that there is a nexus, in this

14   case, for the firearm and the ammunition.

15             THE COURT:  All right.  Can you turn that podium so

16   you don't strain your --

17             MR. DePORRE:  Hurt my neck.

18             THE COURT:  Mr. Longstreet, is that correct, that

19   with respect to the interstate commerce elements, the defense

20   would be stipulating that element is satisfied?

21             MR. LONGSTREET:  That is correct, as far as

22   interstate commerce, yes, that is correct, interstate nexus,

23   yes.

24             THE COURT:  Okay.  Thank you.

25             All right.  Mr. DePorre, are we -- so I guess I

 1 │ used the term, "case agent."  I didn't mean that in the

 2 │ technical sense, but --

 3 │          MR. DePORRE:  He is, in fact, a case agent, just

 4 │ not on this case.

 5 │          THE COURT:  Okay.  All right.

 6 │          MR. DePORRE:  The government calls Dustin Hurt.

 7 │          THE COURT:  Agent Hurt, as you are coming up, would

 8 │ you raise your right hand?

 9 │          Do you solemnly swear the testimony you are about

10 │ to give will be the truth?

11 │          AGENT HURT:  Yes, I do.

12 │          THE COURT:  Okay.  Thank you.  Please have a seat.

13 │          The acoustics in this room are not terrific, so as

14 │ you're settling in, could I ask you to keep your voice up and

15 │ speak slowly, so I can hear everything you have to say?

16 │          AGENT HURT:  Yes, sir.

17 │          THE COURT:  Thank you.

18 │                    AGENT DUSTIN HURT,

19 │ called at about 12:09 p.m., was examined and testified on his

20 │ oath as follows:

21 │                    DIRECT EXAMINATION

22 │ BY MR. DePORRE:

23 │ Q.  Mr. Hurt, how are you currently employed?

24 │ A.  The Bureau of Alcohol, Tobacco, Firearms and Explosives.

25 │ Q.  And I don't know if you spelled your name, but could you

 1  do that, for the record?

 2  A.   Yes, sir.  D-U-S-T-I-N, H-U-R-T.

 3  Q.   You said you are employed has a special agent with the

 4  Bureau of Alcohol, Tobacco, and Firearms?

 5  A.   Yes, sir.

 6  Q.   What sort of crimes do you investigate as an ATF agent?

 7  A.   Violent crimes, usually involving firearms.

 8  Q.   Do you investigate alcohol-related crimes?

 9  A.   Not -- not in my career thus far.

10  Q.   How about tobacco-related crimes?

11  A.   Same answer.

12  Q.   Is your particular focus on firearm crimes?

13  A.   Yes, sir.

14  Q.   And where do you work?

15  A.   City of Flint.

16  Q.   How long have you been an police officer?

17  A.   Since 2009.

18  Q.   And what did you -- what sort of training did you

19  receive before you became a law enforcement officer?

20  A.   In terms of education?

21  Q.   Yes.

22  A.   I went to Grand Valley State University, I double

23  majored in criminal justice and political science, and then

24  after that I went to grad school and got a  Master's in

25  business administration.

1  Q.  And your criminal justice major and political science
2  major, that resulted in a Bachelor's degree?
3  A.  Yes, sir.
4  Q.  In 2009, you said you began your law enforcement career.
5  How did you -- what sort of role were you in at that point?
6  A.  I went through the Mid Michigan Police Academy, which is
7  in Lansing Community College, at which point after that, I
8  got employed -- I was a full-time police officer with the
9  City of Grand Ledge, which is about eight miles west of
10 Lansing.
11 Q.  What year did you get your Bachelor's?
12 A.  Bachelor's would have been 2008.
13 Q.  And when did you get your Master's?
14 A.  I believe, 2014.
15 Q.  And then you went to the police academy in -- was
16 that 2009?
17 A.  2009, yes.
18 Q.  All right.  And how many weeks or months was that
19 training?
20 A.  I believe that one was between 16 weeks and 5 months,
21 somewhere in there.
22 Q.  Did you have firearms training in that?
23 A.  Yes, sir.
24 Q.  Did you talk about different investigatory techniques?
25 A.  Often.

*Jury Trial - Volume 1B • November 10, 2022*

**9**

1  Q.  After that, did you -- how long were you a police
2  officer in Grand Ledge?
3  A.  Just shy of three years.
4  Q.  And what did you do after those three years?
5  A.  I was then -- I got hired on by the Michigan State
6  Police.
7  Q.  All right.  Prior to joining the State Police, did you
8  have additional training for the State Police?
9  A.  Additional training for the State Police?
10  Q.  Did you go to the State Police Academy?
11  A.  Yes, sir.
12  Q.  And how many weeks was that?
13  A.  That was approximately five months.
14  Q.  Did you have special training in firearms there?
15  A.  Yes, sir.
16  Q.  And did you talk about investigatory techniques?
17  A.  Often.
18  Q.  Did you talk about different ways people refer to drugs?
19  A.  Yes, sir.
20  Q.  Did you talk about different ways people refer to
21  firearms?
22  A.  Yes, sir.
23  Q.  How long were you with the Michigan State Police?
24  A.  Approximately seven years.
25  Q.  And during that time period, where were you assigned?

```
 1    A.  I was assigned to -- I went out of recruit school I went
 2    to the Flint post.  I was road patrol for approximately
 3    two-and-a-half, three years, and then I got on as a task
 4    force officer with the FBI's Safe Streets Task Force, which
 5    is a gang and violent crimes task force that operates in and
 6    around the City of Flint.  I was there for approximately
 7    three years, and then I transferred to the Lansing post,
 8    where I did road patrol for a short period of time, until I
 9    got onto their violent crime initiative through MSP, Lansing
10    PD, FBI, ATF, all the agencies in that area.  After about a
11    year at Lansing, I promoted to detective sergeant in the
12    polygraph unit, and I ended my career with the State Police
13    there, before coming here.
14    Q.  In Flint and Lansing, did you investigate firearm
15    crimes?
16    A.  Often.
17    Q.  Did you speak with confidential informants?
18    A.  Often.
19    Q.  Did you speak with witnesses?
20    A.  Often.
21    Q.  Did you speak with victims?
22    A.  Often.
23    Q.  Did you speak -- did you listen to recorded
24    communications?
25    A.  Yes, sir, many.
```

```
 1   Q.  What sort of communications would you listen to?
 2   A.  Jail calls, often jail calls, recorded, like, one-party
 3   communication, things like that, and then, obviously,
 4   face-to-face interviews, jailhouse interviews, stuff like
 5   that.
 6   Q.  Did you review evidence obtained from cellular
 7   telephones?
 8   A.  Yes, sir.
 9   Q.  And in reviewing those, did you review, specifically,
10   text messages?
11   A.  Yes.
12   Q.  In the course of your work as a law enforcement, have
13   you listened to 911 calls?
14   A.  Many.
15   Q.  How many -- is it possible for you to quantify the
16   amount of recorded communications discussing firearms that
17   you've listened to?
18   A.  Probably not; over a hundred, less than a thousand,
19   maybe.
20   Q.  If you put that in terms of hours, would you say at
21   least 50 hours or can you give the Court a number?  I don't
22   mean to suggest one.
23   A.  I -- 20 to 50 hours.
24            THE COURT:  This is listening to recordings?
25            MR. DePORRE:  Yes.
```

```
1    BY MR. DePORRE:
2    Q.  Regarding, specifically, firearms?
3    A.  Correct.
4    Q.  How many -- if you can qualify this, how many informants
5    have you spoken with regarding firearms?
6    A.  Maybe 30.
7    Q.  And in those discussions, have you heard informants use
8    slang terms to describe firearms?
9    A.  Yes.
10   Q.  What are some of the slang terms you've heard?
11   A.  Heater, piece, ratchet, tool, hammer, stick, banger.
12   There's plenty of others, I can keep going if you want.
13   Q.  Have you ever heard of a chopper?
14   A.  Yes.
15   Q.  Could you describe what a chopper is?
16   A.  A chopper, or a chop, is an AK-47.
17   Q.  You mentioned, "stick."
18   A.  Uh-huh.
19   Q.  Have you heard informants use the word, "stick?"
20   A.  Often.
21   Q.  Who else has used the word, "stick," or where else have
22   you heard that context referred to specifically as a firearm?
23   A.  Informants, victims, defendants in various cases,
24   recorded calls.
25   Q.  Is that also true of -- you mentioned, "banger."
```

 1   A.   Yes, sir.

 2   Q.   Have you heard the same sort of people refer to a

 3   firearm as a banger?

 4   A.   Yes.

 5   Q.   Now, you testified earlier that a chopper specifically

 6   referred to a unique type of firearm, correct?

 7   A.   Yes.

 8   Q.   And with respect to a "heater," does that refer to a

 9   specific type of firearm?

10   A.   Not necessarily.

11   Q.   Have you ever heard it to describe one type of firearm

12   in particular, as opposed to just general firearms?

13   A.   More often than not, it would be used to refer to a

14   pistol, a handgun.

15   Q.   Are you familiar with a murder-for-hire investigation

16   involving recorded jail calls?

17   A.   Yes.

18        MR. DePORRE:  I would like to play a call from one

19   of those investigations.  Ms. Szukhent, would you

20   start -- I'd like to mark this for purposes of the record as

21   Evidentiary Hearing Exhibit 1, or Hurt 1.

22        THE COURT:  Do you have a copy of what it is you

23   want to mark?

24        MR. DePORRE:  I don't.  It's an audio recording.

25        THE COURT:  Oh, I'm sorry.  It's not the

1    transcript, it's just the recording?

2            MR. DePORRE:  Correct.

3            THE COURT:  Okay.  So what is this a recording of?

4            MR. DePORRE:  It is a recording -- a jail

5    recording in a murder-for-hire investigation.

6            THE COURT:  All right.  Any objection to this,

7    Mr. Longstreet?

8            MR. LONGSTREET:  Is it this phone call?

9            MR. DePORRE:  No.

10           MR. LONGSTREET:  Then I'm objecting to the

11   relevance of what's in a phone call, in another unrelated

12   case, has to do with anything in this case.  I would object

13   to it being played.

14           THE COURT:  Is this -- yeah.  Can you just respond

15   to that?  I have a thought, but go ahead.

16           MR. DePORRE:  Certainly, Your Honor.  This is a

17   specific instance were a -- during a recorded phone call, it

18   is evident --

19           THE COURT:  Hold on one second.  Is something

20   beeping?

21           (A brief pause in the proceedings at 12:18 p.m.)

22           THE COURT:  All right.  So you were saying,

23   Mr. DePorre, this is a recorded jail call in an investigation

24   not related to this case; is that correct?

25           MR. DePORRE:  That's correct.

1     THE COURT:  All right.  And you were going to
2  explain to me the relevance here?
3     MR. DePORRE:  That's correct.  It is evident from
4  the call that they are referring -- that the people speaking
5  on the call are referring to a "stick" as a gun or a firearm.
6     THE COURT:  Is this an investigation that
7  Agent Hurt participated in --
8     MR. DePORRE:  It is.
9     THE COURT:  -- before today?  It's actually -- in
10  other words, this is what I'm trying to get at.  Under
11  Rule 702, a person can be qualified to offer an opinion based
12  on their experience.
13     MR. DePORRE:  Correct.
14     THE COURT:  So my question to you is, is this
15  recording -- listening to this recording, part of the law
16  enforcement experience that Agent Hurt had before coming in
17  today?
18     MR. DePORRE:  It is.
19     THE COURT:  Okay.  Any response to that,
20  Mr. Longstreet?
21     MR. LONGSTREET:  Again, it has no relevance or
22  bearing to the issues in this particular case, what somebody
23  else means in another case doesn't have anything to do with
24  what Mr. Garza means in this particular case, so I don't see
25  how it's relevant to the issues.

```
 1              THE COURT:  Okay.  Thank you.  I appreciate and
 2    understand the objection.  I'm going to overrule it, and I
 3    want to make clear the basis on which I'm going to allow that
 4    testimony for the purpose of this proceeding.  As I
 5    indicated, under Rule 702, a person can be qualified to offer
 6    opinion testimony based on experience.  And Mr. DePorre has
 7    indicated to me that he will, in a series of questions with
 8    Agent Hurt, establish that listening to this recording was
 9    something that Agent Hurt did in the ordinary course of his
10    work, and thus, that the recording and monitoring it is part
11    of the experience that, according to the government,
12    qualifies Agent Hurt to offer an opinion as to the meaning of
13    these slang terms.
14              But before we play the recording, it is probably
15    helpful for you to lay the foundation first, before you do
16    that.
17              MR. DePORRE:  Certainly, Your Honor.
18    BY MR. DePORRE:
19    Q.  Special Agent Hurt, are you involved in an investigation
20    of a murder-for-hire case against a defendant who has been
21    charged in Federal Court, named Reginald Hunter?
22    A.  Yes, sir.
23    Q.  What's your role in that case?
24    A.  I'm the agent in charge of the case, sir.
25    Q.  And as the agent in charge, have you reviewed the
```

1  recorded jail calls from Mr. Hunter to third parties?

2  A.  Yes.

3  Q.  During one of those calls, are you familiar with

4  Mr. Hunter using the word, "stick"?

5  A.  Yes.

6          MR. DePORRE:  All right.  May I play that call?

7          THE COURT:  Is there -- I mean, he's now said that.

8  Is there any reason we need to hear the call?  How long is

9  the call?

10         MR. DePORRE:  I'm going to play about, I think, 13

11  seconds.

12         THE COURT:  All right.  I can spare 13 seconds.

13         MR. DePORRE:  Thank you, Your Honor.  If

14  Ms. Szukhent would start at 5 minutes and 41 into the call.

15         (Audio recording played for the Court

16         at 12:21 p.m.)

17  BY MR. DePORRE:

18  Q.  In that call, did you hear La Kayla Marie Dunning ask

19  Regional Hunter what kind of gun it was that he was arrested

20  with?

21  A.  I did.

22  Q.  And did you hear him respond "like some sticks for

23  real"?

24  A.  Yes, sir.

25  Q.  And then did you hear her ask, "Was it an AK?"

*Jury Trial – Volume 1B • November 10, 2022*

**18**

```
 1   A.  I did.

 2   Q.  And what did he respond?

 3   A.  He said, "No."

 4   Q.  Based on your experience -- we talked a little bit about

 5   a chopper meaning an AK, specifically.  Are there any special

 6   meanings that "stick" has, based on your experience and

 7   training?

 8   A.  Yes.  Oftentimes, when the term "stick" is used, it is

 9   used for an extended magazine -- or a magazine that extends

10   beyond the grip of a pistol.

11   Q.  And have you also heard the term, "banger," used for a

12   particular type of gun?

13   A.  A particular type of gun, no.

14   Q.  Could that refer to a handgun?

15   A.  Yes.

16   Q.  Could it refer to a long gun?

17   A.  Yes.

18   Q.  And that's all based on your experience, correct?

19   A.  Correct.

20   Q.  I'd like you to take a look at what has been marked as

21   Government's Exhibit 5C.  This is trial exhibit Government

22   Exhibit 5C.

23              THE COURT:  What is it?

24              MR. DePORRE:  It's a photograph of the firearm that

25   was seized in this case.
```

```
 1              THE COURT:  Okay.
 2              MR. DePORRE:  Is it on all of the monitors?
 3              THE COURT:  It's not on mine, but I'm not sure why.
 4   Can you see it, Mr. Longstreet?
 5              MR. LONGSTREET:  I can.
 6              THE COURT:  Okay.
 7   BY MR. DePORRE:
 8   Q.  Can you see the firearm depicted in Government's
 9   Exhibit 5C?
10   A.  Yes, sir.
11   Q.  Do you recognize that firearm?
12   A.  I do.
13   Q.  Who manufactured that firearm?
14   A.  Ruger -- Sturm & Ruger.
15   Q.  What model is it?
16   A.  An EC9, nine-millimeter.
17   Q.  And I think you answered the next question.  It fires
18   nine-millimeter caliber ammunition?
19   A.  Yes, sir.
20   Q.  Have you seen -- could you turn to Government's
21   Exhibit 6B?
22              THE COURT:  Is something beeping again?
23              MR. DePORRE:  May I approach, Your Honor?
24              THE COURT:  Yeah.  Is that what was beeping?
25              MR. DePORRE:  Yes.
```

 1          THE COURT:  Okay.

 2  BY MR. DePORRE:

 3  Q.  Do you see the magazine in this case?

 4  A.  Yes, sir.

 5  Q.  And is this magazine a -- does it have any unique

 6  attributes?

 7  A.  The only unique attribute I would see is that it has the

 8  magazine extension for making the grip larger.  So the black

 9  piece that is on top of the butt plate, that would go down

10  over the actual magazine itself, would give you a longer

11  grip, for probably the pinkie finger of the shooter's hand.

12  Q.  And would you go back to 5C, Ms. Szukhent?

13          A typical magazine for an EC9, that was the type of

14  firearm this is, correct?

15  A.  Yes, sir.

16  Q.  Where would that magazine end generally?

17  A.  You can see above where that extension would be, and I

18  would guess that the manufacturer that, when it was sold,

19  would end flush with the bottom of that -- where the grip

20  actually stops at the bottom, where it meets that extension.

21          THE COURT:  Do you know that or are you just

22  guessing?

23  A.  I would guess at this point.  I don't know that for a

24  fact.

25  BY MR. DePORRE:

*Jury Trial - Volume 1B • November 10, 2022*

**21**

1   Q.  Are you familiar with most handguns?

2   A.  Yes.

3   Q.  And do most handguns -- do you know, for a fact, that

4   most handguns have a magazine, that the manufacturer makes,

5   that fits flush with the grip?

6   A.  Yes.

7          MR. DePORRE:  At this point, I would ask

8   Ms. Szukhent to play Government's Exhibit 11B.  This is a

9   transcript of Mr. Garza's call with Madison Merrill.

10          THE COURT:  Is this the one attached to your trial

11   brief?

12          MR. DePORRE:  It is a portion of it, yes.  It is a

13   very small portion of that call.

14          THE COURT:  Okay.

15          (Audio recording played for the Court

16          at 12:27 p.m.)

17          MR. DePORRE:  All right.  Ms. Szukhent, would you

18   also play the full call, and begin at 5 minutes

19   and 40 seconds into the call.

20          (Audio recording played for the Court

21          at 12:27 p.m.)

22          MR. DePORRE:  You can stop it.

23   BY MR. DePORRE:

24   Q.  Special Agent Hurt, have you listened to the entire call

25   that was just played, you know, a portion of it here in court

1  today?

2  A.   Yes.

3  Q.   And are you familiar with the term, "whip"?

4  A.   Yes.

5  Q.   What is a "whip"?

6  A.   It's usually referred to as a vehicle or a car.

7  Q.   Okay.  And how are you familiar with that term, "whip"?

8  A.   I've heard it used countless times from -- over the

9  course of my career.

10  Q.   When you heard the words, "stick" and "banger," in this

11  calls -- in these calls -- or these excerpts of calls, what

12  is your opinion about the meaning of the word, "banger,"

13  first?

14  A.   The meaning, banger would be a firearm.

15  Q.   And what is your opinion about the meaning of "stick"?

16  A.   In that call, listening to it, it actually said,

17  "there's a stick in the banger," so it would mean to me that

18  it was the magazine protruding from the bottom of the grip,

19  meaning the stick in the banger, which is the magazine in the

20  firearm.

21  Q.   And all of that is based on your experience and training

22  with listening to different calls and different people

23  describing firearms to you over the course of your law

24  enforcement career?

25  A.   Yes, sir.

```
 1          MR. DePORRE:  All right.  I have no further
 2   questions.
 3          THE COURT:  Mr. Longstreet, before you ask your
 4   questions, I have a few questions I want to ask.
 5          Agent Hurt, you were asked about your experience
 6   and you gave a fair bit of testimony about that, and you
 7   talked about hearing these terms used, "heater," "stick,"
 8   "banger," and that based on your experience, you understand
 9   those terms to refer to firearms, right?
10   A.  Correct.
11          THE COURT:  So when Mr. DePorre played the first
12   recording, that was a recording in which I can understand how
13   somebody listening to that as part of their duties, you,
14   would conclude that the term -- I think it was "stick" that
15   was used in that recording?
16   A.  Correct.
17          THE COURT:  I can understand how you would regard
18   that term, "stick," as used is referring to a gun, because in
19   the context of that discussion itself, if you were listening
20   to it, the context would indicate to you that's what the
21   speaker meant.
22          Help me understand how, in the other times when
23   folks were using the term, "heater" or "banger" or "stick,"
24   you were able to understand that they were referring to a
25   firearm.  Was it in a similar conversation where they
```

```
 1  specifically said a name of a firearm and then used the term,
 2  "stick," as a synonym?  Was it in an interaction where they
 3  pointed at a firearm and used the term, "stick" or "banger"?
 4  In other words, help me understand what aspect of your
 5  experience allowed you to conclude that when somebody was
 6  using the term, "stick" or "banger," they were connecting it
 7  to a firearm?
 8          Was my question, in any way, clear?  That was my
 9  best effort.
10  A.  Yes, I got it.  So through the course of our duties, we
11  do a lot of controlled purchases with confidential informants
12  and such, and oftentimes a confidential informant and I will
13  talk and they'll say he's got "sticks on deck" or "sticks for
14  sale."  And that means -- and I'll ask them to elaborate, and
15  they'll show me pictures of sticks that were sent to them for
16  sale, and, more often than not, they do have the extended
17  magazine.  And I've had them break that down and tell me what
18  a lot of slang terms for firearms mean, that before my time
19  in Flint, I probably wasn't accustom to, so --
20          THE COURT:  If I am understanding you correctly,
21  the part of your experience with informants that is relevant
22  here, is you've had informants show you a photo of a firearm
23  and used the term, "stick," to describe the contents of the
24  photo?
25  A.  Oftentimes.
```

1          THE COURT:  What about -- you mentioned that your

2     interaction with witnesses is part of the experience that

3     helps you form an opinion that a reference to a "stick" or a

4     "banger" is to a firearm.  Can you help me understand the

5     interactions you've had with witnesses that is relevant here?

6     A.   I have spoken with witnesses on numerous shooting scenes

7     that have said so-and-so had a stick and returned fire before

8     fleeing.  I was at a shooting scene yesterday, where I

9     believe the term, "stick," was used, when shots were being

10    fired into a vehicle in a neighborhood in the City of Flint.

11         THE COURT:  So if I'm understanding you correctly,

12    are you saying that in your -- in repeated conversations that

13    you've had with witnesses, the context in which those

14    witnesses have used the terms, "stick" and "banger," has

15    indicated to you that they must have been referring to a

16    firearm?

17    A.   On numerous occasions, yes.

18         THE COURT:  All right.  And the context, just so I

19    understand it, is, are you saying that they are referencing

20    "stick" or "banger" as firing bullets, that's one way?

21    A.   So the stick, more often than not, refers to the

22    extended magazine that goes into the banger --

23         THE COURT:  Right.

24    A.   -- which would then, obviously, fire the bullet, but

25    yes.

1  THE COURT:  But the references to "sticks" and

2  "bangers" are in the context of bullets being fired, is that

3  what you are saying?

4  A.  Correct, yes, sir.

5  THE COURT:  What about victims?  What experience

6  have you had with victims that enables you to understand that

7  when they are using those terms, they are referring to a

8  firearm?

9  A.  I've spoken with countless shooting victims that have

10  used those terms to explain to me how they were shot with a

11  stick or a banger or a firearm or the like.

12  THE COURT:  And they've tied those terms to the

13  device that was doing the shooting, is that what you're

14  saying?

15  A.  Yes, sir.

16  THE COURT:  I think you also mentioned recorded

17  jail calls and we heard this one, where, as I said, I

18  understand how somebody listening to that call could conclude

19  that the reference to stick or banger, whatever was in that

20  call, is referring to a firearm, because it was in the

21  context of somebody else using a proper name for a firearm.

22  Have other jail calls been like that,

23  where -- how -- let me try this a different way.

24  If I listened to a jail call and somebody just

25  threw out the word, "banger" or "stick," unless there was

```
 1   some context, I wouldn't know what they were talking about.
 2   Can you help me understand the type of context of these other
 3   calls that you listened to, that enabled you to conclude that
 4   references to stick or banger were to a firearm?
 5   A.   A lot of the time, through the course of my
 6   investigative career, it's been the vast majority of the
 7   crime I have investigated have been violent crimes, usually
 8   involving a firearm.  So when I first started -- it takes a
 9   while, I guess is what I'm saying.  It takes practice and it
10   takes talking to CIs and talking to witnesses and talking to
11   victims, and after a while, you start picking up the terms
12   and the terminology.
13        THE COURT:  Let me ask a better question.  When you
14   listen to these recorded jail calls, were others of those
15   calls like this one, where the use of the term, "stick" or
16   "banger," was in connection with an unmistakable, explicit
17   reference to a firearm?
18   A.   Numerous calls.
19        THE COURT:  Okay.  I'm all set with my questions.
20        MR. LONGSTREET:  Thank you.
21                      CROSS-EXAMINATION
22   BY MR. LONGSTREET:
23   Q.   Is it detective, sergeant, agent; what's your title?
24   A.   Agent is fine.
25   Q.   Agent.  All right.  Sir, you had an opportunity to
```

 1    listen to the phone call associated with the case, with

 2    Mr. Noe Garza; is that correct?

 3    A.  Correct.

 4    Q.  All right.  And in that particular phone call, you hear

 5    the word, "banger," used on multiple occasions; is that

 6    correct?

 7    A.  Yes, sir.

 8    Q.  Okay.  And in that particular phone call, when the word,

 9    "banger," is used, it's not necessarily referring to a gun,

10    is it?

11    A.  In my opinion, it is, yes.

12    Q.  So when he says, "I'm about to bang on them niggers,"

13    does that mean he's about to shoot at them or he's about to

14    fight them?

15    A.  It made it sound like when he was trying to get out, and

16    made it sound like he was going to bang on them, as in shoot

17    at them.

18    Q.  Okay.  But can't, also, a person getting into a

19    fistfight mean, I'm banging on somebody?

20    A.  You could, yes.

21    Q.  Okay.  Have sex with a woman, you could be banging on

22    her?

23    A.  Yes.

24    Q.  Okay.  There's other -- banger doesn't always

25    necessarily mean gun, correct?

```
 1   A.   Correct.
 2   Q.   It also means good music; that song was a banger?
 3   A.   Yes, sir.
 4   Q.   So the meaning of the word is, ultimately, in regards to
 5   how it's being used?
 6   A.   Say that again, sir.
 7   Q.   The meaning of a word is sometimes depending on how the
 8   word is being used?
 9   A.   Yes, sir.
10   Q.   Okay.  Now, in the phone call we previously listened to,
11   referring to your murder investigation, the person who was
12   referring to a gun said "gun," correct?
13   A.   He said, "stick."
14   Q.   Okay.  I'm talking about the woman.
15   A.   I believe so, yes.
16   Q.   And he says, "some sticks or something"; is that
17   correct?
18   A.   Yes, sir.
19   Q.   Now, also, you indicated that a stick was a firearm with
20   an extended clip; is that correct?
21   A.   A magazine, yes.
22   Q.   Okay.  But not every time a person is talking about a
23   stick are they referring to an extended clip?
24   A.   I would agree.
25   Q.   Okay.  They could be talking about a gun itself,
```

1   correct?

2   A.   Correct.

3   Q.   Okay.  Or it could be talking about a machete?

4   A.   I've never heard a machete referred to as a --

5   Q.   How about a stick?

6   A.   A --

7   Q.   A stick is a stick, right?

8   A.   Yes, sir.

9   Q.   So a stick doesn't necessarily mean gun, correct?

10   A.   Correct.

11   Q.   All right.  Now, during your time and experience, have

12   you ever heard of or referred someone -- or

13   referred -- someone refer to gun or banger and not be talking

14   about a firearm?

15        THE COURT:  You said, gun.

16        MR. LONGSTREET:  I did.  Let me rephrase my

17   question.  Strike that.

18   BY MR. LONGSTREET:

19   Q.   Have there been times, during your time as an officer,

20   that you referred -- heard someone refer to banger and not be

21   talking about a gun?

22   A.   I haven't -- the context that you just talked about,

23   like a banger of a song or something like that, I have, yes.

24   Q.   And you also heard a conversation or where people talked

25   about sticks and weren't talking about a gun?

1  A.  Usually, in the context of my work, a stick is usually

2  referred to as a gun or a firearm.

3  Q.  But it doesn't necessarily have to mean gun, correct?

4  A.  Correct.

5  Q.  What, if any, special training or experience did

6  you -- have you received, in your time as a police officer,

7  that indicates to you that gives definitions of slang terms?

8  A.  I would say, no formal training in slang terms.

9  Q.  Just simply how certain people use those particular

10  words, correct?

11  A.  Correct.

12  Q.  Okay.  And would you say language is also regional, so

13  banger might mean something one place, but it means something

14  else someplace else?

15  A.  It could.

16  Q.  Okay.  So ultimately, the meaning of a word is up to a

17  person's particular interpretation; would that be correct?

18  A.  I would agree.

19  Q.  And that would be your interpretation of what that word

20  means, not necessarily what the speaker actually meant.

21  Would you agree with that?

22  A.  It could be.

23         MR. LONGSTREET:  Thank you.  Nothing further.

24         THE COURT:  Any other questions, Mr. DePorre?

25         MR. DePORRE:  Just one.

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | REDIRECT EXAMINATION                                                    |
| 2  | BY MR. DePORRE:                                                         |
| 3  | Q.  Of the years you've been in law enforcement, how many of           |
| 4  | those years have been spent in Michigan?                                |
| 5  | A.  All of them.                                                        |
| 6  | Q.  And of the years you've been in law enforcement, how               |
| 7  | many have been in Flint?                                                |
| 8  | A.  Ten, approximately.                                                 |
| 9  | Q.  And how many have been in Lansing?                                  |
| 10 | A.  An additional one -- one and a half.                               |
| 11 | Q.  Well, in the Lansing area.                                          |
| 12 | A.  Four.                                                               |
| 13 | Q.  Were you assigned anywhere besides Flint and Lansing?              |
| 14 | A.  With the State Police?                                              |
| 15 | Q.  With the State Police, Grand Ledge, Lansing area, metro            |
| 16 | areas, at any point with ATF or the State Police?                      |
| 17 | A.  No, sir.                                                            |
| 18 |       MR. DePORRE:  I have no further questions.                        |
| 19 |       THE COURT:  Mr. Longstreet, any follow-up?                        |
| 20 |       MR. LONGSTREET:  No.                                              |
| 21 |       THE COURT:  Thank you.  You may step down.  Thank                 |
| 22 | you for your time today.                                                |
| 23 |       (Witness excused at 12:40 p.m.)                                   |
| 24 |       THE COURT:  Do you want to offer any testimony that              |
| 25 | he was qualified to offer opinion about the meaning of                  |

 1   "stick" and "banger"?

 2              MR. DePORRE:  Very briefly.  What we are really

 3   focusing on is whether or not Mr. Hurt's experience qualifies

 4   him to offer an opinion about those meanings.  And he's

 5   testified that he has heard those terms specifically

 6   referencing firearms, that he's heard that term, "stick,"

 7   specifically referencing a firearm with an extended magazine

 8   on numerous occasions and in various contexts.  And so the

 9   government does maintain that he's qualified to offer an

10   opinion as to this case, with respect to the meaning of

11   "stick" and "banger."

12              Certainly, that's not going to be the ultimate

13   issue for -- you know, the jury will have to conclude whether

14   or not he's able to -- whether or not they agree with his

15   opinion and that's a jury question, but I do believe that he

16   meets the threshold burden to offer that opinion today.

17              THE COURT:  Okay.  Thank you.

18              Mr. Longstreet, your response?

19              MR. LONGSTREET:  The defense disagrees --

20              THE COURT:  Would you mind coming to this

21   microphone?

22              MR. LONGSTREET:  Very good.

23              THE COURT:  It is easier on your neck and we can

24   hear you better.

25              MR. LONGSTREET:  The defense respectfully disagrees

1     with the prosecutor's -- the government's position that

2     the -- this agent is qualified to testify as to the

3     particular meaning of words.  Clearly, the meaning of a word

4     is ultimately determined by the speaker and also the context

5     of which the word is being used.

6              This officer can testify as to what his

7     opinion -- what he believes that word to mean, but

8     ultimately, the meaning of that word and the determination of

9     that word should be determined by the jury.

10             I don't think, at this point, that the government

11    has put on enough evidence, at this point, to suggest that

12    this officer's experiences, along with any of his specialized

13    training or education, provides him specialized knowledge to

14    assist the trier of fact in regard to what "banger" or

15    "stick" means, seeing as how, in this particular phone call

16    with Mr. Garza, the word, "banger," is used multiple times,

17    not necessarily meaning shoot and/or gun.  Also, the officer

18    testified that those words can be used in context and not

19    necessarily mean a firearm.

20             I think it should be left up to the jury to

21    determine what that word means, and the officer should not be

22    allowed to simply say what it means.

23             Thank you.

24             THE COURT:  Okay.  Thank you very much for your

25    thoughts, Mr. Longstreet.

1       I'm persuaded that the government has established

2   that Agent Hurt is qualified to offer the opinion testimony.

3   Again, the step one is from *Kilpatrick,* where the

4   Sixth Circuit says, "Courts often qualify law enforcement

5   officers as expert witnesses under Rule 702, to interpret

6   intercepted conversations that use slang, street language and

7   jargon of the illegal drug trade."

8       So then we have to ask, is Agent Hurt the type of

9   witness who is qualified?  And Rule 702 offers a number of

10  different ways that a witness can be qualified.  One is by

11  experience.

12      And I'm satisfied that Agent Hurt's answers to my

13  questions, particularly the ones where I probed in some

14  detail about the nature of his experience, I'm satisfied that

15  his experience qualifies him to offer the opinion that

16  "banger" and "stick" are references to firearms.

17      Agent Hurt offered four sources of experience that

18  would, in my view, be relevant to his qualifications to offer

19  that opinion.  The first was his experience with numerous

20  informants.  And I asked him, how did you know that when the

21  informants were using the term, "banger" or "stick," they

22  were referring to a firearm?  And he gave an answer to that

23  question.  He explained that it was not uncommon for them to

24  refer to photos and point to a firearm.  So that would be an

25  experience that he has, repeatedly, where the terms are being

1  connected expressly to firearms.

2        He gave a similar answer when I asked him about how

3  his interactions with witnesses led him to conclude that when

4  they referring to a "stick" or "banger," they were referring

5  to a firearm.

6        He did the same with victims, telling me that

7  victims would use that term and explicitly connect it to

8  somebody firing bullets.

9        And with respect to jail calls and recorded calls,

10  he mentioned that there were many that he listened to that,

11  like the one that Mr. DePorre played from a different case,

12  in many of these calls, there were expressed connections

13  between the terms "stick" and "banger" and firearms.

14        So in my view, Agent Hurt has sufficient

15  qualifications to offer the opinions on the meaning of

16  "stick" and "banger" as used in the recorded calls that the

17  government intends to offer him for.

18        Mr. Longstreet, as you always do, you have raised a

19  number of serious arguments, and I think the testimony that

20  you elicited today, if you elicit it before the jury, will

21  give you a number of arguments available to the defense when

22  you are arguing to the jury to try to undermine the force of

23  the testimony.  And I agree with you that, ultimately, this

24  will be the question for the jury, and you will have many

25  arguments available to you to suggest that, notwithstanding

```
 1   Agent Hurt's testimony, "stick" and "banger" didn't mean gun
 2   here, and you will presumably be able to elicit from him, in
 3   front of the jury, many of the acknowledgements that he made
 4   here, during your cross-examination.
 5         So I think that that is the appropriate way to deal
 6   with this.  I can't remember if this was Mr. DePorre's motion
 7   to offer this testimony or --
 8         MR. LONGSTREET:  It was my motion to exclude.
 9         THE COURT:  It was the motion to exclude.  So the
10   motion to exclude will be denied, and I will permit the
11   government to offer the opinion testimony from Agent Hurt
12   with respect to his interpretation of the terms "stick" and
13   "banger" as used on the recorded telephone calls.
14         So when we get to Agent Hurt's testimony in front
15   of the jury, rather than rehash this argument which we've
16   created, as you guys know, in the Sixth Circuit, we don't
17   formally move to qualify somebody as experts.  Mr. DePorre,
18   the proper procedure in a Sixth Circuit published case
19   written by Judge Lawson sitting up there, is for you to call
20   Agent Hurt to lay the foundation that was laid today, in
21   terms of how his experience qualifies him.  And if -- and you
22   can tender him to offer an opinion, and at that point, the
23   defense can simply say you renew your objections from Friday,
24   I will overrule them, and we will move on.  That way the
25   issue is preserved and we have proceeded in the appropriate
```

```
 1    way.

 2              Are you okay proceeding that way, Mr. DePorre?

 3              MR. DePORRE:  Yes, Your Honor.  Thank you.

 4              THE COURT:  Mr. Longstreet?

 5              MR. LONGSTREET:  Yes.

 6              THE COURT:  Okay.  All right.

 7              (Court recessed at 12:48 p.m.)

 8                          _   _   _

 9                   C E R T I F I C A T I O N

10              I, Robert L. Smith, Official Court Reporter of the
      United States District Court, Eastern District of Michigan,
11    appointed pursuant to the provisions of Title 28, United
      States Code, Section 753, do hereby certify that the
12    foregoing pages comprise a full, true and correct transcript
      taken in the matter of USA vs. NOE GARZA, Case No. 21-20405,
13    on Thursday, November 10, 2022.

14
                        s/Robert L. Smith
15                      Robert L. Smith, RPR, CSR 5098
                        Federal Official Court Reporter
16                      United States District Court
                        Eastern District of Michigan
17
18    Date:  07/22/2023
      Detroit, Michigan
19

20

21

22

23

24

25
```