1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MICHIGAN
2                 SOUTHERN DIVISION

3                   —   —   —

    UNITED STATES OF AMERICA,
4
            Plaintiff,
5
     v.                              Case No. 21-20405
6
    NOE GARZA,                       Hon. Matthew F. Leitman
7
            Defendant.
8   _____/

9               JURY TRIAL – Volume 2

10      BEFORE THE HONORABLE MATTHEW F. LEITMAN
            United States District Judge
11      Theodore Levin United States Courthouse
            231 West Lafayette Boulevard
12               Detroit, Michigan
            Tuesday, November 14, 2022
13

14  APPEARANCES:

15  For the Plaintiff:      JULES M. DEPORRE
                            UNITED STATES ATTORNEY'S OFFICE
16                          600 Church Street
                            Flint, MI 48502
17                          (810) 766-5177

18  Also Present:           Jessica Szukhent,
                            United States Attorney's Office
19

20  For the Defendant:      CHARLES O. LONGSTREET, II
                            LONGSTREET LAW FIRM, PLLC
21                          18971 Livernois
                            Detroit, MI 48221
22                          (313) 288-0103

23

24      *To obtain a copy of this official transcript, contact:*
        *Robert L. Smith, Federal Official Court Reporter*
25          *(313) 234-2612 • robert_smith@mied.uscourts.gov*

Case 4:21-cr-20405-MFL-CI   ECF No. 72, PageID.729   Filed 07/23/23   Page 2 of 191
*Jury Trial - Volume 2 • November 14, 2022*

2

1

TABLE OF CONTENTS

2

MATTER                                                          PAGE

3

JURY SWORN.......................................... 13

4

PRELIMINARY JURY INSTRUCTIONS....................... 13

5

OPENING STATEMENTS
by Mr. DePorre...................................... 22

6

by Mr. Longstreet................................... 28

7

WITNESSES:
OFFICER STEVEN FISHER

8

Direct Examination by Mr. DePorre................... 36
Cross-Examination by Mr. Longstreet................. 69

9

Redirect Examination by Mr. DePorre................. 86
Recross-Examination by Mr. Longstreet............... 93

10

CHELSEA CORTEZ

11

Direct Examination by Mr. DePorre................... 95
Cross-Examination by Mr. Longstreet................100

12

Redirect Examination by Mr. DePorre................103
Recross-Examination by Mr. Longstreet..............105

13

Redirect Examination by Mr. DePorre................107

14

OFFICER ANDREW GROCHOLSKI
Direct Examination by Mr. DePorre..................108

15

Cross-Examination by Mr. Longstreet................112

16

ROBERT HUTCHINS
Direct Examination by Mr. DePorre..................119

17

Cross-Examination by Mr. Longstreet................130
Redirect Examination by Mr. DePorre................135

18

Recross-Examination by Mr. Longstreet..............136

19

AGENT DUSTIN HURT
Direct Examination by Mr. DePorre..................138

20

Cross-Examination by Mr. Longstreet................145
Redirect Examination by Mr. DePorre................150

21

Recross-Examination by Mr. Longstreet..............150

22

COURTNEY SELVIA
Direct Examination by Mr. DePorre..................152

23

Cross-Examination by Mr. Longstreet................158
Redirect Examination by Mr. DePorre................161

24

Recross-Examination by Mr. Longstreet..............163
Redirect Examination by Mr. DePorre................164

25

TABLE OF CONTENTS (Continued)

MATTER                                                          PAGE

WITNESSES: (Continued)
OFFICER BRETT ORVIS
Direct Examination by Mr. DePorre...................165
Cross-Examination by Mr. Longstreet................172

GOVERNMENT RESTS...................................180

RULE 29 MOTION....................................180


| EXHIBITS: | Offered | Received |
|---|---|---|
| Government's Exhibit 1A | 42 | 42 |
| Government's Exhibit 1B | 43 | 43 |
| Government's Exhibit 2A | 46 | 46 |
| Government's Exhibit 2B | 47 | 47 |
| Government's Exhibit 3A & 3B | 48 | 48 |
| Government's Exhibit 3C | 49 | 50 |
| Government's Exhibit 4A, 4B & 4C | 53 | 53 |
| Government's Exhibit 5A, 5B, 5C & 5D | 60 | 60 |
| Government's Exhibit 5E | 64 | 64 |
| Government's Exhibit 5F | 63 | 64 |
| Government's Exhibit 6A | 66 | 67 |
| Government's Exhibit 6B | 67 | 67 |
| Government's Exhibit 7 | 117 | 117 |
| Government's Exhibit 8 | 99 | 99 |
| Government's Exhibit 9, 10A, 10B, 11A, 11B & 11C | 117 | 117 |
| Defendant's Exhibit A | 159 | 159 |

```
 1 ┃ Detroit, Michigan
 2 ┃ Monday, November 14, 2022
 3 ┃ at about 9:05 a.m.
 4 ┃                        —   —   —
 5 ┃        THE CASE MANAGER:  All rise.
 6 ┃        The United States District Court for the Eastern
 7 ┃ District of Michigan is now in session, the Honorable
 8 ┃ Matthew F. Leitman, United States District Judge, presiding.
 9 ┃        You may be seated.
10 ┃        The Court calls Case No. 21-20405, United States of
11 ┃ America v. Noe Garza.
12 ┃        Counsel, please your state appearances for the
13 ┃ record.
14 ┃        MR. DePORRE:  Good morning, Your Honor.
15 ┃ Jules DePorre on behalf of the United States.
16 ┃        THE COURT:  Good morning.  Welcome.
17 ┃        MR. LONGSTREET:  Good morning, Your Honor.  May it
18 ┃ please this Honorable Court, Attorney Charles Oliver
19 ┃ Longstreet, II, P68205, appearing on behalf of Mr. Noe Garza,
20 ┃ who is seated and present to my left.
21 ┃        THE COURT:  Good morning.  Welcome to both of you.
22 ┃ Please be seated.
23 ┃        We are here this morning to begin our trial.  We
24 ┃ had a couple preliminary matters to discuss that were raised
25 ┃ in the government's trial brief.
```

1          Let me ask, Ms. Ryan, do we have our jury yet?

2          THE CASE MANAGER:  We do.

3          THE COURT:  Then I want to be as efficient as we

4     can with the jury ready to go.

5          The two issues in the trial brief related to the

6     government's -- what they call intent to introduce res gestae

7     evidence and the issue with respect to the tape recording or

8     statements during interviews.

9          Basically, the government was raising an issue with

10    respect to whether Mr. Garza could introduce his own

11    statements.

12         Can we put off that issue?  It seems to me that

13    issue would come up later on.  Do we need to address that

14    now?

15         MR. DePORRE:  With the second issue regarding his

16    own statements?

17         THE COURT:  Yes.

18         MR. DePORRE:  No.  I've spoken with Mr. Longstreet,

19    and I think it's fair to characterize that he agrees with the

20    government's position in the trial brief on that issue.

21         THE COURT:  Mr. Longstreet; is that correct?

22         MR. LONGSTREET:  To a degree, yes.

23         THE COURT:  Is there any degree that we should be

24    talking about?  Let me put it this way, if we get to a point

25    in the trial where you feel you need to try to elicit a

1    statement that Mr. Garza made that wasn't brought out by the

2    government, ask for a sidebar and we'll take it up there.

3              MR. LONGSTREET:  Very good.  Thank you.

4              THE COURT:  So absent a ruling from me to the

5    contrary, I'm going to assume we are going to hear no

6    questions by you eliciting Mr. Garza's statements.  Good?

7              MR. LONGSTREET:  Yes.

8              THE COURT:  Okay.  I'm concerned you're hurting

9    your neck by doing that, so you guys can sit down.

10             What about the res gestae evidence, did you discuss

11   that?

12             MR. DePORRE:  We have not.

13             THE COURT:  Okay.  So I just want to get a better

14   understanding of what res gestae evidence you are looking to

15   admit.  Basically, how the officer came to be at the Meijer?

16             MR. DePORRE:  Correct.  So how the officer came to

17   be at the Meijer that morning, which has absolutely nothing

18   to do with the underlying facts of the case.  The officer was

19   there -- I just want to make sure witnesses are sequestered.

20             The officer was there to investigate an unrelated

21   shoplifting complaint.  While he was in the store, he

22   received reports that there was ongoing shoplifting.  He went

23   to investigate that and followed -- or went to approach

24   somebody in a white Pontiac Grand Prix that had supposedly

25   been shoplifting at Meijer.

1    THE COURT:  That's the res gestae evidence that

2  you're talking about?

3    MR. DePORRE:  That's part it.  I -- also, as I was

4  preparing more, I wanted to mention a little bit -- during

5  the interview with the defendant, he talked a little bit

6  about selling marijuana and processing what's called keif,

7  using marijuana, and he had butane in his car to make

8  marijuana wax.  None of these things are charged.  They are

9  all -- they are all legal under state law, and so those are

10  also items that I wanted to develop in testimony, because

11  there integral to his ownership of the car, since that's

12  where the keif was, that's where the butane was and so forth.

13    THE COURT:  I want to make sure I understand,

14  you're saying that the government's theory here is that at

15  some point during a conversation with law enforcement,

16  Mr. Garza acknowledged possessing butane and making keif.

17  And then your position is both of those things were found in

18  the car, so you intend to use the discovery of those things

19  in the car, coupled with his statements, to establish his

20  ownership and control of the car?

21    MR. DePORRE:  That's correct.

22    THE COURT:  All right.  Mr. Longstreet.

23    MR. LONGSTREET:  Defense believes, pursuant to 403,

24  that that's needless presentation of evidence.  That simply

25  confuses the issues.  The defense doesn't believe that the

1    evidence of marijuana and/or the keif or my client's attempt

2    to make marijuana wax, which is legal under state law, is

3    relevant to any issue in this case.  It just simply confuses

4    the jury as to what is legal and what is illegal and what the

5    true issues in the case are.

6           The question is whether he was in possession of

7    Suboxone that was in his pocket, and whether he was in

8    possession of a firearm that was under the hood of the car.

9    The fact that there was marijuana and butane and, I believe

10   it was marijuana shake that was present inside of a bag

11   inside of the car, has no relevance as to whether he

12   possessed, with the intent to deliver, Suboxone --

13           THE COURT:  Mr. Longstreet --

14           MR. LONGSTREET:  -- that was in his6pocket pock.

15           THE COURT:  I certainly understand your point.

16   When we were together on Friday, and maybe I misunderstood

17   you, I thought that you were going to challenge Mr. Garza's

18   ownership of the car, and that this witness who you guys were

19   trying to subpoena at the last minute, my understanding was a

20   witness who would be supporting your attempt to disassociate

21   Mr. Garza from ownership of car.  Am I correct about that?

22           MR. LONGSTREET:  That is correct.

23           THE COURT:  All right.  If you guys are going to be

24   taking the position that he doesn't own the car, why isn't it

25   fair for the government to make every effort -- let me try it

1    this way.  It sounds to me like you're going to make an
2    effort to disconnect him from the car.  Given that, why isn't
3    it fair to try for the government to try to connect him to
4    the car?

5            MR. LONGSTREET:  Of course -- let me use my outside
6    voice.  Of course, the government can use any evidence that
7    they believe is factual towards whether my client owns the
8    car, but we believe, under 403, that that particular piece of
9    evidence, the possession of marijuana inside of a bag inside
10   of a car, doesn't lend a person to believe that he is the
11   owner of the car.  There were multiple items that were found
12   inside of the car, some owned by Mr. Reggie Allen, some owned
13   by Robert Hutchins, some of it owned by Noe Garza.
14   Collectively, everybody had something inside the car that
15   they owned.  So how does this particular item, a bag with
16   marijuana in it, that he says belongs to him, how does that
17   suggest that he actually owns the car, too, when everybody in
18   the car had something in the car?

19           Then I would suggest that if Reggie Allen had an
20   item in the car, then Reggie Allen owns it.  If Mr. Hutchins
21   had an item in the car, then he owns it.

22           THE COURT:  Look, I certainly understand the force
23   of your argument that finding a bag of somebody's weed in the
24   car, standing alone, doesn't establish ownership.  My
25   understanding is that Mr. DePorre will try to put together

1    several pieces of evidence to show Garza's ownership and

2    control over the vehicle, and that this would be one piece in

3    this puzzle.  Is that right, Mr. DePorre?

4              MR. DePORRE:  That is correct.  And for what it's

5    worth, like, the butane was in the trunk of the car.  So the

6    other items that were owned by a passenger were not in the

7    trunk of the vehicle.

8              THE COURT:  Let me ask you this:  Mr. DePorre, in

9    your argument to the jury, to the extent that you're

10   referencing this evidence in your argument that you're going

11   elicit, do you have any problem saying, when you reference

12   this, we're not claiming that he violated any marijuana laws,

13   we're only offering this evidence to show you that he owned

14   or controlled the vehicle?  Do you have any problem --

15             MR. DePORRE:  I have no problem with that at all.

16   And I actually think it would be more meaningful if it came

17   from the Court, in terms of there's an instruction that the

18   defendant is only on trial for the charges here.  We could

19   add a sentence to say, you have heard evidence that he

20   possessed marijuana, that has nothing to do with what the

21   jury has to consider, and I think that would really insulate

22   us on appeal.

23             THE COURT:  Mr. Longstreet, anything else?

24             MR. LONGSTREET:  No.

25             THE COURT:  Okay.  Thank you.  I understand and

1    appreciate the 403 objection to that evidence.  I'm going to

2    overrule it.  I think that the evidence of these items found

3    in the vehicle, when coupled with Mr. Garza's statements in

4    the manner that Mr. DePorre proposes, is one piece of

5    evidence that, reasonably, the government could use in a

6    constellation of evidence that tries to connect Mr. Garza to

7    the ownership and/or control of the vehicle.

8            Mr. Longstreet's point is well taken that this one

9    piece of evidence, standing alone, wouldn't establish

10   ownership or control, but I think as part of a bigger picture

11   of evidence, it could be one meaningful piece of the puzzle.

12   I don't think the unfair prejudice substantially outweighs

13   the probative value of the evidence, and to make sure that

14   doesn't happen, we will do two things.  Mr. DePorre has

15   agreed, if and to the extent that he mentions this butane and

16   keif in his argument to the jury, he will highlight that he's

17   not on trial for that and they're not suggesting that that

18   possession was unlawful, and we'll work to come up with an

19   instruction that I give the jury where I repeat the same

20   point.  So I think under those circumstances, we're not going

21   to have a 403 problem, and I will overrule the objection, but

22   I appreciate it.

23           Anything else that we urgently need to take up

24   before we need in our jurors, Mr. DePorre?

25           MR. DePORRE:  Not from the government.

1          THE COURT:  Mr. Longstreet.

2          MR. LONGSTREET:  Nothing on behalf of the defense.

3          THE COURT:  So here's what we will do:  We will

4    bring in the jury, I have a brief set of preliminary

5    instructions, and then each of you guys will give your

6    opening statement, and we'll begin with the government's

7    first witness.

8          For both of you, could I ask, Mr. DePorre, that you

9    physically turn the podium there, so it faces the jury, and,

10   again, I would ask both of you to please stay at the podium

11   while you are speaking to the jury, so that Mr. Smith can

12   capture everything you say on the microphone and the jury can

13   hear it more easily, as well.

14         With that, we will bring in our jury.

15         MR. DePORRE:  Judge, if it is okay, can I move the

16   podium --

17         THE COURT:  Go ahead.

18         MR. DePORRE:  -- so I'm not fumbling.

19         MR. LONGSTREET:  One question, do you have access

20   to an HDMI cord?

21         MS. SZUHKENT:  Uh-huh.  Do you need it?

22         MR. LONGSTREET:  I will.

23         MS. SZUHKENT:  Do you need it for your opening?

24         MR. DePORRE:  You can take it now.

25         THE CASE MANAGER:  All rise for the jury.

*Jury Trial – Volume 2 • November 14, 2022*

**13**

```
 1                (Jury entered at 9:17 a.m.)
 2           THE COURT:  Please be seated.  Ladies and gentlemen
 3    welcome back.  It's nice to see you.  I hope you had a
 4    restful weekend.
 5           Our first order of business is to administer the
 6    juror oath to you, and Ms. Ryan will do that right now.
 7           THE CASE MANAGER:  Please stand and raise your
 8    right hand.
 9           Do you solemnly swear or affirm that you will well
10    and truly try the issues now here pending, and a true verdict
11    render, according to both of the law and evidence given to
12    you in open court, so help you God?
13           THE JURY:  (Collectively) I do.
14           THE CASE MANAGER:  Thank you.
15           THE COURT:  Thank you.  Ladies and gentlemen of the
16    jury, here's our agenda for this morning.  I'm going to begin
17    by giving you a short set of preliminary instructions, and
18    then Mr. DePorre will offer the opening statement on behalf
19    of the government, and Mr. Longstreet will offer the opening
20    statement on behalf of Mr. Garza, and then we will begin with
21    the testimony from witnesses, so please listen carefully.
22           Ladies and gentlemen, what I want to do now is talk
23    to you about the functions that I play as a judge and that
24    you guys play as a jury in the trial, and talk to you a
25    little bit about the order of the trial.
```

1          It's my responsibility to conduct this trial in an

2    orderly, fair and efficient manner, to rule upon the

3    questions of law that arise during the course of the trial,

4    and to instruct you with respect to what the law is, at the

5    end of the trial.

6          You can consider me an umpire or referee.  I have

7    no personal or professional interest in how this case turns

8    out, that is going to be up to you, the members of our jury.

9    My job is to see to it that the trial is fair, that we follow

10   the Rules of Evidence, and that I give you the correct law.

11         I want to go over some of the procedural matters

12   that will arise in our trial.  First of all, the seats that

13   you guys are in now are the seats that you are to take every

14   time you enter the courtroom.  Also, you all have juror

15   badges on and it's very important that you wear those badges

16   when you are in and around this building, because we don't

17   want anybody to mistake you for somebody else and speak to

18   you about this case.  In fact, if you were in the hallway and

19   you saw one of the lawyers, they may turn and walk the other

20   way or look at the floor and ignore you; that's exactly what

21   they should be doing, it's nothing personal.

22         Now, Mr. Smith, who is sitting in front of me, is

23   our court reporter, and he will be taking down everything

24   that is said in the courtroom, stenographically.  If it

25   becomes necessary during the course of the trial to determine

 1   what an exact question was or what the exact answer was, he

 2   will be able to go back and locate that question and answer.

 3   However, we do not have the capability to instantaneously

 4   generate a complete transcript of all of these proceedings

 5   and thus it is essential that you guys listen very carefully.

 6       Now, we have 14 of you, as you can see, in our jury

 7   box today.  At the end, the case is going to be decided by

 8   the unanimous verdict of 12 of you.  That means that at the

 9   close of proofs, we will designate two of you as alternate

10   jurors and we will do that by blind draw, but because we

11   don't know, now, who our alternates are going to be, it is

12   essential that everybody listen carefully throughout all of

13   the proceedings.

14       I now briefly want to touch on the order of the

15   proceedings.  A case like this proceeds in stages.  The first

16   stage is what are call opening statements.  As I mentioned,

17   Mr. DePorre, on behalf of the government, will make his

18   opening statement first, and what he will be doing is

19   outlining what the government believes the evidence will

20   show.

21       Mr. Longstreet will then make his openings

22   statement on behalf of Mr. Garza, and he'll be doing

23   essentially the same things.

24       The opening statements are like roadmaps.  The

25   opening statements are not evidence.  They are intended to

1    only assist you in understanding the party's respective views

2    of the evidence.

3           After we have the opening statements, we proceed to

4    the next stage of the trial, which is the taking of evidence.

5    Mr. DePorre, as counsel for the government, will proceed

6    first, and he will call witnesses to testify, and he may

7    offer exhibits, which could be documents or recordings or

8    other physical objects.

9           Now, for every witness that the government calls,

10   Mr. Longstreet, on behalf of Mr. Garza, will have the

11   opportunity to cross-examine that witness, in order to test

12   the truth and accuracy of that witness's statements, and also

13   in order to elicit testimony that may be favorable to

14   Mr. Garza.

15          After the government has presented all of its

16   witnesses and evidence, then Mr. Garza will have an

17   opportunity, if he so chooses, to present evidence.  But you

18   should understand that Mr. Garza, as the defendant in this

19   criminal case, is not obligated to produce any evidence,

20   whatsoever.  The law does not require him to prove his

21   innocence or to present any evidence.  However, if he does

22   choose to offer witnesses or present evidence, then

23   Mr. DePorre will have the opportunity to cross-examine those

24   witnesses, in order to test the truth of their statements and

25   to elicit evidence that may be favorable to the government.

1          After each side presents its witnesses and

2    evidence, I will then give you instructions with respect to

3    the law that you are to apply in the case.  It is important

4    that you listen to those instructions and every instruction

5    that I give you during the course of the trial, very

6    carefully, and that you follow those instructions during your

7    deliberations.

8          After my instructions, we'll move to closing

9    arguments.  During those arguments, the attorneys will have

10   the opportunity to address you and to argue what they believe

11   the evidence has proven.  The statements of the attorneys in

12   their closing arguments, just like their statements in

13   opening statements, are not evidence.  Your decision in this

14   case must be based only on the evidence and not on the

15   statements of the attorneys.

16         Following the closing arguments of the attorneys,

17   you will deliberate on your verdict.  You will do that by

18   applying the law, as I give it to you, to the facts as you

19   find them.

20         Indeed, your function is to determine what the

21   facts are.  You are the sole and exclusive judges of the

22   facts, and you, alone, are going to determine the weight, the

23   effect and the value of the evidence, as well as the

24   credibility of all of the witnesses who appear in this

25   courtroom.  Your decision as to any fact in this case is

 1    final.

 2              Your function as jurors is equally important as the

 3    function of the Court and the attorneys.  You should give

 4    careful attention to the testimony as it's presented for your

 5    consideration, and you should keep an open mind and not form

 6    or express any opinion about this case until after you have

 7    heard all of the evidence, until after you have heard the

 8    closing arguments of the attorneys, and until after you have

 9    heard the instructions of this Court and retired to the jury

10    room to reach your verdict.

11              So from this point forward, you must not discuss

12    the case with anyone, not members of your family or fellow

13    jurors.  You may discuss the case with your fellow jurors

14    only after all of the evidence has been submitted, you have

15    received your final instructions from me, and I have

16    instructed you to begin your deliberations.

17              Now, what I try to do, ladies and gentlemen, is

18    when we take breaks and when we end for the day, I always try

19    to remember to tell you not to talk about the case.  My

20    memory ain't great, so I'm saying it now, and please keep

21    this in mind, do not discuss the case with anybody, even

22    amongst yourselves, until deliberations start.

23              As I mentioned at the beginning of the case, while

24    you can tell your family members and your friends that you

25    have been chosen as jurors, please don't discuss any aspect

1    of the case, including what happened in court, with them

2    until the end of the case, and at that point, you are free to

3    discuss whatever you want with whomever you want.

4          Now, after the case is submitted to you for

5    deliberations, you still must discuss it only with each other

6    and only in the jury room when you are all together and when

7    I tell you to discuss it.  Again, when the case is over, you

8    can discuss it with whoever you want.

9          In addition, you shouldn't consider any information

10   which may come to you from outside the courtroom.  You

11   shouldn't read any news articles about the trial, if there

12   are any, you shouldn't watch or listen to any television,

13   Internet or radio programs about the trial, if there are any,

14   and you shouldn't communicate about the trial on any social

15   media sites, at all.  Also don't visit any locations that may

16   be mentioned during the trial, and don't do any Internet

17   research of your own, on any issues that are raised or

18   presented during the trial.

19         Trials in this court follow long established rules

20   of procedure and evidence.  The attorneys are trained in

21   those rules and procedure, and from time to time, they may

22   make objections.  I will be called upon to rule on those

23   objections, and I may do so in open court.  It's very

24   important that you not conclude from any of my rulings that I

25   have an opinion on this case or that I favor one side or the

 1    other.  If I do sustain an objection to a question and do not

 2    permit the witness to answer, you should not guess what

 3    answer might have been given or draw any inference from the

 4    fact that the question was asked.

 5            At times, the attorneys and I are required by law

 6    to take up matters of objections and motions outside of your

 7    presence.  We may do this by having the attorneys approach at

 8    sidebar, like you guys saw during jury selection, and we may

 9    use white noise.  Alternatively, the attorneys and I may

10    excuse you guys and discuss the matters here in court,

11    without you guys here.

12            Now, these are purely procedural matters that we

13    are discussing in these settings and they have nothing to do

14    with your job, so you guys shouldn't concern yourself with

15    what we are discussing outside of your presence.

16            It is impossible for me to predict when we have to

17    take up those matters outside of your presence, but I want to

18    assure you, again, that we will make every effort to use your

19    time most efficiently and be most respectful of your time.

20            Now, as I mentioned last week, the government has

21    charged Mr. Garza with three offenses, one count of being a

22    prohibited person in possession of a firearm and ammunition,

23    one count of possession of a firearm with an obliterated

24    serial number, and one count of possession with intent to

25    distribute buprenorphine -- how do you pronounce this,

1    Mr. DePorre?

2              MR. DePORRE:  Buprenorphine, Your Honor.

3              THE COURT:  Yeah, what he just said.  I think it is

4    also called Suboxone.  Is that right, that's the other name

5    for it?

6              MR. DePORRE:  The trade name, yes.

7              THE COURT:  The lawyers will be able to pronounce

8    the drug better than me, but it's spelled

9    B-U-P-R-E-N-O-R-P-H-I-N-E.  This is not a spelling test for

10   any of us, but that's the word.

11             At the end of the case, I will explain to you guys

12   the elements that the government has to prove beyond a

13   reasonable doubt, before Mr. Garza may be convicted on any of

14   those charges.

15             Now, Mr. Garza denies the government's allegations

16   and he has pleaded not guilty to all of the charges against

17   him.  The charges and the formal documents that the charges

18   are included in, called the indictment, are not any evidence,

19   at all, of guilt.  They are just the formal way that the

20   government tells Mr. Garza what he has been charged with.

21   Mr. Garza is presumed innocent of all of the charges that the

22   government has brought against him.  This presumption of

23   innocence stays with Mr. Garza and it's the government's

24   obligation to present evidence, here in court, that overcomes

25   the presumption of innocence and convinces you, beyond a

1   reasonable doubt, that Mr. Garza is guilty.  You must find

2   Mr. Garza not guilty unless the government proofs its case

3   beyond a reasonable doubt.

4          Proof beyond a reasonable doubt does not mean proof

5   beyond all possible doubt.  Possible doubts or doubts based

6   purely on speculation are not reasonable doubts.  A

7   reasonable doubt is a doubt based on reason and common sense.

8   It may arise from the evidence, the lack of evidence, or the

9   nature of the evidence.

10          Proof beyond a reasonable doubt means proof which

11   is so convincing that you would not hesitate to rely and act

12   on it in making the most important decisions of your own

13   life.

14          Now, I may give you additional instructions during

15   the course of the trial, and I will give you detailed

16   instructions at the end of the trial.  All of the

17   instructions, collectively, are important, because together

18   they state the law that you are to apply to this case.

19          Let me know, at any time, if you can't hear or need

20   a break, just by raising your hand, and we'll make sure we

21   take care of you.

22          That concludes my opening remarks to you guys, and

23   I will now turn the floor over to Mr. DePorre for the

24   government's opening statement.

25          MR. DePORRE:  On November 26th, 2020, Noe Garza had

```
 1   a nine-millimeter Ruger semiautomatic pistol hidden in the
 2   engine compartment of his car.  The serial number of the
 3   pistol was scratched off, and Mr. Garza wasn't even legally
 4   able to possess the pistol.  Garza also had numerous doses of
 5   a prescription drug, called buprenorphine or Suboxone, in his
 6   pocket, along with over $800 in cash, and he intended to sell
 7   the buprenorphine/Suboxone for extra cash.
 8            It was the morning of November 26th, 2020, it was
 9   the middle of the pandemic, and it was Thanksgiving, it was a
10   Thursday.  Officer Steven Fisher was working that day.
11   Steve Fisher is an officer with the Metro Police Authority of
12   Genesee County.  It's a department that covers an area -- a
13   small area south of Flint, Flint, Michigan.
14            That morning, Officer Fisher and another police
15   officer, Sergeant Todd Johnson, had gone to a Meijer south of
16   Flint to speak with Meijer employees from the loss
17   prevention department about a prior shoplifting complaint
18   that had happened on a prior day.  While the officers were at
19   the store, Meijer employees alerted that they had seen
20   somebody in the store hiding merchandize.  The Meijer
21   employees saw the person leave the store and go to a white
22   Pontiac Grand Prix.
23            After speaking with a Meijer employee,
24   Officer Fisher and Sergeant Johnson went out to the Meijer
25   parking lot and approached the white Pontiac Grand Prix.
```

1   Officer Fisher contacted the defendant, Noe Garza, who was

2   seated in the driver's seat of the white Pontiac Grand Prix.

3   Fisher asked Mr. Garza to exit.  He put him in handcuffs, and

4   he searched his pockets.  He found 17 doses of Suboxone,

5   along with $810 in cash.

6          Meanwhile, Sergeant Johnson arrested Mr. Garza's

7   companion, who was in the back seat of the white Pontiac

8   Grand Prix, that man's name was Robert Hutchins.

9   Officer Fisher and Sergeant Johnson spoke with

10  Robert Hutchins outside of Mr. Garza's earshot.  Then they

11  went back into Meijer and arrested a third man, named

12  Meldrum Allen, who was also stealing merchandise from Meijer.

13         Officer Fisher next searched the white Pontiac

14  Grand Prix that Garza and Hutchins had been sitting in.  He

15  did the search right in the Meijer parking lot, while

16  Mr. Garza was in a patrol vehicle, also in the Meijer parking

17  lot.  Officer Fisher found numerous items in the car, but

18  important for our case, he found two more strips or doses of

19  Suboxone, and he found a live, nine-millimeter bullet; both

20  of those were under the driver's seat of the white Pontiac

21  Grand Prix.  Officer Fisher also found some cans of butane

22  and a weight vest, which looks like a bulletproof vest, in

23  the trunk of the car.

24         After searching the car, Officer Fisher and the

25  other officer took Garza, Hutchins and Allen, the third

1   person, to the Metro Police Authority office.  They also

2   towed and impounded the white Pontiac Grand Prix.

3          At the station, police spoke with Hutchins and

4   Allen, and Officer Fisher conducted a video-recorded

5   interview of Garza.  Garza told Officer Fisher that he was

6   unemployed and that he sold marijuana.  He's not charged with

7   marijuana in this case, so that's not something that we're

8   going to ask you to even consider.

9          He also said he bought butane to make marijuana

10  wax.  He said he used a small mesh bag, like a laundry bag,

11  to make a substance called keif, and he spelled that K-E-I-F.

12  He described keif as marijuana dust.  He also talked about

13  the weight vest that officers found in the car, and he said

14  that he had gotten the vest about six days earlier.

15         At various times during the interview, Garza

16  referred to the White Pontiac Grand Prix as my car.

17  Mr. Garza said his ex-girlfriend had helped him get

18  unemployment money, which he used to purchase the car.

19  During the interview, Garza also admitted that he sold

20  Suboxone.  He claimed that he took some of the Suboxone, and

21  he said that he lied to his doctor to get a prescription for

22  two doses per day, when, in reality, he only needed one dose

23  per day.  Garza claimed that he sold his remaining Suboxone

24  for extra money.

25         After the interview, Garza went to jail.

```
 1   Officer Fisher met up with another officer named
 2   Andy Grocholski, who was working the second shift that day,
 3   and they did a second search of the Grand Prix.  This search
 4   was performed in the impound lot.  During the search,
 5   Officer Grocholski opened the hood of the car and found a
 6   loaded, nine-millimeter Ruger semiautomatic handgun hidden
 7   there in the engine compartment.  The gun was in a small,
 8   black mesh bag, and the serial number of the gun had been
 9   scratched off.  All of this happened on November 26th, 2020.
10        On December 10th, 2020, Mr. Garza was still in jail
11   and his mother, Dominga Flanagan, obtained permission from
12   the Metro police to take possession of the impounded white
13   Pontiac Grand Prix.  That was December 10th, 2020.
14        On December 16th, 2020, Mr. Garza called his
15   girlfriend, a woman named Madison Merrill.  Mr. Garza was
16   still in jail, and the call was recorded, and during the
17   call, Mr. Garza told Merrill that he could protect her if she
18   got him out of jail by paying his bond.  Garza used a slang
19   term and told Merrill that he still has his "banger," his
20   "stick."  That his mom had it in the car, and that the police
21   had missed it during the search.  That was
22   December 16th, 2020.
23        On June 11th, 2021, Garza was charged with
24   possessing the gun that Officer Fisher found back on
25   Thanksgiving.  The gun was in the white Pontiac Grand Prix.
```

1    As the Court has informed you, Garza has been

2   charged with three crimes.  He's been charged with Count 1,

3   of being a prohibited person in possession of a firearm;

4   Count 2, with possession of a firearm that had an obliterated

5   serial number; and Count 3, with possession with intent to

6   distribute a controlled substance.

7    The Judge is going to instruct you on the elements

8   in this case, and each count has its own separate elements.

9   But the parties have entered into stipulations about some of

10  the facts.  Stipulations are basically agreements.  You will

11  see a stipulation about whether or not the gun -- and in this

12  case, you will see a stipulation that the gun did cross a

13  state line prior to being in Michigan, and that satisfies the

14  jurisdictional element.

15   There is also a stipulation that the defendant was

16  prohibited from possessing a firearm or possessing

17  ammunition, because of his prior convictions, and that he

18  knew that he was prohibited.  And there's an agreement that

19  the Suboxone strips contained buprenorphine, which is a

20  controlled substance.

21   So as you hear the evidence in this case and

22  throughout trial, it's important to pay attention to the

23  facts that are in dispute, the facts that are being contested

24  by both sides, and that's whether or not Mr. Garza possessed

25  a firearm and ammunition, and whether or not he possessed and

1    intended to distribute Suboxone.

2            Throughout this trial, you will hear from

3    Officer Steve Fisher, the Metro police officer, you will hear

4    from Officer Andy Grocholski who found the gun, he's the

5    officer that found the gun with Officer Fisher, and you will

6    hear from other police officers and witnesses, but perhaps

7    most importantly, you will hear the defendant's own words,

8    his own words, telling you -- or telling Officer Fisher that

9    he intended to distribute Suboxone, and telling his

10   girlfriend that he still had the banger in the car

11   with -- that his mom had picked up.

12           At the end of trial, I will ask you to return a

13   verdict, and I'll ask you to find the defendant guilty of

14   possession of a firearm by a prohibited person, guilty of

15   possession of a firearm with an obliterated serial number,

16   and guilty of possession with intent to distribute

17   buprenorphine.

18           Thank you.

19           THE COURT:  Thank you, Mr. DePorre.

20           Mr. Longstreet.

21           MR. LONGSTREET:  Thank you.

22           Good morning, ladies and gentlemen of the jury.

23           THE JURY:  (Collectively) Good morning.

24           MR. LONGSTREET:  My name is

25   Attorney Charles Longstreet, II.  I am counsel charged with

1    the responsibility of representing the accused in this

2    matter, Mr. Noe Garza.  And this is a defense opening

3    statement.

4         During our opening statement, we're going to

5    attempt to discuss with you what we believe the evidence is

6    going to show.  We're also going to discuss with you issues

7    that we believe you should be paying attention to during this

8    trial.

9         Understand that criminal defense is not about

10   playing tricks or pulling wool over your eyes.  It is our

11   attempt to ask you to review the evidence in this case

12   critically, to show you that the prosecution can't and will

13   not prove, beyond a reasonable doubt, that Mr. Noe Garza was

14   in possession of a firearm found under the hood of a vehicle,

15   nor was he in possession, with the intent to distribute,

16   Suboxone.

17        First, I would like to talk to you about the facts

18   and what we believe the evidence will show.  I would like to

19   take you to the date of November 26th, 2021, at the location

20   of 2474 Hill Road, in the City of Flint, State of Michigan.

21   At this location is a Meijer store.

22        You are going to hear from two police

23   officers -- well, one police officer, Steven Fisher.  He was

24   accompanied by his partner, Sergeant Todd Johnson.  They

25   arrive at the Meijer store, as the government has told you,

 1   on an investigation of shoplifting.  Upon their arrival, they

 2   come in contact with Meijer loss prevention, and they are

 3   directed to a white Grand Prix.  In that Grand Prix is seated

 4   my client, who's uninvolved in the shoplifting.

 5        You're going to hear from Officer Fisher, who is

 6   going to tell you that my client was not a suspect in the

 7   shoplifting.  You are going to hear that Sergeant Johnson

 8   approaches the vehicle occupied by two people, Mr. Garza in

 9   the front seat, and seated behind Mr. Garza was

10   Mr. Robert Hutchins.

11        Now, you're going to learn that Robert Hutchins was

12   the one that was inside the store stealing.  You are going

13   hear that at a certain point, that Mr. Hutchins was pulled

14   out of the car by Sergeant Johnson.  You are going to hear

15   that as soon as Hutchins was pulled out of the car by

16   Sergeant Johnson, Mr. Hutchins started singing, and what I

17   mean by singing is, he started telling what happened.

18        He started saying, yes, I'm here, I'm stealing, I'm

19   stealing.  He's then going to tell you that he starts saying

20   that Mr. Noe Garza was a drug dealer, and that Mr. Noe Garza

21   had a gun, and all the motivations for a thief to change a

22   narrative, but that's not all.

23        You're going to hear that, at a certain point, my

24   client was pulled out of the vehicle and subsequently

25   arrested, not for shopping lifting, but being in possession

1      of Suboxone, and I'm going to discuss the issue of Suboxone

2      with you in just a few moments.

3              But moving further, you're going to hear, at a

4      certain point, that both Hutchins and Garza are pulled out of

5      car, and that the vehicle is searched, including underneath

6      the hood.  Officer Fisher is going to tell you that at a

7      certain point, he did what's called an inventory search

8      inside the Meijer parking lot.  You're going to hear that

9      during this inventory search, that Officer Johnson looked

10     underneath the hood and didn't find a gun.

11             You're going to hear that, at a certain point, they

12     spoke to a Meldrum Allen, or Reggie Meldrum Allen, who was

13     the second thief inside the store.  You're going to hear that

14     at a certain point, he was also arrested for shoplifting.

15     You're going to hear, at a certain point, the police came to

16     him and started asking him questions, and he says there might

17     be something underneath the hood of the car.

18             You're going to hear that there is a second search,

19     several hours later, at the tow yard, by Officer Fisher, and

20     in his second search, the firearm is discovered.  And, yes,

21     you're going to hear certain statements about Mr. Garza and

22     what Mr. Garza said, but we submit to you, at a certain

23     point, you're going to see that the statements that he makes

24     both in his interview and in the jail are contradictory, and

25     we are going to ask that you not rely on those statements.

 1          Now, I would like to talk to you about the
 2   standards of evidence that we're going to be asking you to
 3   look at, and I'm also going to look at these very important
 4   issues as you are going along during the prosecution's
 5   presentation of the evidence.
 6          First, the standard.  The defense believes that
 7   there is going to be -- or the evidence is going to show all
 8   kinds of doubt in reference to whether my client was in
 9   possession of a firearm, and that reasonable doubt is going
10   to rise from the evidence, what the government does show you,
11   and what's most important, the lack of evidence, what the
12   government doesn't show you.
13          The government must prove this case beyond this
14   reasonable doubt, and it must be so convincing that you would
15   not hesitate to rely on it.  And at the end of the case, if
16   you are not convinced, then I'm going to ask that your vote
17   be not guilty as to all counts, and the defense believes that
18   this evidence will significantly lack in quality.
19          First, I'd like to point out some of the issues.
20   First, lack of evidence of the possession of a firearm.  The
21   evidence will show that the gun was found under the hood of
22   the car.  You're going to hear from somebody by the name of
23   Blake Parkes.  Blake Parkes, you're going to learn, was the
24   registered owner of the white Grand Prix.  You're going to
25   hear that at a certain point shortly before this trial,

1    federal agents spoke to Mr. Parkes, and Mr. Parkes points out

2    that it's Meldrum Allen who purchased the car from him.

3           Furthermore, you're going to hear that not only was

4    there no DNA, not only was there no fingerprints, the

5    government didn't even bother to look.  The defense

6    believes -- or the defense will show that that's going to be

7    problematic, with three people occupying one car, with one

8    gun underneath the hood.

9           Furthermore, the government will only show you that

10   they are relying on the word of two heroin addicts.  You're

11   going to hear that both Robert Hutchins and

12   Meldrum Reggie Allen were both heroin addicts, both in

13   Meijer, both stealing items.  The one person you are going to

14   hear wasn't stealing anything, wasn't subject to police

15   investigation during that shopping theft, was Mr. Garza, who

16   was seated in the car, because he had given these two persons

17   a ride to the store.

18          Now, discuss the phone call.  You're going to hear

19   a very ugly phone call with my client and his girlfriend, and

20   you're going to hear some words that are being spoken that

21   will amount to tough talk.  "I'm going to protect you.  I got

22   you.  I got the stick.  I got the stick."  But the government

23   is going to show you two statements made by my client, and

24   during the first statement, you're going to hear

25   Officer Fisher ask any client whose gun was that that we

 1   found in the car?  Mr. Garza, I don't know, wasn't mine.  We

 2   get -- that statement happens on November 26th, 2021.

 3          The government is also going to play you another

 4   statement made by my client, on December 16th, 2021, when

 5   he's talking to his girlfriend, and he tells his girlfriend

 6   "I got the stick.  The police didn't find my gun."  Even

 7   though the police had told him they found the gun two weeks

 8   earlier.  You're going to see that those statements

 9   contradict.  My client's own statement about the possession

10   contradict.

11          At the end of this case, I'm going to ask you for a

12   verdict of not guilty, because the prosecution will not show,

13   beyond a reasonable doubt, that my client is guilty of any

14   crime, including possession of a firearm.

15          The second thing I would like to talk to you about

16   is the possession of the Suboxone.  Yes, my client had

17   Suboxone in his pocket, but the question is, did he possess

18   that Suboxone with the intent to distribute it?  You're going

19   to hear that my client admits that he's a recovering heroin

20   addict.  You're going to hear that my client used Suboxone to

21   keep from getting dope sick.  You're going to hear that

22   Suboxone is a drug intended to help people get off of

23   opioids.

24          And what you're not going to see is any other

25   evidence that suggests that my client is a drug dealer of any

1    sort.  You're going to hear that the marijuana he was in

2    possession of was legal.  You're going to hear that the

3    Suboxone that he was in possession of was intended to help

4    him.  You're going to hear that Suboxone is a drug intended

5    to help people get off of opioids, not get them addicted to

6    opioids.  Thus there will be no evidence to suggest that my

7    client possessed a controlled substance with an illicit

8    intent to distribute.

9            At the end of this case, the defense will submit to

10   you that there will be a significant amount of evidence that

11   lacks proof beyond a reasonable doubt, that my client was in

12   possession of a firearm and my client did not possess a drug

13   with the illicit intent to distribute, and at the end of this

14   case, as I'm going to ask you now, for a verdict of not

15   guilty.

16           Thank you for your time and attention.

17           THE COURT:  Thank you, Mr. Longstreet.

18           When Mr. Longstreet is done gathering his

19   materials, Mr. DePorre, you may call your first witness.

20   Mr. DePorre, during the questioning, would you flip the

21   podium around there, so you are facing the witness?

22           Who is it that the government is calling?

23           MR. DePORRE:  Your Honor, the government calls

24   Steve Fisher.

25           THE COURT:  Mr. Fisher, would you raise your right

1    hand?

2              Do you swear the testimony you are about to give

3    will be the truth?

4              OFFICER FISHER:  I do.

5              THE COURT:  Thank you.  Welcome to the United

6    States District Court.  Would you settle into the witness

7    box, please.  And as you are settling in, could I ask you,

8    when answering questions, to please keep your voice up, so

9    that we can hear you, and please speak slowly.  Thank you

10   very much.

11                    OFFICER STEVEN FISHER,

12   called at about 9:56 a.m., was examined and testified on his

13   oath as follows:

14                     DIRECT EXAMINATION

15   BY MR. DePORRE:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   Would you please state and spell your first and last

19   name for the record.

20   A.   Steven Fisher, S-T-E-V-E-N, F-I-S-H-E-R.

21   Q.   Mr. Fisher, how are you employed?

22   A.   I'm an officer for the Metro Police Authority of

23   Genesee County.

24   Q.   Where is that office, the Metro Police Authority of

25   Genesee County?

1   A.   It is in Mundy Township, which is in Genesee County.

2   Q.   And if you were to point it out on your hand, could you

3   show me about where Genesee County is?

4   A.   (Illustrating.)

5   Q.   So a little north of Detroit?

6   A.   Yes.

7   Q.   How long have you been a police officer?

8   A.   Twelve years.

9   Q.   And how long, specifically, have you been at

10  Mundy Township?

11  A.   Three years.

12  Q.   Were you working back on November 26th, 2020?

13  A.   I was.

14  Q.   And what day was that?  What significance did that day

15  have for you?

16  A.   It was Thanksgiving.

17  Q.   What did you -- what shift did you work that day?

18  A.   6:00 a.m. to 6:00 p.m.

19  Q.   And at some point during the day, did you go to Meijer?

20  A.   I did.

21  Q.   Could you explain to the jury where the Meijer is

22  located, in relation to the Metro Police Authority?

23  A.   The Meijer is the next building to the west of our

24  police department.

25  Q.   So how long would it take you to drive from your office

1  to Meijer?

2  A.  Seconds.

3  Q.  Why did you end up going to Meijer that day?

4  A.  I don't recall, specifically.  Meijer does experience a

5  lot of retail fraud, shoplifting, and so we find ourselves

6  going there to speak with loss prevention routinely.  I was

7  there for another matter.

8  Q.  When you talked to them about that other matter, were

9  you speaking with Meijer loss prevention employees?

10  A.  I was.

11  Q.  At some point, did somebody talk to you about

12  shoplifting that was ongoing, while you were there at the

13  store?

14  A.  I did.  The head of loss prevention for that Meijer, her

15  name is Jody Monpos, and Sergeant Johnson and I were speaking

16  with her, and she told us that there was somebody in the

17  store actively concealing.

18  Q.  You mentioned a person named Sergeant Johnson.  Could

19  you tell the jury who Sergeant Johnson is, in relationship to

20  your investigation in this case?

21  A.  Yes.  So Todd Johnson, at the time, was a sergeant from

22  my department.  He's now retired.  He was just with me to

23  speak with loss prevention, as well.

24  Q.  So the two of you are there, you get information that

25  somebody is shoplifting?

1    A.   Yes.

2    Q.   Did they provide you any description of the vehicle that

3    the people -- that the person had gone to?

4    A.   Eventually, yes.

5    Q.   What sort of car was that?

6    A.   It was a white Pontiac Grand Prix.

7    Q.   And was the car -- where was the car parked?

8    A.   In the Meijer parking lot.

9    Q.   Did you go out to the Grand Prix?

10   A.   Yes.

11   Q.   At some point, did you arrest an individual named

12   Noe Garza?

13   A.   I did.

14   Q.   Do you see Mr. Garza today?

15   A.   I do.

16   Q.   Could you describe the clothes that Mr. Garza is

17   wearing?

18   A.   Seated to my right.  He's wearing a white shirt, with a

19   dark colored tie, with, looks like, white spots on it.

20        MR. DePORRE:  I would ask the record to reflect

21   that Mr. Fisher has identified Mr. Garza.

22        THE COURT:  Any objection?

23        MR. LONGSTREET:  None.

24        THE COURT:  All right.  It shall so reflect.

25   BY MR. DePORRE:

1   Q.  Where was Mr. Garza when you approached the white

2   Grand Prix?

3   A.  He was in the driver seat.

4   Q.  And what did -- how did he respond when you asked him to

5   get out; what did he do?

6   A.  He was surprised, as I guess anybody would be, to have a

7   police officer there asking him to step out, but he was

8   compliant.

9   Q.  You said he was compliant.  Did you search him after you

10  handcuffed him?

11  A.  I did.

12  Q.  Did you find anything?

13  A.  I did.

14  Q.  What did you find?

15  A.  In his right-front pants pocket, he had 17 Suboxone

16  strips, and in his left-front pants pocket, he had $810 in

17  cash.

18  Q.  You said he had $810.  At some point, did you -- you

19  must have counted that money?

20  A.  I did.

21  Q.  Do you recall what denominations, what size bills you

22  found?

23  A.  I do not recall.

24  Q.  Is there anything that would refresh your memory on

25  that?

1    A.   I have paperwork in my binder that would tell me.

2         MR. DePORRE:  All right.  I'm going to -- if I may

3    approach, Your Honor?

4         THE COURT:  Yes.

5    BY MR. DePORRE:

6    Q.  Officer Fisher, I'm going to hand you a piece of paper.

7    I'd like to you take a look at it and see if that refreshes

8    your memory about the denominations that you found that day.

9         THE COURT:  Can you first -- when he hands it to

10   you, would you first identify it, so we know what it is?

11   A.  Yes, sir.

12        THE COURT:  Can you tell us?

13   A.  Yes, sir.  This form, it's a notice of seizure and

14   intent to forfeit form.

15   BY MR. DePORRE:

16   Q.  And does that refresh your memory about what sort of

17   denominations the $810 were in?

18   A.  Yes.

19   Q.  Could you tell the jury what size bills and how many of

20   each bill that you found?

21   A.  There were a variety of denominations.  $50 bill; it was

22   mostly twenties, 37 $20 bills; a $10 bill; and two $5 bills.

23   Q.  You said you also found Suboxone in one of the pockets.

24   Which one was it?

25   A.  Right-front pants pocket.

1          MR. DePORRE:  Would you hand me Government's

2   Exhibit 1A?

3          May I approach with the exhibit and scissors?

4          THE COURT:  Yes.

5   BY MR. DePORRE:

6   Q.  Officer Fisher, would you please open the evidence bag

7   for Government's Exhibit 1A.  There are several bags there.

8   A.  Yeah.  Pull them out?

9   Q.  Yes, please.  Is this the Suboxone that you seized from

10  the Mr. Garza's front pants pocket?

11  A.  Yes.

12         MR. DePORRE:  At this time, Your Honor, I would

13  move for admission of Government's Exhibit 1A.

14         THE COURT:  Any objection?

15         MR. LONGSTREET:  None from the defense.

16         THE COURT:  It's admitted.

17         (Government's Exhibit No. 1A received into

18         evidence.)

19  BY MR. DePORRE:

20  Q.  What did you do when you got back to the office with

21  Government's Exhibit 1A, with the Suboxone?

22  A.  It was packaged and submitted into property to be sent

23  to the lab.

24  Q.  Did you do anything -- did you take a picture of it?

25  A.  I did.

1    Q.  I would ask you to open that binder there and look at

2    Government's Exhibit 1B.  And did you take that photo?

3    A.  I did.

4         MR. DePORRE:  Your Honor, I would move for

5    admission of Government's 1B.

6         THE COURT:  Any objection?

7         MR. LONGSTREET:  None.

8         THE COURT:  It's admitted.

9         MR. DePORRE:  Thank you.

10        (Government's Exhibit No. 1B received into

11        evidence.)

12        MR. DePORRE:  Thank you.  Would you, Ms. Szuhkent,

13   pull up Exhibit 1B?

14   BY MR. DePORRE:

15   Q.  Is this a photograph of Government's Exhibit 1B that you

16   took?

17   A.  Yes.

18   Q.  Now, after you searched Mr. Garza's pocket, at some

19   point, did it come to your attention that there was somebody

20   else in the car?

21   A.  Yes.

22   Q.  And what was that person's name?

23   A.  That person was Robert Hutchins.

24   Q.  Was he placed in handcuffs?

25   A.  He was.

1    Q.   And who put him in handcuffs?

2    A.   Sergeant Johnson did.

3    Q.   Without going into what was said, at some point, did you

4    speak with Mr. Hutchins?

5    A.   I did, yes.

6    Q.   And where was Mr. Garza as you spoke with Mr. Hutchins?

7    A.   He was in my patrol car, out of earshot; he couldn't

8    hear our conversation.

9    Q.   Where was Mr. Hutchins, where was your conversation?

10   A.   The conversation took place in the Meijer parking lot.

11   Mr. Hutchins was standing outside of the white Pontiac

12   Grand Prix.

13   Q.   After you spoke with Mr. Hutchins, what did you do next?

14   A.   Well, a piece of information that we learned was that

15   there was another suspect inside of Meijer, who was also

16   stealing.  We called for an additional officer to the scene,

17   which was officer Anne Davies, and Officer Davies stayed with

18   the two suspects we had in custody, while Sergeant Johnson

19   and I went back into the store and secured the third suspect.

20   Q.   Officer Davies, is she still an officer with Metro

21   police?

22   A.   She is not, she's retired.

23   Q.   Did you -- were you able to find a third shoplifting or

24   another shoplifting suspect in -- a third person, a second

25   shoplifting suspect in Meijer?

```
 1   A.   We did.

 2   Q.   What did you do with that person?

 3   A.   He was arrested as well.

 4   Q.   After you arrested that individual, did you learn his

 5   name?

 6   A.   Yes, Meldrum Allen.

 7   Q.   And did he have a nickname that he used?

 8   A.   Not that I learned at that time.

 9   Q.   Did you later come to know him as Reggie Allen or

10   Reginald Allen?

11   A.   Yes.

12   Q.   After you arrested Mr. Allen, what did you do next?

13   A.   He was brought outside, with the other two suspects.  I

14   conducted an inventory search of the vehicle in the lot.

15   Q.   When you say "vehicle," what car specifically?

16   A.   The white Pontiac Grand Prix.

17   Q.   Did you look under the driver's seat of the white

18   Pontiac Grand Prix?

19   A.   I did.

20   Q.   I would like you to look in that binder, at Exhibit 2A.

21          Don't pull it up yet, but would you pull up 1B,

22   please.

23          Do you recognize Government's Exhibit 2A?

24   A.   Yes.

25   Q.   And what is Government's Exhibit 2A?
```

1    A.   It is a photograph that I took underneath the driver's

2    seat of the white Pontiac Grand Prix.

3            MR. DePORRE:  Your Honor, at this point, I would

4    move for admission of Government's Exhibit 2A, which is not

5    the one on the screen.

6            THE COURT:  Any objection?

7            MR. LONGSTREET:  No.

8            THE COURT:  That's admitted.

9            (Government's Exhibit No. 2A received into

10           evidence.)

11           MR. DePORRE:  Would you pull up Government's

12   Exhibit 2A?

13   BY MR. DePORRE:

14   Q.   Could you describe what this depicts, what this

15   photograph depicts?

16   A.   The white-and-blue packaging you see, those are two

17   additional strips of Suboxone.

18   Q.   And did you collect those as evidence when you found

19   them?

20   A.   I did.

21           MR. DePORRE:  Your Honor, I'm going approach with

22   Government's Exhibit 2B.

23   BY MR. DePORRE:

24   Q.   Are those the Suboxone strips that you got from

25   underneath the driver's seat of the white Pontiac Grand Prix?

1    A.   Yes.

2              MR. DePORRE:  Your Honor, at this point, I would

3    move for admission of Government's Exhibit 2B.

4              THE COURT:  Any objection?

5              MR. LONGSTREET:  None.

6              THE COURT:  That's admitted.

7              (Government's Exhibit No. 2B received into

8              evidence.)

9    BY MR. DePORRE:

10   Q.   Now, is one of those packets opened?

11   A.   It is.

12   Q.   Did you open the packet?

13   A.   I did not.

14   Q.   And was one of the packets from Government's Exhibit 2A

15   open?

16   A.   Yes.

17   Q.   Did you open that packet?

18   A.   I did not.

19   Q.   After you -- when you found the packets, were they open?

20   A.   No.

21   Q.   After you took the packets what, if anything, did you do

22   with them?

23   A.   They get sent to the State Police crime lab.

24   Q.   I would like to go back to the search -- thank you -- of

25   the driver's seat.  Would you take a look at the next

1  photograph in that book, it is Government's Exhibit 3A, and

2  then turn the page and also take a look at Government's

3  Exhibit 3B.  Do you recognize those photographs?

4  A.  Yes.

5  Q.  Did you take them?

6  A.  I did.

7  Q.  And were they taken of the -- what do they depict?

8  A.  It is a photograph of the interior of the white Pontiac

9  Grand Prix, specifically, there's a live round of

10  nine-millimeter ammunition that is positioned between the

11  center console and the rail that the driver's seat slides on.

12          MR. DePORRE:  At this point, Your Honor, I would

13  move for admission of Government's Exhibits 3A and 3B.

14          THE COURT:  Any objection?

15          MR. LONGSTREET:  None.

16          THE COURT:  Those are admitted.

17          (Government's Exhibit Nos. 3A and 3B received into

18          evidence.)

19          MR. DePORRE:  Ms. Szuhkent, would you please pull

20  up Government's Exhibit 3A.

21  BY MR. DePORRE:

22  Q.  Do you -- could you describe for the jury sort of where

23  in the car Government's 3A is depicting?

24  A.  So this photograph was taken from the rear-driver's-side

25  of the vehicle and taken that photograph through the open

1    rear-driver's-side door.  And the driver's seat on the left

2    side of the picture, there, is moved all the way forward, so

3    I could take this photo of this round of ammunition.  The

4    round is the brass-colored object that is next to that black

5    rail.

6    Q.  Did you take Government's Exhibit 3B, was that a closer

7    picture of that same round?

8    A.  Correct.

9    Q.  Would you pull that up?

10            And is that the same round?

11   A.  Yes, it is.

12   Q.  What caliber did you say it was?

13   A.  It's a nine-millimeter.

14   Q.  And did you collect that?

15   A.  I did.

16           MR. DePORRE:  Could I have Government's Exhibit 3C?

17   Your Honor, may I approach?

18           THE COURT:  Sure.  You don't need to keep asking.

19   BY MR. DePORRE:

20   Q.  And is that a -- is that the evidence that you seized

21   from underneath the driver's seat next to the center console

22   of the white Pontiac Grand Prix?

23   A.  Yes.

24           MR. DePORRE:  Your Honor, at this point, I would

25   move to admit Government's Exhibit 3C.

```
 1              THE COURT:  Any objection?
 2              MR. LONGSTREET:  None.
 3              THE COURT:  It's admitted.
 4              (Government's Exhibit No. 3C received into
 5              evidence.)
 6    BY MR. DePORRE:
 7    Q.  Did you also search the trunk of the Pontiac Grand Prix?
 8    A.  I did.
 9    Q.  Did you find anything out of the ordinary in that trunk?
10    A.  Yes, more than one thing.
11    Q.  What did you find?
12    A.  I found a vest that resembled body armor, like police
13    officers or military would wear for ballistics protection.  I
14    also found numerous cans of butane, in an orange five-gallon
15    bucket.  There was also several pounds of marijuana powder.
16    Q.  And did you seize the vest, initially?
17    A.  Yes.
18    Q.  Did you later come to learn that it was not a ballistics
19    vest?
20    A.  I did.  It was actually a -- the panels inside were not
21    bulletproof panels, it was a weight vest, just steel weights.
22    Q.  Where was Mr. Garza while you were conducting this
23    search?
24    A.  He was seated in my patrol car, which was parked very
25    near to where the white Grand Prix was while I was searching
```

1   it.

2   Q.   Would he have been able, from his vantage point, to see

3   you searching the car?

4   A.   Yes.

5   Q.   Could you see him as you were searching?

6   A.   If I would have looked, yes.

7   Q.   While you were in the Meijer parking lot, did you open

8   the hood of the Pontiac Grand Prix.

9   A.   I did.

10  Q.   Did you search under it?

11  A.   I did.

12  Q.   Was it a thorough search?

13  A.   No.   Relatively common in police training, we're told

14  there are a couple of areas underneath the hood of a car that

15  people might conceal items.   Specifically, the most common is

16  in what's called the air box, or where your air filter is, so

17  that's basically what I opened the hood to search and I

18  didn't find anything inside of it.

19  Q.   Nothing in the air box?

20  A.   No.

21  Q.   Did you search under the car?

22  A.   No.

23  Q.   At that point, after you looked under the hood, were you

24  completed with the search?

25  A.   Yes.

1    Q.   That day at the Meijer, how many people did you end up

2    arresting?

3    A.   Three.

4    Q.   Could you remind us of their names or remind the jury of

5    their names?

6    A.   Noe Garza, Robert Hutchins and Meldrum Allen.

7    Q.   Where did you take them after you were done with the

8    search of the car?

9    A.   They were taken back to our office, next door to the

10   Meijer.

11   Q.   And what happened with the car?

12   A.   The car was towed by Alexander's Towing, to be

13   impounded.

14   Q.   You said, at the office, Hutchins, Allen and Garza were

15   all there.  Did you talk to Hutchins?

16   A.   Yes.

17   Q.   And did you talk to Allen?

18   A.   Yes.

19   Q.   Did you talk to Garza?

20   A.   Yes.

21   Q.   And where did you speak with him?

22   A.   I spoke to Garza in an audio-video recorded interview

23   room at the office.

24   Q.   Was the interview room recording when you had the

25   conversation with him?

1    A.   Yes.

2    Q.   And did you -- did you create a download of that

3    recording?

4    A.   Yes.

5          MR. DePORRE:  Your Honor, at this point, I would

6    move for admission of Government's Exhibits 4A, 4B and 4C.

7          THE COURT:  Are those -- collectively, what are

8    those?

9          MR. DePORRE:  Those are snippets of the recording

10   of the interview.

11         THE COURT:  Any objection?

12         MR. LONGSTREET:  No.

13         THE COURT:  Okay.  Those are admitted.

14         (Government's Exhibit Nos. 4A, 4B and 4C received

15          into evidence.)

16         MR. DePORRE:  Would you pull up Government's

17   Exhibit 4A.

18         MS. SZUHKENT:  Do you want me to play it?

19         MR. DePORRE:  Not yet.

20   BY MR. DePORRE:

21   Q.   During the interview, did you advise Mr. Garza of his

22   Miranda Rights?

23   A.   I did.

24         MR. DePORRE:  All right.  Would you go ahead and

25   play that?

1           THE COURT:  Can you explain for the jury what

2   Miranda Rights are?  Some of them have problem seen it on TV,

3   but let's be clear.

4   BY MR. DePORRE:

5   Q.  Could you explain to the jury what Miranda Rights are?

6   A.  When somebody is in custody for a crime and before a

7   police officer can ask them questions relating to that crime,

8   I have to read them their Miranda Rights.

9   Q.  And we are going hear them, verbatim, in a second.

10          THE COURT:  Okay.

11          MR. DePORRE:  Go ahead.

12          (Video played for the jury.)

13          MR. DePORRE:  You can stop it there.

14  BY MR. DePORRE:

15  Q.  Is that you, at the bottom, talking and giving those

16  Miranda Rights?

17  A.  It is.

18  Q.  And what are you wearing on your face?

19  A.  A mask.

20  Q.  Why were you wearing a mask at that point?

21  A.  It was November of 2020 and COVID was pretty prevalent.

22  Q.  Was Mr. Garza also wearing a mask?

23  A.  Yes.

24  Q.  And did you find, in listening to it, that the mask

25  muffled some of the recording?

```
 1   A.  After having listened to it, it does -- it is more
 2   distorted than it usually is, if people are not masked in
 3   that room.
 4   Q.  During the interview, did you and Mr. Garza discuss the
 5   car that was in the Meijer parking lot?
 6   A.  We did.
 7   Q.  And did you talk about money that Mr. Garza had in his
 8   pocket?
 9   A.  Yes.
10   Q.  Did you ask him about how he got money, or did he tell
11   you how he got money to buy the car?
12   A.  He told me he got unemployment money to purchase the
13   car.
14           MR. DePORRE:  Your Honor, at this point, I
15   would -- or, Ms. Szuhkent, would you please play Government's
16   Exhibit 4B.
17           (Audio played for the jury.)
18           MR. DePORRE:  Could you pause it there?
19   BY MR. DePORRE:
20   Q.  First, you asked the defendant, when was the last time
21   you worked, and how did he respond?
22   A.  It had been a few months.
23           MR. DePORRE:  Would you back it up about five
24   seconds and go ahead and play it again?
25           (Audio played for the jury.)
```

1    BY MR. DePORRE:

2    Q.  All right.  And then he said who helped him get his

3    unemployment?

4    A.  His girlfriend.

5    Q.  And what did he do with that money?

6    A.  To get that car, is what he said.

7    Q.  During the interview, did you ask Mr. Garza where he got

8    the cash in his pocket?

9    A.  Yes.

10   Q.  What did he tell you?

11   A.  That he sold marijuana and that he sold Suboxone.

12   Q.  Did you specifically ask him about Suboxone?

13   A.  Yes.

14   Q.  And did he tell you how he got Suboxone?

15   A.  He claimed that he had a prescription from a doctor for

16   it.

17   Q.  And did he say how much of the Suboxone he sold -- how

18   much of his prescription he sold?

19   A.  He said that he would sell half of what he got from the

20   doctor.

21          MR. DePORRE:  All right.  At this point, I would

22   move -- or I would ask you to play Government's Exhibit 4C.

23          (Video recording played for the jury.)

24   BY MR. DePORRE:

25   Q.  Did he say that he lied to the doctor to up his

1    prescription?

2    A.   He did.

3    Q.   During the interview, did you ask Mr. Garza about a gun?

4    A.   I did.

5    Q.   And at that point in your investigation, had you found a

6    gun?

7    A.   I had not.

8    Q.   Why did you ask him about a gun, then?

9    A.   It was a bluff.  We had information there was gun in a

10   vehicle.  We hadn't found it, and I took a chance to try to

11   bluff him, to see if he would tell me where it was at in the

12   vehicle.

13   Q.   Did it work?

14   A.   It did not.

15   Q.   Later during your interview, did you show him

16   photographs that you had taken of items that you found in the

17   car?

18   A.   Yes.

19   Q.   Did you show him a photograph -- did you show him the

20   photograph on Government's Exhibit 3B?

21          Can you pull that up, 3B?

22          Did you show Mr. Garza this photograph?

23   A.   I did.

24   Q.   And did you show him other photos as well?

25   A.   I did.

1   Q.   Did you show him a photo of some marijuana?

2   A.   Yes.

3   Q.   Did you show him a photo of a gun?

4   A.   No.

5   Q.   And why not?

6   A.   I didn't have a photograph a gun to show him.

7   Q.   At some point, did you talk about marijuana?

8   A.   Yes.

9   Q.   And did he -- did you specifically talk about a

10  marijuana product called keif?

11  A.   We did.

12  Q.   How do you spell keif?

13  A.   I believe he spelled it K-E-I-F.

14  Q.   Were you familiar with keif, prior to speaking with

15  Mr. Garza?

16  A.   I was not.

17  Q.   What did Mr. Garza tell you that keif is?

18  A.   He took trimmings from marijuana plants, so anything

19  other than the marijuana bud, and he would put it into a

20  small mesh bag and beat it into a five-gallon bucket and turn

21  it into a powder.

22  Q.   And the powder, then, what is that?

23  A.   That is the keif, the powder.

24  Q.   Did you also speak to him about making marijuana wax?

25  A.   Yes.

1  Q.  And did he describe the process for making marijuana

2  wax?

3  A.  He did.

4  Q.  Could you explain what he told you, to the jury?

5  A.  So because of the cans of butane in his vehicle, and I

6  was familiar, at the time, with it's called a butane lab for

7  making THC wax, Mr. Garza explained to me that you push the

8  butane through the keif, which then results in the production

9  of the wax.

10  Q.  After you were done with the interview, did Mr. Garza go

11  to jail?

12  A.  He did.

13  Q.  What did you do next?

14  A.  At the time, Officer Grocholski was coming on his shift,

15  and I had a number of items that I needed to return to

16  Mr. Garza's vehicle, items that didn't have any evidentiary

17  value, as well as we had information that a gun might be

18  underneath the hood of the vehicle in the engine compartment.

19  So Officer Grocholski and I went to the tow yard to return

20  the property and continue the inventory search to try to

21  locate the unsecured gun.

22  Q.  You said you started your shift at 6:00 a.m.?

23  A.  Yes.

24  Q.  When did Officer Grocholski start his shift?

25  A.  At the time, I think he was working 2:00 p.m.

```
 1    to 2:00 a.m.
 2    Q.  And do you recall what time of the day this was that you
 3    went to the impound lot?
 4    A.  It would have been very shortly after he came on shift.
 5    Q.  Was it still light out?
 6    A.  Yes.
 7    Q.  Did Officer Grocholski look under the hood of the car?
 8    A.  He did.
 9    Q.  Did you take photos of the engine compartment of the
10    car?
11    A.  Yes, I did.
12    Q.  Would you take a look at Government's Exhibit 5A, 5B, 5C
13    and 5D.  Do you recognize all of those photographs?
14    A.  I do.
15    Q.  Did you take those photographs?
16    A.  I did.
17    Q.  Are they of the hood of the white Pontiac Grand Prix
18    that was seized that day?
19    A.  Of the engine compartment, yes.
20              MR. DePORRE:  At this point, Your Honor, I would
21    move to admit Government's Exhibits 5A, 5B, 5C and 5D.
22              THE COURT:  Any objection?
23              MR. LONGSTREET:  None from the defense.
24              THE COURT:  Those are admitted.
25              (Government's Exhibit Nos. 5A, 5B, 5C and 5D
```

1           received into evidence.)

2           MR. DePORRE:  Would you pull up Government's

3    Exhibit 5A, Ms. Szuhkent?

4    BY MR. DePORRE:

5    Q.  Is this the engine compartment of the car?

6    A.  It is.

7    Q.  And could you describe what's depicted on the left-hand

8    side of the engine compartment, there's a box and below that

9    black box, what that is?

10   A.  That's the car's battery.

11          MR. DePORRE:  Would you now go to 5B?

12   BY MR. DePORRE:

13   Q.  And could you describe what this is?

14   A.  That's a photo of the area between the battery and the

15   metal wall of the engine compartment, and a black mesh bag

16   that Officer Grocholski located.

17   Q.  Would you turn to Government's Exhibit 5C?

18          Could you tell the jury what this is?

19   A.  It is a photo of after that mesh bag was recovered from

20   where it was concealed and showing that it contained a

21   pistol.

22   Q.  Is that how the pistol looked when it was found?

23   A.  Yes.

24   Q.  And could you describe what's on the bottom part of the

25   pistol, inserted into the handle of the pistol?

1    A.  The magazine.

2    Q.  And that handle of the pistol, is that -- what is that

3    referred to as?

4    A.  The grip.

5    Q.  And where the magazine inserts, what is that part

6    called?

7    A.  The magazine well.

8    Q.  And in this case, does that magazine extend out beyond

9    the grip?

10   A.  It does.

11   Q.  Is that how it looked when you found the pistol that

12   day?

13   A.  Yes.

14   Q.  Was the pistol loaded?

15   A.  It was.

16        MR. DePORRE:  All right.  Would you show

17   Government's Exhibit 5D?

18   BY MR. DePORRE:

19   Q.  At this point, have you taken the pistol out of the

20   magazine -- excuse me, the magazine, have you taken it out of

21   the magazine well?

22   A.  Yes.

23   Q.  Whose hand is that on the bottom of the pistol -- on the

24   bottom of the magazine?

25   A.  I believe that's my hand.

1    Q.  And did you take this photograph?

2    A.  Yes.

3    Q.  And to be clear for the record, who found the mesh bag?

4    A.  Officer Grocholski.

5            MR. DePORRE:  At this point, I would like to

6    approach with what has been marked as Government Exhibit 5F,

7    it is a firearm.  So I'm going to ask for the case agent to

8    take the exhibit up.

9            THE COURT:  That's fine.

10   BY MR. DePORRE:

11   Q.  Do you recognize what's been marked as Government's

12   Exhibit 5F?

13   A.  I do.

14   Q.  Did you see it on November 26th, 2020?

15   A.  I did.

16           MR. DePORRE:  Your Honor, at this point, I would

17   move for admission --

18   BY MR. DePORRE:

19   Q.  Could you describe what it is?

20   A.  It is a Ruger LC9, nine-millimeter semiautomatic handgun

21   with an obliterated or destroyed serial number.

22   Q.  And is there also a magazine there?

23   A.  There is.

24           MR. DePORRE:  Your Honor, at this point, I would

25   move for admission of Government's Exhibit 5F.

1    THE COURT:  Is the testimony that those items,

2  there, were found in the white Pontiac Grand Prix?

3  A.  Yes, sir.

4    THE COURT:  Any objection?

5    MR. LONGSTREET:  None.

6    THE COURT:  Okay.  Those are admitted.

7    (Government's Exhibit No. 5F received into

8    evidence.)

9  BY MR. DePORRE:

10  Q.  I would like you, also in that book, to take a look at

11  Government's Exhibit 5E.  You mentioned that the pistol had

12  an obliterated serial number.  Could you take a look at

13  Exhibit 5E and tell me if that's how the pistol looked when

14  you seized it on November 26th from the white Pontiac

15  Grand Prix?

16  A.  Yes, sir.

17    MR. DePORRE:  At this point, I would move for

18  admission of Government's Exhibit 5E.

19    THE COURT:  Any objection?

20    MR. LONGSTREET:  None.

21    THE COURT:  That's admitted.

22    (Government's Exhibit No. 5E received into

23    evidence.)

24    MR. DePORRE:  Would you pull up Government's

25  Exhibit 5E up?

 1   BY MR. DePORRE:

 2   Q.   Is that how the serial number looked?

 3   A.   Yes.

 4   Q.   All right.  Would you also go back to Government's

 5   Exhibit 5C?

 6          There can you see where the serial number plate

 7   would be on Government's Exhibit 5C?

 8   A.   Yes.

 9   Q.   Could you describe that, where it's located for the

10   jury, just so they can have an idea of the close-up pictures?

11   A.   Yeah.  You could see, like, the silver line going

12   horizontally along the frame of the pistol.  It is -- if you

13   drew a line up directly from where the grip is.

14   Q.   You mentioned that it's a Ruger pistol, correct?

15   A.   Correct.

16   Q.   Is it a revolver?

17   A.   No.

18   Q.   What sort of pistol is it?

19   A.   Semiautomatic.

20   Q.   And is that serial number below the slide of the

21   semiautomatic firearm?  Is it below where the slide would go,

22   if you were to cock it?

23   A.   Yes, yes.

24   Q.   How many rounds were in the pistol when you seized it

25   that day?

Case 4:21-cr-20405-MFL-CI ECF No. 72, PageID.793 Filed 07/23/23 Page 66 of 191
*Jury Trial - Volume 2 • November 14, 2022*

**66**

1   A.   There were no rounds in the chamber, but there were six

2   rounds in the magazine.

3   Q.   Could you tell the jury what it means to have a

4   chambered round in the pistol?

5   A.   The chamber is where the bullet sits in the barrel

6   before it's fired.

7   Q.   For there to be a round in the chamber, does the gun

8   have to be cocked or racked or --

9   A.   Yes.

10  Q.   Did you take a photograph of the ammunition?

11  A.   I did.

12  Q.   Would you turn to government Exhibit 6A?  Is that

13  a -- excuse me, 6B.  Is that a photograph of the ammunition

14  you took?

15  A.   It is.

16         MR. DePORRE:  Would you hand me Government's

17  Exhibit 6A?  It was mismarked as 6B, but it is actually 6A?

18  And would you collect Government's Exhibit 5F from the stand?

19  Thank you.

20  BY MR. DePORRE:

21  Q.   Do you recognize Government's Exhibit 5A?

22         THE COURT:  Do you mean 6?

23         MR. DePORRE:  6A.  Thank you, Your Honor.

24  A.   Yes.

25         MR. DePORRE:  And at this point, the Government

1  moves for admission of Government's Exhibit 6A?

2           THE COURT:  Any objection?

3           MR. LONGSTREET:  No.

4           THE COURT:  That's admitted.

5           (Government's Exhibit No. 6A received into

6           evidence.)

7  BY MR. DePORRE:

8  Q.  Did you take a photo of Government's Exhibit 6A?

9  A.  Yes.

10  Q.  What caliber rounds are there?

11  A.  Nine millimeter.

12  Q.  And the photo is Government's Exhibit 6B?

13  A.  Yes.

14           MR. DePORRE:  I move admission of 6B.

15           THE COURT:  Any objection?

16           MR. LONGSTREET:  No, none.

17           THE COURT:  That's admitted.

18           (Government's Exhibit No. 6B received into

19           evidence.)

20           MR. DePORRE:  Would you pull that up, please.

21  BY MR. DePORRE:

22  Q.  Is that the photograph that you took?

23  A.  It is.

24  Q.  Are those the six rounds of ammunition that were in the

25  magazine?

1    A.   Yes.

2    Q.   After you found the Ruger pistol and -- the loaded Ruger

3    pistol, did you ever go back and talk to Mr. Garza and tell

4    him that you had found it?

5    A.   No.

6    Q.   Did you show him a picture of the gun?

7    A.   No.

8    Q.   Did you ever re-interview him to ask him more questions,

9    any follow-up questions about the gun?

10   A.   No.

11          MR. DePORRE:  I have nothing further, Your Honor.

12          THE COURT:  This is a good time for our morning

13   break.  Ladies and gentlemen, you'll see as we get into this,

14   we do a break in the morning and the afternoon.  So we will

15   take about a 10- to 15-minute break here, a comfort break.

16   Please don't discuss the case, and we will see you shortly.

17          THE CASE MANAGER:  All rise for the jury.

18          (Jury excused at 10:43 a.m.)

19          THE COURT:  All right.  The jury is out.

20          Anything you need to address with me, Mr. DePorre?

21          MR. DePORRE:  Nothing for the government.

22          THE COURT:  Mr. Longstreet?

23          MR. LONGSTREET:  Nothing, sir.

24          THE COURT:  Okay.  Thank you.  See you in about

25   10, 15 minutes.  Thank you.

```
 1              (Court recessed at 10:44 a.m.)

 2                           _   _   _

 3              (Court reconvened at 11:02 a.m.; Court, Counsel and

 4              all parties present.)

 5         THE COURT:  Mr. DePorre, are you ready to continue?

 6         MR. DePORRE:  I am, Your Honor.

 7         THE COURT:  Mr. Longstreet, are you?

 8         MR. LONGSTREET:  Sir, yes, sir.

 9         THE COURT:  Okay.  Let's bring in our jury.

10         THE CASE MANAGER:  All rise for the jury.

11         (Jury entered at 11:04 a.m.)

12         THE COURT:  Ladies and gentlemen, welcome back.

13   Please be seated.

14         Mr. Longstreet, please proceed with your questions.

15         MR. LONGSTREET:  Thank you.

16                    CROSS-EXAMINATION

17   BY MR. LONGSTREET:

18   Q.  Good morning, Officer.

19   A.  Good morning, sir.

20   Q.  Thank you.  First, I would like to direct your attention

21   to 2474 West Hill Road, that is the Meijer location; is that

22   correct?

23   A.  Yes, sir.

24   Q.  And you go there for a shoplifting investigation; is

25   that correct?
```

 1    A.   Yes.

 2    Q.   All right.  And the part of your investigation, you come

 3    in contact with Mr. Hutchins; is that correct?

 4    A.   Yes.

 5    Q.   Okay.  And you also come in contact with Mr. Garza, who

 6    was in the driver's seat of the Pontiac, correct?

 7    A.   Yes, sir.

 8    Q.   Okay.  And now, during this particular investigation,

 9    the first person you pull out of the car is Mr. Garza?

10    A.   That's correct.

11    Q.   All right.  And while Mr. Hutchins remained in the

12    vehicle?

13    A.   Yes.

14    Q.   All right.  And at a certain point, Mr. Hutchins is

15    pulled out of the vehicle, correct?

16    A.   Correct.

17    Q.   Now, what's most important is that Mr. Hutchins is in

18    the back-driver's-side of the vehicle, correct?

19    A.   That's correct.

20    Q.   And at a certain point, there's a period of time that

21    he's left alone inside of the vehicle, correct?

22    A.   That's correct.

23    Q.   Would that be enough time to reach in his pocket and

24    dump a shell?

25    A.   It could be.

1   Q.   Thank you.  Now, at a certain point, you pulled

2   Mr. Hutchins -- or your partner pulls Mr. Hutchins out of

3   car; is that accurate?

4   A.   Yes, sir.

5   Q.   All right.  And your partner has a conversation with

6   Mr. Hutchins; is that correct?

7   A.   Yes.

8   Q.   All right.  And as part of that conversation, you learn

9   information that prompts you to search the vehicle; is that

10  right?

11  A.   The vehicle would have been searched anyway.

12  Q.   Anyway.  Okay.  And as part of the search -- the vehicle

13  would have been searched because Mr. Garza was arrested; is

14  that accurate?

15  A.   Yes.

16  Q.   All right.  Now, at a certain point, you conduct what's

17  called an inventory search, correct?

18  A.   That's correct.

19  Q.   And this inventory search is to log all the items that

20  are in the car, accurate?

21  A.   Yes.

22  Q.   All right.  And not everything that was in this vehicle

23  belonged to Mr. Garza; is that accurate?

24  A.   Yes.

25  Q.   All right.  Now, let's discuss the inventory search.

1    You indicated during direct examination that you received

2    training from your department in regards to inventory

3    searches; is that accurate?

4    A.  Yes.

5    Q.  All right.  And as part of your training and inventory

6    searches, you were taught to look in the engine compartment,

7    correct?

8    A.  That's not specific just to inventory searches, but

9    vehicle searches, yes.

10   Q.  So part of your training in doing vehicle searches is to

11   search the engine compartment of a vehicle, correct?

12   A.  Correct.

13   Q.  All right.  And that is because police, as part of their

14   investigation, is looking for contraband hidden inside the

15   engine compartment, correct?

16   A.  Yes.

17   Q.  You look in multiple places inside of an engine

18   compartment as a part of your training, correct?

19   A.  A few specific ones, it depends on the make, model of

20   the vehicle, where the voids are that could conceal items.

21   Q.  A few places in the engine compartment.  Tell this jury,

22   based on your training, what portions of the engine you would

23   search?

24   A.  Like I said, there is different voids, the different

25   makes and models of vehicles have just on their design from

1    the manufacturers, but every vehicle has an air box, it has

2    to have an air filter, and there has to be -- there's a void

3    in all of those air boxes, where items have been found by

4    police officers, and part of the training was that it is best

5    practice to check the air box, if you are able to.

6    Q.  Where else?

7    A.  Again, it would depend on the make and model of the

8    vehicle.  You would have to check the engine compartment.

9    Q.  Give us examples of places that you would search in

10   vehicles, no matter of make or model.

11   A.  Sure.  If there is a void behind a headlight that would

12   be searched.

13   Q.  Let me stop you there.  Specifically, the headlights,

14   both?

15   A.  If is there a void, sir.

16   Q.  Sir, question specifically to the headlights, you would

17   search both headlights; is that correct?

18   A.  If I was going to search one, I would search both, yes.

19   Q.  In between headlights is generally the radiator,

20   correct?

21   A.  Yes.

22   Q.  And so you would look to the front of the engine

23   compartment, the headlights, and then you would go to the

24   left side and do the same thing, correct?

25   A.  Yes, sir.

1    Q.  All right.  And you would use your duty flashlight to do

2    that?

3    A.  If I needed to, yes.

4    Q.  Okay.  Where else would you look, headlights, where

5    else?

6    A.  If there was the access to the cabin air filter, there

7    is a void there, it would it be along the firewall.

8    Q.  Let me stop you there.  Cabin air filter is toward the

9    front of the engine, correct?

10   A.  Correct.

11   Q.  All right.  Behind the engine block, correct?

12   A.  If there was a place to hide something.

13   Q.  Okay.  We are talking about the cabin air filter, that's

14   typically behind the engine block, correct?

15   A.  Yes.

16   Q.  All right.  Where else would you search?  So we talked

17   about headlights in the front, we talked about the air box in

18   the front, where the air filter is, and we also talked about

19   the cabin filter, towards the back.  You also said the

20   firewall, correct, the firewall of an engine?

21   A.  Not an area we typically search, but --

22   Q.  You said firewall.

23   A.  I did say firewall.

24   Q.  Okay.  And the firewall sits between the engine and the

25   interior of the vehicle?

```
 1   A.   Correct.

 2   Q.   You searched that as well?

 3   A.   Likely not.

 4   Q.   Now, specifically, let's use headlights.  Every car has

 5   headlights, right?

 6   A.   Yes.

 7   Q.   Okay.  I'd like to show you what was previously

 8   presented as Government's Exhibit 5A.  Now this Pontiac

 9   Grand Prix has headlights, right?

10   A.   It does.

11   Q.   Okay.  What I would like to show you has been marked as

12   and previously admitted as Government's Exhibit 5A.

13           THE COURT:  Mr. Longstreet, do you mind activating

14   this screen as well, so we have one more?

15           MR. LONGSTREET:  Sure.

16           THE COURT:  Thank you.

17   BY MR. LONGSTREET:

18   Q.   All right.  This is the engine block of the 2008

19   Grand Prix, correct?

20   A.   Correct.

21   Q.   A car with headlights?

22   A.   It does have headlights.

23   Q.   All right.  And as part of your first inventory search

24   you indicated you would check the air box and you would check

25   the headlights, correct?
```

```
 1   A.  I said it is a possibility to check behind headlights,
 2   but --
 3   Q.  And the police officer that you are, doing a thorough
 4   job, you searched that area, correct?
 5   A.  Yes.
 6   Q.  Okay.  Now, let's blow this up a little bit.  Now, the
 7   headlights sit right in front of this white -- see the
 8   radiator right there?
 9   A.  I do.
10   Q.  And the headlights would be to the left, right?
11   A.  Correct.
12   Q.  All right.  And the headlight would be to the right,
13   correct, where the Government's Exhibit sign is, right?
14   A.  Correct.
15   Q.  That would be another headlight?
16   A.  Right.
17   Q.  Right behind that is the battery, right?
18   A.  Correct.
19   Q.  You searched that area and didn't find a gun, right?
20   A.  That's incorrect.
21   Q.  You searched that area the first time and didn't find a
22   gun?
23   A.  That's incorrect as well.
24   Q.  So you didn't do a thorough job in your search the first
25   time?
```

1    A.   Yes, sir.

2    Q.   Okay.  Is that an excuse or something that you just

3    didn't do?

4    A.   I could elaborate, if you would like me to.

5    Q.   That's okay.  Now, you also searched the air box, and

6    that would be where the air filter was located, correct?

7    A.   Correct.

8    Q.   And after you did this thorough search, based on

9    your -- your department standards, you close the hood and you

10   had the car towed away, correct?

11   A.   Correct.

12   Q.   All right.  Now, in the interim, you talk to or have

13   conversations with Mr. Allen, correct?

14   A.   Yes.

15   Q.   Mr. Allen is the person who was found inside the store

16   stealing stuff, right?

17   A.   Correct.

18   Q.   And he was also associated with this 2008 Grand Prix,

19   correct?

20   A.   Not to my knowledge.

21   Q.   All right.  But you know he was accompanied by Mr. Garza

22   and Mr. Hutchins?

23   A.   Correct.

24   Q.   All right.  And you -- based on the information that you

25   received from him several hours later, you go back to the

 1    tow yard to find -- or look under the engine compartment

 2    again, correct?

 3    A.   Correct.

 4    Q.   All right.  Now, this is several hours after the first

 5    search, accurate?

 6    A.   Yes.

 7    Q.   All right.  And you go back and that's when you find the

 8    second gun -- the gun -- oops, right near the headlights,

 9    correct?

10    A.   No.

11    Q.   I'm sorry.  Your partner, the person you went with,

12    found the firearm there; is that correct?

13    A.   You're saying behind the headlights, yes, it was behind

14    the headlights, but the void that you have right there,

15    zoomed in -- the one more towards the lower end of the

16    screen -- no, a little lower, lower, that's higher.  There

17    you go, that's the void that I would have checked at Meijer.

18    Q.   All right.  This is the void you would have checked at

19    Meijer?

20    A.   Correct.

21    Q.   However, the firearm was found approximately six -- a

22    foot back, by this battery, right?

23    A.   Yes, sir, because batteries are typically secured down

24    and immobile.  I was unaware -- I did not inspect the battery

25    and find, at that time, that it was not secured down; the

 1    battery was just sitting in there loose.  So it wouldn't have

 2    been normal for me to move the vehicle's battery to search

 3    behind it.

 4    Q.  Okay.  Got you.  Thank you, sir.  Appreciate that.

 5         Question:  Were you using your duty-issued

 6    flashlight when you were conducting this search?

 7    A.  It was daytime, likely not, unless there was a void that

 8    was dark, that I wanted to inspect.

 9    Q.  Okay.  Now, this bag that the firearm was in had a

10    distinctive mesh design to it; is that correct?

11    A.  It is a mesh bag, yes.

12    Q.  And it had a string on it?

13    A.  Yes.

14    Q.  What I'm showing you is marked as Exhibit 5B.  We are

15    taking a look at the mesh bag in its position; is that

16    correct?

17    A.  That is the mesh bag, that is the battery on the top

18    portion of the screen.

19    Q.  Okay.

20    A.  But that photograph is taken after the battery's been

21    moved out of the way, so you could view the mesh bag better.

22    Q.  Okay.  Now, this mesh bag is sitting just about on top

23    of that white section of bar; is that correct?

24    A.  No.

25    Q.  So, sir, these two aren't similar?

1    A.   The photograph on the left is taken from a different

2    angle.  That's actually taken from when I was standing on the

3    passenger side, looking down, so that battery had to be moved

4    away from the passenger's-side fender to be able to view

5    that.

6    Q.   But most certainly, it's within viewing of the surface;

7    is that correct?

8    A.   The bag was not --

9    Q.   The mesh bag.

10   A.   The bag was not in view --

11   Q.   Very good.

12   A.   -- without moving the battery.

13   Q.   Now, you also spoke, at a certain point, with

14   Mr. Hutchins; is that correct?

15   A.   Yes.

16   Q.   Okay.  And Mr. Hutchins gave you information in regards

17   to what was going on at the Meijer store, correct?

18   A.   Yes.

19   Q.   And part of your discussions with Mr. Hutchins, he gave

20   you a very specific description of the firearm; is that

21   correct?

22   A.   He did.

23   Q.   Okay.  And, in fact, he said it was a .380?

24   A.   Correct.

25   Q.   What you found wasn't a .380?

```
 1   A.   It was not.
 2   Q.   And he also was very specific about the -- very specific
 3   about the type of clip that was in the gun, 14-shot, correct?
 4   A.   Yes.
 5   Q.   And this was not a 14-shot firearm, correct?
 6   A.   It was not.
 7   Q.   All right.  But he's the one that was very specific
 8   about where a gun could be found, right?
 9   A.   Yes.
10   Q.   And he was also the one in the back seat, where a bullet
11   was found, right?
12   A.   I think I should clarify here.  Mr. Hutchins said that
13   the firearm would be located near the driver's seat, he never
14   said the engine compartment.
15   Q.   Okay.  But he also in the back seat where the bullet was
16   found, right?
17   A.   He was in the back seat.  I would not describe the
18   location of the bullet as being in the back seat.
19   Q.   Okay.  Sir, this is the back seat, right?
20   A.   It is a photo taken from the back seat, yes.
21   Q.   Okay.  And this is the back portion of the vehicle,
22   correct, where this seat has been slid forward?
23   A.   Correct, so that area would not have been visible in
24   that way with the seat in the position it was found in.
25   Q.   Okay.  But it most certainly is not going to stop a
```

1    person sitting in the back seat from kicking it under the

2    seat, right?

3    A.  I suppose not.

4    Q.  All right.  You don't know how that bullet got there,

5    correct?

6    A.  I didn't place it there.  I didn't know how it got

7    there.

8    Q.  Okay.  All right.  Now, as a part of your department, do

9    you ever -- as a part of your investigation to determine who

10   had possession of an item, make a request for latent prints?

11   A.  Yes.

12   Q.  And as a part of trying to determine who had possession

13   of a particular item, do you ever submit anything to the

14   Michigan State lab for DNA testing?

15   A.  Sometimes.

16   Q.  In this instance, that wasn't done; is that correct?

17   A.  I don't recall.

18   Q.  You don't recall or you don't know?  I mean, because you

19   are the person who led this investigation, correct?

20   A.  That's not how it really works in my department.

21   Q.  You are the person that led this investigation, correct?

22   A.  Up until the point where I type my report and turn in

23   the property to the evidence room.

24   Q.  Uh-huh.

25   A.  After that, I'm not in charge of the investigation.

1  Q.  Okay.  But you are the person who placed the items on

2  evidence; is that correct?

3  A.  Yes.

4  Q.  And also, there is a certain point where another officer

5  may take over your investigation.  Did you ever talk to that

6  person and say, hey, man, I got three people in the car, you

7  might want to have that tested for latent prints?

8  A.  No.

9  Q.  Okay.  Were the bullets that you found submitted for

10  latent print testing?

11  A.  I don't know.

12  Q.  And was it swabbed or tested for DNA testing to

13  determine who actually had that bullet in their hand?

14  A.  Not by me.

15  Q.  Not by anyone in your department; is that correct?

16  A.  I don't know.

17  Q.  Okay.  All right.  Sir, at a certain point, you had a

18  long conversation with Mr. Garza; is that correct?

19  A.  Correct.

20  Q.  And you had a discussion about the Suboxone; is that

21  correct?

22  A.  Yes.

23  Q.  And you received information that he uses Suboxone,

24  correct?

25  A.  That's what he said, yes.

1  Q.  He told you because he gets dope sick?

2  A.  Yes.

3  Q.  All right.  And are you aware that Suboxone is a drug

4  for recovering opioid addicts?

5  A.  Yes.

6  Q.  And the purpose of -- you understand the purpose of

7  Suboxone is to stop people from getting dope sick?

8          MR. DePORRE:  Your Honor, objection.

9          MR. LONGSTREET:  If he knows.

10         MR. DePORRE:  Foundation, in this case.

11         MR. LONGSTREET:  I asked, if he knows.

12         THE COURT:  Let's start with, does he know the

13  purpose of Suboxone?

14  BY MR. LONGSTREET:

15  Q.  Do you know the purpose of Suboxone?

16  A.  I know that is the clinical purpose, yes.

17  Q.  And the clinical purpose is for keeping opioid addicts

18  from getting dope sick, so they can eventually get off of

19  opioids?

20  A.  Yes.

21  Q.  And are you aware that people who don't have a

22  prescription still use it to get off of the dope?

23  A.  Do you mean, if they got it without --

24  Q.  If they got it without a prescription, they might be

25  using it to still get off of dope, self-medicating?

```
 1   A.   They could be.

 2   Q.   Okay.  Are you aware that you really don't get high off

 3   of Suboxone?

 4   A.   I think that's contrary to what I have been told, but --

 5   Q.   Okay.

 6   A.   -- I'm not an expert.

 7   Q.   Now, you indicated that you bluffed Mr. Garza about this

 8   firearm, correct?

 9   A.   Correct.

10   Q.   You said, "Whose firearm was that I found?"

11   A.   Yes.

12   Q.   All right.  So that Mr. Garza would believe that you

13   found a gun, right?

14   A.   That was the intention of asking the question that way.

15   Q.   Okay.  To make him believe that you had found the gun?

16   A.   Yes.

17   Q.   Correct.  Okay.

18        Did you happen to listen to the phone call of

19   December 6th?

20   A.   I did.

21   Q.   Okay.  And in that phone call, you hear him talking

22   about "the fucking Metro police didn't find my banger,"

23   right?

24   A.   Yes.

25   Q.   But you told him you had found a gun, right?
```

```
1    A.   I did tell him that.

2    Q.   Okay.

3    A.   However, he was in view of my search of the vehicle at

4    the Meijer lot, so he would have known that I didn't pull it

5    from engine compartment.

6    Q.   Are you assuming that he saw you versus knowing?

7    A.   I suppose I am.

8    Q.   Okay.  Thank you.

9         So you hear this phone call on December 16th, and

10   hear Mr. Garza say, "the police didn't find my banger," even

11   though you told him ten days before, you had found a gun,

12   correct?

13   A.   Correct.

14        MR. LONGSTREET:  Nothing further.

15        THE COURT:  Thank you, Mr. Longstreet.

16        Mr. DePorre, any redirect?

17        MR. DePORRE:  Yes, Your Honor.  Just got to take

18   minute to get plugged in here.

19                    REDIRECT EXAMINATION

20   BY MR. DePORRE:

21   Q.   Officer Fisher, when you search the engine compartment

22   of a vehicle during an inventory search, do you start taking

23   apart the engine?

24   A.   No.

25   Q.   Do you start removing parts of the engine like the -- do
```

```
 1    you take out the air filter?

 2    A.   Yes.

 3    Q.   Do you take out the headlights?

 4    A.   No.

 5    Q.   Did you take out the radiator?

 6    A.   No.

 7    Q.   So what exactly do you take out of an engine

 8    compartment -- actually I'm going to make it very specific to

 9    this case.  What do you remember taking out during the first

10    search -- the first inventory search of the engine

11    compartment of the white Pontiac Grand Prix?

12    A.   The air filter.

13    Q.   Is that the only thing?

14    A.   Yes.

15         MR. DePORRE:  I'd like to pull up Government's

16    Exhibit 5A, please.

17    BY MR. DePORRE:

18    Q.   I'm going to hand you a laser pointer.  There is a red

19    exclamation that activates the pointer when you press it with

20    your thumb.

21         Have you had firearms training?

22    A.   Yes.

23    Q.   Are you a pretty good shot?

24    A.   I am.

25    Q.   I would like you to hit the part of the car from here,
```

1    with that laser pointer, of where you found -- excuse me, of

2    where Officer Grocholski found the mesh bag?

3    A.  I can't see on the screen, I don't think -- or I can't

4    see it.

5    Q.  All right.  You can't see the pointer?

6    A.  I can't see.

7            MR. DePORRE:  Could the witness just get up and

8    point to it?

9            MR. LONGSTREET:  Yes, I would appreciate.

10           MR. DePORRE:  I hope you are better with firearms

11   than laser pointers.

12   A.  This is the vehicle's battery, and the bag and firearm

13   were located next to the battery, down on the left side of

14   it.

15   BY MR. DePORRE:

16   Q.  And did you have to move the battery -- or did

17   Officer Grocholski have to move the battery to find the mesh

18   bag?

19   A.  Yes.

20   Q.  Was it something that you saw during that first

21   inventory search?

22   A.  Yes.

23   Q.  You saw the battery?

24   A.  Yes.

25   Q.  Did you see the mesh bag during the first inventory

1   search?

2   A.   No.

3   Q.   What would you have done if you had seen a mesh bag

4   during the first inventory search?

5   A.   I would have pulled it out.

6           THE COURT:   Could you come back to -- -

7   BY MR. DePORRE:

8   Q.   Just so our record is very clear, once you get back to

9   the seat, I will re-ask that question.

10          What would you have done if you had found a mesh

11  bag in the engine compartment?

12  A.   I would have pulled it out.

13  Q.   Okay.  Mr. Hutchins gave you some very specific

14  information about the firearm, correct?

15  A.   Yes.

16  Q.   You talked on cross-examination about how it was a .380

17  caliber firearm.

18  A.   Mr. Hutchins said that it would be that caliber, yes.

19  Q.   Can you explain whether or not .380 rounds can be fired

20  from a nine-millimeter caliber firearm?

21  A.   I have not seen that.  I'm not familiar with that.

22  Q.   Can other rounds be fired by a nine-millimeter caliber

23  firearm beside a nine?

24  A.   I don't know.

25  Q.   Do you know about the size difference between a .380 and

1    a nine-millimeter?

2    A.  Just having held both, I know that it is not much of a

3    size difference at all.

4    Q.  They are pretty close?

5    A.  Yes.

6            MR. DePORRE:  And then would you pull up

7    Government's Exhibit 6B, please.

8    BY MR. DePORRE:

9    Q.  Do you know exactly how many rounds would fit inside

10   this magazine?

11   A.  I do not.

12   Q.  Mr. Hutchins told you it was a 14-round mag; that came

13   out on cross?

14   A.  Yes.

15   Q.  And do you have any idea of whether or not 14 rounds

16   would fit in there?

17           MR. LONGSTREET:  Objection; question calls for

18   speculation.  The witness testified he didn't know how many

19   would fit if there.

20           THE COURT:  I think he just answered he doesn't

21   know.

22   A.  I don't know.

23   BY MR. DePORRE:

24   Q.  Is that an extended magazine?

25   A.  Yes.

1          MR. DePORRE:  Could we pull up Government's
2    Exhibit 3C?
3          MS. SZUHKENT:  That's physical evidence.
4          MR. DePORRE:  Sorry.  Would you pull up
5    Government's Exhibit 3B?
6          THE COURT:  Which one did you ask for?
7          MR. DePORRE:  3B.
8          THE COURT:  Go ahead.
9    BY MR. DePORRE:
10   Q.  The round that's depicted there, is that a .380-caliber
11   round?
12   A.  No.
13   Q.  So presumably, whoever lost that round -- or if someone
14   tossed a round there, they would know what caliber it was,
15   correct?
16         MR. LONGSTREET:  Objection; assumes and calls for
17   speculation.
18         THE COURT:  I will sustain that.
19   BY MR. DePORRE:
20   Q.  Have you ever -- do you have a car?
21   A.  I do.
22   Q.  And do you drive a patrol car?
23   A.  Yes.
24   Q.  Have you ever had something fall out of the right-front
25   pants pocket?

```
 1   A.   Yes.
 2   Q.   Could you describe where it falls when you are driving
 3   in your car?
 4   A.   Between the center console and the driver seat.
 5   Q.   And have you ever found things that fell out of your
 6   pocket between the rack and the center console, the rack
 7   where the car (sic) slides?
 8   A.   Yes.
 9   Q.   Have you found money there?
10   A.   Yes.
11   Q.   And did that money fall out of your right-front pants
12   pocket?
13   A.   Yes.
14   Q.   Have you ever tried to toss something into that, from
15   the back seat?
16   A.   No.
17   Q.   Did you have to move the seat to take that photograph?
18   A.   Yes.
19   Q.   And before you moved the seat, did you know that there
20   was a round of ammunition there?
21   A.   No.
22   Q.   Did you move the seat to search it?
23   A.   Yes.
24   Q.   To search underneath it?
25   A.   Yes.
```

```
 1    Q.  You were asked whether or not people could take Suboxone
 2    without a prescription to try to get off of heroin.  Do you
 3    know any other reasons people might take Suboxone without a
 4    prescription?
 5    A.  As far as my training has been, is that Suboxone will
 6    give somebody -- an opioid user a small, brief high between
 7    them using heroin or opiate pills, whichever they are --
 8    Q.  Are you familiar with a drug called methadone?
 9    A.  Yes.
10    Q.  Does Suboxone work in a similar way?
11    A.  Yes.
12              MR. DePORRE:  I have no further questions.
13              THE COURT:  Mr. Longstreet, anything else from you?
14              MR. LONGSTREET:  Just briefly, about Suboxone.
15                         RECROSS-EXAMINATION
16    BY MR. LONGSTREET:
17    Q.  It's a brief high, but it's a brief high to assist those
18    who are heroin addicted, from getting off of heroin, correct?
19    A.  Yes, sir.
20    Q.  Okay.  And the main point of it is to take it so they
21    don't get dope sick, so they can continue not taking heroin,
22    correct?
23    A.  I believe that would be the intent.
24    Q.  All right.  And that's a drug that helps opioid users,
25    correct?
```

1   A.   When it is not being abused.

2           MR. LONGSTREET:  Okay.  Nothing further.

3           THE COURT:  Okay.  Thank you.  You may step down.

4   Thank you for your time.

5           (Witness excused at 11:35 a.m.)

6           THE COURT:  The government may call its next

7   witness.

8           MR. DePORRE:  Your Honor, the government calls

9   Chelsea Cortez.

10          THE COURT:  Ms. Cortez, could you come up here for

11  a moment?  Can you raise your right hand?

12          Do you swear the testimony you are about to give

13  will be the truth?

14          MS. CORTEZ:  Yes.

15          THE COURT:  Thank you.  Please settle into the

16  witness chair.  As you are sitting down, may I ask you if you

17  would please keep your voice up and speak slowly, so that all

18  of us can clearly hear what you have to say.

19          MS. CORTEZ:  Sure, yes.

20          THE COURT:  Thank you.

21          MR. DePORRE:  I just noticed there's a lot of other

22  evidence up there.

23          THE COURT:  Do you want to grab it?

24          MR. DePORRE:  Yes.  If I could ask the case agent

25  to do that.  You can leave the binder up there, though.

```
 1
 2                        CHELSEA CORTEZ,
 3   called at about 11:36 a.m., was examined and testified on her
 4   oath as follows:
 5                        DIRECT EXAMINATION
 6   BY MR. DePORRE:
 7   Q.  While he's doing that, I will start by asking some
 8   questions.  First, would you state your name and spell your
 9   full name for the record?
10   A.  Sure.  Chelsea Cortez.  The first name is C-H-E-L-S-E-A,
11   last name C-O-R-T-E-Z.
12   Q.  Ms. Cortez, how are you employed?
13   A.  I am a department analyst with the Department of
14   Licensing and Regulatory Affairs for the State of Michigan
15   and the MAPS program.
16   Q.  And would you explain to the jury what the MAPS program
17   is?
18   A.  MAPS stands for Michigan Automated Prescription System,
19   and it is the State of Michigan's electronic drug monitoring
20   system that collects information on any scheduled drugs
21   dispensed to residents of Michigan.
22   Q.  You said it collects information.  Where does it collect
23   it from?
24   A.  So anyone dispensing a prescription in the state -- or
25   controlled substances, is required to report information on
```

1    that prescription to the MAPS system.

2    Q.   And do they have a software program where they enter

3    that information?

4    A.   They do.  They have two options.  Many pharmacies use a

5    vendor to submit their data for them, through their pharmacy

6    records system, or they also have an option to manually enter

7    the prescription information directly into the MAPS system.

8    Q.   You said, dispensers.  Typically, what sort of people

9    dispense controlled substance?

10   A.   The majority of controlled substances are dispensed by

11   pharmacies, and then there are also licensed prescribers that

12   also hold a license to dispense medication, so we call those

13   dispensing prescribers, who would dispense out of their

14   office.

15   Q.   What sort of information do they enter when they enter a

16   prescription into the MAPS.

17   A.   So anyone dispensing the medication is required to

18   report the patient information, name, date of birth, address,

19   as well as information on the prescriber, the prescriber DEA

20   number, name, address and the medication name, the dosage,

21   day supply, and -- I believe that's it.

22   Q.   What's the purpose of all of that information?

23   A.   The purpose of collecting that information is to provide

24   information to prescribers prescribing controlled substances,

25   so that they can get a detailed history of the prescriptions

1    of their patients.  So the purpose of the MAPS system is to

2    ensure patient safety.

3    Q.  Now, if I'm taking antibiotics and I have a

4    prescription, does that information get entered into MAPS?

5    A.  No, that would not.

6    Q.  And why not?

7    A.  Antibiotics are not a scheduled drug, so they are not

8    reported to the MAPS system.

9    Q.  So only -- when we talk about scheduled drugs, those are

10   controlled substances?

11   A.  Correct.

12   Q.  Not every drug that needs a prescription is a controlled

13   substance?

14   A.  Correct.

15   Q.  Is buprenorphine entered into MAPS?

16   A.  Yes.

17   Q.  And is that a controlled substance?

18   A.  Yes.

19   Q.  Is there a law that requires all of this to happen?  Is

20   there some sort of regulation that requires prescribers

21   or -- dispensers, excuse me, to enter their information into

22   MAPS?

23   A.  Yes.  The Board of Pharmacy Rules, which are also in the

24   Michigan statute, requires a dispenser or dispensing

25   prescriber to report data on a prescription within one

1    business day of the dispensation.

2    Q.   And after the information is reported, are you able to

3    run a report for a particular medical provider?

4    A.   Yes.

5    Q.   Are you able to run a report for a particular pharmacy?

6    A.   Yes.

7    Q.   Are you able to run a report for a particular

8    individual?

9    A.   Yes.

10   Q.   And is there -- on those reports is there a specific

11   section for recent prescriptions of buprenorphine?

12   A.   Yes.

13   Q.   Did you generate a report in this case, for Noe Garza?

14   A.   Yes.

15   Q.   All right.  I would like you -- in front of you there's

16   a black binder, and there's some tabs on the side.  If you

17   would flip to tab 8.  Do you recognize that?

18   A.   Yes.

19   Q.   Could you explain what that is?

20   A.   This is a copy of the MAPS report run for Noe Garza,

21   showing the prescription history for any scheduled controlled

22   substances dispensed between November 26th, 2018 and

23   November 26th, 2020.

24   Q.   So this report goes back two years, from

25   November 26th, 2020?

```
 1   A.   Correct.
 2            MR. DePORRE:  Your Honor, at this point, I would
 3   move for admission of Government's Exhibit 8.
 4            THE COURT:  Any objection?
 5            MR. LONGSTREET:  None.
 6            THE COURT:  That's admitted.
 7            (Government's Exhibit No. 8 received into
 8            evidence.)
 9   BY MR. DePORRE:
10   Q.   If you would look on the Government's Exhibit 8, did
11   Mr. Garza have any prescriptions within that two-year time
12   period?
13   A.   Yes.
14   Q.   And what sort of drug was prescribed?
15   A.   He was prescribed hydrocodone acetaminophen, which is
16   generic for Norco.
17   Q.   Is that a controlled substance?
18   A.   Yes.
19   Q.   Did he have any other prescriptions?
20   A.   No.
21   Q.   Within that two-year period, that was the only
22   controlled substance?
23   A.   Correct.
24   Q.   Did he have a prescription for buprenorphine?
25   A.   No.
```

1          MR. DePORRE:  I have no further questions.

2          THE COURT:  Mr. Longstreet.

3                    CROSS-EXAMINATION

4    BY MR. LONGSTREET:

5    Q.   Hi.  How are you today?

6    A.   Good.

7          THE COURT:  Do you mind coming to the podium,

8    Mr. Longstreet?

9          MR. LONGSTREET:  I'm sorry.

10   BY MR. LONGSTREET:

11   Q.   Good morning, ma'am.

12   A.   Good morning.

13   Q.   You just showed us the MAPS information for Mr. Garza;

14   is that correct?

15   A.   Correct.

16   Q.   He had a prescription for Vicodin, correct?

17   A.   Yes.

18   Q.   And Vicodin is an opioid, correct?

19   A.   Correct.

20   Q.   And it is an opioid that's often used as a drug of

21   abuse; is that correct?

22   A.   Correct.

23   Q.   And something that would get them off -- a drug that

24   would get them off of Vicodin would be Suboxone, right?

25   A.   Correct.

1    Q.   Okay.  And a person would use Suboxone to get off of
2    Vicodin, correct?
3    A.   Yes.
4    Q.   Okay.  Now, the initiation of information into the MAPS
5    system is done by the prescriber; is that correct?
6    A.   No, by the dispenser.
7    Q.   Dispenser.  When you say, "dispenser," is it the person
8    giving the drugs to the doctor?
9    A.   No.
10   Q.   Okay.  It is the dispensary, like CVS?
11   A.   Correct.
12   Q.   Okay.  Can I receive -- go to my doctor and receive a
13   sample of a controlled substance?
14   A.   I don't know.
15   Q.   Okay.
16   A.   I don't believe so.
17   Q.   But most certainly, the information that's placed in
18   this -- in this MAPS system is done by the person dispensing
19   the drug?
20   A.   Correct, to the patient.
21   Q.   Not by the patient?
22   A.   No.
23   Q.   Okay.  So if the person on the front end doesn't put in
24   the information, then you don't know that he has a
25   prescription, correct?

1    A.   Correct.

2    Q.   All right.  And has anyone ever violated the law and not

3    put the information in MAPS?

4    A.   I can't say.  I don't know.

5    Q.   Okay.  Have you ever heard of a doctor's office being a

6    little late about programming the information in and it not

7    being in MAPS?

8    A.   I don't know.

9    Q.   Okay.  Could a doctor, in his office, ever provide to a

10   patient a sample of a drug and it not be in MAPS?

11   A.   I don't know.  I don't -- I'm not familiar with how a

12   sample would work.

13   Q.   Okay.  But you are aware of situations where someone can

14   receive a sample of a drug at an office, before they go to

15   CVS to pick up a prescription for that drug?

16   A.   Yes.

17   Q.   Okay.  And if a doctor had given a sample to a -- of a

18   drug to a patient before they go to CVS to get it, MAPS

19   wouldn't be aware of it, correct?

20   A.   Potentially, no.

21   Q.   Okay.  So not all information in regards to how a

22   patient gets a drug is monitored by MAPS, correct?

23   A.   Can you rephrase?

24   Q.   I'm going to repeat the question.  Not all the

25   information in regards to how a patient got a drug is

1  recorded by MAPS; is that correct?

2  A.   I'm -- the way the public health code is written

3  requires them to report any controlled substance given to a

4  patient.

5  Q.   But if they don't, it is not the patient's fault?

6  A.   Correct.

7  Q.   Right.

8          MR. LONGSTREET:  All right.  Nothing further.

9          THE COURT:  Mr. DePorre.

10          MR. DePORRE:  Would you pull up Government's

11  Exhibit 8 again?  Are you able to zoom in on the bottom,

12  where it says prescriptions?

13                     REDIRECT EXAMINATION

14  BY MR. DePORRE:

15  Q.   Are you able to see on your screen --

16  A.   Uh-huh.

17  Q.   -- the quantity of pills that were prescribed for

18  Mr. Garza for the hydrocodone acetaminophen?

19  A.   Yes.

20  Q.   You testified that that could either be Vicodin or

21  Norco?

22  A.   Correct, those would be the brand name.

23  Q.   How many pills were prescribed back in February of 2019?

24  A.   He was prescribed 12 pills.

25  Q.   And for how many days was he given that prescription?

*Jury Trial - Volume 2 • November 14, 2022*

**104**

1   A.  For a three-day supply.

2   Q.  Is that a high quantity of drugs?

3   A.  No.

4   Q.  Based on your role, do you monitor prescribers for

5   overprescribing controlled substances?

6   A.  Yes.

7   Q.  And would this sort of prescription raise any red flag,

8   whatsoever?

9   A.  No.

10  Q.  You were asked some questions about samples.  If a

11  doctor prescribes a patient a controlled substance and the

12  patient leaves the doctor's office with that controlled

13  substance, does the doctor become the dispensing provider?

14  A.  If the patient receives the controlled substance in

15  their office, yes.

16  Q.  Okay.  And then does the doctor have an obligation to

17  enter that information into MAPS?

18  A.  Yes.

19  Q.  So just because somebody doesn't go to a pharmacy

20  doesn't mean that there isn't an obligation to enter it into

21  MAPS?

22  A.  Correct.

23  Q.  Is there always, whenever a controlled substance is

24  given to a patient, is there a legal requirement to enter

25  that into MAPS?

```
 1    A.   Yes.
 2    Q.   You were also asked some questions about buprenorphine.
 3    You were asked whether or not that's intended to help people
 4    get off opioids.  Is buprenorphine a drug that's commonly
 5    abused?
 6    A.   I don't know.  I don't believe so.
 7    Q.   Is it -- does it have any sort of pain medication
 8    properties?
 9    A.   Yes.  Buprenorphine is also used as a pain management
10    drug.
11    Q.   In what sort of cases would it be appropriate for a
12    prescriber to prescribe buprenorphine, rather than something
13    like Vicodin?
14    A.    In instances, potentially, where the patient has a high
15    risk of overdose or complications.
16    Q.   And in those instances, does the buprenorphine give them
17    pain relief?
18    A.   Yes.
19    Q.   Does it give them a small high?
20    A.   I don't believe so.
21         MR. DePORRE:  Okay.  Thank you.
22         THE COURT:  Mr. Longstreet.
23                   RECROSS-EXAMINATION
24    BY MR. LONGSTREET:
25    Q.   So people don't get high off of Suboxone, it helps you
```

1  from getting sick, but you don't really get high off of it;

2  is that accurate?

3  A.  Not to my knowledge, but I'm -- I'm not familiar with

4  the mechanisms of action of buprenorphine.

5  Q.  You say, not to your knowledge.  Not to your knowledge

6  that people don't get high off of it?  Or to my knowledge,

7  people don't get high off it?  Which one are you saying.  I

8  want to make sure these people are clear on that.

9  A.  In my role as an analyst, I'm not familiar with the

10  effects of buprenorphine on an individual.

11  Q.  Now, buprenorphine is a substance that is in Suboxone?

12  A.  Correct.

13  Q.  It is not completely Suboxone, correct?  It's that drug,

14  amongst some other drugs, make Suboxone, correct?

15  A.  Correct, Suboxone is a combination of buprenorphine and

16  naloxone.

17  Q.  So it is a combination of a particular drug, not just

18  one drug, correct?

19  A.  Correct.

20  Q.  Okay.  You indicated that doctors prescribe this

21  particular opioid because Suboxone, you can't even O.D. on

22  it, right?

23  A.  Not to my knowledge.

24  Q.  Right.

25          MR. LONGSTREET:  Nothing further.

```
 1              THE COURT:  Thank you.
 2              MR. DePORRE:  I just have one question.
 3              THE COURT:  Okay.
 4                      REDIRECT EXAMINATION
 5   BY MR. DePORRE:
 6   Q.  Do you know whether or not you can overdose on Suboxone?
 7   A.  Not for certain, no.
 8   Q.  You don't know, either way?
 9   A.  No.
10              MR. DePORRE:  Thank you.
11              THE COURT:  Okay.  Thank you for your time.  You
12   may step down.
13              (Witness excused at 11:52 a.m.)
14              THE COURT:  The government may call its next
15   witness.
16              MR. DePORRE:  The government now calls
17   Andrew Grocholski.
18              THE COURT:  Mr. Grocholski, could you come up for a
19   moment.
20              Would you raise your right hand.
21              Do you swear the testimony you are about to give
22   will be the truth?
23              OFFICER GROCHOLSKI:  I do.
24              THE COURT:  Thank you.  As you are coming up,
25   please make yourself comfortable in our witness box.  And
```

```
 1   when you're answering questions, could you please speak
 2   slowly and keep your voice up, so that we can hear all you
 3   have to say.
 4              OFFICE GROCHOLSKI:  Yes.
 5              THE COURT:  Thank you.
 6                     OFFICER ANDREW GROCHOLSKI,
 7   called at about 11:53 a.m., was examined and testified on his
 8   oath as follows:
 9                        DIRECT EXAMINATION
10   BY MR. DePORRE:
11   Q.  I always ask people to spell their last name for the
12   record, but in your case, it's more important of a question.
13              Would you please state your full name and spell it
14   for the record.
15   A.  Andrew Grocholski, A-N-D-R-E-W, G-R-O-C-H-O-L-S-K-I.
16   Q.  Mr. Grocholski, how are you employed?
17   A.  I'm a police officer.
18   Q.  And where are you an officer?
19   A.  Metro Police Authority, in Genesee County.
20   Q.  How long have you been there?
21   A.  Just under six years.
22   Q.  Were you there back in Thanksgiving of 2020?
23   A.  Yes, I was.
24   Q.  And before you worked for Metro, where else did you
25   work?
```

```
 1   A.  City of Flint.

 2   Q.  And how long were you an officer there?

 3   A.  Just under four years there.

 4   Q.  So total, how long have you been a police officer?

 5   A.  Just shy of ten years.

 6   Q.  What is your current rank?

 7   A.  I'm a sergeant.

 8   Q.  Were you working on Thanksgiving 2020?

 9   A.  Yes, I was.

10   Q.  Do you remember what your shift was?

11   A.  Yes, I do.

12   Q.  What was it?

13   A.  That day was a 2:00 to 2:00, 2:00 p.m. to 2:00 a.m. at

14   night.

15   Q.  So you went in during the afternoon?

16   A.  That's correct.

17   Q.  Did you have Thanksgiving dinner that day?

18   A.  Probably, but I don't remember.

19   Q.  Was it before 2:00 a.m. -- or 2:00 p.m. rather?

20   A.  It would been before 2:00, correct, yeah.

21   Q.  When you came in that day, did you assist

22   Officer Steve Fisher on a search of a vehicle?

23   A.  Yes, I did.

24   Q.  And where was that -- where was the vehicle?

25   A.  The vehicle was located at a towing lot, Alexander's
```

1    Towing lot.

2    Q.  And is that in an area that's covered by your

3    department?

4    A.  Yes, it is.

5    Q.  What type of car did you search?

6    A.  The vehicle was a 2008 white Pontiac Grand Prix.

7    Q.  And where did you search in the vehicle?

8    A.  I assisted a little bit with the interior, but my focus

9    was on the engine compartment of that vehicle.

10   Q.  While you were there searching, did Officer Fisher take

11   any photos of the engine compartment?

12   A.  He did take pictures, yes.

13   Q.  I'm going to pull up Government's Exhibit 5A.  Is this a

14   photograph of the engine compartment?

15   A.  Yes, it is.

16   Q.  And did you search this engine compartment?

17   A.  Yes, I did.

18   Q.  What did you find?

19   A.  Located a nine-millimeter Ruger EC9s pistol, in a black

20   mesh bag.

21   Q.  And could you come off the stand and point exactly where

22   you found that mesh bag, on the large screen near defense

23   counsel's table?

24   A.  The mesh bag was located along the side of the battery,

25   right in this area (indicating).

1    Q.  All right.  You can head back to the stand.  When you

2    found the mesh bag, what did you do?

3    A.  Photographs were taken.

4    Q.  Did you -- when you say, " photographs were taken," did

5    you take the photographs?

6    A.  I did not.

7    Q.  Okay.  Who took them?

8    A.  Officer Fisher.

9    Q.  How did he know to take photographs?

10   A.  Because I alerted him that there was a firearm or a -- a

11   firearm in a mesh bag next to the battery.

12   Q.  And did you move the battery to find that mesh bag?

13   A.  I believe I did, yes.

14   Q.  As you -- did you find the firearm inside the mesh bag?

15   A.  Yes, I did.

16   Q.  Did he photograph the mesh bag?

17   A.  He did.

18   Q.  Did he photograph the firearm inside the mesh bag?

19   A.  He did.

20   Q.  I'm going ask you to pull up Government's Exhibit 5B.

21          Is this the mesh bag that you found?

22   A.  It is.

23   Q.  Would you pull up Government's Exhibit 5D?

24          Is that the firearm that was inside the mesh bag?

25   A.  Yes, it is.

1   Q.  And you found all of that?

2   A.  Correct, yes, I did.

3          MR. DePORRE:  All right.  I have no further

4   questions.

5          THE COURT:  Thank you.  Mr. Longstreet.

6                      CROSS-EXAMINATION

7   BY MR. LONGSTREET:

8   Q.  Sir, how long did you look -- strike that.

9          Good morning, sir.

10  A.  Good morning.

11  Q.  All right.  How long did you look prior to you finding

12  the gun behind the battery?

13  A.  I couldn't tell you, to be honest.

14  Q.  Okay.  Did you have any prior information, prior to

15  going to look at the car where the battery would be found?

16          THE COURT:  The battery or gun.

17  BY MR. LONGSTREET:

18  Q.  Excuse me.  The gun would be found.  Thank you for the

19  correction.

20  A.  I had information, yes.

21  Q.  You had information that the gun would be behind the

22  battery?

23  A.  Would be in, potentially, the engine compartment.

24  Q.  Okay.  You received that information from

25  Mr. Reggie Allen?

1    A.  I did not, no.

2    Q.  You did not, but somebody else did?

3    A.  Correct.

4    Q.  Okay.  Thank you.

5         Now, this area where you found the firearm, was

6    that also close to the headlights?

7    A.  It would be, yeah, it would be.

8    Q.  Okay.  And that void between the headlight and where the

9    battery -- where the firearm was found, is that a hollow

10   area, from what you can recall?

11   A.  As far as where the --

12   Q.  Between the headlight and where you found the firearm,

13   is that whole area hollowed out?

14   A.  I don't recall that information.

15   Q.  You don't recall.  Okay.  You could see the mesh bag

16   from headlight area?

17   A.  No, I could not.

18   Q.  Could you see the mesh bag on the surface, when you

19   looked?

20   A.  Not -- nope.

21   Q.  So you had to move the battery in order to find it?

22   A.  Correct.

23   Q.  Okay.  Very good.

24         MR. LONGSTREET:  Nothing further.

25         THE COURT:  Mr. DePorre.

 1          MR. DePORRE:  I have no further questions.

 2          THE COURT:  Government may call its next witness.

 3     Thank you for your time.

 4          (Witness excused at 12:00 p.m.)

 5          THE COURT:  Okay.

 6          MR. DePORRE:  Your Honor, could we briefly sidebar?

 7          THE COURT:  Sure.

 8          (Sidebar conference held on the record

 9          at 12:00 p.m. as follows:

10          MR. DePORRE:  My next witness is in custody.  I can

11     call somebody in between him, and I can call a separate

12     witness, but the one after that will be a custodial witness.

13          THE COURT:  How much -- if you call somebody else,

14     how long would it be?  My original plan was to go until

15     about 12:30.

16          MR. DePORRE:  What time is it now?

17          THE COURT:  Noon.

18          MR. LONGSTREET:  12:00.

19          THE COURT:  We can break now and start with the

20     custody witness at 1:00.

21          MR. DePORRE:  That would make the most sense.

22          MR. LONGSTREET:  I'm great with that.  Okay.  Thank

23     you.

24          (Sidebar conference concluded at 12:01 p.m.)

25          THE COURT:  Ladies and gentlemen, we were trying to

```
 1   plan out the day.  We have decided that now would be a good
 2   time to take our lunch break.  So we will break and reconvene
 3   promptly at 1:00.  Just so you know the schedule for this
 4   afternoon, today we have to break a little bit early, as I
 5   have to do a naturalization ceremony for some new citizens.
 6   So when we start at 1:00, we will go straight through until
 7   about 2:50.  That won't be our usual schedule for an
 8   afternoon, but we won't take an afternoon break, we will
 9   extend a little bit, and make as much progress as we can.
10   Have a nice lunch.  There are some great places around here
11   if you didn't bring your lunch.  We will see at 1:00.  Please
12   don't discuss the case.
13            THE CASE MANAGER:  All rise for the jury.
14            (Jury excused at 12:02 p.m.)
15            THE COURT:  Please be seated.  So the jury is out.
16            Mr. DePorre, can you give me a preview of coming
17   attractions?  So at 1:00, who is that witness that you will
18   be calling?
19            MR. DePORRE:  Thank you, Your Honor.  The next
20   witness we would like to call is Robert Hutchins.
21            THE COURT:  Okay.
22            MR. DePORRE:  He's in custody, as I previously
23   mentioned, and that after that, I would ask to call
24   Dustin Hurt.
25            THE COURT:  Do you have any other witness beyond
```

```
 1    that today?
 2             MR. DePORRE:  I do.  Courtney Selvia after that,
 3    and then the case agent Brett Orvis.  I recognize that we may
 4    not get to those last two witnesses.
 5             THE COURT:  Okay.  Great.  Anything for you, before
 6    we take our break?
 7             MR. DePORRE:  Not on behalf of the government.
 8             THE COURT:  Mr. Longstreet, anything for you?
 9             MR. LONGSTREET:  No, sir.
10             THE COURT:  So we'll start at 1:00 and we'll begin
11    with a witness who is in custody.  Mr. DePorre will make
12    arrangements with the marshal to make sure they know your
13    plan to call that witness at 1:00 and can hopefully have him
14    ready to be up here promptly at 1:00.
15             MR. DePORRE:  I will.
16             THE COURT:  Okay.  Thank you very much.
17             MR. DePORRE:  Your Honor, can we keep our stuff in
18    the courtroom?
19             THE COURT:  Yes.
20             MR. DePORRE:  Thank you.
21             THE CASE MANAGER:  All rise.  Court is in recess.
22             (Court recessed at 12:03 p.m.)
23                          —   —   —
24             (Court reconvened at 1:02 p.m.; Court, Counsel and
25             all parties present.)
```

```
 1              THE COURT:  All right.  Mr. Longstreet, we are
 2   going to just admit those exhibits -- go on the record and
 3   admit those exhibits.  Are you ready?
 4              MR. LONGSTREET:  Yes.
 5              THE COURT:  So, Mr. DePorre, you want to identify
 6   the exhibits and admit them?
 7              MR. DePORRE:  Certainly, Your Honor.  Thank you.
 8   The government seeks to admit, at this point, without any
 9   objection from defense, for Exhibit Number 7, which is a
10   vehicle release authorization; Exhibit 9, an FBI receipt for
11   property; Exhibit 10A, a certified copy of Mr. Garza's
12   certificate of live birth; Exhibit 10B, a
13   certificate -- excuse me, a certified copy of the marriage
14   license between Dominga Garza and Raymond Flanagan;
15   Exhibit 11A, which is a screen shot of a jail recording
16   system; 11B, which is an excerpt of a jail call; and 11C,
17   which is also an excerpt of a jail call.  There is also three
18   stipulations that we would --
19              THE COURT:  Mr. Longstreet, do you agree to the
20   admission of those exhibits?
21              MR. LONGSTREET:  Yes.
22              THE COURT:  Those are all admitted.  Go ahead.
23              (Government's Exhibit Nos. 7, 9, 10A, 10B, 11A, 11B
24              and 11C received into evidence.)
25              MR. DePORRE:  There are three stipulations which I
```

```
 1   put exhibit stickers on and marked as exhibits.
 2   Stipulation 12, regarding Mr. Garza's prior conviction --
 3           THE COURT:  On those, unless you have an objection,
 4   when you finish with the last bit of testimony, why don't you
 5   stand up and just read those to the jury?  That's how I
 6   generally do it.
 7           MR. DePORRE:  Last in the government's case in
 8   chief?
 9           THE COURT:  Yes.
10           MR. DePORRE:  Okay.
11           THE COURT:  Are you okay with that?
12           MR. DePORRE:  That's fine.
13           THE COURT:  Mr. Longstreet, are you okay with that?
14           MR. LONGSTREET:  Yes, sir.
15           THE COURT:  Okay.  Sir, do you mind taking off your
16   mask while you are testifying, please.
17           MR. HUTCHINS:  Yeah.
18           (Mr. Hutchins was seated in the witness stand
19            at 1:08 p.m.)
20           THE CASE MANAGER:  All rise for the jury.
21           (Jury entered at 1:09 p.m.)
22           THE COURT:  Please be seated.  Ladies and
23   gentlemen, welcome back.  I hope you had a nice lunch.
24           Mr. DePorre, the government may call its next
25   witness.
```

```
 1              MR. DePORRE:  Thank you, Your Honor.  The
 2   government calls Robert Hutchins.
 3              THE COURT:  Mr. Hutchins, could you raise your
 4   right hand?
 5              Do you swear the testimony you are about to give
 6   will be the truth?
 7              MR. HUTCHINS:  Yes.
 8              THE COURT:  All right.  Mr. Hutchins, let me ask,
 9   if I could, would you please keep your voice up and speak
10   slowly, so we can all hear and understand what you have to
11   say?  Okay.
12              MR HUTCHINS:  Yes, sir.
13              THE COURT:  Okay.
14                        ROBERT HUTCHINS,
15   called at about 1:09 p.m., was examined and testified on his
16   oath as follows:
17                        DIRECT EXAMINATION
18   BY MR. DePORRE:
19   Q.  Mr. Hutchins, would you please spell your first and last
20   name.
21   A.  R-O-B-E-R-T, H-U-T-C-H-I-N-S.
22   Q.  I'm going to ask you some questions about something that
23   happened in November of 2020.  Do you remember Thanksgiving
24   of that day, November -- Thanksgiving, November 2020?
25   A.  Yes, sir.
```

1    Q.   And at some point that day, were you arrested?

2    A.   Yes, sir.

3    Q.   Who were you with?

4    A.   Nino Garza and Reggie Allen.

5    Q.   You said, Nino Garza?

6    A.   Yeah.

7    Q.   Do you know Mr. Garza's first name?

8    A.   No, sir, I always knew him as Nino.

9    Q.   And where were you arrested at?

10   A.   Meijer, on Hill Road.

11   Q.   Where had you been earlier that day, before you went to

12   Meijer?

13   A.   On Clancy, off of Corunna Road.

14   Q.   And in terms of that day, was that the first time you

15   saw Mr. Garza on Thanksgiving of 2020?

16   A.   Yes, sir.

17   Q.   That morning, while you were at Clancy, did you see

18   Mr. Garza with a gun?

19   A.   Earlier that morning.

20   Q.   When that morning?

21   A.   Around 8:00, maybe.

22   Q.   And where were you when you saw him with the gun?

23   A.   In the vehicle.

24   Q.   In which vehicle?

25   A.   A Grand Prix.

1   Q.   What were you doing in the Grand Prix with Mr. Garza?

2   A.   I went out there with Reggie.  Reggie Allen asked me to

3   come out to the vehicle with Garza.

4   Q.   Asked you to come out to the Grand Prix?

5   A.   Yeah.

6   Q.   And where was Mr. Garza at the time?

7   A.   Sitting in the driver's seat.

8   Q.   Whose Grand Prix was it?

9   A.   I believe it was Mr. Garza's.

10  Q.   Had you seen him driving that car in the past?

11  A.   Yeah, a couple times before.

12  Q.   Why do you say you believe it was Mr. Garza's?

13  A.   He never told me that it was actually his vehicle, I

14  just assumed, because I've seen him with the vehicle.

15  Q.   And have you ever seen Reggie Allen drive that vehicle?

16  A.   I've seen him in it, in the driver's seat, drive the

17  vehicle.

18  Q.   You've seen Reggie Allen drive the vehicle?

19  A.   Pull up, yeah, not multiple times, just once.

20  Q.   Did Reggie Allen ever tell you that it was his vehicle?

21  A.   He claimed that it was his, once upon a time.

22  Q.   Did he tell you what happened to it?

23  A.   No, never told me what happened to it.

24  Q.   Did he tell you whether or not he sold it?

25  A.   No, he never told me if he sold it.

```
 1   Q.   Have you ever heard Mr. Garza use the term, "whip"?
 2   A.   I've heard it.
 3   Q.   The term, "whip"?
 4   A.   Yes.
 5   Q.   What does a whip refer to?
 6   A.   Driving a vehicle, whipping the vehicle around.
 7   Q.   Would you -- would you in -- would you ever use the
 8   term, "whip"?
 9   A.   Yeah, I've used it myself.
10   Q.   And a whip would that describe the Pontiac Grand Prix?
11   A.   If you're in that vehicle, you'd be whipping it around.
12   Q.   So that would be a whip?
13   A.   Yes, it's a street term for driving a vehicle.
14   Q.   You said you saw -- you saw Mr. Garza with the gun on
15   Thanksgiving morning.  What were you doing when you saw him
16   with the gun?
17   A.   Sitting in the back seat, talking with him and
18   Reggie Allen.
19   Q.   And do you remember what you were talking about?
20   A.   Just talking about what Reggie was going to do and just
21   sitting out there, talking about normal stuff.
22   Q.   Where were you when you were talking?
23   A.   I was in the back seat.
24   Q.   And where was Reggie?
25   A.   In the passenger.
```

*Jury Trial - Volume 2 • November 14, 2022*

**123**

```
 1   Q.  And where was Mr. Garza?
 2   A.  Driver's seat.
 3   Q.  About how much time had passed from the time you saw
 4   Mr. Allen drive the car, how many days or weeks?
 5           MR. LONGSTREET:  Objection; leading.
 6           THE COURT:  Overruled.
 7           Go ahead.
 8   BY MR. DePORRE:
 9   Q.  How much time had passed from the time that you had seen
10   Mr. Allen drive the car, until Thanksgiving?
11   A.  Maybe a week.
12   Q.  And at this point, it was -- he was in the passenger
13   seat?
14   A.  Yeah, he was in the passenger seat.
15   Q.  Was there any reason that he would have been in the
16   passenger seat, if it was his car?
17           MR. LONGSTREET:  Objection; calls for speculation.
18           THE COURT:  Sustained.
19           Go ahead.
20   BY MR. DePORRE:
21   Q.  You mentioned that they were talking about what they
22   were going to do.  What did Reggie Allen say that he was
23   going to do?
24   A.  He was trying to get a ride to boost.
25   Q.  And what does that mean, could you explain?
```

*Jury Trial - Volume 2 • November 14, 2022*

```
 1    A.   Go to the store and steal.

 2    Q.   And did Mr. Garza agree to give him a ride?

 3    A.   He agreed to give him a ride, to drop him off, yes.

 4    Q.   And where was he going to take him to?

 5    A.   Hill Road Meijer.

 6    Q.   Did you see him with the gun -- where was Mr. Garza when

 7    he had the gun?

 8    A.   Sitting in the driver's seat.

 9    Q.   And would you -- how would you describe the gun?

10    A.   Describe it black, maybe

11    nine-caliber -- nine-millimeter.

12    Q.   Are you --

13    A.   I didn't handle it.  I just seen it for a quick -- maybe

14    two minutes.

15    Q.   Are you familiar with a .380 caliber?

16    A.   No, I ain't familiar with a .380 caliber.

17    Q.   Do you know the difference between a nine --

18    A.   Not really.

19    Q.   Do they look the same to you?

20    A.   Yeah.  If I seen it, it would probably look the same to

21    me.

22              MR. DePORRE:  Could you pull up Government's

23    Exhibit 5D?

24    BY MR. DePORRE:

25    Q.   Is this the gun that you saw Mr. Garza with that
```

1    morning, Thanksgiving morning?

2    A.   Possibly could be the gun that he had that morning.

3    Q.   Was it a gun that looked just like this?

4    A.   Similar.

5         MR. LONGSTREET:  Objection; calls for speculation.

6    BY MR. DePORRE:

7    Q.   What sort -- were there any differences that you can

8    describe between the gun that you saw and this gun?

9    A.   No.

10        MR. DePORRE:  Could you pull up Government's

11   Exhibit 1B?

12   BY MR. DePORRE:

13   Q.   Do you recognize what this is?

14   A.   Yeah, Suboxone.

15   Q.   And have you ever seen Mr. Garza sell Suboxone before?

16   A.   I've seen him with Suboxone --

17        MR. LONGSTREET:  Objection to him selling Suboxone

18   before.

19        THE COURT:  Response.

20        MR. DePORRE:  On the -- I will rephrase the

21   question, Your Honor.

22        THE COURT:  Okay.

23   BY MR. DePORRE:

24   Q.   On the morning when you went to Meijer, when you were at

25   Clancy Avenue, did you see Mr. Garza with this Suboxone?

1    A.   No.  I didn't see him with no Suboxone that morning.

2    Q.   Did you know whether or not Mr. Garza sold any drugs

3    that morning?

4    A.   All I know is he gave some drugs.

5    Q.   Did he give Suboxone?

6    A.   No, not to my knowledge.

7    Q.   And did he get anything in return for giving those

8    drugs?

9    A.   No.

10   Q.   Did -- when you went to Meijer, did you steal anything

11   from the Meijer?

12   A.   I went in there and grabbed something, yes.

13   Q.   What did you steal?

14   A.   I came out with gloves and -- I can't remember, a couple

15   other things.

16   Q.   And do you remember what type of gloves they were?

17   A.   Some Nike baseball gloves.

18   Q.   Did the police arrest you?

19   A.   No, they did not.

20   Q.   Did they follow you out to the white Grand Prix?

21   A.   No.  They -- I was told that the guy inside informed

22   them that there was another guy coming out.

23   Q.   And when did you first have contact with the police at

24   Meijer?

25   A.   In the back seat of the Grand Prix.

1   Q.  And what did they have you do when they were in the back

2   seat of the Grand Prix?

3   A.  Had me get out of the vehicle and they put me in another

4   vehicle.

5   Q.  Did you talk to them that day?

6   A.  Yes.

7   Q.  Did you tell them about the gun?

8        Would you pull up 5D?  Thank you.

9        Did you tell them about the gun that day?

10  A.  They asked me about a gun, and I told them, yes, I seen

11  a gun.

12  Q.  Were you charged that day?

13  A.  No.

14  Q.  Are you currently in jail?

15  A.  Yes.

16  Q.  And what are you in jail for?

17  A.  Attempted carjacking, possession of methamphetamines,

18  possession of fentanyl.

19  Q.  Have you pled guilty to all of those?

20  A.  Yes.

21  Q.  And when did you plead guilty?

22  A.  November 1st.

23  Q.  Of this year?

24  A.  Yes, sir.

25  Q.  Did you and I meet last Wednesday, at Genesee County

```
 1   jail?
 2   A.  Yes, sir.
 3   Q.  Is that the first time you've met me?
 4   A.  Yes, sir.
 5   Q.  When we met, did I promise you anything?
 6   A.  No.
 7   Q.  Did I -- did I make any threats to convince you to
 8   testify today?
 9   A.  No.
10   Q.  Are you hoping for anything?
11   A.  No.
12   Q.  How many times had you seen Mr. Garza before
13   Thanksgiving of 2020?
14   A.  Maybe a dozen times, in passing.
15   Q.  And who was with Mr. Garza when you saw him on those
16   maybe dozen times?
17   A.  Normally, he was by himself or he was with Maddi.
18   Q.  And could you tell the jury who Maddi is?
19   A.  It was his girlfriend, at the time.
20   Q.  When you saw him, what -- what kind of car was he
21   driving?
22   A.  It was different cars.
23   Q.  And when you saw him, did he ever talk about having a
24   gun?
25   A.  What, the other times?
```

1    Q.   Yeah.

2            MR. LONGSTREET:  Objection to the relevance.

3            THE COURT:  Response.

4            MR. DePORRE:  Your Honor, I was going to ask him

5    about whether or not he's heard certain slang terms spoken by

6    the defendant.

7            THE COURT:  Why don't you get to that and skip over

8    the one that you just asked.

9    BY MR. DePORRE:

10   Q.   Have you ever heard Mr. Garza use the word, "banger"?

11   A.   Yes.

12   Q.   And have you ever -- what was he talking about when he

13   used the word banger?

14   A.   Normally, it's pistol.

15   Q.   Have you ever heard him use the word "stick"?

16   A.   Yes.

17   Q.   What does that refer to?

18   A.   A clip in the pistol.

19   Q.   And does a stick refer to a particular type of clip or

20   magazine?

21   A.   Yes.

22   Q.   What type of magazine does it refer to?

23   A.   Normally 30, holds 30.

24   Q.   A 30-round mag?

25   A.   It's 30 rounds in it.

1    Q.  Or an extended magazine?

2    A.  Yeah.

3              MR. DePORRE:  All right.  I have no further

4    questions.

5              THE COURT:  Mr. Longstreet.

6                        CROSS-EXAMINATION

7    BY MR. LONGSTREET:

8    Q.  Mr. Hutchins, good afternoon, sir.

9    A.  Good afternoon.

10   Q.  Let me start with something preliminary.  Aside from

11   this carjacking that you just pled to, have you ever been

12   charged with any other crimes of theft, dishonesty or false

13   statement in the last ten years?

14   A.  No.

15   Q.  No theft crimes in the last ten years?

16   A.  Not to my knowledge.

17   Q.  Not to your knowledge.  You don't have any record of

18   theft?

19   A.  I got a record of theft, but not in the last ten years.

20   Q.  Not in the last ten years, though?

21   A.  No.

22   Q.  What about dishonesty or false statement?

23   A.  No.

24   Q.  Okay.  So you just are currently in jail for carjacking,

25   correct?

1    A.   Attempted carjacking.

2    Q.   Attempted carjacking, and that's a plea down from

3    carjacking?

4    A.   Yes.

5    Q.   Okay.  So you got a reduced charge on November 1st,

6    correct?

7    A.   Yes.

8    Q.   Okay.  And you spoke to Mr. DePorre shortly thereafter,

9    correct?

10   A.   Yes.

11   Q.   Okay.  Now, you haven't been sentenced on that; is that

12   correct?

13   A.   No, sir.

14   Q.   Okay.  And do you expect your lawyer in your case to ask

15   for a departure, or a lower sentence, because of your

16   cooperation here today?

17   A.   No, sir.

18   Q.   Okay.  Now, you indicated you spoke -- you saw my client

19   with a firearm that morning; is that correct?

20   A.   Yes, sir.

21   Q.   Okay.  Did you describe that firearm to the police as

22   a .380 with a 14-shot magazine?

23   A.   No, sir.

24   Q.   Do you recall giving a statement to the police on the

25   day you were arrested of November 26th, 2020?

1    A.   Yes, sir.

2    Q.   During that statement, did you indicate to them that you

3    were there to shoplift?

4    A.   Yes, sir.

5    Q.   Okay.  And you hadn't bought any heroin from Mr. Garza

6    that morning; is that correct?

7    A.   No.

8    Q.   You weren't intending on buying any from him; is that

9    correct?

10   A.   No.

11   Q.   At a certain point, did you describe to the police that

12   Garza showed you a, pistol you believed it was a .380 with

13   a 14-shot magazine?  Did you tell that to the police?

14   A.   No.

15   Q.   So if the police indicated that you did make that

16   statement, they would be wrong?

17   A.   Yes.

18   Q.   Okay.  Now, you didn't see my client with that firearm

19   at Meijer, did you?

20   A.   No, not at Meijer.

21   Q.   Now, you were in the back seat of the car, correct?

22   A.   Yes, sir.

23   Q.   And when you were pulled out of the back seat, you were

24   sitting behind Mr. Garza, correct?

25   A.   Yes, sir.

```
 1   Q.  Okay.  And the items in the back seat, a lot of those
 2   belonged to you, that you had taken out of Meijer?
 3   A.  Not all the items belonged to me.
 4   Q.  But some of them did?
 5   A.  Yes, sir.
 6   Q.  Okay.  Now, you indicated earlier, when the prosecution
 7   asked you whether a firearm -- or banger means firearm.
 8   Doesn't also banger mean a needle that you shoot in your arm?
 9   A.  Never heard the term.
10   Q.  Never heard the term banger?
11   A.  No.
12   Q.  Okay.  You indicated that you saw this firearm inside
13   the car for two minutes, but didn't see it thereafter?
14   A.  What was that, sir.
15   Q.  You indicated earlier that you saw this firearm
16   at 8:00 in the morning, but you didn't see it for more than
17   two minutes?
18   A.  Yes.
19   Q.  Okay.  And you didn't see it after those two minutes; is
20   that correct?
21   A.  No.
22   Q.  Okay.  And you were unaware of whether the firearm was
23   still in the car at the time that you were in Meijer,
24   correct?
25   A.  I was aware that it was in the car, I just didn't know
```

1    where.

2    Q.   Okay.  And you told the police that it was in the driver

3    seat of car, correct?

4    A.   No, I don't believe I -- where I told them the banger

5    was at in the car.

6    Q.   Okay.  Now, is it fair to say that prior to -- strike

7    that.

8             When you were pulled out of the car by

9    officer -- by the police, you started giving information,

10   correct?

11   A.   They just -- yes.

12   Q.   That's because you were suspected in this shoplifting

13   spree; is that correct?

14   A.   No.  That's the questions they just started asking me.

15   Q.   Pardon me.

16   A.   They just asked me what was going on, yes.

17   Q.   Okay.  And you were never arrested for shoplifting?

18   A.   No.

19   Q.   And you were released?

20   A.   Yes.

21   Q.   Even though you admitted to stealing items out of the

22   store?

23   A.   Yes.

24   Q.   So the police know you were shoplifting, but let you go?

25   A.   Yes.

```
 1  Q.  Okay.  When you were pulled out of the car, you were
 2  taken to a secluded area; is that correct?
 3  A.  Yes.
 4  Q.  And that's when you started giving information about
 5  Mr. Garza and what he was doing, correct?
 6  A.  Yes.
 7  Q.  Okay.  After you gave this information, the police,
 8  knowing that you were stealing, you were bye-bye, let go,
 9  right?
10  A.  Yes.
11          MR. LONGSTREET:  Nothing further.
12          THE COURT:  Mr. DePorre, any follow-up?
13                  REDIRECT EXAMINATION
14  BY MR. DePORRE:
15  Q.  You were just asked on cross-examination if Mr. Garza
16  gave you heroin that morning.
17  A.  Yes.
18  Q.  Did you see Mr. Garza give anybody heroin that morning?
19  A.  Reggie Allen.
20  Q.  Mr. Garza gave Reggie Allen heroin?
21  A.  Yes, that's what I was told.
22  Q.  And then you said that you didn't get -- you didn't see
23  Reggie Allen pay Mr. Garza anything for that heroin?
24  A.  No.
25  Q.  What was the plan, how was Reggie going to reimburse
```

1    Mr. Garza for the heroin?

2    A.   I'm not sure how he was going to reimburse him for the

3    heroin.  I just knew it was heroin given and then he was

4    getting a ride to go boost.

5    Q.   When the police stopped you in the white Pontiac

6    Grand Prix and pulled you out and spoke with you that day,

7    did they put you in handcuffs?

8    A.   Yes.

9    Q.   And did they take you to the police station?

10   A.   Yes, Metro police station.

11   Q.   What did you tell them when you were in the Meijer

12   parking lot?

13   A.   In the back of the patrol car?

14   Q.   Yep.

15   A.   They asked me what was going on, if there was any

16   weapons that we needed to know about or any narcotics in the

17   vehicle.  That they already had information that there was.

18   So I just told them what I seen, and then that was about it.

19   Q.   What specifically, did you tell them that you saw?

20   A.   That prior to that, there was a weapon in the vehicle

21   and narcotics, and then after that, they just took us to the

22   Metro police station.

23        MR. DePORRE:  Thank you.  Nothing further.

24        THE COURT:  Mr. Longstreet.

25

```
 1                      RECROSS-EXAMINATION
 2   BY MR. LONGSTREET:
 3   Q.  You said you saw Reggie driving this car the week
 4   before?
 5   A.  Yeah, about a week.
 6   Q.  And he owned that car?
 7   A.  Who?
 8   Q.  Reggie.
 9   A.  Oh, I don't know if he owned it.
10   Q.  When he was driving it around?
11   A.  I don't know what he was doing.  He just stopped for a
12   second and left.
13   Q.  I'm sorry.
14   A.  He just stopped for a second and then left.
15   Q.  But you actually saw Reggie driving this car,
16   Reggie Allen driving this car around?
17   A.  Yes.
18            MR. LONGSTREET:  Okay.  Nothing further.
19            THE COURT:  Okay.  He is done.  Thank you for your
20   time.
21            (Witness excused at 1:30 p.m.)
22            THE COURT:  Mr. DePorre, the government may call
23   its next witness.
24            MR. DePORRE:  Your Honor, at this point, the
25   government calls Dustin Hurt.
```

```
 1              THE COURT:  Mr. Hurt, would you come up and raise
 2    your right hand?
 3              Do you swear that the testimony you are about to
 4    give will be the truth?
 5              AGENT HURT:  Yes, sir.
 6              THE COURT:  Okay.  Thank you.  Please be seated,
 7    and would you keep your voice up and speak slowly for us.
 8              AGENT HURT:  Yes, sir.
 9              THE COURT:  Thank you.
10                         AGENT DUSTIN HURT,
11    called at about 1:31 p.m., was examined and testified on his
12    oath as follows:
13                        DIRECT EXAMINATION
14    BY MR. DePORRE:
15    Q.  Mr. Hurt, would you begin by stating your name and
16    spelling your first and last name for the court reporter?
17    A.  Yes, sir.  Dustin Hurt, D-U-S-T-I-N, H-U-R-T.
18    Q.  How are you currently employed?
19    A.  I'm a special agent with the Bureau of Alcohol, Tobacco,
20    Firearms and Explosives.
21    Q.  Where are you assigned?
22    A.  Flint, Michigan.
23    Q.  How long have you been an ATF agent?
24    A.  Since October of 2018.
25    Q.  Do you have any other police experience?
```

1    A.   Yes, sir.

2    Q.   How long have you been a police officer?

3    A.   Since 2009.

4    Q.   And where did you start?

5    A.   Grand Ledge Police Department, about eight miles west of

6    Lansing, Michigan.

7    Q.   Prior to becoming an officer at Grand Ledge, did you

8    have any educational background or educational training?

9    A.   Yes, sir.

10   Q.   Tell the jury what you've studied so far?

11   A.   I went to Grand Valley State University.  I have

12   Bachelor's degrees in Criminal Justice and Political Science,

13   I got those in 2008, after which I got a Master's degree in

14   Business Administration from Davenport University, that I

15   obtained in 2014.

16   Q.   And did you also go to a police academy?

17   A.   Multiple.

18   Q.   What was the first police academy that you went?

19   A.   The Mid-Michigan Police Academy, which is at Lansing

20   Community College.

21   Q.   And you then you became an officer in Grand Ledge?

22   A.   Yes, sir.

23   Q.   How long were you an officer in Grand Ledge?

24   A.   Approximately three years.

25   Q.   What did you do next?

1   A.  I got hired by the Michigan State Police and I went to

2   recruit school -- Michigan State Police recruit school, their

3   academy, in 2012.

4   Q.  How long was Michigan State Police academy?

5   A.  Around five months.

6   Q.  And then did you become a Michigan State Police officer?

7   A.  Trooper, yes, sir.

8   Q.  How long were you a trooper?

9   A.  Approximately seven years.

10  Q.  During that time, where were you assigned?

11  A.  After recruit school I was assigned to the Flint post in

12  Michigan.  I was road patrol for approximately three years,

13  and then I went to the FBI's Safe Streets Task Force, which

14  is a gang and violent crime task force in and around the

15  City of Flint, and in approximately 2017, I transferred to

16  the Lansing post, where I again worked --

17  Q.  Before you go -- how long were you assigned to the

18  Safe Streets Task Force?

19  A.  Just shy of three years.

20  Q.  Then you said you went to Lansing?

21  A.  Yes, sir.  I went to the Lansing post, where for a

22  little over a year, I worked road patrol, and then I got

23  assigned to the violent crime initiative, which was a task

24  force that was comprised of the Michigan State Police,

25  Lansing Police Department, East Lansing, FBI, ATF, a lot of

1    the local agencies.

2    Q.  After that, where did you go next?

3    A.  I promoted to --

4         MR. LONGSTREET:  For purposes of judicial economy,

5    I will stipulate to his qualifications as an expert.

6         THE COURT:  It's up to you, Mr. DePorre.  If you

7    want to give the jury a little more sense of his background,

8    I will certainly give you a little leeway.  If not, we can

9    move right to his opinion testimony.

10        MR. DePORRE:  I think I can move it along much

11   quicker.

12   BY MR. DePORRE:

13   Q.  In all of your time as a police officer working in

14   Flint, have you heard different slang terms for firearms?

15   A.  Yes, sir.

16   Q.  Could you tell the jury some of the slang terms that

17   you've heard?

18   A.  Yes, sir.  Heater, ratchet, tool, stick, banger, piece,

19   the list goes on.

20   Q.  Have you ever heard of a chopper?

21   A.  Yes, sir.

22   Q.  And could you explain what a chopper refers to?

23   A.  Yes.  A chopper or a chop is commonly referred to as an

24   AK-47, whether it be an AK-47 rifle to be fired from the

25   shoulder, or pistol.

1  Q.  And you mentioned the word, "banger."  Could you

2  describe what a banger means?

3  A.  Commonly, bangers are referred to -- most commonly

4  referred to just firearms, nothing in particular, usually a

5  pistol.

6  Q.  What about stick, you mentioned the word, "stick."  What

7  does a stick mean?

8  A.  Stick is usually referred to as extended magazine or

9  what holds the bullets that go in the magazine well of a

10  pistol or a rifle, anything that takes a magazine.

11  Q.  Have you had an opportunity to listen to a jail call

12  between Mr. Garza and his girlfriend, Madison Merrill?

13  A.  Yes.

14  Q.  I would like to play a portion of that.  Would you

15  actually -- before we do that, would you pull up Government's

16  Exhibit 5C?

17        Do you recognize this firearm?

18  A.  Yes, I do.

19  Q.  What type of firearm is it?

20  A.  It's a Sturm & Ruger EC -- model EC9 nine-millimeter

21  pistol.

22  Q.  Could you tell jury the difference between a .380 and

23  nine-millimeter pistol?

24  A.  Yes.  So a nine-millimeter and a .380, one is metric,

25  and one is English.  So a nine-millimeter is actually the

```
1   same as .380 of an inch, so the diameter is the same.  It is
2   the length that comes into play, usually, with nines and
3   380s.  Your most common nine-millimeter round is a nine-by-19
4   millimeters, so the casing will be 19 millimeters long,
5   whereas a .380 casing would be shorter.
6   Q.  I want you to take a look at the magazine on this
7   Government's Exhibit 5C.  Would you describe this as an
8   extended magazine?
9   A.  Yes.
10  Q.  Have you heard such magazines referred to as a stick?
11  A.  Yes.
12       MR. DePORRE:  Now, I'd would like you to pull up,
13  Ms. Szuhkent, Government's Exhibit 11B.  Before you play
14  it --
15  BY MR. DePORRE:
16  Q.  I'm going to ask you to listen to a portion of a jail
17  call that you said that you'd listened to the entire call,
18  and I'm going to ask you some questions about it, but the
19  people speaking speak pretty fast, so I would like you to
20  really focus in on the words being said.  Can you do that?
21  A.  Yes, sir.
22  Q.  Go ahead play it.
23       (Audio played for the jury.)
24  BY MR. DePORRE:
25  Q.  Did you hear the defendant -- or did you hear the
```

1    speaker in that call use the term, "stick"?

2    A.   Yes.

3    Q.   And did you hear him use the term, "banger"?

4    A.   Yes.

5    Q.   Based on your years of experience and your knowledge of

6    slang terms and your review of this call, what did the term,

7    "stick," refer to?

8    A.   The stick would refer to the magazine, the extended

9    magazine.

10    Q.   What did the term, "banger," refer to?

11    A.   The firearm that the extended magazine was in.

12         MR. DePORRE:   All right.   Now I would ask you to

13    pull up Government's Exhibit 11C, this is another audio clip,

14    and would you play it.

15         (Audio played for the jury.)

16    BY MR. DePORRE:

17    Q.   Again, what is the word, "stick" -- or did you hear the

18    word, "stick," in that call?

19    A.   Yes.

20    Q.   And did you hear the word, "banger," in that call?

21    A.   Yes.

22    Q.   What does the word, "stick," mean?

23    A.   In that call, it was actually referred to as my "banger"

24    with a "stick" in it or on it.   I don't know if it was in or

25    on, but it was referred to both, which I would construe as

```
 1    the extended magazine inside the firearm.
 2              MR. DePORRE:  I have no further questions.
 3                        CROSS-EXAMINATION
 4    BY MR. LONGSTREET:
 5    Q.  Agent, good afternoon, sir.
 6    A.  Good afternoon.
 7    Q.  If Mr. Garza is referring to a gun, do you know what gun
 8    he's referring to?
 9    A.  An actual gun, no, sir.
10    Q.  Okay.  Secondly, you indicated that "banger" means gun,
11    correct, in the streets?
12    A.  In the context of this, yes.
13    Q.  Okay.  And you are indicating that banger is a street
14    term that means gun, correct?
15    A.  Correct.
16    Q.  All right.  And is it fair to say that you've listened
17    to the entirety of Mr. Garza's phone call?
18    A.  Yes.
19    Q.  Okay.  And you also understand that Mr. Garza said
20    banging and banger multiple times; is that correct?
21    A.  Yes, sir.
22    Q.  And it is your contention when he says banging, he means
23    shooting, and banger means gun, correct?
24    A.  Correct.
25    Q.  Okay.  I need a moment.
```

1          And you have heard the entirety of this phone call,

2    correct?

3    A.   Yes, sir.

4    Q.   Okay.  What does "them hands" mean?

5    A.   It usually means a fight.

6    Q.   That's a fight, and that means you are using your fists,

7    right?

8    A.   That's correct.

9    Q.   I would like to direct your attention to the

10   two-minutes-and-eight-seconds mark of the video -- I mean of

11   the phone call.

12         MR. LONGSTREET:  Looks like I'm running into some

13   technical difficulties.

14         UNIDENTIFIED PERSON:  Is the sound up on your

15   computer?

16         MR. LONGSTREET:  It is.  It is all the way up.

17         Your Honor, I may need a break to work out some

18   technical difficulties.

19         THE COURT:  Holly, are you back there?  Let me see

20   if this works this time.  Look at that.  Can you help

21   Mr. Longstreet with the sound?

22         MR. LONGSTREET:  The sound.

23         (An off-the-record discussion was held

24          at 1:43 p.m.)

25         THE COURT:  By the way, ladies and gentlemen, we

Case 4:21-cr-20405-MFL-CI ECF No. 72, PageID.874 Filed 07/23/23 Page 147 of 191
*Jury Trial - Volume 2 • November 14, 2022*

147

```
 1    have IT issues like this all the time.  This
 2    courtroom -- some of my colleagues are lucky enough to have
 3    the fancy, high-tech courtrooms, but this is not one of
 4    those.  We just deal with this all the time, and we have
 5    wires all over the place.  We do the best we can.  This is
 6    certainly not the fault of Mr. Longstreet or the government,
 7    if we have blips like this.
 8            Why don't we take a five-minute break, and you can
 9    have a comfort break.  You don't need to sit here and watch
10    us figure out our own computer system.
11            THE CASE MANAGER:  All rise for the jury.
12            (Jury excused at 1:44 p.m., court recessed.)
13                              —   —   —
14            (At 1:47 p.m., Court reconvenes; Court, counsel and
15            all parties present.)
16            THE CASE MANAGER:  All rise for the jury.
17            (Jury entered at 1:47 p.m.)
18            THE COURT:  Please be seated.  We have solved our
19    technical challenges and we are ready to proceed.
20            Mr. Longstreet, please continue.
21            MR. LONGSTREET:  Thank you.
22    BY MR. LONGSTREET:
23    Q.  Again, just to refresh the jury's memory, you listened
24    to the entirety of this recording, correct?
25    A.  Yes.
```

1    Q.  And banging means shooting and banger means gun,

2    according to you, correct?

3    A.  Yes, sir.

4    Q.  Okay.

5            (Audio played for the jury.)

6    BY MR. LONGSTREET:

7    Q.  All right.  You hear Mr. Garza say, "I'm gonna banging

8    on this dude when I see him.  You know I got them hands."

9    A.  Yes, sir.

10   Q.  So you just told us having them hands mean fisticuffs,

11   right?

12   A.  Yes, sir.

13   Q.  All right.  And then when Mr. Garza says I'm banging on

14   him, I got them hands, is he talking about banging with his

15   hands?

16   A.  Yes, sir.

17   Q.  So banging don't necessarily mean gun, it might mean I'm

18   throwing some punches, right?

19   A.  It could.

20   Q.  So banging don't always mean guns?

21   A.  In the context of this case and that call, when he said

22   banger, yes, when he said bang about hands.

23   Q.  Okay.  So you also heard him say, "banging on him,"

24   several more times in this phone call, correct?

25   A.  I believe so.

Case 4:21-cr-20405-MFL-CI   ECF No. 72, PageID.876   Filed 07/23/23   Page 149 of 191
*Jury Trial - Volume 2 • November 14, 2022*

**149**

1    Q.   Okay.  And does he always mean hands, when he's talking

2    about that, or is he talking about shooting?

3    A.   In the jail context, I believe he means hands.

4    Q.   Now, I would like to direct your attention to the

5    four-minute mark of this phone call.

6              (Audio played for the jury.)

7              MR. LONGSTREET:  Excuse me for a moment.

8              (Audio played for the jury.)

9    BY MR. LONGSTREET:

10   Q.   All right.  You hear someone say, "they put a green

11   light out on Nino.  They ain't even got a gun to put a green

12   light out on Nino."  You heard that?

13   A.   Yes.

14   Q.   So when he was talking about gun, he said what, gun,

15   right?

16   A.   Correct.

17             MR. LONGSTREET:  Okay.  Nothing further.

18             THE COURT:  Mr. DePorre.

19             MR. LONGSTREET:  Excuse me a moment.  My client

20   might have some questions.  If I could have just a moment,

21   please.

22             (An off-the-record discussion was held

23             at 1:51 p.m.)

24             MR. LONGSTREET:  Nothing further.

25             THE COURT:  Mr. DePorre.

```
 1                  REDIRECT EXAMINATION
 2   BY MR. DePORRE:
 3   Q.  Are you familiar with the term, "green light"?
 4   A.  Yes, sir.
 5   Q.  What's a green light?
 6   A.  Usually a green light is a green light to put a hit out
 7   on somebody or violate somebody, within the gang context.
 8   Q.  Sorry to speak over you.
 9   A.  I said, within a gang context.
10   Q.  Within a gang context.
11        When he says they don't have a gun to put a green
12   light on him, is that referring to something he has?
13   A.  Not the way I heard it, no.
14   Q.  Is that referring to other people not having a gun?
15   A.  Correct.
16   Q.  And when he refers to his gun throughout this call, does
17   he -- how does he refer to it?
18   A.  A banger or a stick, or a banger with a stick.
19        MR. DePORRE:  No further question.
20                  RECROSS-EXAMINATION
21   BY MR. LONGSTREET:
22   Q.  So when he's talking about someone else's gun, it's a
23   gun, but when he's talking about his gun, it's a banger?
24   A.  In this call, that's what I would say, yes.
25        MR. LONGSTREET:  Okay.
```

```
 1              THE COURT:  Thank you, Agent Hurt.
 2              (Witness excused at 1:52 p.m.)
 3              THE COURT:  Government may call its next witness.
 4              MR. DePORRE:  Your Honor, the government calls
 5    Courtney Selvia.
 6              THE COURT:  Can you pronounce that last name again
 7    for me.
 8              MR. DePORRE:  Selvia, S-E-L-V-I-A, and I may be
 9    mispronouncing it.
10              THE COURT:  Okay.  Ms. Selvia, could you come up to
11    the front, please.  Just stop for a minute.
12              Please raise your right hand.
13              Do you swear the testimony you are about to give
14    will be the truth?
15              MS. SELVIA:  Yes.
16              THE COURT:  Thank you.  Welcome to the United
17    States District Court.  If you could settle into the witness
18    chair.  I would just ask, when you are answering questions,
19    could you keep your voice up and please speak slowly so we
20    can hear everything you have to say.
21              MS. SELVIA:  Okay.
22              THE COURT:  Thank you.
23                        COURTNEY SELVIA,
24    called at about 1:53 p.m.  was examined and testified on her
25    oath as follows:
```

1                          DIRECT EXAMINATION

2     BY MR. DePORRE:

3     Q.   Good afternoon.

4     A.   Hi.

5     Q.   Would you please state your name.

6     A.   Courtney Selvia.

7     Q.   And could you spell your first and last name for the

8     court reporter?

9     A.   Courtney is C-O-U-R-T-N-E-Y, last name is Selvia,

10    S-E-L-V-I-A.

11    Q.   Ms. Selvia, how are you employed?

12    A.   I'm a dispatch clerk at Metro Police Authority.

13    Q.   Are you a police officer?

14    A.   No.

15    Q.   Are you -- do you do any sort of law enforcement

16    activities at your job?

17    A.   No.

18    Q.   What is it that you do?  Can you describe your job to

19    the jury?

20    A.   Yep.  I'm a records clerk, so I maintain all records for

21    our department, and I dispatch calls, walk-ins.  I basically,

22    you know, sit at the front desk and handle everything that

23    comes at the front desk.

24    Q.   How long have you been working there?

25    A.   Eight years.

```
 1   Q.  And were you working there throughout the pandemic?
 2   A.  Yeah.
 3   Q.  Were you there in November of 2020?
 4   A.  Yes.
 5   Q.  How about December of 2020?
 6   A.  Yes.
 7   Q.  What are your responsibilities with respect to impounded
 8   vehicles?
 9   A.  If the vehicle is impounded and it goes a tow company, I
10   authorize vehicle release forms to the register owners when
11   they come to our office.  So in order to get the vehicle from
12   the impound lot, they have to come to me first.
13   Q.  Could you tell the jury what a vehicle release form is?
14   A.  Yep.  So in order for a registered owner to get their
15   car out of the tow company, if it has been impounded, they
16   have to come to me, they pay $50, and then the registered
17   owner has to provide title or registration, proof of
18   insurance, that they have it, and photo ID.
19   Q.  And you said they have to provide title and
20   registration?
21   A.  Yes, title or registration.
22   Q.  Now, I want to focus back on December of 2020.  Were the
23   protocols for a vehicle release form, were they the same in
24   December of 2020 as they are today?
25   A.  No.  With COVID, we kind of relaxed our policies a
```

1    little bit, because people were having trouble getting into

2    the Secretary of State with their appointments and

3    everything.

4    Q.  So you say you relaxed the policies.  What sort of

5    things would you accept in order to release a vehicle -- what

6    sort of documentation would you accept in order to release a

7    vehicle from impound?

8    A.  Well, now we have to see valid driver's license, valid

9    registration and proof of insurance, but because of COVID,

10   with everyone having trouble getting appointments at the

11   Secretary of State at that time, we were accepting title or

12   registration.

13   Q.  So if somebody came to you with the title, they could

14   get the car?

15   A.  At that time, yes.

16   Q.  Now, what if the title was in a relative's name or

17   somebody else's name?

18   A.  Whoever the title's name -- whoever's name is on the

19   title has to be the one that comes to the police department

20   to get the release form.

21   Q.  What if they are in jail?

22   A.  Then they can -- they can authorize somebody else to get

23   the release from our office, but we have to have a notarized

24   letter stating that the registered owner, whoever is on the

25   title, gives permission for that person to get the vehicle.

```
 1    Q.  So you would compare the title to the notarized
 2    letter --
 3    A.  Yeah, yep.
 4    Q.  -- to make sure that the person who signed the notarized
 5    letter is on the title?
 6    A.  You're asking if I would compare them at the office when
 7    they brought those documents in?
 8    Q.  Yes.
 9    A.  Yes.
10    Q.  And that was your policy in December of 2020?
11    A.  Yes.
12    Q.  And your policy has changed now, correct?
13    A.  Yeah, it is the same policy, we aren't relaxing it
14    anymore.  They have to have valid registration and proof of
15    insurance and valid driver's license in order it get it now.
16    Q.  But you can still get it with a notarized letter, if a
17    loved one or a family member is in jail?
18    A.  In addition to those documents, yes.
19    Q.  Okay.  What sort of information is on the vehicle
20    release authorization?
21    A.  Everything; the make, model, year, VIN, plate
22    information, the date that I completed the vehicle release,
23    who I gave the vehicle to, tow company, my information.  I
24    sign off on it, once it is completed.
25    Q.  I would like you to pull up Government's Exhibit 7,
```

```
 1    which has been admitted into evidence.  Would you zoom in at
 2    the top of that, where the date is?
 3             Do you recognize this form, Government Exhibit 7?
 4    A.  Yes.
 5    Q.  And what's the date on it here?
 6    A.  December 10th of 2020.
 7    Q.  Can you zoom out now?
 8             Can you point out where it says the name of the
 9    person who took possession of this car?
10    A.  You want me to point it out?
11    Q.  Can you just say the name?
12    A.  Dominga Flanagan.
13    Q.  That's at the bottom.  Would you zoom in there at the
14    bottom and get that?  Thank you.
15             Now, it says it was released with a notarized
16    letter.  Did you save a copy of the letter?
17    A.  No, I didn't.
18    Q.  Did you save a copy of the title?
19    A.  No.
20    Q.  But did you look at both?
21    A.  Yes.
22    Q.  At the very bottom, there's a checkmark and a box that's
23    very small.  Would you zoom in there,
24    Ms. Szuhkent -- actually, it has to go all the way up to the
25    end.  Sorry.
```

1              Would you read that, if you could, for the jury?

2    A.   Yep.  The "tow only" says a vehicle shall not be driven

3    without a valid driver's license, registration and proof of

4    insurance provided by the registered owner.  If the

5    registered owner of this vehicle has not provided the

6    aforementioned documents, the vehicle must be towed by a

7    licensed tow company.

8    Q.   Now, in this case, did you have the registration?

9    A.   No.

10   Q.   And is that why you checked that box?

11   A.   Yep.  They have to have valid driver's license, valid

12   registration and proof of insurance in order to drive it away

13   from the tow company.  If they don't have those documents, we

14   indicate "tow only," on the form.

15   Q.   Would you zoom out?  And then lastly, would you zoom in

16   this chart here, where it says the year, the color, and the

17   body style, basically across here?

18           And would you read that to the Grand Jury (sic),

19   what year and model it is?

20   A.   It's a 2008 Pontiac Grand Prix.

21   Q.   And then it also says on the form -- you can click

22   out -- what color it is.  Do you see that?

23   A.   Yes.

24   Q.   What color is it?

25   A.   White.

1    Q.  Thank you.

2            MR. DePORRE:  I have no further questions.

3            THE COURT:  Mr. Longstreet.

4                      CROSS-EXAMINATION

5    BY MR. LONGSTREET:

6    Q.  Is it officer?

7    A.  I'm a dispatcher.

8    Q.  Dispatcher.  Okay.  How are you this afternoon?

9    A.  I'm doing well.  Yourself?

10   Q.  I'm doing fairly well.  Thank you for asking.

11           You indicated that you work for dispatch for the

12   Metro Police Authority of Genesee County, correct?

13   A.  Yes.

14   Q.  And you are the one that created this document that was

15   marked as Government's 7?

16   A.  I completed it, yes.

17   Q.  And you indicated that in order for you to turn over a

18   vehicle, you need to have a notarized letter from the

19   registered owner, correct?

20   A.  Yes.

21   Q.  Did you check the title of the vehicle prior to

22   releasing it?

23   A.  Yes.  I always check the title and compare that to the

24   name on the notarized letter.

25   Q.  Are you aware that the title owner's name was

1   Blake Austin Parkes?

2   A.   No.

3   Q.   Okay.  Would reading a Metro Police Authority of Genesee

4   County vehicle inventory tow record refresh your recollection

5   of the name of the title owner of that vehicle?

6   A.   Yeah.

7            MR. LONGSTREET:  May I approach the witness?

8            THE COURT:  Sure.

9            MR. DePORRE:  Before he does, I would like to see

10   the form.

11           (Defendant's Exhibit A marked for identification

12           purposes.)

13   BY MR. LONGSTREET:

14   Q.   I would like to show you what has been now marked as

15   Defendant's Proposed Exhibit A for identification purposes

16   only.  Ma'am, can you tell me the document that I just handed

17   you?

18   A.   This is our vehicle inventory and towing record.

19   Q.   And that vehicle towing record, is that a document

20   that's kept in the regular course of business with the Metro

21   Police Authority of Genesee County?

22   A.   Yes.

23   Q.   And this is a document that's regularly kept by this

24   department?

25   A.   Yes.

1    Q.  And does it fairly and accurately depict a tow record

2    distributed by your department?

3    A.  Yes.

4         MR. LONGSTREET:  Defense move -- I can't, it's

5    their case in chief.

6    BY MR. LONGSTREET:

7    Q.  Ma'am, on this particular document, do you see the name

8    of the title owner?

9    A.  Yes.

10   Q.  And the name of that title owner is?

11   A.  Blake Austin Parkes.

12   Q.  Okay.  Thank you.

13        MR. DePORRE:  Are you done?  Sorry.  Are you done?

14        MR. LONGSTREET:  No, sir.

15        MR. DePORRE:  Okay.

16   BY MR. LONGSTREET:

17   Q.  From your recollection, how is Ms. Flanagan and

18   Mr. Parkes related?

19   A.  I don't know.

20   Q.  And you would only have released a vehicle that had a

21   letter from Mr. Parkes?

22   A.  No.  Like I said, I compared the title to the notarized

23   letter.  So it may have been a signed title, so it might have

24   had Mr. Parkes' name printed on the title, but the defendant

25   had signed the back of the title, and I compared that with

1    the name on the notarized letter.

2    Q.  Do you have the signature on the back of the title?

3    A.  I don't know.

4    Q.  Okay.

5    A.  I don't have that document.

6    Q.  Do you recall what signature was on the back of that

7    title?

8    A.  I don't remember.

9    Q.  Okay.  Did you see buyer/seller on the title?

10   A.  I don't remember.

11   Q.  Okay.  You don't recall Noe Garza being on the document

12   anywhere, correct?

13   A.  I don't remember.

14   Q.  And the only documentation we have of the owner is

15   Blake Austin Parkes, correct?

16   A.  Correct.

17            MR. LONGSTREET:  Okay.  Nothing further.  Thank

18   you.

19            THE COURT:  Mr. DePorre.

20                    REDIRECT EXAMINATION

21   BY MR. DePORRE:

22   Q.  Ms. Selvia, you talked about a signed title, correct?

23   A.  Yes.

24   Q.  Could you describe to the jury what a signed title is?

25   A.  Well, when I see a title, sometimes their name is

1    printed on the front of the title.  If it was sold to

2    somebody else, they would sign the back of the title, with

3    their name and signature.

4    Q.  And did you see more of those during December of 2020

5    because of the pandemic?

6    A.  Yes.

7    Q.  And why is that?

8    A.  Like I said, people were having trouble getting into the

9    Secretary of State, getting their appointment, so we had to

10   kind of relax our policy a little bit to accommodate those

11   who were having trouble getting in.

12   Q.  Now, the form that will Mr. Longstreet showed you, did

13   it specifically say, title, who was on the title of the

14   vehicle?

15   A.  No.

16   Q.  Did it say who was on the -- who was the owner of the

17   vehicle?

18   A.  Yes.

19   Q.  And where would that information come from?

20   A.  Probably from the title, I assume.

21   Q.  Where else could it come from?

22   A.  Maybe an old registration in the vehicle, proof of

23   insurance maybe, I'm not sure.

24   Q.  Do you ever run the vehicle in the Secretary of State's

25   database?

```
1    A.   Yes.
2    Q.   And that database, does that include information from
3    signed titles?
4    A.   No.
5    Q.   Does it only include information about registered
6    owners?
7    A.   Yes.
8    Q.   And when that form is completed, do you know whether or
9    not the person who completes the form uses the information
10   from the Secretary of State's office or from the actual
11   signed title?
12   A.   I'm assuming they just take it right from the Secretary
13   of State's information, like when they run a vehicle.
14   Q.   And in some cases, would they even have access to the
15   signed title?
16   A.   Maybe not, no.  It could be at their house, or it
17   doesn't necessarily have to be in the vehicle with them when
18   they get arrested.
19            MR. DePORRE:  No further questions.
20            THE COURT:  Mr. Longstreet, anything else?
21            MR. LONGSTREET:  Quickly.  Thank you.
22                    RECROSS-EXAMINATION
23   BY MR. LONGSTREET:
24   Q.   Ma'am, your department has access to what they call
25   LEIN; is that correct?
```

```
 1   A.   Yes.
 2   Q.   And LEIN is the database of which the Secretary of State
 3   provides information in regards to titles, ownerships,
 4   registration, so on and so forth; is that correct?
 5   A.   Yes.
 6   Q.   And the police department can take a VIN number and type
 7   in the VIN number into LEIN, and you've got a name of the
 8   owner, right?
 9   A.   Yes.
10         MR. LONGSTREET:  Nothing further.
11         THE COURT:  Mr. DePorre.
12                    REDIRECT EXAMINATION
13   BY MR. DePORRE:
14   Q.   Is that what you assume happened in this case?
15   A.   Probably, yes.
16         MR. DePORRE:  Nothing further.  Thank you.
17         THE COURT:  Ms. Selvia, thank you for your time.
18   You may step down, and the government may call its next
19   witness.
20         (Witness excused at 2:08 p.m.)
21         MR. DePORRE:  Your Honor, the government calls
22   Brett Orvis.
23         THE COURT:  Mr. Orvis, you've seen this drill.
24   Would you raise your hand?
25         Do you swear the testimony you are about to give
```

1    will be the truth?

2            OFFICER ORVIS:  Yes, I do.

3            THE COURT:  Okay.  You've heard me say this; if

4    you'd make yourself comfortable, and keep your voice up and

5    speak slowly, that will help us hear you.  Thank you.

6                    OFFICER BRETT ORVIS,

7    called at about 2:08 p.m., was examined and testified on his

8    oath as follows:

9                    DIRECT EXAMINATION

10   BY MR. DePORRE:

11   Q.  You've seen everybody else do it, so go ahead and state

12   your name and spell it for the record.

13   A.  My name is Brett, B-R-E-T-T, Orvis, O-R-V-I-S.

14   Q.  How are you employed?

15   A.  I'm currently employed with Mount Morris Police

16   Department, and I'm assigned to the FBI Flint Safe Streets

17   Task Force.

18   Q.  What's your role in this case?

19   A.  I was in charge of charging this case, doing some of the

20   follow-up and presenting it for court.

21   Q.  And is it fair to characterize you as the case agent or

22   officer in charge?

23   A.  Yes.

24   Q.  You mentioned that you were involved in charging the

25   case.  When was the case actually charged?

```
 1    A.   I believe it was June 11th of 2021.

 2    Q.   And around that time, did you assist in transporting

 3    some of the defendant's property?

 4    A.   Yes.

 5    Q.   What sort of things were taken -- what sort of things

 6    did you receive custody of?

 7    A.   Yeah.  So after the defendant was charged, we took

 8    custody of his property.  He was taken from the jail and

 9    taken into federal custody.  Normally, we don't take -- we

10    don't turn any property over to the U.S. Marshals, so I would

11    have had his personal belongings that he was arrested with

12    when he came to jail.

13    Q.   All right.  Would you pull up Government's Exhibit 9?

14              And do you recognize what's on the screen and

15    what's been admitted as Government's Exhibit 9?

16    A.   Yes.  This is a property receipt form for when property

17    is turned over to somebody from the FBI.

18    Q.   Who did you turn the property over to in this case?

19    A.   To Noe Garza's mother, Dominga Flanagan.

20    Q.   And did she sign for the property?

21    A.   She did.

22    Q.   Would you zoom in at the very bottom?

23              Is that her signature or yours?

24    A.   That is hers.

25    Q.   You can zoom out.  And then would you zoom in the
```

1    middle, where it says the description of items?

2              Are these the items that you turned over to

3    Ms. Flanagan?

4    A.  Yes.

5    Q.  Can you read them?

6    A.  Sure.  A Citizens metal wristwatch, black.  A black

7    cross necklace.  A silver necklace with small animal charm.

8    Three hair ties.  A pack of Newports.  A 420 hat, and two

9    TouchPay jail receipts.

10   Q.  All right.

11   A.  TouchPay.

12   Q.  TouchPay?

13   A.  Yeah.

14   Q.  Where did you give this property to Ms. Flanagan?

15   A.  I believe it was at the Michigan State Police post, in

16   Flint.

17   Q.  And when did you give it to her?

18   A.  It would have been shortly after -- well, yeah, it would

19   have been a couple days after the charge, so on this form, it

20   is on 6/14/2021, so three days later.

21   Q.  Would you zoom in on the top-left of that form, where

22   has the case ID and the date?

23              Is that the FBI's case ID in this case?

24   A.  Yes.

25   Q.  And is that where it says the date the property was

```
 1    turned over?
 2    A.   Yes, it does.
 3    Q.   And that coincides with your recollection of when the
 4    case was charged?
 5    A.   Yes.  The case was charged three days prior to this.
 6    Q.   I'd like you to take a look at -- would you pull up
 7    Government Exhibit 10A?
 8              Do you recognize this form?
 9    A.   I do.
10    Q.   What is this?
11    A.   This is the birth certificate for Noe Garza.
12    Q.   And would you zoom in on the top-half of it?
13              All right.  Do you see Mr. Garza's name there?
14    A.   I do.
15    Q.   Now, zoom in on the bottom-half of the written portion,
16    where it identifies the mother's name.
17              And who was Mr. Garza's mother?
18    A.   So at time, it was Dominga Andrea Garza.
19    Q.   All right.  Would you next go to Government Exhibit 10B?
20    Do you know what this is?
21    A.   Yes.  This is a marriage license for -- I guess she had
22    two previous last names, Dominga VillaPando or Dominga Garza.
23    Q.   Would you zoom in there where it says the name of
24    VillaPando, that's on the top-right?
25    A.   Yes.
```

1    Q.   Does it indicate who she married?

2    A.   It does.

3    Q.   Would you zoom in on the left-hand column to the name of

4    the individual she married?

5         Would you that read that?

6    A.   Yeah.  So this marriage was between

7    Raymond Lawrence Flanagan, Jr. and Dominga VillaPando, or

8    Garza.

9    Q.   It's your understanding, when you turned over the

10   property from -- that had been seized from Metro, that you

11   turned it over to Dominga Flanagan, who was Mr. Garza's

12   mother?

13   A.   Yes, that was at his request.

14   Q.   All right.  Would you please pull up Government

15   Exhibit 11A.

16        Could you explain to the jury what Government

17   Exhibit 11A is?

18   A.   So this is a screen shot that I took of the jail call.

19   Basically, it is a jail call from Noe Garza, and at the

20   top-right, it's his PIN number, the date and time, and then

21   the dialed number, and then the duration of the call.  This

22   is just a system that we use, as investigators, to review

23   jail calls.

24   Q.   And are jail calls always recorded?

25   A.   They are always recorded, yes.

1   Q.   What if the jail call is with an attorney?

2   A.   Then we do not listen.

3   Q.   And is it marked privileged somehow?

4   A.   Not to my knowledge.

5   Q.   Or attorney/client?

6   A.   Not on the screen that we review.

7   Q.   Do you have to just know it's with an attorney?

8   A.   Yeah.  So normally, if we hear any relation to an

9   attorney or attorney-client privilege, we stop listening

10  immediately.

11  Q.   Did you hear any attorney discussions in this case?

12  A.   There was none, no.

13  Q.   And did you listen to all of Noe Garza's jail calls?

14  A.   No.

15  Q.   Why did you listen -- or why, specifically, did law

16  enforcement listen to this one?

17  A.   This one was brought to my attention by one of the

18  sergeants at my local police department.  It was being -- the

19  calls were being listened to in regards to a different case

20  at the time.

21  Q.   All right.  And were the calls, they were being listened

22  to because who was called or was it because of Mr. Garza?

23  A.   Because of who was called.

24  Q.   And the person called was this person at the

25  number 810 -- or do you know what number was called in this

1    case?

2    A.   Yes.  The number dialed here was (810) 884-9032.

3    Q.   And then it says the name of the caller from the jail.

4    Can you read that for the record?

5    A.   Noe Garza.

6    Q.   And then in the top-right, would you zoom in there,

7    where it has the PIN?

8            Could you explain what the significance of the PIN

9    number is?

10   A.   Yeah.  It is a personal number that the inmates have to

11   put in to access their accounts.

12   Q.   All right.  And then below that PIN, there is a last

13   name.  And then would you zoom in, actually, on that entire

14   block right here, Ms. Szuhkent?

15           What day was this call made?

16   A.   As far as specific day of the week I'm not sure, but it

17   was on December 16th, 2020, at 2:42 p.m.

18   Q.   Okay.  And if you wanted to, you could get a calendar

19   and look up what day that was?

20   A.   Yes.

21   Q.   What time was it at?

22   A.   2:42 p.m., 14:42.

23   Q.   Did you listen to the entire jail call?

24   A.   Yes.

25   Q.   And did you listen to points of the call where Mr. Garza

```
 1   discussed a stick?
 2   A.  Yes.
 3   Q.  And where he discussed a banger?
 4   A.  Yes.
 5           MR. DePORRE:  Again, I would like to play
 6   Government Exhibit 11A.
 7           (Audio played for the jury.)
 8           MR. DePORRE:  All right.  And then, please play
 9   clip number 11B -- sorry, please play clip number 11C.  Thank
10   you.  Ms. Szuhkent noted that the last clip was 11B, and this
11   is 11C.
12           (Audio played for the jury.)
13           MR. DePORRE:  No further questions.
14           THE COURT:  Mr. Longstreet, any questions?
15                   CROSS-EXAMINATION
16   BY MR. LONGSTREET:
17   Q.  Sir, you are the case agent in this case; is that
18   correct?
19   A.  Yes, sir.
20   Q.  And that means you are responsible for directing the
21   investigation in this case; is that correct?
22   A.  Yes.
23   Q.  All right.  Now, sir, as a part of your investigation,
24   did you speak to or have anyone from your agency speak to a
25   person by the name of Blake Austin Parkes?
```

1    A.   Yes.

2    Q.   Okay.  And you had -- you had, yourself, or somebody

3    from your agency spoke to Blake Austin Parkes on November 7th

4    of 2022; is that correct?

5    A.   I'm not exactly sure of the dates, but they did speak to

6    him, yes.

7    Q.   And, sir, you are aware that Mr. Parkes identified

8    Meldrum Allen as the person who sold the car --

9         MR. DePORRE:  Objection, hearsay.

10        THE COURT:  Let me see you at sidebar for a second.

11        (Sidebar conference held on the record at 2:19 p.m.

12        as follows:

13        THE COURT:  Do you have a response to the hearsay

14   objection?

15        MR. LONGSTREET:  No, I don't.  This is obviously

16   going to be sustained, then.  I would just simply say that I

17   believe it is admissible because the prosecution has at great

18   lengths tried to identify the owner of the vehicle

19   unsuccessfully.  The prosecution has tried to identify,

20   multiple times, unsuccessfully, the owner of that vehicle.

21   This particular officer received -- I guess I can ask the

22   question without getting into hearsay.  Let me ask the

23   question without getting into hearsay.

24        THE COURT:  At least we will go question by

25   question.  I will sustain this objection.  Why don't you tell

1   me now, what question you want to ask, so we can head this

2   off?

3           MR. LONGSTREET:  Okay.  Based on your

4   investigation, you learned the owner of the vehicle was

5   Blake Austin Parkes.  You learned during the course of your

6   investigation the vehicle was sold.  You learned during the

7   course of your investigation that the vehicle was sold to

8   Meldrum Allen.

9           MR. DePORRE:  I think that's all hearsay.  I don't

10  think it goes to anything other than the truth of the

11  out-of-court statement.

12          THE COURT:  Let me ask this.  This guy Parkes is

13  under subpoena, right?

14          MR. LONGSTREET:  He is.

15          THE COURT:  My inclination is to sustain this

16  objection now, see if this guy shows up.  You can elicit this

17  from him directly, that he told this officer he was the

18  owner.  That would be another way to get this evidence in and

19  he can testify to other stuff.  And if for some reason

20  there's an issue there, if you don't get from him that, we

21  will revisit whether this witness should be recalled.  So

22  basically, I'm punting on it now.  Do you have a problem with

23  that?

24          MR. LONGSTREET:  The issue I have is I'm trying to

25  develop the identification of Meldrum Allen, that his

 1   photograph.

 2          THE COURT:  Did that come from this guy Blake?

 3          MR. DePORRE:  This witness wasn't even -- didn't

 4   even show him the photograph, so the identification was made

 5   by somebody else, Blake, to another officer.  This has

 6   nothing to do with the officer on the stand.

 7          MR. LONGSTREET:  But he wouldn't know who the

 8   person in the picture was, but only that he identified this

 9   person as the person he sold the car to.  I would need them

10   to identify who the person in the picture is, because they

11   are the ones that knows.

12          THE COURT:  Well, look, for now I'm going to

13   sustain this objection, and but I'm not closing the door on

14   whether we can revisit this with this witness, and we'll

15   cross that bridge if we need to.  You can ask this Blake

16   fellow as many questions as you want about what he told the

17   officers.

18          MR. LONGSTREET:  Uh-huh.

19          THE COURT:  Then if I have to revisit, to let you

20   ask this guy some more questions, I will.

21          MR. LONGSTREET:  Okay.  Very good.

22          (Sidebar conference concluded at 2:23 p.m.)

23   BY MR. LONGSTREET:

24   Q.  Sir, in the course of your investigation, did you

25   investigate a person by the name of Meldrum Allen?

1    A.   You've got to be more specific.

2    Q.   Did you investigate who he was?

3    A.   Yes.

4    Q.   Okay.  And as a part of your investigating who he was,

5    did you pull any photographs of Mr. Allen?

6    A.   No.

7    Q.   Have you seen a photograph of Mr. Allen?

8    A.   No.

9            MR. LONGSTREET:  All right.  Nothing further.

10           THE COURT:  Thank you.

11           Mr. DePorre, any other questions?

12           MR. DePORRE:  Not for this witness, Your Honor.

13           (Witness excused at 2:24 p.m.)

14           THE COURT:  Mr. DePorre, you may call your next

15   witness.

16           MR. DePORRE:  We are out of witnesses, Your Honor.

17           THE COURT:  Okay.  Then, why don't you -- I think

18   you had some stipulations to read in.

19           MR. DePORRE:  Thank you.

20           THE COURT:  Do you mind doing that at the podium?

21           MR. DePORRE:  These are long, and they are wordy

22   because they are written by attorneys.

23           THE COURT:  Just go slow.

24           MR. DePORRE:  The first one is what's been marked

25   as Exhibit 12.  It states, "Stipulation regarding prior

1    conviction.  The United States, by Dawn N. Ison,

2    United States Attorney, and Jules DePorre, Assistant United

3    States Attorney, and the defendant, Noe Garza, through his

4    attorney, Charles Longstreet, stipulate and agree that:

5              One, as of the date of the offense charged in

6    Count 1 of the Superseding Indictment, the defendant had been

7    convicted of a crime that was punishable by imprisonment for

8    a term exceeding one year.

9              Two, as of the date of the offense charged in

10   Count 1 of the Superseding Indictment, the defendant knew

11   that he had been convicted of a crime that was punishable by

12   imprisonment for a term exceeding one year.

13             Three, this conviction of defendant, prior to the

14   date of the offense charged in Count 1 of this Superseding

15   Indictment, prohibited the defendant from possessing a

16   firearm and ammunition under Title 18, United States Code,

17   Section 922(g).

18             And fourth, as of the date of the offense charged

19   in Count 1 of the Superseding Indictment, the defendant knew

20   that his prior conviction prohibited him from possessing a

21   firearm.

22             It is signed by Jules DePorre, Assistant United

23   States Attorney; Charles Oliver Longstreet, II, attorney for

24   defendant; and Noe Garza, defendant."

25             The next stipulation has been marked as

 1    Government's Exhibit 13.  It is a "Stipulation to controlled

 2    substance.  The United States, by Dawn N. Ison, United States

 3    Attorney, and Jules DePorre, Assistant United States

 4    Attorney, and the defendant, Noe Garza, through his attorney,

 5    Charles Longstreet, stipulate and agree that buprenorphine

 6    referenced in Count 3 of the Superseding Indictment was, in

 7    fact, buprenorphine, a Schedule 3 controlled substance.

 8    Dated and signed by Jules M. DePorre, Assistant United States

 9    Attorney; Charles Oliver Longstreet, II, attorney for

10    defendant; and Noe Garza, defendant."

11         And then the third stipulation, Government

12    Exhibit 14, is entitled, "Stipulation to firearm and

13    ammunition interstate nexus."

14         It states:  United States of America, by Dawn

15    N. Ison, United States Attorney, and Jules DePorre, Assistant

16    United States Attorney, and the defendant, Noe Garza, through

17    his attorney, Charles Longstreet, together, the parties

18    stipulate and agree that the firearm described in Count 1 and

19    Count 2 of the Superseding Indictment, specifically a Sturm

20    Ruger & Company, Model EC9s, nine-millimeter Ruger caliber

21    semiautomatic pistol, was manufactured outside of the State

22    of Michigan, and therefore, the possession of the firearm was

23    "in or affecting commerce" within the meaning of Title 18,

24    United States Code, Section 922(g), and the firearm has been

25    "shipped or transported in interstate commerce or foreign

1   commerce" within the meaning of Title 18, United States Code,

2   Section 922(k).

3           The parties stipulate and agree that the ammunition

4   described in Count 1 of the Superseding Indictment,

5   specifically six rounds of nine-millimeter Ruger caliber

6   ammunition that was in a magazine located in the pistol, and

7   one round of nine-millimeter Ruger caliber ammunition was

8   manufactured outside the State of Michigan and, therefore,

9   the possession of the ammunition was "in or affecting

10  commerce" within the meaning of 18, United States Code,

11  922(g).

12          The parties stipulate and agree that the firearm

13  described in Count 1 and 2 of the Superseding Indictment is a

14  weapon which will or is designed to, or may readily be

15  converted to, expel projectile by the action of an explosive,

16  and is, therefore, a firearm for the purpose of 18,

17  United States Code, 922(g) and 922(k).

18          The parties stipulate and agree that the ammunition

19  described in Count 1 of the Superseding Indictment is

20  ammunition or cartridge cases, primer, bullets, or propellant

21  powder designed for use in any firearm, and is therefore

22  ammunition for the purposes of 18, United States Code,

23  Section 922(g).

24          Again, it is dated and signed by the parties,

25  Jules M. DePorre, Assistant United States Attorney,

1    Charles O. Longstreet, II, attorney for defendant, and

2    Noe Garza, defendant."

3          That concludes the government's proof in this case.

4          THE COURT:  So does the government rest?

5          MR. DePORRE:  We do.

6          THE COURT:  Okay.  Ladies and gentlemen, we are

7    going to end things for today, now.  We have made such good

8    progress that we are ahead of schedule.  So please return as

9    scheduled for a prompt 9:00 beginning, tomorrow morning.

10   Please don't discuss the case.  I wish you safe travels and I

11   look forward to seeing you tomorrow.

12          THE CASE MANAGER:  All rise for the jury.

13          (Jury excused at 2:30 p.m.)

14          THE COURT:  Okay.  Please be seated.  The

15   government has rested.

16          Mr. Longstreet, do you care to make any sort of

17   motion at this point.

18          MR. LONGSTREET:  Yes.  The defense at this time

19   makes a Rule 29 motion for directed verdict, as we don't

20   believe --

21          THE COURT:  Come to the podium.

22          MR. LONGSTREET:  Yes.

23          THE COURT:  Thank you.  And you can tilt it back

24   towards me, so you're not straining your neck.

25          MR. LONGSTREET:  In a light viewed most favorable

1    to the prosecution, we do not believe the prosecution has

2    produced enough evidence at this point to proceed to the jury

3    to the issue of possession.

4            We've heard witnesses testify in regard to a

5    firearm.  We heard witness -- we heard officers say that what

6    Mr. Garza said when he said, banger, meant stick.  However,

7    what they have failed to show is that what Mr. Garza was

8    talking about was the firearm that was in the car that was

9    found on November 26th, 2020.  There has been no nexus

10   between my client and that firearm.  There has been no

11   showing that he possessed that firearm, actually or

12   constructively.  And they presented no evidence to this jury

13   that would suggest, either by direct or circumstantial

14   evidence, that he was constructively in possession of that

15   firearm.

16           The prosecution has failed to meet their proof,

17   beyond a reasonable doubt, even in the light most favorable

18   to the prosecution, and at this time, the defense asks for a

19   directed verdict of not guilty.

20           THE COURT:  What do you say with respect to the

21   part of the tape recording where Mr. Garza uses the term,

22   either banger or stick, one of those two, in connection with

23   a statement that the -- what's the name of police force here?

24           MR. LONGSTREET:  Metro Police --

25           THE COURT:  That the Metro PD didn't find the

```
 1    banger or the stick.  I don't have the transcript in front of
 2    me.  This all comes in reasonably close proximity.  And in
 3    viewing the evidence in the light most favorable to the
 4    government, why wouldn't it be reasonable to reason that
 5    banger means gun, because there's certainly testimony from
 6    which the jury could find that.  And then the only thing that
 7    Metro PD didn't find was the gun.  We haven't heard evidence
 8    they didn't find anything else.
 9            So drawing the inferences in the light most
10    favorable to the government, why couldn't the jury put
11    special emphasis on that part of the tape where there's a
12    connection between what the PD didn't find and a gun?
13            MR. LONGSTREET:  There can't be a fair inference
14    drawn from the evidence for two reasons.  The first statement
15    was made on November 26th, 2020, when the officer tells my
16    client, I found your gun.  Whose is it?  That will give
17    Noe Garza the reasonable inference to draw that they found a
18    gun.  Then 16 days later -- or, excuse me, 20 days later,
19    he's on the phone telling his girlfriend they didn't find a
20    gun that the police told him they found.
21            THE COURT:  Look, I'm just thinking out loud here.
22    It is 16 days later, and he hasn't been charged with a gun
23    crime.  Couldn't the jury reasonably say Garza called their
24    bluff and he caught them?  He didn't admit to a gun, and
25    between the time that they tried to bluff him and the date of
```

```
 1   this second phone call, nobody suggested there's a gun,
 2   nobody's charged him with a gun offense, and so couldn't the
 3   jury find that, by the time of this second call, he has
 4   realized that they haven't yet found the gun?
 5           MR. LONGSTREET:  I think the Court is using the
 6   logic of a lawyer versus using the logic of a judge.
 7           THE COURT:  I used to be a lawyer.
 8           MR. LONGSTREET:  You still are, just a judge.
 9           I think the Court is using the logic of a lawyer,
10   not necessarily that of a lay person, in drawing those
11   particular inferences, in that he wasn't charged with that.
12   It is not his problem that he wasn't charged with that.  It
13   is not the -- it is not for them to decide, just because he
14   wasn't charged with something doesn't mean that he is under
15   the belief that what he was told by the police was true, that
16   they found a gun on November 26th, but yet on December 16th,
17   he's telling his girlfriend, "they didn't find my fucking
18   banger," when the police told him that we found a gun in the
19   car.  Now, that's the only belief that he could have, is
20   because the police told him we found it.
21           THE COURT:  All right.  Well, what's your -- what's
22   your interpretation of that statement by Mr. Garza?
23           MR. LONGSTREET:  Wolf talking, tough talking.
24           THE COURT:  Look, help me understand.  I understand
25   there's talking tough but talking tough must have some
```

1    meaning.

2            MR. LONGSTREET:  Not really, it's just talking

3    tough.  It's just, yeah, I'm gonna protect you, I got this,

4    and they don't have a doggone thing.  He can talk tough all

5    he wants to.  The question is, was he talking about the gun

6    in that car when he had that conversation, and the

7    prosecution hasn't shown that he was talking about that

8    specific gun that he was told that they found.  Give us the

9    evidence to suggest that he was talking about that gun.

10   Where is that?  That's not on this record.

11           All they got is him talking tough on the phone,

12   yeah, I'm going to bang on him, I'm going to bang this, I'm

13   going bang that.  The officer tells you, well, banging --

14   bang could mean shoot or bang could mean throw punches.

15   Please help me understand where in this evidence that the

16   government is getting at the point that, because my client

17   says, yeah, I got this stick, I got the stick, I got the

18   banger, my mom got it.  Well, if his mom got it, guess what,

19   he doesn't have it.

20           So either way it goes, the government has not shown

21   proof beyond a reasonable doubt that the conversation that my

22   client was having with his girlfriend, he's referring to that

23   gun.  They have not created any nexus between my client and

24   that gun.  He's sending some -- because a person who is

25   charged with carjacking says, yeah, he had a gun.  But

1   there's nothing else there to suggest that he put that gun

2   there, the gun was in his hands, we didn't fingerprint it, we

3   didn't DNA test it to determine if he had the firearm or at

4   least connect him to it whatsoever.  All we are using is the

5   word of a carjacker, who comes in and says, well, I don't

6   even know if he had the gun at Meijer.  What evidence do we

7   have that he was talking about that gun and he possessed that

8   gun?  It is just not on this record.

9          THE COURT:  Thank you.  Are you making a motion

10  also directed at the Suboxone count?

11         MR. LONGSTREET:  Yes.

12         THE COURT:  Okay.  Do you have any thoughts on

13  that?

14         MR. LONGSTREET:  Actually, I won't, because the

15  statement was that he sold some, but the question is, did he

16  possess with intent to deliver?  I think there is something

17  on the record, one piece of evidence, because on the -- in

18  the video, he says I was going to sell some.

19         THE COURT:  Are you making a motion on that count?

20         MR. LONGSTREET:  No, I'm not.

21         THE COURT:  All right.  Mr. DePorre.

22         MR. DePORRE:  Thank you.  Mr. Longstreet correctly

23  identifies the standard, which is, there has to be sufficient

24  evidence for a reasonable juror to find proof beyond a

25  reasonable doubt, and in this case there is.

```
 1              With respect to the firearm, the critical evidence
 2     is that, first of all, there is a witness who says that the
 3     morning before the stop on Thanksgiving morning, Mr. Garza
 4     actually possessed a firearm, and specifically the firearm
 5     that was displayed, looked like the firearm that he had.  He
 6     described it as a black firearm, which was a semiautomatic,
 7     which is how this firearm -- this particular firearm looked.
 8              THE COURT:  Can I interrupt for a second?
 9              MR. DePORRE:  Certainly.
10              THE COURT:  Is your theory that even if they had
11     never found the gun in the car, that the testimony of this
12     one witness, Hutchins, if believed by the jury, puts a gun in
13     his hand on that morning, and that's felon in possession and
14     they could convict on that basis alone?
15              MR. DePORRE:  No, I don't think -- I mean, I think
16     that could be, academically, our theory; it is not.  There is
17     a mountain of evidence beside that, that is relevant, and has
18     been put into evidence in this case and is before the jury
19     for their consideration.
20              THE COURT:  I'm just asking in the context of a
21     Rule 29 motion, how could I possibly rule that there's no way
22     the jury could find that he was in possession of a firearm
23     when there was direct testimony that he was in possession of
24     a firearm?
25              MR. DePORRE:  Yeah.
```

1            THE COURT:  It is a favorable question to you.

2            MR. DePORRE:  That testimony, alone, could win it

3    for us, but it is not that testimony alone.

4            THE COURT:  All right.  Go ahead.

5            MR. DePORRE:  Did I answer your question?

6            THE COURT:  What I was trying to get at was, I was

7    thinking, in my own mind, is there some theory that that

8    wasn't the possession that was charged in the indictment, it

9    is some other possession in the car later on.  I'm just

10   wondering.

11           MR. DePORRE:  No.  That possession is charged in

12   the indictment, because it was on the same day, so it was on

13   or about November 26th, 2020, which is what's alleged, and it

14   includes the possession of that particular firearm, which is

15   the firearm that he said is consistent with the one he

16   observed.  So I think that, alone, could do it.

17           I guess my point, broader, was that there's a lot

18   more evidence besides that.  There is the jail call, where he

19   says that the firearm -- that he still has the firearm, so it

20   seems to be acknowledging ownership.  He calls it, my mom got

21   one of my bangers.  He uses "my" when referencing banger.

22   There is evidence that banger is in reference to a firearm,

23   and that because he says, "the banger with the stick in it,"

24   he's specifically referencing a firearm with an extended

25   magazine, which is the Ruger that is charged in the

1  indictment.

2         There is also evidence about his possession of the

3  ammunition, particularly the ammunition that was inside the

4  car, underneath the driver seat.  That ammunition is located

5  next to two tabs of Suboxone.  The defendant had --

6         THE COURT:  Isn't the ammunition in the gun?

7         MR. DePORRE:  There's six rounds of ammunition in

8  the gun.

9         THE COURT:  Right.  So in other words, if I were to

10  find that there was sufficient evidence to withstand this

11  motion with respect to the gun, isn't that necessarily a

12  finding that there is sufficient evidence to withstand the

13  ammunition part of the motion, because there were bullets in

14  the gun?

15         MR. DePORRE:  It is.  There are three different

16  means of violation that's alleged in the Count 1 of the

17  indictment.  So there's possession of the Ruger firearm,

18  possession of six rounds of ammunition that were in the

19  magazine of the Ruger, and then possession of one additional

20  round of nine-millimeter ammunition.

21         The last round -- the two first ones, the six

22  rounds of nine-millimeter ammo and the gun go together.  The

23  additional round was the one that was found in the car.  He

24  refers to the car as his car, in the interview with the first

25  investigating officer, Officer Fisher.  He says that his

Case 4:21-cr-20405-MFL-CI   ECF No. 72, PageID.916   Filed 07/23/23   Page 189 of 191
*Jury Trial - Volume 2 • November 14, 2022*

**189**

```
1   girlfriend helped get him the unemployment money to purchase
2   the car.  So there is a lot of evidence of constructive
3   possession of that nine-millimeter round that's underneath
4   the seat where the Suboxone tabs are also found.
5           He also has Suboxone in his pocket, so it seems
6   like stuff is falling out of his pockets and underneath the
7   seat of his car.
8           THE COURT:  Anything else?
9           MR. DePORRE:  Thank you, Your Honor.
10          THE COURT:  I'm going to reserve decision on the
11  motion, and we'll pick up tomorrow, I will revisit it if
12  there is a conviction, but I will reserve decision for now.
13          Mr. Longstreet, tomorrow, is the plan to present
14  evidence on behalf of Mr. Garza?
15          MR. LONGSTREET:  Yes, sir.
16          THE COURT:  Could you give me a preview of coming
17  attraction?  Is it this Parkes fellow?
18          MR. LONGSTREET:  One witness and possibly an agent
19  of the government.
20          THE COURT:  So my plan will be to begin tomorrow
21  with your case.  Mr. Longstreet, if you guys could, again,
22  get here -- the marshals say that Mr. Garza can't make it up
23  here until 9:00, but if the lawyers could be here at,
24  say, 8:30, we'll have an informal conference in chambers to
25  review the jury instructions one last time, and then we will
```

Case 4:21-cr-20405-MFL-CI   ECF No. 72, PageID.917   Filed 07/23/23   Page 190 of 191
*Jury Trial - Volume 2 • November 14, 2022*

**190**

1    put everything on the record, once Mr. Garza gets back here.

2              Is that okay with you, Mr. DePorre?

3              MR. DePORRE:  Yes, it is, Your Honor.

4              Will there be any time in between -- I would only

5    ask for a short break in between the close of the defendant's

6    evidence and the commencement of closing statements so that I

7    could tweak any instructions that have changed in reference

8    in our closings.

9              THE COURT:  What sort of instruction, jury

10   instructions?

11             MR. DePORRE:  Yes, Your Honor.

12             THE COURT:  First of all, I will take a 15-minute

13   break, but in terms of when we set the break, my hope is that

14   after our informal conference in the morning and our placing

15   the stuff on the record, that you will know, pretty quickly,

16   what the final version of the instructions are.

17             So my thought would be to come in tomorrow, put the

18   final instruction decisions on the record, have

19   Mr. Longstreet present the defense case, and then I would

20   give my first set of closing instructions, then take a break,

21   and then you guys can come in with the jury fresh and each

22   give your closing argument.

23             Does that work for you?

24             MR. DePORRE:  It does.

25             THE COURT:  Mr. Longstreet?

1     MR. LONGSTREET:  Yes.

2          THE COURT:  So we will have this case to the jury

3   certainly by noon, I would guess, at the absolute latest, and

4   probably sooner, tomorrow.

5          Anything else for the government?

6          MR. DePORRE:  No.  Thank you, Your Honor.

7          THE COURT:  Mr. Longstreet.

8          MR. LONGSTREET:  No, sir.

9          THE COURT:  See you guys tomorrow.  Thank you.

10         THE CASE MANAGER:  All rise.  Court is in recess.

11         (Proceedings concluded at 2:45 p.m.)

12                          —   —   —

13            C E R T I F I C A T I O N

14         I, Robert L. Smith, Official Court Reporter of the
    United States District Court, Eastern District of Michigan,
15  appointed pursuant to the provisions of Title 28, United
    States Code, Section 753, do hereby certify that the
16  foregoing pages comprise a full, true and correct transcript
    taken in the matter of USA vs. GARZA, Case No. 21-20405, on
17  Monday, November 14, 2022.

18
                              *s/Robert L. Smith*
19                        Robert L. Smith, RPR, CSR 5098
                          Federal Official Court Reporter
20                        United States District Court
                          Eastern District of Michigan
21
22  Date:  07/22/2023
    Detroit, Michigan
23

24

25