```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                           —   —   —

     UNITED STATES OF AMERICA,
 4
                   Plaintiff,
 5
       v.                                    Case No. 21-20405
 6
     NOE GARZA,                              Hon. Matthew F. Leitman
 7
                   Defendant.
 8   _____/

 9                   JURY TRIAL - Volume 3

10          BEFORE THE HONORABLE MATTHEW F. LEITMAN
                  United States District Judge
11         Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
12                    Detroit, Michigan
                  Tuesday, November 15, 2022
13

14   APPEARANCES:

15    For the Plaintiff:      JULES M. DEPORRE
                              UNITED STATES ATTORNEY'S OFFICE
16                            600 Church Street
                              Flint, MI 48502
17                            (810) 766-5177

18    Also Present:          Jessica Szukhent,
                             United States Attorney's Office
19
      For the Defendant:      CHARLES O. LONGSTREET, II
20                            LONGSTREET LAW FIRM, PLLC
                              18971 Livernois
21                            Detroit, MI 48221
                              (313) 288-0103
22

23

24       To obtain a copy of this official transcript, contact:
            Robert L. Smith, Federal Official Court Reporter
25            (313) 234-2612 • robert_smith@mied.uscourts.gov
```

```
 1                      TABLE OF CONTENTS

 2    MATTER                                          PAGE

 3    WITNESSES:

 4    BLAKE A. PARKES
      Direct Examination by Mr. Longstreet................ 7
 5    Cross-Examination by Mr. DePorre....................10

 6    OFFICER LOUIS VALEGA
      Direct Examination by Mr. Longstreet................15
 7    Cross-Examination by Mr. DePorre....................20

 8    DEFENSE RESTS.......................................20

 9    RULE 29 MOTION RENEWED..............................23

10    OFFICER BRETT ORVIS
      Direct Examination by Mr. DePorre...................25
11    Cross-Examination by Mr. Longstreet.................30

12    PROOFS CLOSED.......................................31

13    JURY INSTRUCTION....................................33

14    CLOSING ARGUMENTS
      by Mr. DePorre......................................49
15    by Mr. Longstreet...................................67
      Rebuttal by Mr. DePorre.............................77
16
      FINAL JURY INSTRUCTIONS.............................79
17

18

19

20    EXHIBITS:                      Offered       Received

21    Defendant's Exhibit B              8             9

22

23

24

25
```

1    Detroit, Michigan

2    Tuesday, November 15, 2022

3    at about 9:52 a.m.

4                            —   —   —

5              (Court, Counsel and Defendant present.)

6              THE CASE MANAGER:  All rise.

7              The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Matthew F. Leitman, United States District Judge, presiding.

10             You may be seated.

11             The Court calls Case No. 21-20405, United States of

12   America v. Noe Garza.

13             Counsel, please state your appearances for the

14   record.

15             MR. DePORRE:  Good morning, Your Honor.

16   Jules DePorre on behalf of the United States.  With me at

17   counsel table is Jessica Szuhkent, from the U.S. Attorney's

18   Office, and Brett Orvis, the case agent in this matter.

19             THE COURT:  Good morning.

20             MR. LONGSTREET:  Good morning.  May it please this

21   Honorable Court, Charles Oliver Longstreet, II, P68205,

22   appearing on behalf of Noe Garza, who is present and seated

23   to my left.

24             THE COURT:  Good morning.  Welcome to both of you.

25             We are here for our second day of jury trial.  I

 1   had an opportunity to meet with counsel in chambers to iron

 2   out the final jury instruction issues.  The jury instructions

 3   are being printed right now and will be ready to go.

 4          My understanding from the discussions with counsel

 5   is that, Mr. Longstreet, you and Mr. Garza do wish to call at

 6   least one and maybe more witnesses; is that correct?

 7          MR. LONGSTREET:  That is accurate.

 8          THE COURT:  So my plan would be to bring our jury

 9   back in, and you can call your witnesses.  And it sounds

10   like, from our discussion, we don't anticipate a lengthy

11   defense case in terms of time; is that fair?

12          MR. LONGSTREET:  Twenty minutes, max.

13          THE COURT:  And my thought -- and then Mr. DePorre,

14   you were talking about a government rebuttal case, but also

15   not a long one?

16          MR. DePORRE:  Correct, Your Honor.

17          THE COURT:  So what I want to tell the jurors is my

18   plan is to get this case to them by lunch, which would mean

19   you guys will present -- start with the defense case, then

20   the government's rebuttal case, and by then, I should have my

21   set of jury instructions.  I will give my instructions, and

22   then I will give them a break, so they come back fresh with

23   each of your closing arguments, and then we'll get the case

24   to them, and they can do their lunch.  Does that work for

25   you?

Case 4:21-cr-20405-MFL-CI  ECF No. 73, PageID.923  Filed 07/23/23  Page 5 of 99
*Jury Trial - Volume 3 • November 15, 2022*

5

```
 1          MR. DePORRE:  It does.  There is one additional
 2   matter; after the defense concludes with its two witnesses,
 3   at some point I think it would be proper to voir dire the
 4   defendant as to his election not to testify.
 5          THE COURT:  Okay.  That's probably a good point.
 6          MR. DePORRE:  That should be done outside of the
 7   presence of the jury, before I call the rebuttal witnesses.
 8          THE COURT:  We will do that.  We'll take a very
 9   short break at that point.
10          MR. DePORRE:  Thank you, Your Honor.
11          THE COURT:  That makes sense to me.  Okay.  Then I
12   probably won't take a break between my instructions and your
13   closings.  Does that work for you?
14          MR. DePORRE:  That's fine.
15          THE COURT:  Mr. Longstreet.
16          MR. LONGSTREET:  I'm ready.
17          MR. DePORRE:  Will you print two extra copies of
18   the instructions for the parties?
19          THE COURT:  Yes.  I have them printing 20, so there
20   should be plenty for everybody.  They'll be one for you guys,
21   and then for you, Mr. Longstreet, and Mr. Garza, too.
22          MR. DePORRE:  Yesterday there was some discussion
23   about us asking --
24          THE CASE MANAGER:  All rise for the jury.
25          THE COURT:  We'll take that up in a minute.
```

```
 1                (Jury entered at 9:56 a.m.)

 2           THE COURT:  Please be seated.  Ladies and

 3   gentlemen, let me start with an apology for the late start,

 4   but I want to couple that apology with the good news.  While

 5   you guys have been in there for waiting for us, we have been

 6   working hard to figure out the most efficient way to present

 7   the case to you, and we made substantial progress, and right

 8   now we are on target to get the case to you guys by

 9   lunchtime, so we made a lot of progress while you guys were

10   in there.  I don't want you to think we were out here, you

11   know, practicing our golf swing.  We were actually doing

12   work, and the work that we were doing will inure to your

13   benefit.  So thank you for your patience, but I do want to

14   apologize that you guys were sitting in there.

15           And this is the opportunity for Mr. Longstreet to

16   call any witnesses on behalf of Mr. Garza, if he wishes to do

17   so.  Mr. Longstreet, would you like to call any witnesses?

18           MR. LONGSTREET:  Yes.  The defense would call two

19   witnesses in the matter, and the first will be

20   Mr. Blake Austin Parkes.

21           THE COURT:  All right.  Mr. Parkes, do you mind

22   coming up here and standing right in front of the bench just

23   for one moment, sir.

24           Would you raise your right hand.

25           Do you swear that the testimony you will provide
```

1  will be truth?

2          MR. PARKES:  Yes.

3          THE COURT:  Thank you.  Mr. Parkes, will you settle

4  into the witness chair over here.  And as you are settling

5  in, let me ask you to please keep your voice up and speak

6  slowly, so we can hear everything you have to say.

7          MR. PARKES:  Yes, Your Honor.

8          THE COURT:  Thank you.

9                    BLAKE A. PARKES,

10  called at about 9:57 a.m., was examined and testified on his

11  oath as follows:

12                  DIRECT EXAMINATION

13  BY MR. LONGSTREET:

14  Q.  Good morning, sir.

15  A.  Good morning.

16  Q.  Can you please state your name for the record?

17  A.  Blake Parkes.

18  Q.  Mr. Parkes, I would like to direct your attention to the

19  day of November 2nd, 2022.  Do you recall that day?

20  A.  That, to the best of my knowledge, yeah, I've been

21  trying to remember it for a few days now, yes.

22  Q.  Thank you.  And on that day, were you approached by two

23  federal agents?

24  A.  Yes, sir.

25  Q.  Okay.  And when you made contact with these federal

 1  agents, you had discussion in reference to a 2008 white

 2  Grand Prix?

 3  A.  Yes, I did.

 4  Q.  And at some point, did you own that 2008 white

 5  Grand Prix.

 6  A.  Yes.

 7  Q.  Okay.  And when you owned this 2008 white Grand Prix, at

 8  some point did you sell the vehicle?

 9  A.  Yes, I did.

10  Q.  Okay.  And do you -- and when these agents came to see

11  you, did they provide you photographs of persons that you may

12  have sold the car to?

13  A.  Yes, they showed me three pictures.

14  Q.  Okay.  Thank you.  I'd like to show you what is going to

15  be marked as Defendant's Proposed Exhibit B for

16  identification purposes only.

17          (Defendant's Exhibit B marked for identification

18          purposes.)

19  BY MR. LONGSTREET:

20  Q.  Sir, do you recognize the photograph on the screen?

21  A.  Yes, I do.

22  Q.  Okay.  And is this the person you identified as the

23  person who purchased your vehicle?

24  A.  Yes, it is.

25  Q.  Does that fairly and accurately depict the photograph

1    that you were shown of the person that, possibly, you sold

2    this vehicle to?

3    A.   I believe it is the same photo, yes.

4           MR. LONGSTREET:  Thank you.  The defense moves for

5    Exhibit B to be entered into evidence as Defendant's B.

6           THE COURT:  Any objection?

7           MR. DePORRE:  No, Your Honor.

8           THE COURT:  Okay.  That's admitted.

9           (Defendant's Exhibit B received into evidence.)

10           MR. LONGSTREET:  Thank you.

11    BY MR. LONGSTREET:

12    Q.   I want to direct your attention -- well, do you recall

13    when you sold this vehicle?

14    A.   From the research I did, going back in my phone, I

15    believe it was in November of 2019.

16    Q.   At a certain point, were you called by the police to

17    pick up this vehicle?

18    A.   I received a letter from a police department.  I tried

19    to do research on that as well, I don't know what department,

20    but I did receive a letter stating that the vehicle was

21    impounded in Owosso, and I did go down there to try to find

22    out what happened and why the car was there, but the bill was

23    so high on the vehicle, it was close to what I had sold the

24    car for, so I just left it there.

25    Q.   Do you recall whether that was in November or December

```
 1    of 2020?
 2    A.   It was at least two months after I had sold the car.
 3              MR. LONGSTREET:  Thank you.  Nothing further.
 4              THE COURT:  Mr. DePorre, any questions?
 5                          CROSS-EXAMINATION
 6    BY MR. DePORRE:
 7    Q.   You said you looked back in your phone, and you believe
 8    you sold the car in November of 2019?
 9    A.   Yes, sir.
10    Q.   And then you said it was Owosso that you got a call from
11    where the car was impounded?
12    A.   I received a letter from a police department, but I
13    don't believe it was Owosso.  I just know that the car got
14    impounded in Owosso -- it was a couple miles of where it was
15    left in a farmer's field.
16    Q.   Now, where you are you from?
17    A.   I'm in Linden.
18    Q.   Do you know where Mundy Township is?
19    A.   Yes, sir.
20    Q.   Are you sure it wasn't Mundy Township?
21    A.   As far as the police department that contacted me?
22    Q.   No.  Where the impound lot was.
23    A.   No, absolutely not.  It was -- it was on Corunna Road,
24    in Owosso.  It's a tow yard that's no longer in business,
25    they are closed now.  I tried contacting that tow yard for
```

1 information and I found out they were out of business.

2 Q.   And that you think was also back in 2019?

3 A.   I think that was in the early part of 2020 when I found

4 out the car was impounded.

5 Q.   All right.  And you said that you sold the car.  How

6 much did you sell it for?

7 A.   I believe it was $900.

8 Q.   And how much did that impound lot want for it?

9 A.   It was close to that, 700, 800, I think, to get the car

10 back.

11 Q.   And it wasn't worth that to you?

12 A.   No.  The car wasn't running, and it had some damage to

13 it that it didn't have when I sold it, that's why I left it

14 there.

15 Q.   Do you buy and sell cars?

16 A.   Sometimes, like a little side thing.

17 Q.   Are you pretty good of deciding on what the value of the

18 car is?

19 A.   I believe so, yeah.

20 Q.   All right.  So for you, it wasn't worth 700 bucks?

21 A.   No.

22 Q.   All right.  After January of 2020, you don't know what

23 happened to that car, do you?

24 A.   No clue.

25 Q.   You have no idea if somebody else paid 700 bucks to get

 1   it out of impound?

 2   A.  No, I do not know.

 3   Q.  You don't know if somebody traded it for something else?

 4   A.  Well, I did some research on that, too, and from what I

 5   found out, that you have 30 days once you get that letter,

 6   and then the tow yard can either sell the car or auction it

 7   or scrap it.  I don't know what they did with it after that.

 8   Q.  I want to show you an exhibit --

 9          MR. DePORRE:  Actually, you have to do it.  This is

10   Government's Exhibit 5F.  We would like to approach.

11          THE COURT:  Go ahead.

12   BY MR. DePORRE:

13   Q.  Do you recognize Government's Exhibit 5F?

14   A.  No, sir.

15   Q.  That's not your gun?

16   A.  No, sir.  I've never owned a pistol.

17   Q.  And you have never left a gun inside a Grand Prix that

18   you later -- a Pontiac Grand Prix that you sold?

19   A.  Positive, no, I've never left a gun in any vehicle.

20   Q.  All right.  Do you have any control over the person that

21   buys the car from you -- you can actually head back with the

22   gun.  Thank you, Mr. Orvis.

23          Do you have any control over whether or not the

24   next person that buys the car from you or the person after

25   that or the person after that, if any have them register the

 1   car, do you have any way to know that?

 2   A.   Aside from going physically to the Secretary of State

 3   with them, no.  But what I generally do when I sell a vehicle

 4   is take -- I make the person buying the car sign off on it

 5   and I take a photo of that title.  I really tried my hardest

 6   to find that for the two agents that stopped by my house, but

 7   for some reason I believe it was an old phone and I don't

 8   have that information for this car.

 9   Q.   But you have some information that shows you sold it

10   back in 2019?

11   A.   Yeah, just -- I have the Facebook conversation from the

12   person that met me at the gas station, because I know I sold

13   the car at Meijer gas station, in Flint, and -- but whoever

14   had that Facebook profile and the person I was contacting

15   deleted it, and it deleted all of our conversation and any

16   information there.

17   Q.   You said you are from Linden.  Did you sell it at the

18   Meijer on Hill Road?

19   A.   No, it was on Center Road, in Flint.

20   Q.   The Burton Meijer?

21   A.   Correct.

22   Q.   All right.  And you said you sold it to the person that

23   was up on the screen.

24   A.   There were two people there that night, but I believe it

25   was the person on the screen that actually paid me and drove

1    off with the vehicle.

2    Q.  Was the other person a woman?

3    A.  No, it was a black male.

4    Q.  And did that guy on the screen, did he have all the

5    money to buy the car --

6    A.  No, he did not.

7    Q.  -- at first?

8    A.  No.  He was borrowing money from the person that was

9    with him.  I do remember that it took him quite a long time,

10   they were counting up small bills to make up the amount that

11   they needed.

12   Q.  All right.  When you sold the car, was the

13   battery -- was the battery mounted, was it affixed, or do you

14   have any idea whether or not it was loose in the car or was

15   it bracketed in?

16   A.  I believe it was mounted correctly.  I didn't do -- I

17   mean, this vehicle, I didn't own for a long period of time.

18   I bought the car at auction, and I mainly detailed it and put

19   tires on it and sold the vehicle.

20   Q.  All right.  And you have no idea what happened to it

21   after you sold it?

22   A.  No, sir.

23           MR. DePORRE:  Nothing further.

24           THE COURT:  Mr. Longstreet.

25           MR. LONGSTREET:  Nothing, thank you.

```
 1            THE COURT:  Thank you, Mr. Parkes.  I appreciate
 2   your time.
 3   A.   Thank you.
 4            (Witness excused at 10:07 a.m.)
 5            THE COURT:  Mr. Longstreet, do you have any other
 6   witnesses you wish to call?
 7            MR. LONGSTREET:  Defense would call
 8   Agent Louis Valega.
 9            THE COURT:  Sir, would you come forward and raise
10   your right hand?
11            Do you swear that the testimony you are about to
12   give will be the truth?
13            OFFICER VALEGA:  Yes, sir, I do.
14            THE COURT:  Thank you.  Welcome.  Would you please
15   make yourself comfortable in the witness chair, and could I
16   ask you to please speak slowly and keep your voice up.
17            OFFICER VALEGA:  Yes, sir.
18            THE COURT:  Thank you.
19                      OFFICER LOUIS VALEGA,
20   called at about 10:08 a.m., was examined and testified on his
21   oath as follows:
22                      DIRECT EXAMINATION
23   BY MR. LONGSTREET:
24   Q.   Good morning, sir.
25   A.   Good morning.
```

*Jury Trial - Volume 3 • November 15, 2022*

1    Q.   Please state your name and occupation for the record.

2    A.   My name is Louis Valega.  I'm employed with the Michigan

3    State Police.

4    Q.   Sir, were you so employed on November 2nd, 2022?

5    A.   Yes, sir, I was.

6    Q.   And part of your duties with the Michigan State Police,

7    did you happen to come in contact, on that day, with a person

8    by the name of Blake Austin Parkes?

9    A.   Yes, I did.

10   Q.   And, sir, did you make contact with Blake Austin Parkes

11   as a part of an investigation in the case of the

12   United States v. Noe Garza?

13   A.   Yes, sir, I did.

14   Q.   And, sir, did you go to this particular location for a

15   specified reason?

16   A.   Yes, sir, I did.

17   Q.   And what was that reason?

18   A.   Mr. Parkes was the registered owner in LEIN, which is

19   the Law Enforcement Information Network, for the 2008 white

20   Pontiac Grand Prix.

21   Q.   And he was the registered owner in LEIN on this

22   particular vehicle, November 2nd of 2022, correct?

23   A.   Yes, sir.

24   Q.   Thank you.  And, sir, as a part of your investigation

25   into the United States v. Noe Garza, did you present to

1   Mr. Parkes three photographs?

2   A.   Yes, sir, I did.

3   Q.   And in those three photographs -- I would like to show

4   you what has been admitted as Defendant's B.  Do you

5   recognize the photograph that is depicted on the screen?

6   A.   Yes, I do.

7   Q.   And, sir, could you identify who this person is in this

8   photograph?

9   A.   That is Meldrum Allen.

10  Q.   Thank you.  And is Meldrum Allen also a part of the

11  investigation into United States v. Noe Garza?

12  A.   He is related, yes.

13  Q.   Thank you.  And you are aware he was arrested with

14  Mr. Garza on November 26th, 2020?

15  A.   Yes, sir.

16  Q.   Sir, as part of your investigation into this 2008 white

17  Grand Prix, did you receive information that the vehicle was

18  possibly sold in 2020?

19           MR. DePORRE:  Objection, Your Honor.

20           THE COURT:  What's the basis of the objection?

21           MR. DePORRE:  Hearsay.

22           THE COURT:  Let me see you guys at sidebar for a

23  second.  Can you take that down while we are --

24           (Sidebar conference held on the record

25           at 10:11 a.m. as follows:

1        THE COURT:  What is this?  You want to ask him what

2    a witness told him it was sold in 2020.

3        MR. LONGSTREET:  Whether he received information or

4    whether he learned that the vehicle was sold in 2020.  It's

5    in his report.

6        THE COURT:  Isn't that hearsay?

7        MR. LONGSTREET:  It doesn't go to the truth of the

8    matter asserted.  It goes to the extent of his investigation.

9        THE COURT:  It seems to me that it goes to the

10   truth of the matter asserted.

11       MR. LONGSTREET:  That the vehicle was purchased

12   in 2020 versus 2019?

13       THE COURT:  You want to establish the fact that it

14   was sold in 2020.

15       MR. LONGSTREET:  That's correct.

16       THE COURT:  So it seems to me, this is being

17   offered for the truth of that assertion.

18       MR. LONGSTREET:  Let me see if I can get around

19   that.

20       THE COURT:  Do you want to try here, before in

21   front of the jury?

22       MR. LONGSTREET:  Sure.

23       THE COURT:  Who do you believe told him it was sold

24   in 2020?

25       MR. LONGSTREET:  Mr. Parkes.

1          THE COURT:  Why didn't you ask Parkes that?  You

2    had the live witness right there.

3          MR. LONGSTREET:  I did, who testified it was

4    in 2019.  I guess I should have refreshed his recollection as

5    to -- well, there would be no reason to refresh his

6    recollection, because he didn't say his memory needed to be

7    refresh.  He just said he remembered based on the information

8    that he looked at, that it was in 2019.

9          THE COURT:  My view is, I don't -- first of all, I

10   think it is hearsay and, second of all, I think that Parkes

11   is -- if the source of this information is Parkes?

12          MR. LONGSTREET:  Yes.

13          THE COURT:  He would have been the right person to

14   ask, and to the extent that this guy is offering a different

15   version from Parkes, he's impeaching the other witness.  So

16   mainly, I think it's hearsay and I'm going to sustain the

17   objection.

18          MR. LONGSTREET:  Okay.

19          THE COURT:  Okay.

20          (Sidebar conference concluded at 10:13 a.m.)

21          THE COURT:  Okay.

22          MR. LONGSTREET:  Nothing further of this witness.

23   Thank you.

24          THE COURT:  Thank you.

25          Mr. DePorre, any questions?

```
1              MR. DePORRE:  Thank you, Your Honor.
2                         CROSS-EXAMINATION
3   BY MR. DePORRE:
4   Q.  Trooper Valega, good morning.
5   A.  Good morning, sir.
6   Q.  I just have one question for you.  What is
7   Meldrum Allen's middle name?
8   A.  Reginald, to my knowledge.
9   Q.  Do you know if he uses the nickname Reggie?
10  A.  I have heard him -- I have heard Reggie Allen as a
11  nickname for him, yes.
12             MR. DePORRE:  I have nothing further.
13             THE COURT:  Mr. Longstreet.
14             MR. LONGSTREET:  Nothing.  Thank you.
15             THE COURT:  Okay.  Thank you, Mr. Valega.
16             (Witness excused at 10:14 a.m.)
17             THE COURT:  Mr. Longstreet, any other witnesses?
18             MR. LONGSTREET:  At this time the defense closes
19  its case in chief.
20             THE COURT:  Okay.  Ladies and gentlemen, for
21  procedural reasons, we are going to take a very short break
22  here, and I do mean very short, and then we will bring you
23  right back and we will keep moving.  Thank you for your
24  cooperation.
25             THE CASE MANAGER:  All rise for the jury.
```

```
 1                  (Jury excused at 10:14 a.m.)

 2             THE COURT:  Please be seated.

 3             Mr. Garza, can you scoot to the microphone?  You

 4   can stay seated; do you mind taking off your mask?  I want to

 5   chat with you for a moment.

 6             THE DEFENDANT:  Yes, sir.

 7             THE COURT:  Mr. Garza, do you understand that in

 8   this trial, you have an absolute right to testify in your own

 9   defense, if you wish to do so?  Do you understand that sir?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  And have you had a sufficient

12   opportunity to talk to Mr. Longstreet and to consider his

13   advice about whether you should testify in your own defense

14   here?

15             THE DEFENDANT:  I have, Your Honor.

16             THE COURT:  Has he answered all of your questions

17   on that issue?

18             THE DEFENDANT:  He has.

19             THE COURT:  Have you had enough time to think about

20   that issue?

21             THE DEFENDANT:  I have, Your Honor.

22             THE COURT:  And based on your own thoughts on the

23   matter and your discussions with Mr. Longstreet, have you

24   decided whether you wish to testify in your own defense here?

25             THE DEFENDANT:  I have decided.
```

```
1          THE COURT:  What is your decision?
2          THE DEFENDANT:  I'm not going to testify.
3          THE COURT:  Thank you.  Mr. DePorre, any other
4    questions that you wish me to ask of Mr. Garza?
5          MR. DePORRE:  No, Your Honor.
6          THE COURT:  Mr.  Longstreet, any questions that you
7    want to ask, to make a fuller record in that regard?
8          MR. LONGSTREET:  No.
9          THE COURT:  Okay.  All right.  So it seems to me,
10   is the next step, Mr. DePorre, your rebuttal case?
11         MR. DePORRE:  It is, Your Honor.
12         THE COURT:  And remind me what this is, it is a
13   pretty short case?
14         MR. DePORRE:  It is.  It is basically playing
15   excerpted clips of the interview between Steven Fisher and
16   Mr. Garza, and I will be presenting that testimony through
17   the case agent.
18         THE COURT:  All right.  These are different clips
19   than we heard in the case in chief?
20         MR. DePORRE:  Yes, Your Honor.
21         THE COURT:  Okay.
22         MR. DePORRE:  At this point, Your Honor, it has
23   come to my attention Mr. Parkes is still in the courtroom,
24   and I just want him to know he's free to go.
25         MR. LONGSTREET:  Yes.
```

1      THE COURT:  Mr. Parkes, I'm sorry.

2      MR. DePORRE:  He's welcome to stay.

3      THE COURT:  Thank you for coming, Mr. Parkes, I

4  appreciate it.  I thought he was interested in hearing what I

5  had to say.

6      MR. DePORRE:  If he stayed during jury

7  instructions, he's truly interested.

8      THE COURT:  My plan will be to bring them back in

9  and hear the government's rebuttal case, which seems like it

10  is going to be pretty short, and then I will give them my

11  instructions and we will go right into closing arguments.  Is

12  that good for you, Mr. DePorre?

13      MR. DePORRE:  Very good.

14      THE COURT:  Mr. Longstreet.

15      MR. LONGSTREET:  Yes.  However, I do need to, I

16  believe, procedurally, renew my Rule 29 motion.

17      THE COURT:  Is now the time to do it?

18      MR. LONGSTREET:  I thought it would have to be

19  after the closing of the prosecution's case in chief, and

20  then again at closing of the defense's case in chief.

21      MR. DePORRE:  I actually think it is at the close

22  of my case in chief and then at the end of trial, after

23  there's a verdict.

24      THE COURT:  Yeah.  Just in case it needed to be

25  done now, I will treat this as you renewing it and I will

Case 4:21-cr-20405-MFL-CI  ECF No. 73, PageID.942  Filed 07/23/23  Page 24 of 99
*Jury Trial - Volume 3 • November 15, 2022*

**24**

```
 1    continue to reserve it.  But I think Mr. DePorre is correct,
 2    I think that the -- I think you've raised it at the
 3    appropriate time at the end of the government's case, and I
 4    think it can be made again, or renewed, I'm just looking at
 5    the rule, within 14 days after the verdict.
 6                MR. LONGSTREET:  Okay.  I thought it was actually
 7    twice during trial.
 8                THE COURT:  But I think you are covered.
 9                MR. LONGSTREET:  Very good.  Thank you.
10                THE COURT:  All right.  Holly, let's bring them
11    back.
12                THE CASE MANAGER:  All rise for the jury.
13                (Jury entered at 10:18 a.m.)
14                THE COURT:  Please be seated.  Welcome back.
15                Mr. DePorre, does the government wish to present
16    any rebuttal case?
17                MR. DePORRE:  It does, Your Honor.
18                THE COURT:  Please proceed.
19                MR. DePORRE:  Thank you, Your Honor.  The
20    government calls Detective Brett Orvis.
21                THE COURT:  I'll swear you in, again, just in case.
22                Do you swear that the testimony you are about to
23    give will be the truth?
24                OFFICER ORVIS:  I do.
25                THE COURT:  Thank you.  Please join us.  You have
```

 1    heard me say several times, please speak up and speak slowly,

 2    so please do that.

 3              OFFICER ORVIS:  Yes, sir.

 4                        OFFICER BRETT ORVIS,

 5    called at about 10:19 a.m., was examined and testified on his

 6    oath as follows:

 7                        DIRECT EXAMINATION

 8    BY MR. DePORRE:

 9    Q.  I will make you respell your last name in case.

10    A.  Yes.  I'm Sergeant Brett Orvis, O-R-V-I-S.

11    Q.  Remind us about your involvement in this case?

12    A.  Yes.  So I am a task force officer with the Federal

13    Bureau of Investigation, in Flint.  I was responsible for

14    coordinating and prosecuting this case.

15    Q.  And you weren't involved in the initial investigation,

16    were you?

17    A.  No, I was not.

18    Q.  Did you receive some of the evidence that was gathered?

19    A.  I did.

20    Q.  And did you receive a recording of an interview between

21    the defendant and the officer that initially conducted the

22    investigation, Steve Fisher?

23    A.  Yes, I did.

24    Q.  Did you review that video?

25    A.  I have.

1   Q.  And have you done it more than once?

2   A.  Yes.

3   Q.  All right.  And have you -- can you identify the people

4   speaking?

5   A.  Yes.

6   Q.  All right.  I would ask you to take a look at -- would

7   you pull up Government's Exhibit 15A.  Don't play it just

8   yet.

9           Now, in the video, at some point did Mr. Garza talk

10  about picking up other people or driving other people to

11  Meijer?

12  A.  He does.

13  Q.  And who does he drive -- who does he say -- excuse

14  me -- who does he say that he drives to Meijer?

15  A.  He makes reference to Reggie, to giving him a ride -- or

16  that he wanted a ride to Meijer.

17  Q.  And then was there somebody else that he references that

18  was with Reggie?

19  A.  Yes, Mr. Hutchins.

20  Q.  All right.  I would like to now ask you to listen to

21  Government's Exhibit 15A.

22          (Video played for the jury.)

23  BY MR. DePORRE:

24  Q.  All right.  Who asked Garza to take them to Meijer?

25  A.  Reggie asked for a ride to Meijer.

*Jury Trial - Volume 3 • November 15, 2022*

```
 1    Q.  And did Garza say that he asked Reggie to take him to
 2    Meijer?
 3    A.  No, he did not.
 4    Q.  And did Garza say that his clothes -- all of his clothes
 5    were in the car?
 6    A.  Yes.  He makes reference to all of his clothes being in
 7    his vehicle.
 8    Q.  All right.  Now I'd like to you play Government's
 9    Exhibit 15 B -- actually don't play it yet.  Sorry.  I jumped
10    the gun.
11          At some point during the interview that you
12    reviewed, does Mr. Garza talk about a vest?
13    A.  Yes.
14    Q.  And what is that vest that he's referencing?
15    A.  It is a weight vest.  Originally, it was believed to be
16    a ballistics vest, but it was later determined to be a weight
17    vest.
18    Q.  All right.  And during the course of him discussing
19    that, does he refer to the car -- the white Pontiac Grand
20    Prix?
21    A.  Yes.
22    Q.  And what does he call that?
23    A.  He calls it my car.
24    Q.  I would now like to play Government's Exhibit 15B.
25              (Audio played for the jury.)
```

```
 1   BY MR. DePORRE:
 2   Q.  Did you hear him also reference the title?
 3   A.  Yeah, he said the title was in the car.
 4   Q.  And did he -- what pronoun did he use to reference the
 5   title?  How did he refer to the title?
 6   A.  My car.
 7   Q.  All right.  Would you just play, like, the last four
 8   seconds of 15B -- five seconds?
 9           (Audio played for the jury.)
10   BY MR. DePORRE:
11   Q.  All right.  Would you next play Government's
12   Exhibit 15C?  During the call, did he talk about the vest
13   being in his car for an extended period of time?
14   A.  Yes.
15   Q.  All right.  Would you play 15C?
16           (Video played for the jury.)
17           THE COURT:  You said in your question during the
18   call.  Did you mean during the interview?
19           MR. DePORRE:  I did.  Thank you for the
20   clarification.
21           THE COURT:  Okay.
22   BY MR. DePORRE:
23   Q.  Now, at some point during the interview, we heard that
24   Officer Fisher asked Mr. Garza, whose gun did I find?  Did
25   Mr. Garza reference the vehicle during his answer to that
```

1    question?

2    A.   Yes.

3    Q.   All right.  Would you play Government's Exhibit 15D?

4              (Video played for the jury.)

5    BY MR. DePORRE:

6    Q.   Did you hear, "They didn't have no guns on them when

7    they got in my car"?

8    A.   Yes, that's exactly what he said, yes.

9    Q.   During the interview, did he also talk about processing

10   a marijuana substance called keif?

11   A.   Yes.

12   Q.   What did he say he used to process that?

13             MR. LONGSTREET:  I'm going to object to the

14   relevance.

15             MR. DePORRE:  I can --

16             THE COURT:  Response.

17             MR. DePORRE:  The firearm in this case was found in

18   a mesh bag, and the defendant used a mesh bag to process

19   keif, so that's the relevance.

20             THE COURT:  Okay.  Overruled.

21             Go ahead.

22             MR. DePORRE:  Would you play Government's

23   Exhibit 15E?

24             (Video played for the jury.)

25             MR. DePORRE:  All right.  I have no further

 1  questions.

 2          THE COURT:  Mr. Longstreet.

 3                      CROSS-EXAMINATION

 4  BY MR. LONGSTREET:

 5  Q.  Sir, we have seen multiple pictures of this mesh bag,

 6  correct?

 7  A.  Yes.

 8  Q.  And there's no marijuana residue or anything that

 9  suggests that Mr. Garza used that bag to make keif, correct?

10  A.  No.

11  Q.  Thank you.  Now, this weight vest we keep talking about,

12  it's a weight vest to develop core strength, right?

13  A.  I'm not sure what it was being used for.

14  Q.  But it is a weighted vest?

15  A.  It is a weighted vest.

16  Q.  And it is for fitness, right?

17  A.  That could be.

18  Q.  But most certainly, it is not a bulletproof vest?

19  A.  It is not a ballistics vest.

20  Q.  And it is not going to stop any bullets?

21  A.  No.

22  Q.  Okay.  Secondly, we talked about the video with comment,

23  the title was in the car, correct?

24  A.  Yes.

25  Q.  And you are aware that, based on your review of this

1    case, that in order for somebody to get the car back, they

2    would have had to have the title, right?

3    A.   A signed title, yes.

4    Q.   So tell me, if he was talking about this particular car,

5    how could they get the car back if the title was inside the

6    car when he got arrested?

7    A.   I'm not aware of the details of that.

8    Q.   Right.

9            THE COURT:  Anything else?

10            MR. LONGSTREET:  Nothing.  Thank you.

11            THE COURT:  Mr. DePorre.

12            MR. DePORRE:  No rebuttal, Your Honor.

13            THE COURT:  Okay.  Thank you.

14            (Witness excused at 10:29 a.m.)

15            THE COURT:  Is that the close of the government's

16    rebuttal case?

17            MR. DePORRE:  It is.

18            THE COURT:  Okay.  All right.  Ladies and

19    gentlemen, what we are going to do now is move into jury

20    instructions and closing arguments, so I'm going do my magic

21    trick; I'm going to ask Holly to come out.  We are going to

22    pass out to you guys -- everybody's going to get two

23    documents, one is going to be a set of the jury instructions,

24    so you can read along with me, and everybody is also going to

25    get a copy of the verdict form.

1        So, Holly, can you share these with the jurors and

2   then a couple to each counsel table, please.

3        MR. DePORRE:  Judge, while these are being

4   distributed, could we have a brief sidebar?

5        THE COURT:  Sure.

6        (Sidebar conference held on the record

7        at 10:30 a.m. as follows:

8        MR. DePORRE:  Before the jury came out, I raised an

9   issue about an additional instruction, and I wrote myself a

10  sticky note.  It was on the issue of marijuana.  You asked me

11  to include that in my remarks about the argument that he's

12  not charged with any marijuana offenses.  I thinks that's

13  sufficiently -- I intend to include that in closing, as well.

14  I think it has been sufficiently addressed, but I had

15  suggested earlier, possibly the Court providing a limiting

16  instruction.

17        THE COURT:  I will say, at the end of the written

18  instruction that I have here, I will orally advise them, even

19  though it is not on the papers, that this case is not about

20  marijuana, and he's not charged with marijuana.

21        MR. DePORRE:  Thank you.

22        THE COURT:  Is that okay, Mr. Longstreet?

23        MR. LONGSTREET:  Yes.

24        THE COURT:  Okay.

25        (Sidebar conference concluded at 10:31 a.m.)

1            THE COURT:  Ladies and gentlemen, the instructions

2    have been given to you so you can read along with me and help

3    you follow.  What I'm going to do now is give you the

4    instructions up to instruction number 22.  When I finish 22,

5    I'm going to turn it over to the lawyers to give their

6    closing arguments, and when they are done, I will give you

7    the final instructions.  Please listen very carefully.

8            Members of the jury, now it is time for me to

9    instruct you about the law that you must follow in deciding

10   this case.  I will start by explaining your duties and the

11   general rules that apply in every criminal case.  Then I will

12   explain some rules that you must follow in evaluating

13   particular testimony and evidence.  Then I will explain the

14   elements or parts of the crimes that the defendant is accused

15   of committing.  And last, I will explain the rules that you

16   must follow during your deliberations in the jury room, and

17   the possible verdicts that you may return.  Please listen

18   very carefully to everything that I say.

19           You have two main duties as jurors.  The first one

20   is to decide what the facts are, from the evidence that you

21   saw and heard here in court.  Deciding what the facts are is

22   your job, and not mine, and nothing that I have said or done

23   during this trial was meant to influence your decision about

24   the facts in any way.

25           Your second duty is to take the law that I give

1    you, apply it to the facts, and decide if the government has

2    proved that the -- proved the defendant guilty beyond a

3    reasonable doubt.  It is my job to instruct you about the

4    law, and you are bound by the oath that you took at the

5    beginning of the trial, to follow the instructions that I

6    give you, even if you personally disagree with them.

7           This includes the instructions that I gave you

8    before and during the trial, and these instructions that I am

9    now providing.  All of the instructions are important, and

10   you should consider them together, as a whole.

11          The lawyers may talk about the law during their

12   arguments, but if what they say is different from what I say,

13   you must follow what I say.  What I say about the law

14   controls.  Perform these duties fairly.  Do not let any bias,

15   sympathy or prejudice that you may feel toward one side or

16   the other influence your decision in any way.

17          As you know, the defendant has pleaded not guilty

18   to the crimes charged in the indictment.  The indictment is

19   not any evidence, at all, of guilt, it is just the formal way

20   that the government tells the defendant what crimes he's

21   accused of committing.  It does not even raise any suspicion

22   of guilt.

23          Instead, the defendant starts the trial with a

24   clean slate, with no evidence, at all, against him, and the

25   law presumes that he is innocent.  This presumption of

 1    innocence stays with him, unless the government presents

 2    evidence here in court that overcomes the presumption and

 3    convinces you, beyond a reasonable doubt, that he is guilty.

 4    This means that the defendant has no obligation to present

 5    any evidence at all, or to prove to you, in any way, that he

 6    is innocent.  It is up to the government to prove that he is

 7    guilty, and this burden stays on the government from start to

 8    finish.  You must find the defendant not guilty, unless the

 9    government convinces you, beyond a reasonable doubt, that he

10    is guilty.

11         The government must prove every element of the

12    crimes charged, beyond a reasonable doubt.  Proof beyond a

13    reasonable doubt does not mean proof beyond all possible

14    doubt.  Possible doubts or doubts based purely on speculation

15    are not reasonable doubts.  A reasonable doubt is a doubt

16    based on reason and common sense.  It may arise from the

17    evidence, the lack of evidence, or the nature of the

18    evidence.

19         Proof beyond a reasonable doubt means proof which

20    is so convincing that you would not hesitate to rely and act

21    on it in making the most important decisions in your own

22    lives.  If you are convinced that the government has proved

23    the defendant guilty beyond a reasonable doubt, say so by

24    returning a guilty verdict.  If you are not convinced, say so

25    by returning a not guilty verdict.

1         You must make your decision based only on the
2 evidence that you saw and heard here in court.  Do not let
3 rumors, suspicions or anything else that you may have seen or
4 heard outside of court influence your decision in any way.

5         The evidence in this case includes only what the
6 witness said while they were testifying under oath, the
7 exhibits that I allowed into evidence, and the stipulations
8 that the lawyers agreed to.  Nothing else is evidence.
9 Lawyers' statements and arguments are not evidence.  Their
10 questions and objections are not evidence.  My legal rulings
11 are not evidence, and my comments and questions are not
12 evidence.

13         During the trial, I did not let you hear the
14 answers to some of the questions that the lawyers asked, and
15 sometimes I ordered you to disregard things that you saw or
16 heard, or I struck things from the record.  You must
17 completely ignore all of these things.  Do not even think
18 about them.  Do not speculate about what a witness might have
19 said.  These things are not evidence, and you are bound by
20 your oath not to let them influence your decision in any way.
21 Make your decision based only on the evidence as I have
22 defined it here, and nothing else.

23         You are to consider only the evidence in this case.
24 You should use your common sense in weighing the evidence.
25 Consider the evidence in light of your everyday experience

1    with people and events and give it whatever weight you

2    believe it deserves.  If your experience tells you that

3    certain evidence reasonably leads to a conclusion, you are

4    free to reach that conclusion.

5            In our lives, we often look at one fact and

6    conclude from it that another fact exists.  In law, we call

7    this an inference.  A jury is allowed to make reasonable

8    inferences, unless otherwise instructed.  Any inferences you

9    make must be reasonable and must be based on the evidence in

10   the case.  The existence of an inference does not change or

11   shift the burden of proof from the government to the

12   defendant.

13           Now, some of you may have heard the terms, direct

14   evidence and circumstantial evidence.  Direct evidence is

15   simply evidence like the testimony of an eyewitness, which,

16   if you believe it, directly proves a fact.  If a witness

17   testified that he saw it raining outside and you believed

18   him, that would be direct evidence that it was raining.

19           Circumstantial evidence is simply a chain of

20   circumstances that indirectly proves a fact.  If somebody

21   walked into the courtroom wearing a raincoat covered with

22   drops of water, and carrying a wet umbrella, that would be

23   circumstantial evidence from which you could conclude that it

24   was raining.

25           It is your job to decide how much weight to give

1   the direct and circumstantial evidence.  The law makes no

2   distinction between the weight that you should give to either

3   one, and does not say that one is any better evidence than

4   the other.  You should consider all of the evidence, both

5   direct and circumstantial, and give it whatever weight you

6   believe it deserves.

7              Another part of your job as jurors is to decide how

8   credible or believable each witness was.  This is your job,

9   not mine.  It's up to you to decide if a witness's testimony

10  was believable and how much weight you think it deserves.

11  You are free to believe everything that a witness said, or

12  any part of it, or none of it at all, but you should act

13  reasonably and carefully in making these decisions.

14             Let me suggest some things for you to consider in

15  evaluating each witness's testimony.  Ask yourself if the

16  witness was able to clearly see or hear the events?

17  Sometimes even an honest witness may not have been able to

18  see or hear what was happening and may make a mistake.  Ask

19  yourself how good the witness's memory seemed to be.  Did the

20  witness seem able to accurately remember what happened?  Ask

21  yourself if there was anything else that may have interfered

22  with the witness's ability to perceive or remember the

23  events.  Ask yourself how the witness acted while testifying.

24  Did the witness appear honest or did the witness appear to be

25  lying?  Ask yourself if the witness had any relationship to

```
 1    the government or the defendant or anything to gain or lose
 2    from the case that might influence the witness's testimony.
 3    Ask yourself if the witness had any bias or prejudice or
 4    reason for testifying that might cause the witness to sly --
 5    to lie or slant the testimony in favor of one side or the
 6    other.  And ask yourself how believable the witness's
 7    testimony was, in light of all of the other evidence.  Was
 8    the witness's testimony supported or contradicted by other
 9    evidence that you found believable?  If you believe that a
10    witness's testimony was contradicted by other evidence,
11    remember that people sometimes forget things, and that even
12    two honest people who witness the same event, may not
13    describe it exactly the same way.
14          These are only some of the things that you may
15    consider in deciding how believable each witness was.  You
16    may also consider other things that you think shed some light
17    on the witness's believability.  Use your common sense and
18    your everyday experience in dealing with other people, and
19    then decide what testimony you believe and how much weight
20    you think it deserves.
21          Another point about the witnesses.  Sometimes
22    jurors wonder if the number of witnesses who testified makes
23    any difference.  Do not make any decisions based only on the
24    number of witnesses who testified.  What is more important is
25    how believable the witnesses were and how much weight you
```

1    think their testimony deserves.  Concentrate on that, not the

2    numbers.

3            There is one more general subject that I want to

4    talk to you about before I begin explaining the elements of

5    the crimes charged.  The lawyers for both sides objected to

6    some of the things that were said or done during the trial.

7    Do not hold that against either side.  The lawyers have a

8    duty to object whenever they think that something is not

9    permitted by the Rules of Evidence.  Those rules are designed

10   to make sure that both sides receive a fair trial.  And do

11   not interpret my rulings on their objection as any indication

12   of how I think the case should be decided.  My rulings were

13   based on the Rules of Evidence, not on how I feel about the

14   case.  Remember that your decision must be based only on the

15   evidence that you saw and heard here in court.

16           That concludes the part of my instructions

17   explaining your duties and the general rules that apply in

18   every criminal case.  In a moment, I will explain the

19   elements of the crimes that the defendant is accused of

20   committing, but before I do that, I want to emphasize that

21   the defendant is only on trial for the particular crimes

22   charged in the indictment.  Your job is limited to deciding

23   whether the government has proved the crimes charged.

24           The defendant has been charged with several crimes.

25   The number of charges is no evidence of guilt, and this

 1    should not influence your decision in any way.  It is your

 2    duty to separately consider the evidence that relates to each

 3    charge and to return a separate verdict for each one.

 4          For each charge, you must decide whether the

 5    government has presented proof, beyond a reasonable doubt,

 6    that the defendant is guilty of that particular charge.  Your

 7    decision on one charge, whether it is guilty or not guilty,

 8    should not influence your decision on any of the other

 9    charges.

10          Count 1 charges the defendant with being a

11    prohibited person in possession of a firearm and ammunition.

12    For you to find the defendant guilty of this crime, you must

13    find that the government has proved each and every one of the

14    following elements, beyond a reasonable doubt.

15          First, that the defendant has been convicted of a

16    crime punishable by imprisonment for more than one year.  The

17    government and the defendant have agreed that the defendant

18    has previously been convicted of a crime punishable by

19    imprisonment for more than one year.

20          Second, that the defendant, following his

21    conviction, knowingly possessed a firearm or the ammunition

22    specified in the indictment.

23          Third, that at the time the defendant possessed the

24    firearm or ammunition, he knew that he had been convicted of

25    a crime punishable by imprisonment for more than one year.

1    The government and the defendant have agreed that the

2    defendant knew he had been convicted of a crime punishable by

3    imprisonment for more than one year.

4         Fourth, that the specified firearm or ammunition

5    crossed a state line prior to the alleged possession.  It is

6    sufficient for this element to show that the firearm or the

7    ammunition was manufactured in a state other than Michigan.

8    The government and the defendant have agreed that the firearm

9    and ammunition crossed a state line prior to the alleged

10   possession.

11        Now, I will give you more detailed instructions on

12   some of these elements.  First, the defendant does not have

13   to own the firearm or ammunition in order to possess them.

14   Next, I want to explain something about possession.  The

15   government does not necessarily have to prove that the

16   defendant physically possessed the firearm or ammunition for

17   you to find him guilty of this crime.

18        The law recognizes two kinds of possession, actual

19   possession and constructive possession.  Either one of these,

20   if proved by the government, is enough to convict.  To

21   establish actual possession, the government must prove that

22   the defendant had direct physical control over an object or

23   substance, and knew that he had control of it.  To establish

24   constructive possession, the government must prove that the

25   defendant had the right to exercise physical control over the

1   object or substance and knew that he had this right and that

2   he intended to exercise physical control over them at some

3   time either directly or through other persons.

4           For example, if you left something with a friend,

5   intending to come back later and pick it up, or intending to

6   send somebody else to pick it up for you, you would have

7   constructive possession of it while it was in the actual

8   possession of your friend.  But understand that just being

9   present where something is located, does not equal

10  possession.  The government must prove that the defendant had

11  constructive possession of the firearm or ammunition and knew

12  that he did, for you to find him guilty of this crime.  This,

13  of course, is all for you to decide.

14          The term, "knowingly," means voluntarily and

15  intentionally and not because of mistake or accident.  If you

16  are convinced that the government has proved all of these

17  elements, say so by returning a guilty verdict on this

18  charge.  If you have a reasonable doubt about any one of

19  these elements, then you must find the defendant not guilty

20  of this charge.

21          Count 2 charges the defendant with possession of a

22  firearm with an obliterated serial number, in violation of

23  federal law.  For you to find the defendant guilty of this

24  crime, you must be convinced that the government proved each

25  and every one of the following elements beyond a reasonable

1  doubt.

2          First, that the defendant knowingly possessed a

3  firearm.  And, again, the term, "knowingly," means

4  voluntarily and intentionally, and not because of mistake or

5  accident.

6          Second, that the firearm had moved from one state

7  to another.  The government and the defendant have agreed

8  that the firearm moved from one state to another.

9          Third, that the manufacturer's serial number of the

10  firearm had been removed, obliterated or altered.

11          Fourth, that the defendant knew that the serial

12  number had been removed, obliterated, or altered.

13          If you are convinced that the government has proved

14  all of these elements, say so by returning a guilty verdict

15  on this charge.  If you have a reasonable doubt about any one

16  of these elements, then you must find the defendant not

17  guilty of this charge.

18          Count 3 charges the defendant with the crime of

19  possession with intent to distribute buprenorphine.  Don't

20  hang on my pronunciation of this word.  Give it to me one

21  more time, Mr. DePorre.

22          MR. DePORRE:  Buprenorphine.

23          THE COURT:  Buprenorphine.  Buprenorphine is a

24  controlled substance.  For you to find the defendant guilty

25  of this crime, you must find that the government has proved

1   each and every one of the following elements, beyond a

2   reasonable doubt.

3           First, that the defendant knowingly possessed

4   buprenorphine.

5           Second, that the defendant intended to distribute

6   buprenorphine.

7           Now I will give you more detailed instructions on

8   some of these terms.  We have already discussed the meaning

9   of actual and constructive possession.  Those same

10  instructions and definitions apply to this Count 3.  Remember

11  that just being present where something is located does not

12  equal possession.  The government must prove that the

13  defendant had possession of buprenorphine, and knew that he

14  did, for you to find him guilty of this crime.  This, of

15  course, is all for you to decide.

16          To prove that the defendant knowingly possessed

17  buprenorphine, the defendant did not have to know that the

18  substance was buprenorphine.  It is enough that the defendant

19  knew that it was some kind of controlled substance.  Further,

20  the defendant did not have to know how much buprenorphine he

21  possessed.  It is enough that the defendant knew he possessed

22  some quantity of buprenorphine.

23          The phrase, "intended to distribute," means the

24  defendant intended to deliver or transfer a controlled

25  substance sometime in the future.  If you are convinced that

1    the government has proven all of these elements, say so by

2    returning a guilty verdict on this charge.  If you have a

3    reasonable doubt about any one of these elements, then you

4    must find the defendant not guilty of this charge.

5            I want to say a word about the dates mentioned in

6    the indictment.  The indictment charges that the crimes

7    happened on or about November 26th, 2020.  The government

8    does not have to prove that the crimes happened on that exact

9    date, but the government must prove that the crimes happened

10   reasonably close to that date.

11           This concludes the part of my instructions

12   explaining the elements of the crime.  Next, I will explain

13   some rules that you must use in considering some of the

14   testimony and evidence.

15           A defendant has an absolute right not to testify or

16   present evidence.  The fact that the defendant did not

17   testify cannot be considered by you in any way.  Do not even

18   discuss it your deliberation.  Remember that it is up to the

19   government to prove the defendant guilty, beyond a reasonable

20   doubt.  It is not up to the defendant to prove that he is

21   innocent.

22           You have heard the testimony of Dustin Hurt, who

23   testified as an opinion witness.  You do not have to accept

24   Dustin Hurt's opinion.  In deciding how much weight to give

25   it, you should consider the witness's qualifications and how

1    he reached his conclusions.  Also consider the other factors

2    discussed in these instructions for weighing the credibility

3    of witnesses.  Remember that you, alone, decide how much of a

4    witness's testimony to believe, and how much weight it

5    deserves.

6          You have heard that before this trial, the

7    defendant was convicted of crimes.  These early convictions

8    were brought to your attention only as one way -- excuse me.

9    The point I want to make here is that the earlier convictions

10   are not evidence that the defendant, here, is guilty of the

11   crimes for which he's on trial now.  Other than that, you can

12   disregard what you have written there on number 19.

13         During the trial, you may have seen counsel use a

14   timeline which was offered to assist in the presentation and

15   understanding of the evidence of evidence.  It is my

16   understanding you may see this in closing argument.  The

17   material on the timeline is not, itself, evidence and must

18   not be considered as proof of any facts.

19         You have heard evidence that the defendant,

20   Mr. Garza, made statements in which the government claims he

21   admitted certain facts.  It is for you to decide whether the

22   defendant made the statements and if so, how much weight they

23   deserve.  In making these decisions, you should consider all

24   of the evidence about the statements, including the

25   circumstances under which the defendant allegedly made them.

1  You may not convict the defendant solely upon his own

2  uncorroborated statement or admission.

3          The government and the defendant have agreed or

4  stipulated to certain facts, and therefore you must accept

5  the following stipulated facts as proved.

6          First, that the firearms and ammunition alleged in

7  the indictment were manufactured outside of the state of

8  Michigan and were moved from one state to another.

9          Second, that the defendant knew he had a prior

10  conviction for a crime punishable by imprisonment for a term

11  exceeding one year.

12          And third, that the buprenorphine alleged in the

13  indictment was, in fact, buprenorphine, a controlled

14  substance.

15          I want to make one other point that is not on here.

16  During the trial, you have heard reference to marijuana and

17  keif, and I want to make clear to you that Mr. Garza is not

18  on trial for any marijuana-related offenses or any

19  keif-related offenses of any kind.

20          Before we go to closing, let me see counsel at

21  sidebar for a second.

22          (Sidebar conference held on the record

23          at 10:54 a.m. as follows:

24          THE COURT:  So I noticed as I was giving these

25  instructions, that one in the packet that I missed was this

1  reference to him being convicted of certain crimes, and they

2  were brought to the jury's attention to help them decide how

3  believable his testimony was.  I didn't give that instruction

4  when I caught it.  I said -- I mentioned only the last

5  sentence there, that the crimes aren't evidence that he's

6  guilty of the crimes he's on trial for now.

7         Do either of you think I need to do anything else

8  related to this point, Mr. DePorre?

9         MR. DePORRE:  The government doesn't.  We believe

10  it is clear.

11         MR. LONGSTREET:  Nothing on behalf of the

12  defendant.

13         THE COURT:  Okay.  Thank you.

14         (Sidebar conference concluded at 10:55 a.m.)

15         THE COURT:  All right.  Ladies and gentlemen, I

16  have reached the end of the initial portion of my

17  instructions, and I'm going to turn it over to Mr. DePorre

18  now for the government's closing argument.

19         Mr. DePorre.

20         MR. DePORRE:  Thank you, Your Honor.

21         THE COURT:  Go ahead.

22         MR. DePORRE:  Thank you.  Good morning.

23         THE JURY:  (Collectively) Good morning.

24         MR. DePORRE:  This is my opportunity to talk about

25  the law and the facts.  And before I get started going down

1    that road and talking about the law or the facts, there's one

2    key piece of evidence that I want to highlight.

3            Back during opening yesterday, I said that you

4    would hear the defendant's own words.  The most compelling

5    evidence in this case is that the defendant told his

6    girlfriend that he could protect her.  He told her that he

7    had a banger, that his mom had it in the car, and that the

8    Metro Police didn't find it.

9            Would you play Government's Exhibit 11B?

10           (Audio played for the jury.)

11           MR. DePORRE:  The only reasonable explanation that

12   he would say this is that he believed it.  He believed he had

13   pulled one over on the cops and that he had gotten away with

14   it.

15           Think back to your childhood.  I think back to

16   mine.  I think about my mother giving me the advice to don't

17   count your chickens before they are hatched.  That's exactly

18   what Mr. Garza did, he counted his chickens.  He thought he

19   had gotten away with it.  He thought that Mom still had the

20   banger in the car that she had picked up from the impound

21   lot.

22           When this case started, during opening, I told you

23   that I would ask you to return a guilty verdict on all three

24   counts.  You've heard now the Court provide you with the

25   primary instructions that you have to follow during your

1   deliberations.

2          And on page 4 of that instruction packet that's in

3   front of you, he read page 4, paragraph 4.  He talked about

4   what it means to prove something beyond a reasonable doubt.

5   It is the government's burden, ladies and gentlemen, to prove

6   every element of the crime charged, beyond a reasonable

7   doubt.  And then he defines reasonable doubt.

8          Proof beyond a reasonable doubt does not mean proof

9   beyond all possible doubt.  Possible doubts or doubt based

10  purely on speculation are not reasonable doubts.  A

11  reasonable doubt is a doubt based on reason and common sense.

12  It may arise from the evidence, the lack of evidence, or the

13  nature of the evidence.

14         Common sense.  Common sense.

15         Now, the Court has provided you with the elements

16  of all the offenses, the three elements of the three counts,

17  and we're going to talk about each one of them and talk about

18  what it means to prove them beyond a reasonable doubt.

19         So let's look first at Count 1, possession of a

20  firearm by a prohibited person.  The elements are listed

21  there on page 14 of the packet.  They start at capital

22  letter A.  The first element is that the defendant had been

23  convicted of a crime punishable by imprisonment for more that

24  are one year.  The parties agree.

25         Second, that the defendant, following his

1    conviction, knowingly possessed a firearm or the ammunition

2    specified in the indictment.  We're going to come back to

3    that.

4         Third, that at the time the defendant possessed the

5    firearm, he knew the -- he knew he had been convicted of a

6    crime punishable by imprisonment for more than one year.

7    Again, check it off, the parties agree.

8         And then fourth, that the specified firearm crossed

9    state line prior to the alleged possession.  The parties

10   agree, you can check that off.

11        So Count 1 comes down to whether or not the

12   defendant knowingly possessed the firearm and the ammunition.

13   And remember during opening, I talked about two key questions

14   to pay attention to during -- throughout this trial.  I said

15   the first one was whether Garza knowingly possessed a firearm

16   and ammunition.

17        Now, you've heard the instructions about actual

18   possession and about constructive possession.  I like to use

19   an analogy.  I currently am possessing this pen.  Is this my

20   pen?  It is in my possession.  I also have a pen -- well,

21   there is one in my bag, there is one right here, this pen

22   right here.  I possess that pen.  This pen that I'm holding,

23   this is actual possession.  That pen over there is

24   constructive possession.  And you know what, I probably have

25   a pen back in my office.  In fact, I know I do, it is sitting

 1    in a coffee cup on my desk.  I possess that pen, too.  That's

 2    my pen.

 3              All of those are forms of possession.  We don't

 4    have to prove that the defendant had the gun in his hand.  We

 5    are telling you it was in the engine compartment, but that's

 6    where he possessed it.

 7              Let's talk about the second count, because really,

 8    the second count and the first count, they kind of come down

 9    and boil down to the same issue.

10              The elements of the second count are listed on

11    page 16 of your packet.  The first element is that the

12    defendant knowingly possessed a firearm.  Well, that's what

13    we have to figure out.

14              Second, that the firearm has moved from one state

15    to another.  Again, the parties agree, check it off.

16              Third, that the manufacturer's serial number of the

17    firearm had been removed, obliterated or altered.

18              And fourth, that the defendant knew the serial

19    number had been removed, obliterated or altered.

20              The parties don't agree on those.

21              Would you pull up Government's Exhibit 5E?

22              So you're going to have to decide whether or not

23    this firearm had an obliterated serial number, whether that

24    serial number was -- I want to get this wording

25    right -- removed, obliterated or altered.  And you are going

1  to have to decide whether anyone who would have possessed

2  this gun would have known that the firearm (sic) was removed,

3  obliterated or altered.

4        I'm going to ask Mr. Orvis to stand up and

5  demonstrate for you or show you Government Exhibit 5F.  Why

6  don't you start down here, with juror number 1, and we go all

7  the way to juror number 14.

8        So really the crux of this case is about

9  possession.  It's about whether the defendant knowingly

10  possessed firearm and ammunition.

11        Would you pull up the timeline?

12        Now, this next exhibit, as the Court instructed, it

13  is not an exhibit, it is an aid -- a visual aid, and it is a

14  timeline of the conduct in this case.

15        So here, first we have November 26th, 2020, that's

16  the day the police arrest Mr. Garza in the Meijer parking

17  lot.  That's the day they do an inventory search of the car,

18  and they find a nine-millimeter bullet and they find two

19  strips of Suboxone underneath the driver seat.  It wasn't

20  a .380-caliber bullet they found; it was a nine-millimeter

21  bullet.

22        That's also the day they search Mr. Garza's pocket

23  and find Suboxone in his pocket.  We are not really focused

24  on that now; we're going move to Count 3 in a minute.  But

25  the ammunition is important.  It's the day Mr. Hutchins

 1    says -- you can take Mr. Hutchins -- you assess his

 2    credibility, but in the parking lot, he tells the officer,

 3    hey, there's a gun in the car and the officer looks, and then

 4    he interviews, and then he looks again.  And that's the day,

 5    on Thanksgiving, that he finds the gun in the engine

 6    compartment, in a black mesh bag underneath the battery.  It

 7    is also the day that Mr. Hutchins is

 8    interviewed -- Mr. Hutchins and Mr. Garza.

 9            So Garza's interview, you've seen clips of it, it

10    is recorded.  You have seen him talk about my car, my title,

11    my belongings, all my stuff was in that car, my weight vest,

12    my butane, my marijuana, which again, that's -- who cares

13    about marijuana, right?  That's not what we're talking about

14    today.  We're talking about things that Mr. Garza owns that

15    are in my car.  Reggie doesn't give him a ride to Meijer, he

16    gives Reggie a ride to Meijer.

17            We don't know when -- we know that from Mr. -- the

18    testimony earlier this morning, that Mr. Parkes sold that car

19    to Reggie Allen back in November -- or around November

20    of 2019.  We don't know what happened with who owned it or

21    anything like that.  We know that when the police impounded

22    the car, the registered owner was Mr. Parkes.  We don't know

23    the rest, it's not in evidence.

24            That Thanksgiving, he tells Officer Fisher how he

25    bought the car.  He got some unemployment payments, his

1    ex-girlfriend helped him with it, and that's how he got the

2    money to buy my car.

3            Now, let's talk a little bit about Mr. Hutchins.

4    He came in here wearing a jail uniform -- jail garb, and he

5    is pending sentencing right now, for a carjacking.  As

6    prosecutors, we have an expression, we say to juries like you

7    that we wish we could call priests and rabbis in cases, but

8    that's not who our witnesses are.  The reference is to people

9    that haven't committed crimes, that have had -- that aren't

10   going to show up wearing a prison jumpsuit or jail jumpsuit.

11   That's not whom -- that's not who Mr. Hutchins is.  It is on

12   you to decide, you know, what -- what credibility you want to

13   give his testimony.

14           But there are some things that are kind of

15   corroborated.  He says he was on Clancy that morning.  He

16   says he saw a gun.  He said he didn't remember if it was

17   a .380 or a nine, but it looked like the gun we showed you in

18   the picture.

19           Could you pull up Government Exhibit 5C?

20           It was black, semiautomatic pistol he said.  Looked

21   like this one, with the extended magazine.

22           He also talked about a whip.  He said that that's a

23   slang reference to a car.  Now, some people know that, some

24   people don't.  But you heard it from Mr. Hutchins, take it

25   for what it's worth.

1              Could you go back to the timeline?

2              Now, this is a broad timeline, but there's a lot of

3    stuff going on the 26th of 2020 of November.  There's a lot

4    of stuff.  You could have a timeline, in your own mind, at

5    least of the things that happened that day.  Meet up at

6    Clancy.  Drive to Meijer.  Get arrested.  Search of

7    Mr. Garza's person.  Search of the vehicle.  Interview with

8    Mr. Garza.  Search of the vehicle again.

9              Remember that second search, that's the one where

10   they find the gun.  You heard testimony about where Mr. Garza

11   was for the first search; he was in the Meijer parking lot.

12   He didn't see him find a gun.  Now, Officer Fisher found a

13   bullet and he had information from Robert Hutchins that there

14   was gun in the car, so he tried a ruse, he tried a bluff.  He

15   asked, whose gun did I find?  And today, you heard his

16   answer.  It wasn't my gun, but I didn't see Reg or them get

17   in my car with no gun.

18             Can you play that exhibit again?  I think it is

19   either 15C or D.

20             (Video played for the jury.)

21             MR. DePORRE:  Nope, not that one.  Sorry.

22             (Video played for the jury.)

23             MR. DePORRE:  I was looking at them when they got

24   in my car.  He wasn't looking at them when they got in his

25   own car.  The ruse doesn't work, he admits it.

```
 1    Officer Fisher moves on.  He starts showing pictures of
 2    things he did find in the car; he shows him a picture of a
 3    bullet and some other stuff that he found.  Mr. Garza goes
 4    off to jail.  And then in that timeline in your mind, is that
 5    second inventory search in the impound lot, and that's when
 6    they find the gun.
 7               Now, would you pull the timeline up again?
 8               That sums up November 26th.  There's a lot, but
 9    that kind of sums it up.
10               We move on to December 10th, that's the day that
11    Mr. Garza's mother, Dominga Flanagan.  Remember you saw the
12    birth certificate; you saw the marriage license.  You saw
13    Brett -- excuse me, Detective Orvis' or Sergeant Orvis'
14    testimony that he turned over property to Mr. Garza's mother,
15    Dominga Flanagan.  That's the day Ms. Flanagan picks up the
16    car.  The vehicle is released.  The vehicle release is signed
17    to her.
18               Could you pull up Government's Exhibit 7?
19               There it is, at the bottom.
20               Would you zoom in on the bottom-half where it says,
21    released to Dominga Flanagan with notarized letter.
22               There is a notarized letter that she presents.  And
23    you heard the testimony, she has to present a copy of the
24    title or title and a notarized letter.  We don't know where
25    she got the title from.  Did she go back in the car?  Did the
```

1    police give it to her?  That's not in evidence.  We don't

2    know.  But you heard the testimony that that's what's

3    required.  She presents a notarized letter and the title.

4              And then the jail call.

5              Go back to the timeline, please.

6              December 16, 2020.  You have heard clips from the

7    jail call.  We started with the first clip that you heard,

8    where he references it twice.

9              Would you play Government Exhibit 11C?

10             He says, my mom got my whip.  We know what whip

11   means, car.  My mom got some money that's owed me.  My mom

12   got one of my bangers, the one with the stick in it.  And we

13   know from Special Agent Hurt, the ATF guy, the guy familiar

14   with firearm terms, the guy that knows the precise

15   measurement of a .380-caliber bullet and a 9 nine-millimeter

16   bullet.

17             Could you play 11C?

18             (Audio played for the jury.)

19             MR. DePORRE:  Would you go back to the timeline.

20   We're asking a lot of technology, but we have a phenomenal

21   assistant here.  Thank you.

22             That's -- excuse me.  That's December 16th, 2020,

23   and then you've heard testimony that Mr. Garza isn't charged

24   with the gun until June 11th, 2021.  You heard Officer Fisher

25   testify he never went back after he found the gun and

1    interview Mr. Garza, he didn't tell him, hey, I did find that

2    gun.  So what did Mr. Garza believe when he made that jail

3    call to Madison Merrill?

4            Now, defense has had some themes throughout the

5    trial, and he's going to have an opportunity to speak to you.

6    And one of things I want to caution you against is, don't

7    look at each particular piece of evidence in isolation.  Look

8    at all the evidence that has been presented at trial and make

9    your determination based on that.

10           One of the themes the defense has raised is, well,

11   that call, that's tough talk.  That's braggadocios.  If you

12   get me out, I've got my banger with my stick, I can protect

13   you.  He's trying to convince his girlfriend to pony up

14   the 500 bucks to get him out of jail.  Ask yourself if that

15   fits with all the other evidence, or if the context of the

16   call fits with the evidence that, no, that's his banger,

17   that's one with the stick in it, in his mom's car, that's

18   his.

19           Another theme that kind of arose was Officer

20   Fisher, he was sloppy that first time he looked in the car.

21   He missed the mesh bag right under the battery.  Well, does

22   that mean that Mr. Garza didn't possess it?  I mean, maybe he

23   should have been more thorough with the search.  Maybe he did

24   exactly what the protocol is, but it doesn't matter, it

25   doesn't matter.  That doesn't impact whether or not he

1   possessed the firearm.

2          Another topic that has been raised; banger could

3   mean something else.  Banger could mean a syringe that he was

4   talking about.  Well, he says banger, twice.  You

5   heard -- you heard Hutchins say banger is a term for gun.

6   You heard from the Special Agent who's talked to multiple

7   people in Flint about guns and firearms, he told you what

8   banger means.  And you have the context of the call.

9          Here is another theme, the ruse, Fisher's ruse.

10  Well, why would he say he had a banger in the car if he had

11  heard already from Officer Fisher that they had found the

12  banger, they had found the gun?  It must not mean gun.  Well,

13  Garza didn't watch the second search.  He was present for the

14  first one, and he didn't see a photo of the gun when

15  Officer Fisher showed him things on his phone, the things he

16  had seized from the car, and he wasn't charged with the gun

17  until June 11th, 2011 (sic).

18         I'm asking you to not take apart every piece of

19  evidence and view it as a discrete independent thing.  I'm

20  asking to you look at all the evidence.  You can pick apart,

21  you know, one particular thing.  Maybe it would make sense --

22  tough talk might make sense, if his mom didn't pick up the

23  car.  If it wasn't the Metro Police that searched it.  So

24  look at things in the context of the evidence that's before

25  you.

1        Now, we have talked a lot about Counts 1 and 2, and

2   I need to spend some time on Count 3.  Let's discuss Count 3,

3   which charges possession with intent to distribute

4   buprenorphine.  It just kind of rolls off the tongue,

5   buprenorphine.

6        The first element -- and these are on page 17.  I'm

7   going to say, buprenorphine, a few more times.  The first

8   element is the defendant knowingly possessed buprenorphine.

9   Second, that the defendant intended to distribute

10  buprenorphine.  And then down below that, there is a

11  discussion about what it means to prove that he knowingly

12  presented it -- or knowingly possessed it.  This is on B on

13  that page, right, sort of down here.  He had to know it was a

14  controlled substance.

15       And would you pull up Government exhibit 1 -- I

16  guess it is 1B?

17       He knew it was buprenorphine if he knew it was a

18  controlled substance that says -- that's knowingly possessed

19  it.

20       Would you scroll in -- can you zoom in on the tab?

21  Maybe get a big box there.

22       Well, it says it right on there, buprenorphine and

23  naloxone.  And then it says here, RX only, prescription only.

24       So this one kind of boils down to that same issue,

25  which is the issue of whether he -- and this is what we

 1   raised at opening, did he intend to distribute Suboxone?  We

 2   stipulated that the Suboxone packs contain buprenorphine.

 3   Did he intend to distribute it?

 4          And, again, on your instructions -- you can keep

 5   going back to these, because they have some helpful

 6   definitions.  What the intent to distribute means is written

 7   there in C; whether or not the defendant intended to deliver

 8   or transfer a controlled substance sometime in the future.

 9   The defendant said exactly what he planned to do with the 19

10   doses of buprenorphine.  He told Officer Fisher.  He claimed

11   he took Suboxone.  He claimed he lied to his doctor and said

12   that he needed two doses per day, but in reality, he only

13   needed one, that two doses would make him sick, but he got

14   two and he sold the rest for extra money.

15          Would you play the clip 4C?

16          (Audio played for the jury.)

17          MR. DePORRE:  Now, just a brief disclaimer.  You've

18   heard this disclaimer throughout, but this case isn't about

19   marijuana, it's about buprenorphine.

20          Listen to what he says there.  In his own words he

21   intends to distribute some of the buprenorphine, maybe not

22   all of it, but he's going to take some, he's going to get rid

23   of some.  He's got 19 tabs, total; 17 in his right-front

24   pants pocket and two under the seat -- under the driver's

25   seat where he's sitting in his car, the car that he says is

1    his car, and where the nine-millimeter bullet is.  He wants

2    extra money, that's what he says.  He's selling them for

3    extra money.

4         Well, he's got some money, he has $810 in cash in

5    his pocket.  Remember, we heard from Officer Fisher about the

6    denominations, it wasn't all $100 bills.  There weren't

7    any $100 bills.  There was a 50, mostly 20s and some other

8    denominations.

9         Ladies and gentlemen, Noe Garza is in business.

10   He's walking around, he's got a cash register in his left

11   pocket, and he's got his inventory in his right, and he's got

12   two more tabs that fell out underneath the seat of the

13   driver's car.

14        Let's talk about some points raised by the defense.

15   It doesn't matter how addictive Suboxone is.  It doesn't

16   matter whether or not you can overdose.  Those aren't things

17   that are elements that need to be proved by the government.

18   So you've heard some evidence that Suboxone, when prescribed

19   by a licensed provider, is used to treat opioids -- people

20   that are opioid dependent, people that have addiction, and

21   that it also can be used for pain management.

22        But you also heard testimony that Noe Garza doesn't

23   have a prescription for Suboxone.

24        Would you pull up Government Exhibit 8?

25        This is Noe Garza's MAPS report.  It shows his

 1    prescriptions.  He doesn't have a prescription for

 2    buprenorphine.

 3              Would you scroll through to the next page?

 4              Now, the defense also talked about free samples.

 5    But Ms. Cortes testified, the MAPS witness, the person who

 6    came down here from Lansing to talk about what MAPS is and

 7    tell us about that exhibit.  You will have to rely on your

 8    memory, but she talked about who is required to enter a

 9    prescription into MAPS, and her testimony was that the

10    dispensing provider has an obligation to enter it into MAPS.

11    The dispensing provider, doesn't matter if it's a doctor or

12    doesn't matter if it's a pharmacy, whoever dispenses the

13    controlled substances, has to enter it.

14              Guess what?  It doesn't really matter where he got

15    it.  It doesn't matter where he got it.  What matters is.

16    Did he intend to distribute it?  So, you know, if the claim

17    is that these are free samples and he's -- he got lucky,

18    because he got a stack of 19 free samples and he's passing

19    them out to other friends.  Well, ladies and gentlemen, that

20    meets the elements, that meets the elements of this crime.

21    You can decide whether or not the evidence shows that those

22    are free samples, but the evidence here is that those strips,

23    those tabs that are Government Exhibit 1B, those are

24    buprenorphine, and the defendant said he's selling them for

25    extra money.

1    Go to 1B.  All right.  Thank you.  You can take it

2  down.

3    So we are left with three crimes, all with their

4  own independent elements that you have before you on the

5  piece of paper.  And what's critical is just the two

6  questions:  Did Mr. Garza knowingly possess a firearm?  And

7  did he intend to distribute Suboxone?

8    Now, Mr. Longstreet is going to stand up and give a

9  concluding statement or a closing argument for Mr. Garza, and

10  then I'm going to speak again, and then you're going to have

11  an opportunity to deliberate.  When you do that, don't rush.

12  Think about all the evidence in the case, think about all the

13  exhibits that have been presented.  If you need to see an

14  exhibit, you can ask, you can do that.  Only the exhibits

15  that have been introduced at trial you can't -- it might be

16  nice to hear other things, but really what's going to be

17  subject to your deliberations is the evidence that was

18  presented at trial.  And then you will have an opportunity to

19  discuss the case with one another.

20    Most importantly, the government is asking you to

21  use your common sense.  Remember that reasonable doubt -- if

22  it is a reasonable doubt, it has to be based on reason and

23  common sense.  The standard here is not all possible doubt.

24  Use your common sense and return a verdict of guilty on the

25  three counts.

1          Thank you.

2          THE COURT:  Thank you, Mr. DePorre.

3          Mr. Longstreet.

4          MR. LONGSTREET:  Thank you.

5          Again, good morning, ladies and gentlemen of the

6    jury.

7          THE JURY:  (Collectively) Good morning.

8          MR. LONGSTREET:  This is the defense closing

9    statement.  This is an attempt for us to summarize all the

10   evidence that you have heard over the last two days.  This is

11   not, again, an attempt for us to pull the wool over your eyes

12   or misconstrue a fact.  But the responsibility of a defense

13   attorney is to review the evidence presented by the

14   government critically, to show you that the prosecution has

15   not met their burden of proof beyond a reasonable doubt.

16         We held the prosecution or the government to a

17   standard, a very high standard, of proof beyond a reasonable

18   doubt.  And over the last two days, you have had every reason

19   to doubt all of the evidence in the government's case.

20         First, I would like to talk to you about what the

21   standard is.  A reasonable doubt is a doubt that arises from

22   the evidence, meaning what the prosecution has shown you, and

23   it also arises from the lack of evidence, what the

24   prosecution has not shown you.  And over the last two days,

25   the prosecution has failed in every attempt to show that my

 1    client was in constructive possession of a firearm and also

 2    that he possessed with the intent to deliver Suboxone.

 3          Now, the standard that the prosecution must show is

 4    that the evidence proves to you, or the evidence is so

 5    convincing that you would not hesitate to rely on it in

 6    making decisions in your own lives.  The question becomes,

 7    would you bank your life on this evidence?  And we would

 8    submit to you that you would not.  If the evidence does not

 9    convince you beyond a reasonable doubt, then you should say

10    so by voting not guilty on all counts.

11          Now, what, exactly, was the evidence that we needed

12    to look at?  The first question becomes constructive

13    possession.  Did Mr. Garza have a right to have physical

14    control over the firearm?  Did he know he had the right to

15    exercise physical control over the firearm?  And did he

16    intend to exercise physical control over that firearm?

17          Now, the prosecution has presented to you multiple

18    witnesses in this case, and they have presented to you

19    evidence in this case.  And the first and most critical piece

20    of evidence that they try to present to you is a phone call

21    by Mr. Garza.  First, they tell you that on

22    November 26th, 2020, my client -- asked my client -- or he

23    bluffed Mr. Garza, we found the gun.  Whose gun is it?  My

24    client doesn't know, and to this day, he still doesn't know.

25    And the government hasn't shown you that he knew the firearm

1   was under the hood of that car.

2           Secondly, they want to tell you that on

3   December 16th, 2020, that Mr. Garza made this grand admission

4   that that burner -- that banger is mine.  I still got the

5   stick.  Well, on November 26th, he's told they found a gun.

6   But the government wants you to believe that 20 days later

7   he's telling his girlfriend that they didn't find a gun that

8   he knew they found.  Would you bank your life on that?  Are

9   you so convinced that you would make a decision in your

10  everyday life on conflicting evidence?  The government is

11  trying to piece what they want you to believe it is, versus

12  what it actually is.  Let's not be confused about what this

13  really is.

14          They want you to believe that he meant, when he

15  said banger, he was talking about gun.  Well, I find that

16  kind of strange and this is the reason why.  Well, if he

17  meant to say gun, he would have just said gun, like he did

18  during his conversation with his girlfriend.  Now, the

19  government didn't want to play that particular piece of phone

20  call to you, because it doesn't fit in their grand scheme of

21  what they believe this evidence is, so they didn't play the

22  portion of a phone call where my client says gun and meant

23  gun.

24          So they bring you an ATF agent who tells you what

25  banger means, but here's the problem, banger has got a lot of

1     meanings.  This one particular person tells you it is a gun,

2     when he's talking about somebody else's gun.  We heard in the

3     phone call him say they can't put a green light on me, they

4     ain't got no gun to put a green light on me.

5          The officer -- the ATF agent says to you, well,

6     when he says gun that time, he's talking about somebody

7     else's gun.  Okay.  Well, banger means gun, right?  Well,

8     only when he's talking about -- when he's talking about his

9     gun is it a banger?  But then he tells you banging on them

10    means he's punching.  So in order to bang on someone, don't

11    you have to have a banger, which would be your hands?

12         Ladies and gentlemen, like the weapon of mass

13    destruction, don't get confused what this is about.  This is

14    the government piecing what they want you to think this stuff

15    means versus what it actually is.  It doesn't make sense for

16    a man to know they found a gun and then two days

17    later -- then 20 days later, tell his girlfriend they didn't

18    find a gun that he knew they found.  Was he talking about

19    that gun?  The problem is that question sits out there that

20    the government has not answered, and it is not your job to do

21    so.  It is for them to answer that question.  And if the

22    answer is -- if the question is unanswered, the verdict is

23    not guilty.

24         Moving on, the prosecution wants you to believe

25    that my client constructively possessed the firearm under the

```
 1    hood of the car.  First, it's not in the driver seat.  It's
 2    not on his person.  They didn't do any fingerprint testing.
 3    They didn't do any DNA tests.  I'm going to let you know why
 4    that is important in a second.
 5              But the gun is found away from him, we know that.
 6    There is no evidence, and they called a person to the stand,
 7    a co-defendant, to tell you that my client possessed the gun,
 8    but guess what that person didn't say?  What happened to the
 9    gun after they left the house?  This firearm that he
10    allegedly saw my client with after they left the house, he
11    didn't know what happened to it.  And you didn't hear him say
12    that my client put their firearm underneath the hood of the
13    car.  So who put it there?
14              Guess what, ladies and gentlemen, it's not for you
15    to figure out.  It's for them to show you, and they didn't.
16    That's why DNA and fingerprinting is important.  You don't
17    get to give the government credit for not doing the work.
18    You don't get to give the government credit for not doing the
19    work.
20              We know this vehicle was owned and occupied by
21    three people.  Blake Austin Parkes, and Mr. Parkes has
22    nothing to do with this case other than he sold the car.  You
23    have Meldrum Allen, an accused thief, heroin addict, who is
24    in the store stealing, who Mr. Blake Austin (sic) told you he
25    sold the car to.  You have the other co-defendant,
```

1    Mr. Hutchins, telling you that Mr. Allen was driving that car

2    around.  And then you've got Mr. Garza, who drove the car.

3    The question is, out of those three people, who put the gun

4    underneath the hood of the car?  The only person who really

5    had all the great details about it was the carjacker.

6         It's not enough for the government to show you that

7    my client had a gun.  They have to show you he possessed this

8    gun.  If he meant banger and stick, and stick and banger

9    meant firearm with extended clip, guess what, that's not an

10   extended clip, that's an eight-shot magazine.

11        Mr. Hutchins told you that a stick was a 30-round

12   clip.  He gave a description to the police that it was a .380

13   with a 14-round clip.  But guess what?  Neither one of those

14   is this gun.

15        The government has to show you that my client

16   constructively possessed this firearm.  This firearm they

17   failed to fingerprint, latent fingerprint, to determine who

18   had the gun in their hand.  No latent fingerprint testing on

19   the bullets to see who had the bullets in their hands.  No

20   DNA testing on the firearm to see who held the firearm.  This

21   is not for us to do.  We don't have a burden of proof.  It's

22   for the government to show you that my client constructively

23   possessed it.

24        Now, you could believe the word of the carjacker,

25   or they can actually get down to some science and do the real

1    job and identify who had the firearm.  But they didn't do it,

2    and because they didn't do it, it's not guilty.

3            Now, they bring in Mr. Hutchins.  This young man

4    was caught red-handed, stealing at Meijer.  The subject of

5    Fisher's investigation was him, Hutchins, who gets in the

6    back seat of the car.  Ladies and gentlemen, this is

7    critical, he's left in the car by himself when the police get

8    my client, Mr. Garza, out of the car.

9            Now, if you a gun-wheeling carjacker -- ain't my

10   gun.  The nine-millimeter bullet that ties -- supposed to tie

11   my client to the gun is with this guy in the back seat.  Now,

12   are you going put it past this carjacker got a bullet and a

13   gun.  No.  It's actually quite reasonable.  The guy who

14   visits you gets charged with carjacking, what does a gun have

15   to do with it?  Or may possess a firearm.  But you don't have

16   any bullets in this young man's pockets, in the front seat of

17   the car, and they want you to say, oh, well, the stuff fell

18   out of the pockets and stuff landed on the side of the car.

19           How many of you guys have kids and you find French

20   fries, pennies, potato chips, GI Joe, all under your seat.

21   You don't know how they got there.  You didn't do it.  It

22   came out of the back seat.  So is it reasonable that the

23   carjacking -- oh, the police on the way, get rid of this, not

24   my gun.  Then what does he do?  Gets pulled out of the car

25   red-handed, it's him, it's him, it's him.  And what did the

1    police do?  They wanted to get done and go home.

2            So the United States government is asking you to

3    convict him on this guy's word.  Is this evidence that you

4    would bank your life on it?  Would you use this to make

5    everyday decisions in your life?  The word of a lying,

6    stealing carjacker, who's got every reason in the world to

7    lie, and got what he wanted, to get him in trouble, and to go

8    home.

9            Now, the drug dealing piece, and this is actually

10   the worst piece of the case.  Just a little bit about myself.

11   I grew up on the west side of Detroit, and after I got

12   married, I moved home, across the street from my parents.

13   And unfortunately, I lived next to a crack house two doors

14   over, and I saw the heroin addicts running in and out of the

15   house.  I wish I had a drug dealer like Noe Garza.  Hey, man,

16   I got the Suboxone to get you off the heroin.  I got the

17   Suboxone.

18           Ask yourself, ladies and gentlemen, is it

19   reasonable for a drug dealer to possess items that he's going

20   to sell that are going help his customers get off of the

21   product he sells?  Is a drug dealer going to walk around

22   selling a drug that helps his customer get off the drug he

23   sells?  Are you going to bank on that?  Does that make sense

24   to you?  There's no evidence that he was intending to

25   distribute.  There's no evidence that he even knew -- can you

1    pronounce that for me, sir.

2              MR. DePORRE:  Buprenorphine.

3              MR. LONGSTREET:  Buprenorphine.  How does he even

4    know this young man knows that buprenorphine is in this

5    stuff, and he's using it to keep himself from getting dope

6    sick.  We know Suboxone is a drug that helps users of heroin.

7    So you mean to tell me, we got this grand drug dealer going

8    around helping his customers?  A drug that really don't get

9    you high.  A drug that really can't -- yes, it makes a

10   difference whether it makes you high or not, because people

11   sell drugs to people so they could get high.  And if you are

12   not getting high off of it, why would you be thinking he's

13   selling it for that purpose.  Does this make sense to you?

14             There is no other evidence to suggest that my

15   client was a drug dealer because he possessed a drug that

16   helped him get off of the drug that he was addicted to,

17   heroin.

18             Officer Fisher told you my client said, hey, man,

19   I'm getting dope sick.  I get sick.  He got it for his own

20   use.  Now, how he got it?  I don't know.  But the question

21   is, did he possess it with the sole purposes of going to make

22   some money off of it or deal it like a drug dealer?  The

23   answer to that question, to us, is no.

24             Over the last two days, the government has

25   attempted to bring to you evidence they believe would show

 1    that my client was a felon in possession of a firearm.  He

 2    was in possession of a firearm with an obliterated serial

 3    number.  And he -- we admit he had Suboxone, but it's

 4    possession of Suboxone, not possession with intent to deliver

 5    Suboxone or buprenorphine.  The issue is whether he intended

 6    to deliver buprenorphine, and Suboxone isn't all

 7    buprenorphine, it's a mixture of drugs.  So could he have

 8    truly intended to deliver one drug, when that particular drug

 9    had more than one drug in it?  Again, does that make sense to

10    you.

11              This is the last opportunities you're going to have

12    to speak to me.  The government is going to stand up and they

13    are going to challenge just about everything I said.  But the

14    fact will remain that what I said stays true.  It is not an

15    attempt to pull wool over your eyes, but simply view the

16    evidence critically, to hold the prosecution to a burden of

17    proof.  And if they have not met that burden of proof, if

18    they have not convinced you, your vote should be not guilty.

19    We are asking each and every one of you for that vote,

20    because this evidence does not convince you beyond a

21    reasonable doubt that my client is guilty of any crimes in

22    this case.  You would hesitate to rely on it.  You would

23    hesitate to make the most important decisions of your life

24    based on the evidence presented by the government, and

25    because of that, we're asking you for the right verdict, the

1    just verdict, the proper verdict, not guilty all counts.

2            Thank you.

3            THE COURT:  Thank you, Mr. Longstreet.

4            Mr. DePorre, rebuttal for the government?

5            MR. DePORRE:  I'm not going to disagree with all

6    the things he said.  I'm going to take issue with some of

7    them.

8            First, I'm not asking to you rely on Mr. Hutchins.

9    I'm telling you, give his testimony the weight you think it

10   deserves, in light of your observations of Mr. Hutchins, and

11   all the other testimony in this case.

12           Mr. Longstreet has done a remarkable job of looking

13   at discrete issues and picking them apart.  He looks at the

14   call.  Mr. Garza, in the call, uses the word, "gun," to

15   describe other gang members who put a green light out on

16   them.  They don't have a gun.  He uses the word gun.  And

17   when he speaks with his girlfriend, he uses the word,

18   "banger."  It's not that he's trying to hide the words.  We

19   are not saying that -- we are not saying that he's speaking

20   in some complex code.  It is just obvious to Mr. Garza what a

21   banger is, it is obvious to the person listening on the other

22   side of the call what a banger is.  He could have said gun.

23   We are not saying that was sort of cunning word usage by

24   Mr. Garza to disguise what he had in the car.  He's bragging.

25   You know who he is?  He's the guy that catches the touchdown

```
 1    pass, he's running to the end zone, and he spikes the
 2    football, but he's not in the end zone yet.  He's not in the
 3    end zone yet.  They did find the gun.  He's not afraid to say
 4    gun, he just says banger because he knows what that means
 5    and, evidently, the person who is listening to it knows what
 6    it means.
 7            Now, he also talked about three people who owned
 8    the car.  Ask yourself who put the gun under the hood?
 9    That's the question.  Who put the gun under the hood?
10    Blake Parkes said it wasn't him.  He has never owned a
11    pistol.  He sold the car in 2019.
12            So you are left with Meldrum Allen, who looks,
13    frankly, like a drug addict in the photo, and we've heard
14    testimony that he did use drugs.  And you are left with
15    Noe Garza.  It wasn't Reggie's car anymore, Noe made that
16    clear, he had the money, he came up with the money to buy
17    that car, it's his car, he saw Reggie get in the car, he
18    didn't have a gun.  He's the one in the driver's seat.  He's
19    the one who uses mesh bags to make keif.
20            We are not asking you to rely on any particular
21    fact in this case.  Is it plausible that banger means
22    something in different contexts when he's talking about
23    banging on people?  Absolutely.  He's talking about fighting.
24    What we want you to do is look at all the evidence, view it
25    as a whole, and make a decision, and we are confident that
```

1    when you do that, you will find him guilty.

2          Thank you.

3          THE COURT:  Thank you, Mr. DePorre.

4          Ladies and gentlemen, I'm going wrap up my final

5    instructions to you.

6          I earlier concluded the part of my instructions

7    explaining the rules for considering some of the testimony

8    and evidence.  Now let me finish up by explaining some things

9    about your deliberations in the jury room and your possible

10   verdicts.

11         The first thing that you should do in the jury room

12   is choose somebody to be your foreperson.  This person will

13   help guide your discussions and will speak for you here in

14   court.

15         Once you start deliberating, do not talk to the

16   jury officer or to me or to anyone else, except each other,

17   about the case.  If you have any questions or messages, you

18   must write them down on a piece of paper, sign them, and then

19   give them to the jury officer.  The officer will give them to

20   me, and I will respond as soon as I can.  I may have to talk

21   to the lawyers about what you have asked, so it may take me

22   some time to get back to you.  Any questions or messages

23   normally should be sent to me through your foreperson.

24         If you want to see any of the exhibits that were

25   admitted into evidence, you may send me a message and those

1    exhibits will be provided to you.  One more thing about

2    messages, do not ever write down or tell anyone how you stand

3    on your votes.  For example, to not write down or tell anyone

4    that you are split six/six or eight/four or whatever your

5    vote happens to be.  That should stay secret until you are

6    finished.

7           Remember that you must make your decision based

8    only on the evidence that you saw and heard here in court.

9    During your deliberations, you must not communicate with or

10   provide any information to anyone, by any means, about this

11   case.  You may not use any electronic device or media or

12   application unless specifically instructed to do so by this

13   Court, such as a telephone, cellphone, smart phone, iPhone,

14   Blackberry or computer, the Internet, any Internet service or

15   any text or instant messaging service, any Internet chat

16   room, blog or website, such as Facebook, MySpace, LinkedIn,

17   YouTube, Twitter, Instagram, WhatsApp, Snapchat or other

18   similar electronic service to communicate to anyone any

19   information about this case or to conduct any research about

20   this case until I accept your verdict.  In other words, you

21   cannot talk to anyone on the phone, correspond with anyone,

22   or electronically communicate with anyone about this case.

23   You can only discuss the case in the jury room with your

24   fellow jurors during deliberations.

25           I expect you will inform me as soon as you become

1    aware of another juror's violation of these instructions.

2         You may not use these electronic means to

3    investigate or communicate about the case, because it is

4    important that you decide this case based solely on the

5    evidence presented in this courtroom.  Information on the

6    Internet or available through social media might be wrong,

7    incomplete or inaccurate.  Even using your smart phones,

8    tablets and computers and the news and social media apps on

9    those devices, may inadvertently expose you to certain

10   notices, such as pop-ups or advertisements that could

11   influence your consideration of the matters you've heard

12   about in this courtroom.

13        You are only permitted to discuss the case with

14   your fellow jurors during deliberations, because they have

15   seen and heard the same evidence you have.  In our judicial

16   system, it is important that you are not influenced by

17   anything or anyone outside of this courtroom.  Otherwise,

18   your decision may be based on information known only by you

19   and not your fellow jurors or the parties in the case.  This

20   would unfairly and adversely impact the judicial process.

21        A juror who violates these restrictions jeopardizes

22   the fairness of these proceedings, and a mistrial could

23   result, which would require the entire process to start over.

24        Your verdict, whether it is guilty or not guilty,

25   must be unanimous.  To find the defendant guilty of a

 1    particular count, every one of you must agree that the
 2    government has overcome the presumption of innocence with
 3    evidence that proves the defendant's guilt beyond a
 4    reasonable doubt.  To find him not guilty of a particular
 5    count, every one of you must agree that the government has
 6    failed to convince you beyond a reasonable doubt.  Either
 7    way, guilty or not guilty, your verdict must be unanimous.
 8              Now that all the evidence is in and the arguments
 9    are completed, you are free to talk about the case in the
10    jury room.  In fact, it is your duty to talk with each other
11    about the evidence and to make every reasonable effort you
12    can to reach unanimous agreement.  Talk with each other.
13    Listen carefully and respectfully to each other's views.
14    Keep an open mind as you listen to what your fellow jurors
15    have to say.  Try your best to work out your differences.  Do
16    not hesitate to change your mind if you are convinced that
17    other jurors are right and that your original position was
18    wrong.  But do not ever change your mind just because other
19    jurors see things differently or just to get the case over
20    with.
21              In the end, your vote must be exactly that, your
22    own vote.  It is important for you to reach unanimous
23    agreement, but only if you can do so honestly and in good
24    conscience.
25              No one will be allowed to hear your discussions in

1      the jury room, and no record will be made of what you say, so

2      you should all the feel free to speak -- you should all feel

3      free to speak your minds.

4              Listen carefully to what the other jurors have to

5      say and then decide for yourself if the government has proved

6      the defendant guilty beyond a reasonable doubt.  If you

7      decide that the government has proved the defendant guilty,

8      then it will be my job to decide what the appropriate

9      punishment should be.  Deciding what the punishment should be

10     is my job, not yours.  It would violate your oaths as jurors

11     to even consider the possible punishment in deciding your

12     verdict.  Your job is to look at the evidence and decide if

13     the government has proved the defendant guilty beyond a

14     reasonable doubt.

15             I have prepared a verdict form that you should use

16     to record your verdict.  You all have a copy of it, so let's

17     look at it, if you would, with me, please.  You can see the

18     form begins by saying, "We, the jury, unanimously find the

19     following" and that's to emphasize that any checkmark on here

20     must represent the unanimous vote of the jury.

21             It says with respect to Count 1, it says with

22     respect to the charge in Count 1 of the Superseding

23     Indictment, which charges the defendant with being a

24     prohibited person in possession of a firearm and ammunition,

25     we find the defendant -- and your choices are not guilty or

1    guilty.

2            Then goes Count 2, and it says, with respect to the

3    charge in Count 2 of the Superseding Indictment, which

4    charges the defendant with being in possession of a firearm

5    with an obliterated serial number, we find the

6    defendant -- again, you have two choices, not guilty or

7    guilty.

8            It then goes to Count 3, and it says with respect

9    to the charge in Count 3 of the Superseding Indictment, which

10   charges the defendant with possessing with intent to

11   distribute buprenorphine, we find the defendant not guilty or

12   guilty.

13           Then there is a line for the printed name of the

14   person you chose as foreperson, and a signature, and the

15   date.

16           If you decide that the government has proved any of

17   the charges against the defendant beyond a reasonable doubt,

18   say so by having your foreperson mark the appropriate place

19   on the official form.  If you decide that the government has

20   not proved any of the charges against him beyond a reasonable

21   doubt, say so by having your foreperson mark the appropriate

22   place on the form.  Your foreperson should then sign the

23   form, put the date on it, and return it to me.

24           Remember that the defendant is only on trial for

25   the particular crimes charged in the indictment.  Your job is

1  limited to deciding whether the government has proved the

2  crimes charged.

3       Let me finish up by repeating something that I said

4  to you earlier, nothing that I have said or done during this

5  trial was meant to influence your decision in any way.  You

6  decide for yourselves if the government has proved the

7  defendant guilty beyond a reasonable doubt.

8       Finally, remember that if you elected to take notes

9  during the trial, your notes should be used only as memory

10  aids.  You should not give your notes greater weight than

11  your independent recollection of the evidence.  You should

12  rely upon your own independent recollection of the evidence,

13  or lack of evidence, and you should not be unduly influenced

14  by the notes of other jurors.  Notes are not entitled to any

15  more weight than the memory or impression of each juror.

16  Whether you took notes or not, each of you must form and

17  express your own opinion as to the facts of this case.

18       All right.  Let me briefly see counsel at sidebar.

19       (Sidebar conference held on the record

20       at 12:06 p.m. as follows:

21       THE COURT:  Mr. DePorre, any objection to the

22  instructions as read to the jury?

23       MR. DePORRE:  The government has no objections.

24       MR. LONGSTREET:  Sir, no, sir.

25       THE COURT:  So the defense has no objections to the

1    instructions; is that correct?

2             MR. LONGSTREET:  Sir, no, sir.

3             THE COURT:  I tried to ask that in a positive way.

4    Do you have any objections?

5             MR. LONGSTREET:  Sir, no, sir.

6             THE COURT:  Okay.  Thank you.

7             (Sidebar conference concluded at 12:06 p.m.)

8             THE COURT:  Okay.  Ladies and gentlemen, the next

9    step is to pick the two folks who will be our alternate

10   jurors.  Ms. Ryan has poker chips with the numbers 1

11   through 14 on them.  She will draw two chips out of there,

12   and the two folks sitting in the seat that correspond to the

13   chip number be our alterative jurors.

14             A couple points about the folks chosen as

15   alternates.  Your service continues, even if you are

16   designated as the alternate, because sometimes we have,

17   during deliberations, a juror falls ill, or we have a problem

18   and we have to replace that juror with an alternate juror.

19   So even if you are designated as an alternate, that means you

20   won't deliberate right now, but you should not talk about the

21   case with anybody until you hear from the Court that we have

22   reached a verdict, and then you can talk to other people

23   about the case.

24             And because we ordered you guys lunch, I don't want

25   the alternates to lose out on lunch.  So this is what I want

```
 1    to recommend:  We'll pick the alternates, and I suggest that
 2    you guys adjourn for your lunch.  Do not talk about the case,
 3    at all, with the alternates there.  Have a nice relaxing
 4    lunch.  We got you lunch from my all-time favorite place
 5    across the street.  Finish your lunch, then the alternates
 6    will excuse themselves, and only at that point should you
 7    pick your foreperson and begin your deliberations.  No
 8    deliberations with the alternates present, please.  So have a
 9    nice enjoyable lunch.
10            All right.  Our first alternate is in seat
11    number 1, that is Ms. Zatsick.  And our second alternate is
12    in seat number 10, that Ms. Tokarczyk.  Again, you still are
13    on duty, even though you won't be participating in the
14    original deliberations.  We will let you know when and if we
15    get a verdict, but you can still enjoy the wonderful lunch.
16            So the last thing I need to do is administer the
17    oath to Ms. Ryan.
18            Do you solemnly swear you will keep all members
19    sworn upon this panel in some private and convenient place,
20    and that you will permit no one to communicate with them, nor
21    communicate with them yourself, except to inquire if they
22    have agreed upon a verdict, until discharged by this Court,
23    so help you God?
24            THE CASE MANAGER:  I do.
25            THE COURT:  Okay.  Will you please take our jurors
```

1   out for lunch.  Please do not deliberate until the alternates

2   have excused themselves.

3           THE CASE MANAGER:  All rise for the jury.

4           (Jury excused at 12:09 p.m.)

5           THE COURT:  All right.  Please be seated.  The jury

6   has left the room.

7           Mr. DePorre, anything on behalf of the government?

8           MR. DePORRE:  No, Your Honor.

9           THE COURT:  Mr. Longstreet, anything from

10  Mr. Garza?

11          MR. LONGSTREET:  Nothing, no, sir.

12          THE COURT:  If you guys would not stray too far.

13  And if you could make sure Ms. Monda has a way to contact you

14  by cellphone if you are going to leave.  We will let you know

15  as soon as we hear anything, if we do, from our jury.  So

16  thank you very much.  We are done with this.

17          (Proceedings adjourned at 12:10 p.m.)

18                    —   —   —

19          (At 2:05 p.m. Court reconvenes; Court, counsel and

20          Defendant present.)

21          THE COURT:  Okay.  All right.  It's 2:05.  We are

22  back on the record.

23          Mr. DePorre, you are with us for the government.

24  Mr. Longstreet, I see you and Mr. Garza have rejoined us as

25  well.  Thank you for coming back so quickly.

1            I wanted to go on the record.  We have a note from

2   the jury.  It was sent at 1:25, and it asks for certain

3   pieces of evidence.  They are asking for Exhibits 4C, 5B, 5C,

4   and then 11B, 11C and 4B.  They have little asterisks next to

5   11B and 11C and 4B with a note that says really want to see

6   those.  Then it also says picture of gun, 5F.  And it is

7   signed Brandon, the foreperson, and dated today.  It was sent

8   at 1:25.

9            So I wanted to convene and go on the record and

10   talk about how to proceed.  What I want to propose is the

11   following:  That we send back to the jury all of the tangible

12   exhibits, the documents, the photos, stuff like that so they

13   can review that in the jury look.  But some of the exhibits

14   they have asked to review are tape recorded evidence, and

15   what I want to propose there that rather than sending the

16   recording back to the jury room, that we bring the jury into

17   the courtroom, that we empty the courtroom entirely of

18   everybody other than the jury and Ms. Ryan, who would be

19   here, and Ms. Ryan would play any of the audio exhibits they

20   wish to hear and play it as many times as they want.  The

21   jury would be instructed to merely listen while sitting in

22   here, to conduct no deliberations, and then once they have

23   heard the tapes, they could return to the jury room.  And if

24   they need to hear them again, we can do the same exercise.

25            But before we bring them in and do that, I wanted

1    to make sure that both sides are okay proceeding that way, or

2    if there are concerns or objections, I would be pleased to

3    hear those.

4           Mr. DePorre, the government's position, please.

5           MR. DePORRE:  Your Honor, we have no objection with

6    the proposal in terms of viewing the physical exhibits and

7    the -- bringing the jury in to listen to the audio exhibit.

8    There are also physical exhibits that are a firearm,

9    ammunition and the Suboxone, and when you read those exhibits

10   off, I didn't have a chance to make sure that none of those

11   were included.

12          THE COURT:  Right.  Good point.  Under no

13   circumstances do we send a firearm back.  If they want to

14   look at it, it would be the same deal; we will put it in the

15   courtroom, and they could look at it here.  We are not going

16   to send a firearm back in the jury room, but I don't think

17   then asked for that.

18          So to be clear what would go back to the jury is

19   the documentary evidence, not the ammunition, not the gun,

20   not the Suboxone.  All documents would go back.  And the

21   audio recordings and those three pieces of evidence would be

22   in the courtroom if they wanted to look at them.

23          MR. DePORRE:  That sounds good.  Would you mind

24   running through the list again?

25          THE COURT:  Sure.  Ready?

```
 1              MR. DePORRE:  Yep.

 2              THE COURT:  It's 4C, 5B and 5C.  Then there is

 3    picture of gun, 5F.  And then the ones that were denoted

 4    "really want to see" were 11B, 11C and 4B.

 5              MR. DePORRE:  All right.  5F is actually the gun

 6    itself, it is not a photo of gun.

 7              THE COURT:  It's the gun itself?

 8              MR. DePORRE:  Yes.

 9              THE COURT:  Now --

10              MR. DePORRE:  I mean, they will have photos of the

11    gun that are going to go back in 5D and E, but 5F that could

12    just be --

13              THE COURT:  So what we'll do is I'm going to tell

14    them we'll send the photos back, but if they feel the need to

15    look at the gun -- physically look at gun again we'll make

16    arrangements for that.  We are not going to do that right

17    now.

18              MR. DePORRE:  Very good.

19              THE COURT:  Mr. Longstreet, are you okay with that?

20              MR. LONGSTREET:  Yes.

21              THE COURT:  Everybody ready to bring in the jury,

22    Mr. DePorre?

23              MR. DePORRE:  Are --

24              THE COURT:  What I want to do is bring them in here

25    and I want to instruct them in terms of how this will go, and
```

1    then we will all clear out.

2            THE CASE MANAGER:  They will have to go out again

3    because they have to remove him.

4            THE COURT:  That's fine.

5            Mr. Longstreet, you are okay with this way of

6    dealing with the evidence?

7            MR. LONGSTREET:  Yes.

8            THE COURT:  Okay.

9            THE CASE MANAGER:  All rise for the jury.

10           (Jury entered at 2:11 p.m.)

11           THE COURT:  Please be seated.

12           I hope everybody enjoined their lunch from my

13   favorite place in the western world.

14           Ladies and gentlemen, we received a note from you

15   asking to see -- to review certain exhibits.  I wanted to

16   just review with you briefly our plan for having you review

17   the exhibits.

18           First, what we've decided is that we will send back

19   into the jury room all of the documentary exhibits, that

20   includes photographs of stuff and the other documents that

21   were admitted into evidence.

22           With respect to the firearm itself, that's not

23   going to go back nor is the ammunition or the Suboxone.  But

24   there's photos of the firearm that were admitted as exhibits

25   and those will be going back with you.

1        We also received an indication that you wished to
2    hear certain recorded evidence, and we have a procedure for
3    doing that.  What we are going to do is instead of sending
4    the audio recordings back for listening in the jury room, we
5    are going to clear the courtroom of everybody, including me,
6    except Ms. Ryan, and she is going to play whatever recordings
7    you guys wish to hear.  But while she is with you, you are
8    not to discuss this at all.  This is just listening and
9    telling her we want to hear 11B or whatever it is you want to
10   hear, you just identify it.  If you want to hear is again you
11   say one more time.  If you want to hear it ten times you say
12   keep playing it.  Absolutely no discussion about the case in
13   Ms. Ryan's presence.  Once you guys have heard all of the
14   recordings that you wish to hear for this point, you will
15   then go back in the jury room, and once you're back in there
16   with the door closed you can then reconvene your
17   deliberations and resume your discussions.  If at a later
18   point you need to hear more audio evidence again, not a
19   problem, we'll bring you back in and we will do the same
20   procedure.  I won't bore with you why we do things this way,
21   but that's the way we do.
22        So what we'll do now is go through a process of
23   clearing the courtroom, but for now we're going to put you
24   back in that room, and once we are all out of here other than
25   Ms. Ryan, we will bring you back in and do that exercise.

1    Thank you very much.

2               THE CASE MANAGER:  All rise for the jury.

3               (Jury excused at 2:14 p.m.)

4               THE COURT:  Okay.  The jury is out.

5          So I'm going to ask if the marshals will return

6    Mr. Garza to the lockup.  The rest of us will all clear out

7    of here.  The only live person will be Ms. Ryan.  She will

8    play the recordings that they asked, and then we will hand

9    them the documents to go back into the jury room.  We will

10   let you guys know if we hear from them again.  Thank you.

11              (Court recessed at 2:15 p.m.)

12                        —   —   —

13              (Court reconvened at 3:27 p.m.; Court, Counsel and

14              Defendant present.)

15              THE COURT:  Please be seated.

16         The record should reflect Mr. DePorre is here and

17   Mr. Garza has rejoined us as well with counsel.

18         We've received another note from the jury, and the

19   jury has asked -- this is a note written at 3:15, and I will

20   read it verbatim in the record.

21              "Does Count 1 and Count 2 have to go hand in hand?

22   So if guilty for one does that automatically mean guilty for

23   the other?"  And it is signed Brandon, the foreperson.

24              Mr. DePorre, your thoughts?

25              MR. DePORRE:  I think it is an easy answer, but I

```
 1  don't know how to get that answer to the jury.  No, that they
 2  have to assess each count independently, and they have to
 3  find every element beyond a reasonable doubt for all three
 4  counts if they -- for each count that they convict on.
 5           THE COURT:  Mr. Longstreet, your thoughts.
 6           MR. LONGSTREET:  I will have to say they have to
 7  consider each individual charge individually.
 8           THE COURT:  So you agree the answer to the question
 9  is no, they don't have to go hand in hand.
10           MR. LONGSTREET:  That's correct.
11           THE COURT:  So my proposal is while we are all here
12  with Mr. Garza here, to call them in and on the record read
13  this question out loud and then answer it in the way that we
14  just discussed.  Does that work for you, Mr. DePorre?
15           MR. DePORRE:  It does.
16           THE COURT:  Mr. Longstreet?
17           MR. LONGSTREET:  Yes.
18           THE COURT:  Okay.  Let's do it.
19           THE CASE MANAGER:  All rise for the jury.
20           (Jury entered at 3:30 p.m.)
21           THE COURT:  Please be seated.
22           Ladies and gentlemen, we have received a question
23  from you.  I want to read it out loud and then give you an
24  answer.
25           The question that you have asked is:  "Does Count 1
```

1    and 2 have to go hand in hand?  So if guilty for one, does

2    that automatically mean guilty for the other?"

3              The answer to your question is no.  The counts do

4    not go hand in hand.  Each count must be considered

5    independently, and for each count you should determine

6    whether as to that particular count the government has proven

7    each and every element beyond a reasonable doubt.  And,

8    again, you should consider each count independently, and your

9    decision with respect to any particular count is independent

10   of and stands alone your decision with respect to any other

11   count.  So you are not boxed in if you decide one count a

12   particular way, that doesn't in any way dictate how you have

13   to decide any other count.

14             Again, the question with respect to each and every

15   count is did the government prove each and every one of the

16   elements beyond a reasonable doubt.

17             Before we send you back, let me just give you a

18   sense of schedule.  Generally when I have juries deliberating

19   and there is an anticipation that the deliberations will

20   carry over to the next day, I end the day at 4:00 p.m. to

21   give everybody a chance to get out ahead of the traffic.

22             So in this case if you anticipate that your

23   deliberations will carry over into the next day, let us know

24   and we will end matters at 4:00.  If you wish to stay longer

25   and continue your deliberations, that's fine, but I don't

 1    anticipate staying tonight past 5:00.

 2              The main point here I want to emphasize is I don't

 3    want any time pressure in any way to impact your

 4    deliberations.  As I said earlier, you shouldn't reach a

 5    verdict just to end the day, just to get out of here.  The

 6    stakes for both parties are far too high.  So while I have

 7    told you the schedule is for your convenience and for your

 8    planning purpose, I want to impress upon you that the

 9    schedule shouldn't in any way impact how you guys handle your

10    deliberations.

11              Okay.  Let me see counsel at sidebar for one

12    second.

13              (Sidebar conference held on the record at 3:33 p.m.

14              as follows:

15              THE COURT:  Mr. DePorre, are you comfortable with

16    the way I answered the jury's question?

17              MR. DePORRE:  I am.

18              THE COURT:  Anything else you want me to tell them

19    now?

20              MR. DePORRE:  No.  Thank you.

21              THE COURT:  Mr. Longstreet, are you comfortable

22    with the answer?

23              MR. LONGSTREET:  Yes.

24              THE COURT:  Anything else you want me to tell them

25    now?

```
 1            MR. LONGSTREET:  No.

 2            THE COURT:  Okay.

 3            (Sidebar conference concluded at 3:33 p.m.)

 4            THE COURT:  Ladies and gentlemen, thank you.

 5   Please return to the jury room and continue your

 6   deliberations.

 7            THE CASE MANAGER:  All rise for the jury.

 8            (Jury excused at 3:33 p.m.; deliberations

 9            continue.)

10            THE COURT:  All right.  The jury is out.

11            Anything, Mr. DePorre, for the government now that

12   they are gone?

13            MR. DePORRE:  No.  Thank you, Your Honor.

14            THE COURT:  Mr. Longstreet?

15            MR. LONGSTREET:  Pardon me.

16            THE COURT:  Anything for Mr. Garza now that the

17   jury is out?

18            MR. LONGSTREET:  No.

19            THE COURT:  Okay.  Thank you.

20            (Court adjourned at 3:34 p.m.; jurors released at

21            3:45 p.m.)

22                        -    -    -

23

24

25
```

```
 1                    C E R T I F I C A T I O N

 2          I, Robert L. Smith, Official Court Reporter of the

 3  United States District Court, Eastern District of Michigan,

 4  appointed pursuant to the provisions of Title 28, United

 5  States Code, Section 753, do hereby certify that the

 6  foregoing pages comprise a full, true and correct transcript

 7  taken in the matter of USA vs. GARZA, Case No. 21-20405, on

 8  Tuesday, November 15, 2022.

 9

10

11                           s/Robert L. Smith
                             Robert L. Smith, RPR, CSR 5098
12                           Federal Official Court Reporter
                             United States District Court
13                           Eastern District of Michigan

14
    Date:  07/22/2023
15  Detroit, Michigan

16

17

18

19

20

21

22

23

24

25
```